UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATE OF AMERICA,          . Case No. 5:18-cr-00181-JFL-1

            Plaintiff,            .
                                    504 West Hamilton Street
        v.                        . Allentown, PA 18101

ANGEL LUIS CONCEPCION-            .
ROSARIO,                            December 4, 2018
                                  . 9:23 a.m.
            Defendant.            .

. . . . . . . . . . . . .


                    CRIMINAL JURY TRIAL - DAY 2
              BEFORE HONORABLE JOSEPH F. LEESON, JR.
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff            KISHAN NAIR, ESQ.
UNITED STATES OF         US ATTORNEY'S OFFICE
AMERICA:                 615 Chestnut Street, Suite 1250
                         Philadelphia, PA 19106


For Defendant            GLENNIS L. CLARK, ESQ.
ANGEL-LUIS CONCEPCION-   LAW OFFICE OF GLENNIS L. CLARK
ROSARIO:                 1101 Hamilton Street, Suite 351
                         Allentown, PA 18101



Audio Operator:          Justin Wood

TRANSCRIBED BY:          Eileen Dhondt, CET-807
                         Aequum Legal Transcription Services
                         6934 East Almeria Road
                         Scottsdale, AZ 85257


            Proceedings recorded by electronic sound
        recording, transcript produced by transcription service.

                **AEQUUM LEGAL TRANSCRIPTION SERVICES**
                        **480-241-2841**

**INDEX**
**December 4, 2018**

| THE COURT | PAGE: |
|---|---|
| Plaintiff's Opening Statement | 29 |
| Defendant's Opening Statement | 33 |

**WITNESSES:**

**FOR THE PLAINTIFF:**
JOSHUA ROMIG
     Direct Examination by Mr. Nair ... 37
     Voir Dire Examination by Mr. Clark ... 57
     Continued Direct Examination by Mr. Nair ... 60
     Cross-Examination by Mr. Clark ... 77
     Redirect Examination by Mr. Nair ... 85
     Recross-Examination by Mr. Clark ... 86
     Direct Examination by Mr. Nair (Recalled) ... 203
     Cross-Examination by Mr. Clark (Recalled) ... 214

ADRIANNA ELHYANI
     Direct Examination by Mr. Nair ... 87
     Cross-Examination by Mr. Clark ... 91

JOHN CASELLA
     Direct Examination by Mr. Nair ... 97
     Cross-Examination by Mr. Clark ... 104

VASA FAASUAMALIE
     Direct Examination by Mr. Nair ... 108
     Cross-Examination by Mr. Clark ... 112
     Redirect Examination by Mr. Nair ... 115

DANIEL REED
     Direct Examination by Mr. Nair ... 117
     Cross-Examination by Mr. Clark ... 153
     Redirect Examination by Mr. Nair ... 174

JONATHAN DUFFY - previously transcribed and incorporated ... 175

MARK QUESADA
     Direct Examination by Mr. Nair ... 176
     Cross-Examination by Mr. Clark ... 183

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

DAMIAN MURRAY
    Direct Examination by Mr. Nair               189
    Cross-Examination by Mr. Clark          200

**FOR THE DEFENDANT:**

None

**EXHIBITS:**

| FOR THE PLAINTIFF: | MARKED | ENTERED |
|---|---|---|
| Exhibit 2A | -- | 53 |
| Exhibit 3A | -- | 68 |
| Exhibits 12 and 12A | -- | 175 |
| Exhibits 9 and 9A | -- | 200 |
| Exhibits 10, 10A, and 10B | -- | 200 |

**FOR THE DEFENDANT:**

None

1          PROCEEDINGS

2      (Call to the Order of the Court)

3      (Proceedings commence at 9:23 a.m.)

4          DEPUTY CLERK:  -- presiding in a criminal action,

5  number 18-181, United States of America versus Angel Concepcion-

6  Rosario.  Please be seated.

7          THE COURT:  Good morning.

8          MR. NAIR:  Good morning, Your Honor.

9          MR. CLARK:  Good morning, Your Honor.

10         THE COURT:  We're going to do a few housekeeping

11 matters before we begin.  First, how is the sound system?  How

12 is that looking?

13         UNIDENTIFIED SPEAKER:  We brought these speakers up

14 from DEA and we just played it real quick, so I think it's going

15 to be okay with the speakers.

16         THE COURT:  Okay.  Very good.  You may be seated.  We

17 have two interpreters.  I welcome them, but we are going to put

18 that on the record.

19         We have Ms. Rice.  Good morning, ma'am.  Would you

20 state your full name for the record, please?

21         MS. RICE:  Roosevelt (phonetic) Rice.

22         THE COURT:  Let me ask you a few questions, then we'll

23 administer the oath to you.  You are fluent in both English and

24 Spanish, correct?

25         MS. RICE:  I am.

1          THE COURT:  How long have you been speaking Spanish?

2          MS. RICE:  Well, I did say to your clerk in utero

3    probably.  My mother is from Ecuador.  I'm Ecuadorian.  My

4    father was in the Peace Corp.

5          THE COURT:  So all of your life.

6          MS. RICE:  My whole life I've spoken Spanish and

7    English.  My father was in the Peace Corps., so I'm pretty old

8    Peace Corp. baby.

9          THE COURT:  Okay.  And you are an experienced

10   courtroom interpreter, correct?

11         MS. RICE:  Very experienced.

12         THE COURT:  And you, in fact, are court certified

13   interpreter, correct?

14         MS. RICE:  Certified, yes.

15         THE COURT:  And when were you certified?

16         MS. RICE:  In 1995 the test that they say is harder

17   than what they have now.

18         THE COURT:  And you have experience interpreting in

19   federal courts, correct?

20         MS. RICE:  Yes, I do.

21         THE COURT:  And I understand you're willing to provide

22   interpretation services for the defendant and for the Court

23   today, correct?

24         MS. RICE:  I am.

25         THE COURT:  All right.  Mr. Wood, would you administer

1  the oath to Ms. Rice, please?

2          (ROOSEVELT RICE, Interpreter, is Sworn)

3          THE COURT:  Ms. Rice, I know you've already been

4  interpreting for the defendant.  Would you continue to do so and

5  everything that's said in court interpret for him and also for

6  the Court.

7          MS. RICE:  I will, Your Honor.

8          THE COURT:  Thank you.

9          MS. RICE:  Your Honor, I do have interpreting

10  equipment.  However, I do not -- we're going to try to find a

11  headset for it because I forgot that.  I left Denver yesterday

12  at 11:40 last night, so I would like when we get a chance to be

13  able to get through that, but until then, if you could speak

14  into the mic, because my voice drowns out a little bit of what

15  you're saying when I'm not using it.  It will make it easier for

16  both of us.

17          THE COURT:  Very good.  And we also have Mr. Stephen

18  Johnson with us this morning as a back-up interpreter.  Mr.

19  Johnson, a few questions for the record.

20          MR. JOHNSON:  Yes, Your Honor.

21          THE COURT:  You are fluent in both English and

22  Spanish, correct?

23          MR. JOHNSON:  Yes, I am.

24          THE COURT:  And how long have you been speaking

25  Spanish?

MR. JOHNSON: Since I was eight.

THE COURT: And I have to ask, how many years has that been?

MR. JOHNSON: I'm currently 75, so 68 years.

THE COURT: Thank you. And you are an experienced court interpreter, correct?

MR. JOHNSON: I am.

THE COURT: And you have experience in interpreting in federal courts, correct?

MR. JOHNSON: I do.

THE COURT: And I understand you are willing to provide interpretation services for the defendant and for the Court today. Is that correct?

MR. JOHNSON: Yes, I am.

THE COURT: Mr. Wood, would you administer the oath to Mr. Johnson, please?

(STEPHEN JOHNSON, Interpreter, is Sworn)

THE COURT: Would you also administer the oath to the defendant, please?

(The Defendant is Sworn)

THE COURT: Yesterday at the conclusion of the day, defense counsel raised an objection on behalf of his client, and I forgot to issue a ruling on it. I indicated noted, but I need to put a ruling on the record.

And I'm going to overrule that objection. The defense

1  presented a generalized objection to the composition of the jury

2  resulting from the Government's use of peremptory challenges.

3  However, I note that Federal Rule of Criminal Procedure 24

4  allows the Government six peremptory strikes, plus an extra

5  strike when two alternates are seated as was the case yesterday.

6          In accordance with this Rule, the Government used the

7  six peremptory strikes yesterday.

8          Anything else on that subject?

9          MR. CLARK:  No, Your Honor.

10         MR. NAIR:  No, Your Honor.

11         THE COURT:  Very good.  I also want to issue a

12 clarification of a court order we issued on this case.  I think

13 it went out last week, and we looked over and I think a

14 clarification would be useful.

15         I want to provide an additional instruction concerning

16 the Government's use of the December -- of the defendant's 2015

17 prior conviction under Rule 404(b).  My order on the

18 Government's motion precluded the Government from introducing

19 evidence that the defendant fled the scene and caused a high

20 speed chase.

21         I want to clarify that this prohibition includes the

22 very nature of the defendant's additional conviction for felony

23 third degree fleeing to elude a police officer.  The Government

24 should not present evidence of the conviction with respect to

25 that particular charge.

```
1          MR. NAIR:  As to the 404(b).

2          THE COURT:  Yeah.

3          MR. NAIR:  Thank you.

4          THE COURT:  Very good.  Any questions on that point?

5          MR. CLARK:  No, Your Honor.

6          MR. NAIR:  No, Your Honor.

7          THE COURT:  Anything else before we bring the jury in?

8          MR. NAIR:  Not on behalf of the United States.

9          THE COURT:  Mr. Wood, would you bring the jury in,

10   please?

11      (Jury in at 9:33 a.m.)

12          DEPUTY CLERK:  All rise.

13          THE COURT:  Please be seated.

14          Ladies and gentlemen of the jury, welcome to

15   Allentown.  I hope that you will find your visit here a pleasant

16   one this week, and we hope, as I indicated earlier, to conclude

17   the case this week.

18          As is customary sometimes with cases, with trials in

19   particular, there was some homework we had to do this morning

20   before you came in, so we have actually been working.  Even

21   though you were here at 9:00, we've been working since then, but

22   we've finished that work and so we're now ready to begin the

23   trial.

24          Mr. Wood, would you administer the oath to the jurors,

25   please?
```

1    (Jurors Sworn)

2         THE COURT:  In a few minutes, the lawyers are going to

3   give their opening statements to you, but I have a few

4   preliminary instructions before we get to the lawyers' opening

5   statements.

6         If at any time during the trial you are unable to hear

7   me or unable to hear the lawyers or the witnesses, I want you to

8   raise your hand, and that will be a signal to use that we need

9   to speak up or adjust the sound system.

10        As I mentioned yesterday, we will take a lunch break

11  of one hour, approximately halfway through the day, as well as a

12  mid-morning break and a mid-afternoon break.  But if there are

13  any emergencies that you feel the need to do -- take a break

14  immediately, again, raise your hand and that'll be a signal to

15  me that we need to attend to that need.

16        I have some information I'm going to give you about

17  the process of the trial, and let me turn to that now. This will

18  take about ten minutes or so.

19        Now that you've been sworn, let me tell you what your

20  role is as jurors in this case.  Under our system of justice,

21  the role of the jury is to find the facts of the case based on

22  the evidence presented at the trial.  You must decide the facts

23  only from the evidence presented to you in this trial.

24        From the evidence that you will hear and see in court,

25  you will decide what the facts are and then apply those facts to

1  the law that I give to you in my final instructions.  That is

2  how you will reach your verdict.

3          Whatever your verdict, it will have to be unanimous.

4  All of you will have to agree on it or there will be no verdict.

5          In the jury room, you will discuss the case among

6  yourselves, but ultimately each of you will have to make up your

7  own mind.  Therefore, each of you has a responsibility which you

8  cannot avoid and you should do your best throughout the trial to

9  fulfill this responsibility when the time comes to make up your

10  mind.

11          I play no part in finding the facts.  You should not

12  take anything that I may say or do during the trial as

13  indicating what I think of the evidence or about what your

14  verdict should be.  My role is to make whatever legal decisions

15  have to be made during the course of the trial and to explain to

16  you the legal principles that must guide you in your decisions.

17          You must apply my instructions about the law.  Each of

18  the instructions is important.  You must not substitute your own

19  notion or opinion about what the law is or ought to be.  You

20  must follow the law that I give to you, whether you agree with

21  it or not.  You can certainly imagine the confusion we would

22  have if everybody had a different version of the law.  So I will

23  tell you what the law is, and you must follow it.

24          You should perform these duties fairly and

25  impartially.  Both sides are entitled to a fair and impartial

1  trial.  Do not allow sympathy, prejudice, fear or public opinion

2  to influence you.  You should not also be influenced by any

3  person's race, color, religion, national ancestry or gender.

4  Here's a couple of important rules about your conduct

5  as jurors.

6  First, keep an open mind.  Do not make up your mind

7  about the verdict until you've heard all of the evidence and

8  I've given the final instructions about the law at the end of

9  the trial and after you've discussed with your fellow jurors

10  during your deliberations.  So keep an open mind until all those

11  things happen.

12  Second, do not discuss the case among yourselves until

13  the end of the trial when you retire to the jury room to

14  deliberate.  You need to allow each juror the opportunity to

15  keep an open mind throughout the entire trial.  During trial,

16  you may talk with your fellow jurors about anything else, but

17  not about this case.  You need to keep an open mind until you've

18  heard everything and you've heard both sides.

19  Third, during the trial, you should not speak to any

20  of the parties, lawyers, or witnesses involved in the case, not

21  even to pass the time of day.  If any lawyer, party, or witness

22  does not speak to you when you pass in the hall, ride the

23  elevator or the like, remember it's because they are not

24  supposed to talk to you or visit with you, either.  It's on my

25  orders.  They're not being inconsiderate, and obviously, you

1  should not talk to them, either.

2        Number four, do not talk with anyone else or listen to

3  others talk about this case until the trial has ended and you

4  have been discharged as jurors.  It is important not only that

5  you do justice in this case, but that you give the appearance of

6  justice.

7        If anyone should try to talk to you about the case

8  during the trial, please report that to me immediately through

9  my courtroom deputy, Mr. Wood.  Do not discuss the situation

10  with any other juror.  If anyone tries to approach you, talk

11  about the case, notify Mr. Wood, because they're not supposed to

12  do it.

13        Number five, do not discuss this case with anyone

14  outside the courtroom or at home, including your family and

15  friends.  You may tell your family or friends that you have been

16  selected as a juror in this case and you may tell them how long

17  the trial is expected to last.  However, you should also tell

18  them that the judge instructed you not to talk anymore about the

19  case, and that they should not talk to you about it.  The reason

20  for this is that sometimes someone else's thoughts can influence

21  you.  Your thinking should be influenced only by what you learn

22  in the courtroom.

23        Number six, until the trial is over and your verdict

24  is announced, do not watch or listen to any television or radio,

25  news programs, or reports about the case.  We don't expect any,

1   but please do not listen to or watch any, and do not read any

2   news or internet stories or articles about the case or about

3   anyone involved with it.  As I mentioned yesterday, sometimes

4   these things are just flat out inaccurate and we don't want you

5   to have inaccurate or improper information.

6          Number seven, do not use a computer, cellular phone,

7   iPad, iPhone, droid, any other electronic device or tools of

8   technology while in the courtroom or during deliberations.

9   These devices may be used during breaks or recesses for personal

10  uses, but may not be used to obtain or disclose information

11  about this case.  You may not, repeat, you may not communicate

12  with anyone about the case on your cell phone, through email,

13  Blackberry, iPhone, text messaging, or on Twitter, through any

14  blog or website, through any internet chat room, or by way of

15  any other social network or social media websites including

16  Google plus Facebook, MySpace, LinkedIn and YouTube.  You may

17  not use any similar technology of social media even if I have

18  specifically mentioned it.

19         This is a very important order.  I mentioned it

20  yesterday.  I'll probably mention it again during the course of

21  the trial, and if we were to find out that anybody had violated

22  it, there would be serious consequences.  So, please, please,

23  please follow my instructions.

24         Number eight, do not do any research or make any

25  investigation on your own about any matters relating to this

1  case or this type of case.  This means for example that you must

2  not visit any of the scenes I mentioned yesterday, conduct

3  experiments, consult reference works or dictionaries or search

4  the internet, websites or blogs for additional information or

5  use a computer, cellular phone or other electronic devices or

6  tools of technology, or any other method to obtain information

7  about this case, this type of case, the parties in the case, or

8  anyone involved in the case.  Please do not try to find out

9  information from any source outside of this courtroom.  You must

10  decide this case based only on the evidence presented in the

11  courtroom and any instructions that I give you about the law.

12  It would be improper for me -- it would be improper for you to

13  try to supplement that information on your own.

14          Number nine, you should not concern yourselves with or

15  consider the possible punishment that might be imposed if you

16  return a verdict of guilty.

17          Let me tell you a little bit about sidebar

18  conferences.  During the trial, it may be necessary for me to

19  talk with the lawyers out of your hearing.  That is called a

20  bench or a sidebar conference.  If that happens, please be

21  patient.

22          We also ask that you advise me through my courtroom

23  deputy if you are able to hear any of those bench or sidebar

24  conferences because the purpose is to hold discussions outside

25  the hearing of the jury for important reasons.  I know you may

1  be curious about what we are discussing.  We are not trying to

2  keep important information from you.  These conferences are

3  necessary for me to discuss with the lawyers' objections to

4  evidence and to be sure that evidence is presented to you

5  correctly under the Rules of Evidence.  We will, of course, do

6  what we can to keep the number and length of these conferences

7  to a minimum.  If I think the conference will be long, I will

8  call a recess.

9          I may not always grant a lawyer's request for a

10  conference.  Do not consider my granting or denying a request

11  for a conference as suggesting my opinion of the case or what

12  your verdict should or should not be.

13          Let me talk a little bit about the questions for the

14  witnesses.  Only the lawyers and I are allowed to ask questions

15  of witnesses.  You are not permitted to ask questions of

16  witnesses.  If, however, you are unable to hear a witness or a

17  lawyer as I mentioned earlier, please raise your hand and I will

18  correct the situation.

19          Let me talk about how the trial will proceed, the

20  order of events, how things will go.

21          First, the lawyers will have an opportunity to make

22  opening statements to you.  The prosecutor may make an opening

23  statement at the beginning of the case.  The defendant's lawyer

24  may make an opening statement after the prosecutor's opening

25  statement or the defendant may postpone the making of an opening

1  statement until after the Government finished presenting its

2  evidence.  The defendant is not required to make an opening

3  statement, either.

4          The opening statements are simply an outline to help

5  you understand what each party expects the evidence to show.

6  What is said in the opening statements is not itself evidence.

7  It's just a summary of what they expect the evidence will show.

8          Second, after the opening statements, the Government

9  will introduce evidence that it thinks proves the charges stated

10 in the indictment. The Government will present witnesses and the

11 defendant's lawyer may cross-examine those witnesses.  The

12 Government may also offer documents and other exhibits into

13 evidence.

14         Third, after the Government has presented its

15 evidence, the defendant may present evidence but is not required

16 to do so.  As I will tell you many times during the trial, the

17 Government always has the burden or obligation to prove each and

18 every element of the offense charged beyond a reasonable doubt.

19         The defendant is presumed to be innocent of the

20 charges.  The law never imposes on a defendant in a criminal

21 case the burden of proving innocence by calling any witnesses,

22 producing any exhibits, or introducing any evidence.

23         Fourth, after all of the evidence has been presented,

24 the lawyers will have the opportunity to present closing

25 arguments.  Closing arguments are designed to present to you the

1  parties' theories about what the evidence has shown and what

2  conclusions may be drawn from the evidence.  What is said in

3  closing arguments is not evidence, just as what is said in the

4  opening statements is not evidence.

5          Fifth, after you've heard the closing arguments, I

6  will then give you the final instructions concerning the law

7  that you must apply to the evidence that's been presented during

8  the trial.  As I'm doing now, I may also give you instructions

9  on certain aspects of the law throughout the law, as well as at

10 the end of the trial.

11         Sixth, after my final instructions on the law, you

12 will retire to consider your verdict.  Your deliberations are

13 secret.  You will not be required to explain your verdict to

14 anyone.  Your verdict must, however, be unanimous.  All 12 of

15 you must agree to it.

16         Let me talk a little bit about what evidence is.  You

17 must make your decision in this case based only on the evidence

18 that you see and hear in the courtroom.  Do not let rumor,

19 suspicions or anything else that you may see or hear outside of

20 the court influence your decision in any way.

21         The evidence from which you are to find the facts is

22 the following.

23         First, testimony of the witnesses.

24         Second, documents and other things received as

25 exhibits.

1    Third, any fact or testimony that is stipulated; that

2  is, formally agreed to by both sides -- by both parties.

3    The following is not evidence.

4    Statements and arguments of the lawyers;

5    Questions by the lawyers and questions that I might

6  ask.

7    You must not assume that a fact is true just because

8  one of the lawyers or I ask a question about it.  It is the

9  witness answers that are evidence.  Of course, you may need to

10  consider the question to know what a witness means by his or her

11  answer.  For example, if a witness answers yes to a question,

12  you will have to consider the question to understand what the

13  witness is saying.

14    Objections by lawyers, including objections in which

15  the lawyers state facts are not evidence.

16    Any testimony I strike or tell you to disregard is not

17  evidence.

18    Anything you may see or hear about this case outside

19  the courtroom is not evidence.

20    You should use your common sense in weighing the

21  evidence.  Consider it in light of your every day experience

22  with people and events and give it whatever weight you believe

23  it deserves.  If your experience and common sense tells you that

24  certain evidence reasonably leads to a conclusion, you may reach

25  that conclusion.

1    The Rules of Evidence control what can be received

2 into evidence.  When a lawyer asks a question or offers exhibits

3 into evidence and the lawyer on the other side objects and

4 believes that it is not permitted by the Rules of Evidence, then

5 I have to rule on that objection.

6    An objection simply means that a lawyer is asking me

7 to decide whether the evidence should be allowed under the

8 rules.

9    Lawyers have a responsibility to their clients to make

10 objections when they think evidence being offered is improper

11 under the Rules of Evidence.  You should not be influenced by

12 the fact that an objection is made.

13    You should also not be influenced by my rulings on

14 objections to evidence.  If I overrule an objection, the

15 question may be answered or the exhibit may be received as

16 evidence, and you should treat the testimony or exhibit like any

17 other.

18    I may allow evidence in the form of testimony or

19 exhibits, only for a limited purpose.  If I do that, I will

20 instruct you to consider the evidence only for that limited

21 purpose and you must follow that instruction.

22    If I sustain an objection, the question will not be

23 answered or the exhibit will not be received as evidence.

24 Whenever I sustain an objection, you must disregard the question

25 or the exhibit entirely.  Do not think about or guess what the

1  witness might have said in answer to the question.  Do not think

2  about or guess what the exhibit might have shown.

3          Sometimes a witness may have already answered before a

4  lawyer objects or before I rule on an objection.  If that

5  happens and if I sustain the objection, you should disregard the

6  answer that was given.

7          Also, I may order that some testimony or other

8  evidence be stricken or removed from the record.  If I do that,

9  I will instruct you to disregard that evidence.  That means when

10  you are deciding the case, you must not consider or be

11  influenced in any way by the testimony or other evidence that I

12  have told you to disregard.

13          Although the lawyers may call your attention to

14  certain facts or factual conclusions that they think are

15  important, what the lawyers say is not evidence and is not

16  binding on you.  It is your own recollection and interpretation

17  of the evidence that controls your decision.  Do not assume from

18  anything I do or say during the trial that I have any opinion

19  about the evidence or about any of the issues in the case or

20  about what your verdict should be.

21          Let me talk about direct evidence and circumstantial

22  evidence and what they are.

23          Two types of evidence may be used in this trial;

24  direct and circumstantial or indirect evidence.  You may use

25  both types of evidence in reaching your verdict.

1          Direct evidence is simply evidence which, if believed,

2    directly proves a fact.  An example of direct evidence occurs

3    when a witness testifies about something the witness knows from

4    his or her own senses, something the witness has seen, touched,

5    heard or smelled.  Direct evidence is something the witness has

6    seen, something the witness has touched, something the witness

7    has heard, or something the witness has smelled.

8          In contrast, circumstantial evidence is evidence

9    which, if believed, indirectly proves a fact.  It is evidence

10   that proves one or more facts from which you could find or infer

11   the existence of some other fact or facts.  An inference is

12   simply a deduction or conclusion that reason, experience and

13   common sense lead you to make from the evidence.  An inference

14   is not a suspicion or a guess.  It is a reasoned, logical

15   decision to find a disputed fact exists on the basis of some

16   other fact.

17         For example, if someone walks into the courtroom

18   wearing a wet raincoat and carrying a wet umbrella, that would

19   be circumstantial or indirect evidence from which you could find

20   or conclude that it was raining outside.  You would not have to

21   go look outside to see it was raining.  You could just infer

22   that from the fact somebody walked in with a wet raincoat and a

23   wet umbrella.

24         Sometimes different inferences may be drawn from the

25   same set of facts.  The Government may ask you to draw one

1 | inference and the defense may ask you to draw another inference.

2 | You and you alone must decide what inferences you will draw

3 | based on all the evidence.  You should consider all the evidence

4 | that is presented in this trial, direct and circumstantial. The

5 | law makes no distinction between the weight that you should give

6 | to either direct or circumstantial evidence.  It is for to

7 | decide how much weight to give any evidence.

8 | In deciding what the facts are, you must decide what

9 | testimony you believe and what testimony you do not believe.

10 | You are the sole judges of the credibility of the witnesses.

11 | Credibility refers to whether a witness is worthy of belief, is

12 | the witness truthful, is the witness testimony accurate.  You

13 | may believe everything a witness says or only part of it or none

14 | of it.  You may decide whether to believe a witness based on his

15 | or her behavior and manner of testifying, the explanations the

16 | witness gives and all the other evidence in the case just as you

17 | would in any other important matter where you are trying to

18 | decide if a person is truthful, straightforward and accurate in

19 | his or her recollection.

20 | In deciding the question of credibility, remember to

21 | use your common sense, your good judgment and your experience.

22 | In deciding what to believe, you may consider a number of

23 | factors, such as the following.

24 | First, the opportunity and ability of the witness to

25 | see or hear or know the things about what the witness is talking

1    about, what the witness is testifying to.

2            Second, the quality of the witness's knowledge,

3    understanding and memory.

4            Third, the witness's appearance, behavior and manner

5    while testifying.

6            Fourth, whether the witness has an interest in the

7    outcome of the case or any motive, bias or prejudice.

8            Fifth, any relation the witness may have with a party

9    in the case and any effect that the verdict may have on the

10   witness.

11           Sixth, whether the witness said or wrote anything

12   before trial that is different from the witness's testimony in

13   court.

14           Seventh, whether the witness testimony is consistent

15   or inconsistent with other evidence that you believe.

16           Eighth, any other factors that bear on whether the

17   witness should be believed.

18           Inconsistencies or discrepancies in a witness's

19   testimony or between the testimony of different witnesses may or

20   may not cause you to disbelieve that witness's testimony.  Two

21   or more persons witnessing an event may simply see or hear it

22   differently.  Mistaken recollections, like failure to recall, is

23   a common human experience.

24           In weighing the effect of inconsistency, you should

25   consider whether it is about a matter of importance or an

1  insignificant detail.  You should also consider whether the

2  inconsistency is innocent or intentional.  You are not required

3  to accept testimony even if the testimony is not contradicted

4  and the witness is not impeached.  You may decide that the

5  testimony is not worthy of belief because of the witness's

6  bearing and demeanor, or because of the inherent improbability

7  of the testimony, or for the reasons that are sufficient to you.

8           After you make your own judgment about the

9  believability of a witness, you can then attach to that

10  witness's testimony the importance or the weight that you think

11  it deserves.

12          The weight of the evidence to prove a fact does not

13  necessarily depend on the number of witnesses who testify. What

14  is more important than numbers of witnesses is how believable

15  the witnesses are and how much weight you think their testimony

16  deserves.

17          We're getting to the end.  Not much more.  Let me talk

18  about the nature of the indictment.  The Government has charged

19  the defendant Angel Luis Concepcion-Rosario with violating

20  federal law; specifically, one count of possession with intent

21  to distribute, and aiding and abetting the possession with

22  intent to distribute of 40 grams or more; that is, approximately

23  199 grams of a mixture or substance known as Fentanyl, a

24  Schedule 2 controlled substance.  The charge against the

25  defendant is contained in the indictment.

1          An indictment is just the formal way of specifying the

2     exact crime the defendant is accused of committing. An

3     indictment is simply a description of the charge against a

4     defendant.  It is an accusation only.  An indictment is not

5     evidence of anything, and you should not give any weight to the

6     fact that the defendant has been indicted in making your

7     decision in this case.  It is just an allegation.  It has to be

8     proven.

9          The defendant is charged in the indictment with

10    committing the offense that I just mentioned.  To help you

11    follow the evidence, I will now give you a brief summary of the

12    elements of that offense and each of which the Government must

13    prove beyond a reasonable doubt in order to convict of the

14    offense charged.

15         The elements are, first, that the defendant possessed

16    a mixture or substance containing a controlled substance.

17         Second, that the defendant possessed the controlled

18    substance knowingly or intentionally.

19         Third, that the defendant intended to distribute the

20    controlled substance; and

21         Fourth, that the controlled substance was Fentanyl.

22         What I've just told you is only a preliminary outline

23    of the elements of the offense charged.  At the end of the

24    trial, I will give you final instructions on the elements of the

25    offense charged and on (indiscernible) law.  Those final

1  instructions will be more detailed.  They will guide you in

2  reaching your verdict in this case.

3       My final instruction is on the presumption of

4  innocence, burden of proof and reasonable doubt.

5       The defendant has pleaded not guilty to the offense

6  charged.  The defendant is presumed to be innocent.  He starts

7  the trial with a clean slate with no evidence against him.  The

8  presumption of innocence stays with the defendant unless and

9  until the Government presents evidence that overcomes the

10 presumption by convincing you that the defendant is guilty of

11 the offense charged beyond a reasonable doubt.

12      The presumption of innocence requires that you find

13 the defendant not guilty unless you are satisfied that the

14 Government has proved guilt beyond a reasonable doubt.

15      The presumption of innocence means that the defendant

16 has no burden and no obligation to present any evidence at all

17 or to prove that he is not guilty.  The burden or obligation of

18 proof is on the Government to prove the defendant is guilty, and

19 this burden stays with the Government throughout the trial.

20      In order for you to find the defendant guilty of the

21 offense charged, the Government must convince you that the

22 defendant is guilty beyond a reasonable doubt.  That means that

23 the Government must prove each and every element of the offense

24 charged beyond a reasonable doubt.  A defendant may not be

25 convicted based on suspicion or conjecture, but only on evidence

1    proving guilt beyond a reasonable doubt.

2         Proof beyond a reasonable doubt does not mean proof

3    beyond all possible doubt to a mathematical certainty.  Possible

4    doubts or doubts based on conjecture or speculation are not

5    reasonable doubts.

6         A reasonable doubt is a fair doubt based on reason,

7    logic, common sense, or experience.  A reasonable doubt means a

8    doubt that would cause an ordinary reasonable person to hesitate

9    to act in matters of importance in his or her own life.  It may

10   arise from the evidence or from the lack of evidence or from the

11   nature of the evidence.

12        If after hearing all the evidence you are convinced

13   that the Government has proved the defendant guilty beyond a

14   reasonable doubt, you should return a verdict of guilty.

15   However, if you have a reasonable doubt as to an element of an

16   offense, then you must return a verdict of not guilty.

17        Counsel, that concludes my initial instructions.

18   Anything else before we turn to opening statements?

19        MR. NAIR:  Not on behalf of the United States, Your

20   Honor.

21        MR. CLARK:  Not on behalf of the defense, Your Honor.

22        THE COURT:  Very good.

23        Ladies and gentlemen, the next step is for the

24   Government to give an opening statement to you, and that will be

25   presented by Attorney Kishan Nair, Assistant United States

PLAINTIFF'S OPENING STATEMENT

1 Attorney.  Mr. Nair.

2             MR. NAIR:  Thank you, Your Honor.

3                 PLAINTIFF'S OPENING STATEMENT

4             MR. NAIR:  Good morning, ladies and gentlemen.

5             On June 17th of last year, the defendant possessed 199

6 grams of Fentanyl that he admitted was in his car in the air

7 filter of his car's engine.  One hundred and ninety-nine grams

8 of Fentanyl is worth up to $100,000 when sold at retail and

9 broken down into approximately 10,000 doses and sold on the

10 streets for $10 a bag.

11            Fentanyl, you will hear, is 50 times more powerful

12 than heroin.  You'll also hear from the Pennsylvania State

13 trooper who found the Fentanyl in the defendant's air filter of

14 his car and when the trooper recovered that Fentanyl, you will

15 also see video and you will see photographs of the recovery of

16 that Fentanyl.  But there's more.

17            You are also going to learn that in addition to the

18 video that you see, the photographs that you see, that federal

19 law enforcement, the day before the defendant was caught with

20 the Fentanyl, had been conducting a wiretap of the defendant's

21 drug supplier.  That wiretap you will hear will show that his

22 drug supplier is getting 200 grams of a drug ready for pick up

23 the next day from someone who is coming from Reading.

24            You will also hear from Special Agent Joshua Romig

25 from the DEA.  He went into action. What he did was he asked

1 surveillance officers to set up or conduct surveillance the

2 morning the defendant was caught with the drugs. He had them

3 set up surveillance around the residence of his drug supplier

4 (indiscernible).

5      So the next morning, who showed up, but the defendant,

6 in a car -- red car that was registered to his name and he alone

7 was in that vehicle or in that car. Surveillance agents will

8 tell you that they saw the defendant drive around to the back of

9 the drug supplier's house. The drug supplier went into the

10 house and came out of the house with a white plastic bag,

11 grocery-type bag, that clearly was weighted down.

12      You'll also hear that the defendant put the hood of

13 his car up and that the drug supplier, who was known to the

14 agent, came over and met with the defendant, disappeared behind

15 the hood and the hood came down. But there's more. When you

16 see the video and you see the photographs, you'll again see the

17 white plastic bag, grocery bag, that the agent had just seen

18 earlier, about a half hour to an hour earlier.

19      So what did the agents do after they saw the Fentanyl,

20 or what they believed the Fentanyl, or drug, go into the car at

21 that point? They followed him. And they followed him as the

22 car left -- as the defendant's car left and the defendant was

23 driving, they followed him out of Allentown and on his way to

24 Reading is when he was stopped by the Pennsylvania state police

25 trooper that you will hear from.

1    That trooper developed his own investigation of the

2    defendant, asked him questions that would be expected based upon

3    the traffic violation.  The stop was lawful.  The recovery of

4    the drugs was lawful.  And you will hear that.

5    You will also hear that when the trooper approached

6    the defendant in his car, there was an overwhelming smell of air

7    fresheners.

8    You will also hear when the trooper looked into the

9    car, he saw two phones.  One, a black flip or burner phone and

10   another -- and that was in the console, and there was another

11   phone on the seat.

12   You will also hear more.  You will learn that when the

13   defendant was arrested after the Fentanyl was recovered and the

14   trooper used his K-9 or drug dog to find that Fentanyl hidden in

15   the white plastic bag in the air filter that when the defendant

16   was back at the barracks in Pennsylvania State Police barracks

17   in Reading, he admitted to possessing the drug.

18   So in this case, law enforcement was smart in that

19   they had a wiretap on the drug supplier.  They were swift in how

20   quickly they put everything together, set up surveillance, and

21   they were safe by taking that Fentanyl or getting that Fentanyl

22   before it hit the streets.  Before it was turned into 10,000

23   doses.

24   But you will also hear from a drug expert, and that

25   drug expert will tell you several things.  First of all, that

PLAINTIFF'S OPENING STATEMENT

1 Fentanyl is 50 times more powerful than heroin and up to 80 to

2 100 times more powerful than morphine. The drug expert will

3 explain to you the profit mode in this drug transaction.

4 Fentanyl is usually broken down with heroin. It's usually

5 broken down and substituted. Fentanyl is a synthetic opioid,

6 either used to adulterate or increase the potency or the high

7 from heroin. Well in this case it turned out to be Fentanyl and

8 not heroin and that they can be substituted on the street. And

9 when they are, they are sold for $10 a bag, and that that would

10 be enough in this case for 199 grams to make up the 10,000

11 doses.

12      You're also going to hear from the drug expert that

13 air filters are a common way that drug dealers try to mask the

14 smell of drugs from K-9 detection dogs. You are also going to

15 learn that the type of phone that the defendant had, the flip

16 phone, is a common phone for drug dealers to buy. One that's

17 prepaid, disposable meaning you buy it, you contact the people

18 that you're buying drugs from, you contact the people that

19 you're then going to redistribute the drugs to, and you package

20 it, and when you're done in about 30 days, you throw it away.

21      The drug expert will also tell you it's common for

22 drug dealers to keep a friends and family phone, a phone that

23 they know is clean that they can talk to their relatives on and

24 not worry that law enforcement may be listening.

25      You'll hear that those factors will play into the

DEFENDANT'S OPENING STATEMENT

1    opinion of the drug expert that 199 grams had to be for the

2    purpose of distribution.  This is not someone who was going to

3    divide up 199 grams, almost $100,000 worth of drugs, and use it

4    for themselves.  Common sense.

5            In this case, the evidence will be clear, it will be

6    convincing, and it will be compelling.  At the conclusion of

7    this case, I'm going to ask that you return a verdict of guilty

8    against the defendant for possession with intent to distribute

9    40 grams or more of Fentanyl, and also that he aided and abetted

10   that possession with intent to distribute.

11           Thank you.

12           THE COURT:  Mr. Clark, do you wish to make an opening

13   statement?

14           MR. CLARK:  Yes.  May I, Your Honor?

15           THE COURT:  You may proceed.  Attorney Glenn Clark,

16   counsel for the defendant, will now present an opening statement

17   on behalf of the defendant.

18                   DEFENDANT'S OPENING STATEMENT

19           MR. CLARK:  Ladies and gentlemen of the jury, what you

20   just heard is the Government's assessment of what the evidence

21   will be.  Only you, and you alone, as the Judge has told you,

22   will decide what the true facts of the evidence is.   So this is

23   a summary, and the reason why I'm talking to you right now is to

24   (indiscernible).  Your duty, your obligation is to find out what

25   the facts of the evidence is true, not what the Government says.

DEFENDANT'S OPENING STATEMENT

1   Mr. Nair is an honorable man.  He's a nice guy. I like him.  He

2   would not mislead you.  I would not purposely mislead you, but

3   your duty and your obligation is to find my client guilty beyond

4   a reasonable doubt based on evidence and not based on our

5   summary.  You remember what the judge said.  What we say is not

6   evidence in the case.

7           So let's go back to this investigation.  Mr. Nair

8   starts with the investigation started -- the charge against my

9   client coming out of an incident on June 17, 2017. What he

10  didn't tell you was the Government had been investigating some

11  other third party and other parties for weeks.  They got

12  wiretaps for months.  They went to the judge.  They got

13  permission from the Court to set up wiretaps.  What they didn't

14  tell you was not one wiretap, not one conversation, not one

15  negotiation for drug trafficking by my client.

16          Not one.  Not one.  What the Government didn't tell

17  you was that when they had the surveillance on the house, I

18  think it's on Wyoming Street in the City of Allentown.  When

19  they had surveillance on the house, they were not in the

20  position to see what transaction, if any, occurred between my

21  client and a third party.

22          What the Government didn't tell you is that when they

23  stopped the vehicle, the trooper, who already had the dog with

24  him, was told to develop an independent probable cause.  Yet,

25  the Government tells you also they had probable cause when he

1    was on Wyoming Street, but they didn't arrest him.  They let him

2    go.

3         And then they called the trooper and asked the trooper

4    to find probable cause to stop.  So the trooper says well, I saw

5    him cross in the center line and (indiscernible).  So when they

6    pull him over and they stop him, what the Government didn't tell

7    you was they have a video of what occurred there of the dash cam

8    of the police cruiser, but no audio.  They knew what was being

9    discussed.  They can't hear what's being said.

10        The officer says my client consented to a search of

11   his vehicle without even being asked.  Now, you'll have to

12   decide when you hear this evidence, and we'll come back later

13   and have -- and I'll make a legal argument to you about what all

14   this means.  The reason I'm putting those things out for you now

15   -- first of all, I believe there's going to be evidence

16   presented by the Government, but also evidence that you have to

17   consider along with all other evidence as to whether or not my

18   client is guilty of this offense.

19        The burden of proof is always on the Government to

20   prove each and every element as the judge outlined before you.

21   But that doesn't happen automatically.  See, in this country,

22   you're innocent until you're proven guilty.  Every citizen such

23   as my client has that right.  You are the keepers of the gate to

24   make sure that all the evidence by the Government meets that

25   burden of proof beyond a reasonable doubt.  You're in fact the

gatekeepers.

The Government has resources. The Government has money. The Government, they get permission from the judges to do things with probable cause of course. Get permission from other judges to do investigations. We have no quarrel with that.

But what I want to suggest to you is listen carefully to the evidence and make a decision based on the evidence and not based upon some other factors. Yesterday, the judge asked you members of the jury if you believe my client was probably guilty of something because he sits in that chair next to me. And to a person -- to a man -- to a woman, you said no. And you know why you said no? Because you believe in the principles of fairness. You believe in the principles of justice. You believe in the principles that our country is founded upon.

Until that evidence has been presented, you have an open mind, and I want you to keep that open mind until you've heard all of the evidence in this case and then you make your decision based on that evidence.

Thank you.

THE COURT: Thank you, Counsel. The Government may now proceed to present its case.

MR. NAIR: United States calls Special Agent Joshua Romig.

(JOSHUA ROMIG, Witness, is Sworn)

1      THE CLERK:  Can you please state your full name and

2  spelling your last name for the record?

3      MR. ROMIG:  Joshua Romig, R-O-M-I-G.

4      THE CLERK:  Thank you.

5                      DIRECT EXAMINATION

6  BY MR. NAIR:

7  Q    Good morning.

8  A    Good morning.

9  Q    Please tell the ladies and gentlemen of the jury how this

10 investigation began.

11 A    Yes.  The investigation began in December of 2016 when we

12 received information from a confidential source about a drug

13 trafficker in the Allentown and Bethlehem area of Lehigh County.

14 Q    And based upon that information and other information that

15 you had, did you eventually apply for a Title 3 interception of

16 a wire -- an electronic communications of someone by the name of

17 Miguel Bierga Colon (phonetic throughout)?

18 A    We did.

19 Q    Was that in April of 2017?

20 A    Yes, sir.

21 Q    And that court authorization allows you to conduct a

22 wiretap.  Is that correct?

23 A    It did.

24 Q    And what, if anything, did you learn regarding someone by

25 the name of Santiago Correa (phonetic throughout) from listening

Direct Examination - Romig

1  and intercepting the conversations of Miguel Bierga Colon?

2  A    We found out fairly quickly that Santiago Correa was the

3  heroin and cocaine source of supply for Miguel Bierga Colon.

4  Q    And then on May 19th of 2017, did you again approach a

5  federal judge to ask for wire and electronic interception --

6  wiretap of Miguel Bierga Colon's second phone, the new phone?

7  A    Yes.

8  Q    And during the interceptions of that phone, were you able

9  to confirm what you just stated that Bierga Colon was

10  distributing heroin and cocaine and he was obtaining that from

11  Santiago Correa?

12  A    Yes.

13  Q    And those interceptions eventually ended.  Is that correct?

14  A    Of Miguel Bierga Colon's phone?  Yes.

15  Q    And then on June 9th, 2017, did you then approach a federal

16  judge again and ask for authority to conduct a wiretap of

17  Santiago's phone, which you refer to or which you called --

18  A    Target telephone three.

19  Q    -- target telephone three.

20  A    Yes.  We got authorization to conduct a wiretap of Santiago

21  Correa's phone based on probable cause that we got from the

22  wiretap of Miguel Bierga Colon's phone and other things

23  obviously in conjunction with surveillance and other electronic

24  surveillance, such as pings on their phone to determine where

25  they were, not just the voices of the two being intercepted.

1  Q    Explain what a ping is.

2  A    A ping is unfortunately is not the proper term anymore, but

3  a ping is we can -- we have the ability as law enforcement with

4  probable cause and with the authorization of the court to track

5  cell phones, and the cell phone companies, when provided with

6  proper authorization, give us location updates of the cell phone

7  every 15 minutes.  Sometimes they're great down to the meter.

8  Sometimes if it was your cell phone, it could put you in this

9  building.  Sometimes they're not so great based on air.  Just

10 like your cell phone calls aren't so great.  When you drop a

11 call or something, if you're not in a good service area, the

12 pings for the location alerts may be 3000 meters of air up to

13 5000 meters of air.  So you'll have a general idea of the

14 location of the person but not down to the meter or down to a

15 couple of meters.

16 Q    And you said authorization.  That's also from the same

17 federal judge that you go to to get the wiretap permission.  Is

18 that correct?

19 A    Sometimes it is.  Sometimes it's not.  Sometimes it's a

20 magistrate judge for the location information.  In this

21 instance, yes, it was the same judge that authorized the

22 wiretaps.

23       MR. NAIR:  Your Honor, may I approach the witness with

24 what's been previously marked as Government Exhibit 1?

25       THE COURT:  Yes.

1    BY MR. NAIR:

2    Q    For the record, what have I just handed you?

3    A    You handed me my resume.

4    Q    Let's start with your resume.  As it pertains to drug

5    jargon and coded drug language, beginning in August of 1999, how

6    did you start your law enforcement career?

7    A    I was hired as a police officer in the city of Baltimore,

8    Maryland.  Baltimore City Police Department.

9    Q    And did you participate in narcotics investigations?

10    A    I did.  Yes.  Primarily street-level narcotics

11    investigations, hiding out in abandoned houses watching corner

12    street dealers and making arrests based on my observations.

13    Q    And then beginning in April of 2001, what, if anything, did

14    you do?

15    A    I left the Baltimore City Police Department because I was

16    hired by the Berks County District Attorney's Office, and I was

17    assigned to the Berks County Detectives, and I was assigned to

18    their drug unit which was at the time called the Narcotics

19    Enforcement Team.  The level of investigations stepped up

20    significantly from hiding in abandoned houses and watching

21    street corner dealers to working more complex cases, using

22    confidential informants, conducting electronic surveillance that

23    we talked about before, you know, getting location information

24    from phones, assisting in wiretap investigations.  Like I said,

25    the level of investigations went up when I got hired by the DA's

1  Office.

2  Q    Okay.  And did your drug investigations during that time

3  involve a various manner of drugs, including cocaine, heroin,

4  methamphetamine, marijuana -- I'm sorry.  Also other drugs.

5  A    Yes.

6  Q    And were you the affiant or co-affiant of at least 50

7  search warrants that were related to drug investigations?

8  A    I was.

9  Q    Did you also have the opportunity to work in an undercover

10 capacity on at least 20 occasions where you bought controlled

11 substances from dealers?

12 A    I did.  I also in the city of Baltimore had the at least

13 one occasion had the ability to work in an undercover capacity

14 where I purchased crack cocaine.  But it was more prevalent when

15 I got to the Berks County District Attorney's Office.  I did

16 more undercover operations where I pretended to be either a user

17 or a street dealer myself in order to purchase drugs directly

18 from drug dealers.

19 Q    Beginning February of 2008, what, if anything, did you do

20 regarding your career?

21 A    I left the Berks County District Attorney's Office after I

22 was hired by the DEA.  So I went in February, 2008 into the DEA

23 academy in Quantico, Virginia.  We share a space with the FBI at

24 Quantico.

25 Q    And were you the affiant in any Title 3 interceptions or

1 authorizations as a drug enforcement agent?

2 A    Yes, I've been the affiant in numerous wiretap

3 investigations, both here in the Eastern District of

4 Pennsylvania, and also I was assigned out of the academy to DEA

5 in New York, and I worked primarily in the Eastern District of

6 New York which is where I secured -- or I was also the affiant

7 in wiretap investigations in the Eastern District of New York.

8       The Eastern and Southern District of New York buildings are

9 only probably less than a mile apart or just over a mile apart.

10 One is in Manhattan, and one is in Brooklyn, but they cover

11 different areas of the city and the surrounding boroughs.

12 Q    Could you please to the ladies and gentlemen of the jury

13 how a wiretap for a phone works.  And what I'm asking for is not

14 the legal way it works is how does it work.

15 A    In order to secure a wiretap, it's -- the Government

16 considers it the most invasive basically search.  So even more

17 invasive than searching your house.  So you have to go through a

18 very lengthy process in order to gain approvals to conduct a

19 wiretap investigation, to listen to your phone.  So basically

20 what I'm getting at in a very layman's term, it's not what you

21 see on TV.  I can't just go to the judge even and get

22 authorization to do a wiretap.  By the time I've gotten to the

23 judge and the judge has the ability to even review the wiretap,

24 I've gone through six or seven layers -- levels of approvals and

25 probably several months' worth of an investigation before I've

1 gotten to a wiretap.

2      In addition to those levels of approvals, the -- in order

3 to gain the ability to conduct a wiretap, I need to exhaust all

4 other forms of investigation.  I have to show the Court that

5 I've tried to make undercover purchases and why it didn't work.

6 I've tried to use confidential sources and why it didn't work.

7 I've tried to use pole cameras, hidden cameras on poles, to try

8 to watch to assist with surveillance.  I've done regular

9 surveillance; sat in my car for hours on end and watched the

10 target; why I wasn't able to gain the evidence that I needed to

11 prosecute the target.  I've done trash pulls.  I've stolen the

12 target's trash, and I wasn't able to use that.  I've done search

13 warrants or why it wasn't appropriate to execute search

14 warrants.  I've checked with the United States Postal Service

15 and done mail covers and why I couldn't just complete my

16 investigation by just seizing let's say packages, if they were

17 using the mail to send drugs.  Pretty much any investigative

18 technique that you can think of outside of a wiretap, I've got

19 to explain to the judge why those techniques didn't work before

20 I even have the ability to send the wiretap affidavit to the

21 first level of approval. You know, so three or four levels

22 before it even gets to the judge.

23 Q    I'm sorry.

24 A    Go ahead.

25 Q    I'm actually going to lead you now into how is the wiretap

1  --

2  A    I got you, and I'm sorry if that's what you were getting

3  at.  I apologize for my lengthy explanation.  So once you gain

4  approval to conduct a wiretap, it's fairly simple from that

5  point forward.  You're able to listen to two ends of a

6  conversation of whatever phone you're conducting the wiretap on.

7  So if it's my phone, it's whoever I'm talking to and me or

8  whoever is actually using my phone and whoever they're talking

9  to.

10      We also based on those wiretaps would get traditional text

11  messages, so SMS messages back and forth.  There's a little bit

12  more that goes into it, but for today's purposes, that suffices.

13  We can hear the conversations live as they occur, and we can get

14  the text messages live as they come in.

15  Q    And how does the recording equipment work?  How do you

16  produce an accurate recording of the interception?

17  A    So there's -- in the example of Philadelphia, which is the

18  division that I work in, our main server is in the Philadelphia

19  Division in the wire room.  There's a room that's just dedicated

20  to doing wiretaps, and we have what would be called I guess an

21  annex room here in Allentown that also has a server, but it's

22  not the main server.

23      So in other words, it gets filtered through Philadelphia

24  before it comes here, and the originals are kept on the server

25  in Philadelphia.  The original calls and the original text

1   messages.

2   Q    And who is the operator of this equipment during the

3   wiretap?

4   A    Well, our technical operations division obviously in charge

5   of the server in Philadelphia, but whoever is assigned to that

6   specific wiretap shift is really the operator of the equipment -

7   - of the software that the calls are filtered through.

8   Q    And who would that include?

9   A    Me, the affiant in the case, whoever's case it is, my co-

10  case agent in this case, Damian Murray, and then typically

11  everybody kind of works wiretap investigations a little

12  differently, but whoever we assign to actually physically sit in

13  there to monitor the wire, to actually listen to the calls.

14  Q    So that also includes contracted monitors?

15  A    Yes.  Specifically, when the wiretap is in let's say

16  Spanish or another foreign language, we would have contracted

17  monitors come in to basically translate.  So the monitors

18  wouldn't be sitting in there by themselves.  They would be

19  translating.  We would be standing over top of them usually

20  bothering them and saying what did they just say.  What did they

21  just say, for however long we're up on the phone listening to

22  the phone.

23  Q    If I can direct your attention to what's been previously

24  marked as Government's Exhibits 2 and 3.  Are you aware of what

25  those exhibits are?

1  A    Not offhand, no.

2  Q    The recordings in this case, the two intercepts that we're

3  going to play for the jury today are Government's Exhibit 2 and

4  Government's Exhibit 3.  Are you aware of those recordings?

5  A    Yes.

6  Q    And are they digitally recorded copies of two different

7  intercepted calls between Santiago Correa and someone by the

8  name of Norma Navarette (phonetic throughout)?

9  A    They are.

10  Q    And are the recordings that you're aware of in Government's

11  Exhibits 2 and 3 authentic and correct to the best of your

12  knowledge?

13  A    They are.

14  Q    And have there been any changes in, additions to, or

15  deletions in the recordings in Government's Exhibits 2 and 3?

16  A    No.

17  Q    And how would you -- you talked about the server in

18  Philadelphia.  Is that how the recordings were preserved?

19  A    Yes.  They're also preserved on -- once the wiretap comes

20  down, they're saved to a Blu-ray disc or another recording

21  device and sealed as evidence, but the original always maintains

22  in the server.

23  Q    So when you say a wiretap comes down, explain that.

24  A    Wiretaps are authorized typically for 30 days.  So after 30

25  days, we are required by DEA policy to seal the disks.  So in

1  other words we would take that 30 days' worth of audio calls or

2  text messages and actually burn them on to a Blu-ray disc and

3  then submit that as evidence.  It's a little antiquated because

4  remember the Wiretaps Act came about when there was cassette

5  tapes.  There were no computer servers, so the originals would

6  literally be those cassette tapes.  Well, the original now is

7  technically in the server in Philadelphia, but we still make a

8  copy of it which we consider an original copy and save that to -

9  - with the clerk of courts file it as per the Wiretap Act.

10 Q    The original gets filed with the court.

11 A    Correct.

12 Q    And then you have access through the server to make copies

13 for your use.

14 A    Correct.

15         MR. NAIR:  If we could play Government Exhibit 2.

16         (Audio played in Court from 10:34:05 a.m. until 10:34:47

17 a.m.)

18 BY MR. NAIR:

19 Q    In that call in Government Exhibit 2, was that the

20 intercepted call between -- first intercepted call between

21 Santiago Correa and Norma Navarette on June 16th?

22 A    Just to be clear, it wasn't the first intercepted call

23 between the two of them.  It's the one -- the one that we're

24 talking about today.  Yes.  It was.

25 Q    And was that -- most of that if not all of that call is in

1    Spanish.

2    A    Yes.

3    Q    Are you fluent in the Spanish language?

4    A    I'm not.

5    Q    Do you speak a little?  Can you understand a little?

6    A    I do.

7    Q    Now, you recognized what you've already alluded to that

8    you've heard these speakers numerous times before.  Is that

9    correct?

10   A    Correct.

11   Q    And you heard them numerous times after June 17th.  Is that

12   also correct?

13   A    Correct.

14   Q    And the first female voice we heard is Norma Navarette?

15   A    That's the only female --

16            MR. CLARK:  Objection, Your Honor.  There's no

17   foundation for that, Judge.

18            THE COURT:  Okay.  Sustained.

19            MR. NAIR:  I'll build a foundation, Your Honor.

20   BY MR. NAIR:

21   Q    How did you know it was Norma Navarette?

22   A    I've known Norma Navarette since 2015 which was the first

23   time that I had the pleasure of meeting her.  I was in her

24   residence at 877 North Jasper Street in a related investigation.

25   Q    In Allentown.

1    A    In Allentown.

2    Q    And you spoke to her.

3    A    I did, yes.

4    Q    And before Government Exhibit 2 was played for you, were

5    you able to listen to her on other occasions and recognize that

6    voice as the same person that -- or the person you had directly

7    talked to?

8    A    Yes.

9    Q    And when the investigation in this case ended, the first

10   series of wiretaps, when was that?  What month roughly of last

11   year?

12   A    When this -- when the wiretaps ended?

13   Q    On the drug part of the investigation.

14   A    The drug part of this investigation ended in September of

15   2017.  The wiretaps continued in the related -- related part of

16   the investigation until May of this past year.

17   Q    And in the month of September, were you able to talk to

18   Norma Navarette?

19   A    I was.

20   Q    And did you recognize her voice from the wiretap in

21   Government Exhibit number 2 when you were again speaking to her

22   in September of 2017?

23   A    Yes.

24   Q    Okay.  Now, also the same for Santiago Correa.  Did you

25   have the opportunity to listen to him being intercepted numerous

1   times before June 16th in Government Exhibit number 2?

2   A    Yes, both in-person, again, going back to 2015 and again on

3   the telephone wiretaps in and up to the month of June, and after

4   that, in fact.

5   Q    And you said in-person, that would also be in September of

6   2017?

7   A    No, in-person I talked to Santiago Correa in a related

8   investigation going back to 2015.  So I've known Mr. Correa and

9   Ms. Navarette and the other individual that the prosecutor will

10  bring up for several years.

11  Q    Now if I can direct your attention to what's been

12  previously marked as Government 2A.

13            MR. NAIR:  Your Honor, may I approach?

14            THE COURT:  Yes.

15            MR. CLARK:  Objection, Your Honor.  The -- may we

16  approach?

17            THE COURT:  Yes.

18       (Sidebar commenced at 10:38 a.m.)

19       (Sidebar is inaudible and not able to be transcribed)

20       (Sidebar concluded at 10:39 a.m.)

21            MR. NAIR:  Don't publish it, yet.  May I approach?

22            THE COURT:  Yes.

23  BY MR. NAIR:

24  Q    Do you recognize Government Exhibit 2A?

25  A    I do.

1  Q    And what is it?

2  A    This is the English transcript of the call that you just

3  played between Correa and Navarette.

4  Q    You didn't do that translation yourself.  Is that correct?

5  A    I did not.

6  Q    In fact, the translator service -- you're aware that

7  someone will testify today regarding that actual translation?

8  A    I am aware of that.

9  Q    But as far as you're aware of, that translation is not only

10 in English, is that a fair and accurate translation as far as

11 you know regarding who the speakers are?

12 A    Yes.

13 Q    And is that to the best of your knowledge your review as

14 the case agent speaking to the monitor who is present today, the

15 one who translated it, is that a fair and accurate translation

16 based upon your conversation with her regarding that translation

17 that's in front of you right now?

18 A    Yes.

19 Q    Now, in addition who is Norma Navarette in relation to

20 Santiago Correa?

21 A    She is a friend, a distant relative, and she is a drug

22 associate.  She, in my opinion, how I would classify her, she

23 was running a stash house, a drug stash house, for Correa --

24 Santiago Correa.

25 Q    What is a stash house?

1  A    It's a place where drug dealers hide their drugs. She also

2  distributed drugs for Santiago Correa at his behest.

3  Q    And who did she live with?

4  A    She lived with Carlos Ferra (phonetic throughout).

5  Q    And do you know what role, if any, did he have in the

6  investigation?

7  A    He had the exact same role as Norma Navarette.  He and

8  Norma ran the stash house for Mr. Correa together, and they also

9  distributed drugs for Correa at his behest.  He told them who to

10  meet with and how much to sell drugs to and how much money to

11  get for those drugs.

12  Q    During your investigation, did Santiago Correa frequently

13  meet drug dealers at his house on Wyoming Street in Allentown,

14  or did he send them somewhere else?

15  A    No, he almost never met with drug dealers at his house on

16  Wyoming Street.  He would typically send them to Norma and

17  Carlos, especially in the case of Miguel Bierga Colon, but for

18  other people as well.  He would have Norma and Carlos do his

19  distribution for him or other runners that I call them, or

20  couriers, who were working for Mr. Correa and getting money from

21  Mr. Correa in order to sell his drugs.

22  Q    So who, if anyone, did he trust enough to actually meet at

23  his own house to make a drug deal during the investigation that

24  you had?

25  A    The defendant.

1    MR. CLARK:  Objection.  Calls for conclusion.  No

2  factual basis for it.

3    THE COURT:  Sustained.

4    MR. NAIR:  If I could publish 2A to the jury, Your

5  Honor.  And I'd move to admit 2A.

6    MR. CLARK:  That's the transcript from what I

7  understand?

8    MR. NAIR:  Yes.

9    MR. CLARK:  Based on the representation made by the

10  Government, Judge, no objection.

11    THE COURT:  Move to admit?

12    (Plaintiff's Exhibit 2A admitted into evidence)

13  BY MR. NAIR:

14  Q    The transcribed phone call --

15    MR. NAIR:  Can everyone see that?  I have a copy that

16  I can publish for the jury to --

17    THE WITNESS:  Would you like to use my copy?

18    MR. NAIR:  You can see it from your monitor?

19    THE WITNESS:  I can't, but I know what the call says

20  by this point.

21    MR. NAIR:  May I publish to the jury?

22    THE COURT:  Yes.

23    MR. NAIR:  Thank you.

24  BY MR. NAIR:

25  Q    In the beginning of the conversation, Norma Navarette says

1   what?

2   A    Hello.

3   Q    And then Santiago Correa says what.

4   A    Sister, are you still awake?

5   Q    And how does Ms. Navarette respond?

6   A    Yeah.

7   Q    And what does Santiago Correa say at that point?

8   A    In Spanish obviously, he says the one from the R -- from R

9   called that he's coming.

10          THE WITNESS:  You're going to have to make that

11  bigger.  I'm sorry.  My eyesight is shot.

12          The one from R -- from R called that he's coming

13  tomorrow early, so tell the brother if he wants to take out 200

14  and leave them aside, that way in the morning, you don't have to

15  be in the morning in a hurry.

16  BY MR. NAIR:

17  Q    And how does Ms. Navarette respond?

18  A    Well, any which way, if you come now, I'll get it out now.

19  If not, tomorrow morning.

20  Q    And what does Santiago Correa respond?

21  A    Yeah.  I'm going to have to do it now, because tomorrow

22  you'll be sleeping, right?

23  Q    How does Ms. Navarette respond?

24  A    I imagine.

25  Q    And then their voices overlap in the tape?

1  A     Yes.

2  Q     On the recording?

3  A     Yes.

4  Q     And then what, if anything, did Mr. Correa say?

5  A     Correa says he'll be here around 8:30, 9 o'clock.

6  Q     And what did Ms. Navarette say?

7  A     In English, she says damn and then she says yes, come over

8  now in Spanish.

9  Q     And then what, if anything, did Mr. Correa say?

10 A     Correa laughs and then he says tell him to put 200 aside.

11 Q     What did Ms. Navarette say?

12 A     Okay.

13 Q     And what did Mr. Correa say?

14 A     See you soon.

15 Q     Let me back up in the transcribed call.  You interpreted --

16        MR. NAIR:  And I'm sorry, Your Honor, if I could ask

17 for the cautionary instructions.

18        THE COURT:  This is about opinion evidence and expert

19 witnesses?

20        MR. NAIR:  Yes, Your Honor.

21        THE COURT:  Ladies and gentlemen, I'm going to give

22 you a piece of information and that has to do with opinion

23 testimony.

24        The Rules of Evidence ordinarily don't permit

25 witnesses to state their own opinions about important questions

1  in a trial, but there are exceptions to this rule.  You're about

2  to hear testimony from drug enforcement administration, Special

3  Agent Joshua Romig, who of course as you see is on the witness

4  stand.  Because of his knowledge, skill, experience, training or

5  education in the field of coded drug language, he will be

6  permitted to offer an opinion in that field and the reasons for

7  that opinion.

8          The opinions this witness states should receive

9  whatever weight you think appropriate given all the other

10  evidence in the case.  In weighing this opinion testimony, you

11  may consider the witness's qualifications, the reasons for the

12  witness's opinion, and the reliability of the information

13  supporting the witness's opinions as well as the other factors I

14  will discuss in my final instructions for weighing the testimony

15  of witnesses.

16          You may disregard the opinion entirely if you decide

17  that Special Agent Romig's opinion is not based on sufficient

18  knowledge, skill, experience, training, or education.  You may

19  also disregard the opinion if you conclude that the reasons

20  given in support of the opinion are not sound or if you conclude

21  that the opinion is not supported by the facts shown by the

22  evidence, or if you think that the opinion is outweighed by

23  other evidence.

24  BY MR. NAIR:

25  Q    Agent Romig, when Mr. Correa said he -- to tell the brother

1 │ he wants to take out 200, what, if anything, did you interpret

2 │ 200 to be?

3 │        MR. CLARK:  I must object.  First of all, you have to

4 │ offer him as an expert (indiscernible).

5 │        THE COURT:  That objection is sustained.

6 │        MR. CLARK:  I understand I'll have an opportunity to

7 │ cross-examine him, but I just (indiscernible).

8 │        THE COURT:  That is correct.  That objection is

9 │ sustained as well.

10 │        MR. NAIR:  Your Honor, at this point based upon the

11 │ voir dire section that I had with him regarding his

12 │ qualifications, I would offer him up as an expert.

13 │        THE COURT:  Cross-examination.

14 │        MR. NAIR:  In the area of drug jargon and coded drug

15 │ language.

16 │                    VOIR DIRE EXAMINATION

17 │ BY MR. CLARK:

18 │ Q    Good morning, Agent Romig.  I just have a few questions for

19 │ you.

20 │ A    Yes, sir.

21 │ Q    I've looked at your CV, and of course I don't know you, but

22 │ I've looked at your CV, and I wanted to ask you just a few

23 │ questions. Of all the training that you had, is there any

24 │ training that dealt with interpreting language in a recorded

25 │ conversation?

1  A    Only training on the job, which is the hundreds of hours

2  that I've spent since 2001 listening to recorded conversations

3  between either informants or undercovers and targets of our

4  investigation or wire tap intercepts in these drug

5  investigations.

6  Q    Is there such a course to your knowledge?

7  A    I'm not certain.

8  Q    Now, just so that we're clear, when you're going to have to

9  give an expert opinion about interpreting portions of this

10 document -- of Exhibit 2.  Is that correct?

11 A    Yes, sir.

12 Q    Now, in doing that interpretation, you're basing that on

13 your experience, your history, the cases you've handled.  Is

14 that right?

15 A    Yes, including this current investigation, this one that

16 we're talking about today.

17 Q    But in another investigation, in a different investigation,

18 different might be used, code language if you will, of what was

19 going on in that investigation.  Is that right?

20 A    Absolutely.  Yes, sir.

21 Q    So how would you distinguish and how would you determine

22 what's the baseline for knowing whether or not that's coded

23 language or not?

24 A    Fortunately for me, I've worked so many different types of

25 investigations with so many different types of traffickers that

1 | if this were day one of this wiretap, I may not have had the

2 | ability to interpret some of the nuances in the call, but

3 | because I knew these individuals in the case and I knew the area

4 | in a general term, meaning Lehigh Valley and Berks County, where

5 | these crimes were taking place, I felt a hundred percent

6 | confident in interpreting this call the way I did.

7 | Q    Would that -- does that also mean, however, that if you

8 | were in a different region of Pennsylvania, say Pittsburg doing

9 | an investigation there and I know you used to do some work with

10 | some other jurisdictions, that would -- your interpretation of

11 | the information would be based upon where the statements are

12 | being made.  Is that safe to say?

13 | A    Some of the factors.  I would say were some of the factors

14 | in this particular call.

15 | Q    And so when I look at your law enforcement training, which

16 | is quite impressive, there's a course that you took -- strike

17 | that.

18 |        MR. CLARK:  That's all I have, Judge, on the issue of

19 | qualifications for Agent Romig.

20 |        MR. NAIR:  Your Honor, I'd ask Agent Romig to be found

21 | as an expert in the area of drug jargon and coded drug language.

22 |        THE COURT:  Any objection?

23 |        MR. CLARK:  There is an objection, Your Honor.  I

24 | object to that.  I think, though, the objection is that based

25 | upon the -- it's not science.  There's no course.  There's no

1   training.  It's opinion.  I do recognize that the standard for

2   qualifying a person as an expert and Your Honor's already given

3   the cautionary instruction.  I do think it's unfair and it's

4   prejudicial as it relates to my client who so far hasn't been

5   said to be in any communications of any kind.

6          THE COURT:  I'm going to overrule the objection.  I

7   find that the defendant, by his experience, his training, his

8   education, his work is qualified to offer an opinion in the

9   field as indicated of drug jargon and coded drug language.  Did

10  I get that right, in terms of describing the areas?

11         THE WITNESS:  Your Honor, except for calling me the

12  defendant.

13         THE COURT:  I'm sorry.

14         THE WITNESS:  That's okay.  I'm okay with that, but I

15  just want to be clear.

16                   CONTINUED DIRECT EXAMINATION

17  BY MR. NAIR:

18  Q    And let's make this clear, Agent Romig.  I'm only asking

19  about the 200.

20  A    At this time.  Okay.

21  Q    So in other words you could listen to another call, if you

22  listen to several calls in another wiretap going on in

23  Philadelphia, maybe in Allentown, maybe in Reading, maybe

24  Easton, what would 200 mean to you?

25  A    200 would either mean in my opinion 200 grams of heroin, or

1   it could be 200 grams of cocaine, but most likely it would be

2   200 grams of heroin, just because typically that's how heroin is

3   distributed.

4   Q    So let's go away from your expert opinion now and bring you

5   back as a fact witness.  You also had knowledge about this wire

6   from listening to the speakers in the investigation itself,

7   correct?

8   A    Correct, and knowing who some of the players were prior to

9   this date, of course.

10  Q    Okay.  So in the beginning, when the call is translated

11  from Spanish to English, and the -- Santiago Correa says the one

12  from R, what did you interpret "R" as and why?

13  A    Reading, Pennsylvania.  And the reason why I interpreted it

14  as Reading, Pennsylvania, is one, based on the location of where

15  we are and its close proximity to Reading, Pennsylvania, but

16  also because I knew that Santiago Correa had customers in

17  Reading, Pennsylvania, drug customers and resellers in Reading,

18  Pennsylvania.

19  Q    Based on the investigation itself, when Correa talks about

20  so tell the brother, in listening to the calls in this case and

21  other calls, who is the brother?

22  A    The brother was a reference to Carlos Ferra.

23  Q    And to put that into context where it says Santiago Correa

24  -- where it says at the bottom of the conversation, he'll be

25  here around 8:30 9 o'clock tomorrow or 9 o'clock a.m., what if

1 anything -- how did that fit the investigation? What time did

2 you believe that was going to be?

3 A    Well, I believed it was going to be 8:30 and 9 o'clock a.m.

4 and based on my knowledge of Norma Navarette and Carlos Ferra, I

5 knew that that was early for them. 8:30, 9 o'clock in the

6 morning. They were very late risers to say the least.

7 Q    In particular, Santiago Correa says what if anything is

8 related to that sleep issue?

9 A    He actually says you'll be sleeping, and Navarette

10 suggested that he could come in the morning. If not now, in the

11 morning, and when Correa says it's going to be 8:30 or 9 o'clock

12 a.m., she actually says in English damn, because she doesn't

13 want to get up that early.

14 Q    And then at the bottom where -- what does Mr. Correa say

15 again to remind -- I'm sorry, third line from the end of that

16 conversation, after he finished chuckling, what if anything does

17 he remind Norma Navarette to do?

18 A    Tell him, meaning Carlos Ferra, to 200 aside, 200 grams

19 aside.

20 Q    And to put 200 grams into context, based upon your

21 experience in the Reading and Allentown areas, is that an amount

22 -- I'm sorry, in this investigation, was that an amount that was

23 frequently sold by Santiago Correa?

24 A    Of heroin, yes. With cocaine, it was more, usually more.

25 Q    What increments was it in cocaine that Santiago Correa

1  would sell?

2  A    Kilograms or half kilograms, 500 grams or a thousand grams,

3  but they wouldn't refer to it as a thousand grams.  They would

4  refer to it as a half, you know, 500 grams, a half a kilogram,

5  where they would refer to a kilogram as a brick or a kilo.

6  Q    And you weren't actually in the wire room when these calls

7  were coming in at that moment that this call came in.  Is that

8  correct?

9  A    I was not.

10  Q    And who notified you about this case?  Who was working that

11  night, if you remember?

12  A    Task Force Officer Casella if I'm not mistaken or the

13  monitors called me directly.  We would frequently do that.  And

14  when I say the monitors, I mean the translators.  They had my

15  cell phone number and we worked other investigations in the past

16  and they would certainly have the ability to call me directly

17  when it was my case at my suggestion.

18  Q    And based upon the conversation that you had either with a

19  monitor or Task Force Officer Casella, what if anything do you

20  believe Santiago Correa was going to do that night?

21  A    I thought that Santiago Correa was going to go to 877 North

22  Jasper Street to Carlos Ferra and Norma Navarette's house and

23  pick up 200 grams of heroin and take it back to his residence,

24  so that he could distribute it to someone from the R the

25  following morning. And, again, I assumed that R was a reference

Continued Direct Examination - Romig

1  to Reading.

2          THE COURT:  Ladies and gentlemen, we're going to take

3  our midmorning break now.  And so, we're going to give you 10

4  minutes to stretch your legs, use the restrooms if you need to

5  do so.

6          So, Mr. Wood, would you declare a brief recess and

7  we'll be back in 10 minutes?

8          DEPUTY CLERK:  All rise.  Court is in recess.

9          THE COURT:  As we discussed before, please do not

10  discuss this case among yourselves.  You can talk about anything

11  but the case. Don't discuss the witness's testimony, and you

12  heard my instructions earlier.  Please abide by them.  Thank

13  you.

14      (Jury out at 10:59 a.m.)

15          DEPUTY CLERK: Court is in recess.

16      (Recess is taken from 10:59 a.m. to 11:15 a.m.)

17          DEPUTY CLERK:  All rise.  Court is again in session.

18  You may be seated.

19          THE COURT:  You may proceed.

20          MR. NAIR:  Thank you.

21                  CONTINUED DIRECT EXAMINATION

22  BY MR. NAIR:

23  Q    Agent Romig, do you still have exhibit 2A?

24  A    I do.

25          MR. NAIR:  If I may approach, Your Honor.

1          THE COURT:  Yes.

2    BY MR. NAIR:

3    Q    The monitor you have in front of you, Agent Romig, now

4    works?

5    A    It does.

6    Q    And what time was that call intercepted on June 16th?

7    A    At 22:10 hours, which is 10:10 p.m.

8    Q    Now, after this call was intercepted, you were aware of

9    another call that was intercepted.  Is that correct?

10   A    Yes.

11          MR. NAIR:  And if we can play Government Exhibit 3.

12          (Audio played in Court at 11:17:22 a.m. until 11:17:31

13   a.m.)

14   BY MR. NAIR:

15   Q    Was that call also in Spanish?

16   A    Yes.

17   Q    And it was fairly short?

18   A    Yes.

19   Q    And do you recognize, although brief, do you recognize the

20   speakers?

21   A    Yes.

22   Q    And who was speaking in there?

23   A    Again, Santiago Correa and Norma Navarette.

24   Q    And also there was background conversation you could hear

25   briefly in that call.  Is that correct?

1    A    Prior to the phone call being connected, yes.

2    Q    And was that authorized by the court order?

3    A    It is.

4    Q    And briefly explain what background conversation is to the

5    ladies and gentlemen of the jury.

6    A    Pretty common sense, but prior to the call being connected,

7    Correa was obviously speaking to someone else or talking to

8    himself.  I couldn't tell you which one, but he was talking

9    prior to the call actually being connected with Navarette.  So

10   based on the court order, we're authorized to also hear the

11   background conversations.  So if he was talking to let's say a

12   passenger in his car or someone who was in his house that he

13   wasn't on the phone with, we were also allowed legally to listen

14   to those conversations.

15            MR. NAIR:  If I may approach the witness which was --

16            THE COURT:  Yes.

17            MR. NAIR:  -- previously marked as Government Exhibit

18   3A.

19   BY MR. NAIR:

20   Q    Do you recognize Government Exhibit 3A?

21   A    Yes.

22   Q    And what is it?

23   A    This is the English transcript of the conversation that you

24   just heard.

25   Q    And in that transcript, was the call intercepted at

1  approximately 10:24 p.m. on that same night, June 16th of 2017?

2  A    Yes.

3  Q    And the transcript is in what language?  Oh, you already

4  said.  It's English, right?

5  A    Correct.  The call was in Spanish; transcript in English.

6  Q    And, once again, based upon your conversation with the

7  monitor as far as you know in your limited knowledge of Spanish,

8  is that a fair and accurate translation of the Spanish into

9  English?

10 A    It is.

11         MR. NAIR:  And if I could publish -- move to admit

12 Government Exhibit 3A and publish it to the jury.

13         MR. CLARK:  I object, Judge.  I don't know if it's

14 relevant (indiscernible)**11:20:01.  I'm not sure of the

15 relevance.

16         MR. NAIR:  I'll lay a quick foundation.  In that call

17 --

18         THE COURT:  I'm going to sustain the objection.  You

19 may continue your questioning.

20 BY MR. NAIR:

21 Q    In the call, what if anything do you believe occurred?

22 A    Correa is telling Navarette that he's at the house, 877

23 North Jasper Street.

24         MR. NAIR:  Once again, I'd move to admit the

25 Government Exhibit 3A.

1    MR. CLARK:  I object, Your Honor.  This is the day

2  before the alleged transaction involving my client and he's at

3  the house.

4    MR. NAIR:  Well, as an offer of proof, Your Honor,

5  this is a follow-up call to the one we just heard in Government

6  Exhibit 2 where he says get the 200 ready and then I'll be over.

7  You know, he was on his way to pick it up, the 200 grams, and

8  this is the follow-up call to show that he actually went to the

9  house to get it.

10    THE COURT:  I'm going to overrule the objection.

11    (Plaintiff's Exhibit 3A admitted into evidence)

12  BY MR. NAIR:

13  Q    Obviously, I can't testify.  Is that what happened?

14  A    Yes.  I already testified to it, yes.  Correa is at the

15  house and Navarette is telling him to knock on the door; he's

16  there.  Again, I believe the "he" was a reference to Carlos

17  Ferra.  And then Correa said oh, it's open.  Okay.

18    MR. NAIR:  May I publish 3A to the jury?

19    THE COURT:  Yes.  Any objection?

20    MR. CLARK:  No, Your Honor.

21    THE COURT:  All right.

22    MR. CLARK:  (indiscernible).

23    MR. NAIR:  If I may approach the witness to retrieve

24  that?

25    THE COURT:  Yes.

1    BY MR. NAIR:

2    Q    Can you see that on your monitor?

3    A    I can.

4    Q    So, briefly, and I'll publish the document itself for the

5    jurors who can't see it, but at the moment, it says, there's the

6    background conversation.  There's a curse word.  I don't give a

7    blank.  And Navarette says in the conversation what?

8    A    Knock on the door.  He's there.

9    Q    And Mr. Correa says what in response?

10   A    Oh.  Is it open?  Okay.

11           MR. NAIR:  If I may approach the witness again, Your

12   Honor.

13           THE COURT:  Yes.

14   BY MR. NAIR:

15   Q    You're aware of surveillance agents, both at Santiago

16   Correa's house that night and at Norma Navarette's location that

17   night also.  Is that correct?

18   A    Correct.

19   Q    Based upon the information that you received from them, the

20   monitors, what, if anything, did you do that night?

21   A    Surveillance agents confirmed my suspicions from the

22   initial call which was that Correa was going to pick up 200 of

23   something, what I suspected to be heroin, from 877 North Jasper

24   Street from Navarette and Ferra.  They actually physically saw

25   him leave his house at 928 West Wyoming Street and go to 877

1    North Jasper Street in conjunction with at the same time as the

2    call you just heard.  Him showing up.

3    Q    And based upon that belief, who, if anyone, did you contact

4    that night to see if they were available?

5    A    I called Trooper Reed with the Pennsylvania State Police

6    knowing that he was -- we also work with Trooper Reed

7    frequently, but also knowing that he had a K-9 that he could use

8    a drug detection dog if it would be needed the following

9    morning.

10   Q    And why did you contact the state police as opposed to

11   stopping the defendant, or whoever came to pick up those drugs

12   themselves?

13   A    As I testified to earlier, this investigation, at least the

14   drug end of this investigation, didn't end until September, so a

15   few months later.  The money laundering end of the investigation

16   didn't end until May and really it still isn't over of this

17   year.

18        So we were not ready to in June of 2017 notify the

19   defendant or alert the people that we were targeting that DEA

20   was investigating them, because that would have been in effect

21   the end of the investigation.  So we utilized the Pennsylvania

22   State Police in hopes that he could -- meaning Trooper Reed

23   could make it look like a regular traffic stop so that it

24   wouldn't alert these people that we were investigating that the

25   DEA was looking at them, or targeting them.

1  Q    So on the morning of June 17th of 2017, did you arrange for

2  surveillance stations to also be at where?

3  A    At 928 West Wyoming, the residence of Santiago Correa.  I

4  believed based on the surveillance and what I've already

5  testified to and the calls that you've heard and seen

6  transcribed that Santiago Correa was going to travel from 928

7  West Wyoming, his house, go to Norma Navarette's house at 877

8  North Jasper Street, pick up the 200 grams of what I suspected

9  was heroin, and take it back to his house at 928 West Wyoming.

10       Those beliefs that I had were confirmed by the surveillance

11 agents seeing exactly that.  So I instructed our surveillance

12 officers to conduct surveillance the following morning at 928

13 West Wyoming believing that someone would be coming from the R,

14 Reading, to pick up the 200 grams.

15 Q    And at approximately 10:30 in the morning of June 17th of

16 2017, who, if anyone, did you learn showed up?

17 A    The defendant, Mr. Angel Luis Concepcion-Rosario.

18       MR. NAIR:  Let the record reflect that Agent Romig has

19 pointed to and indicated as the defendant present next to

20 counsel in court today, Your Honor.

21 BY MR. NAIR:

22 Q    And after you --

23       MR. NAIR:  I'm sorry, Your Honor.  May the record

24 reflect?

25       THE COURT:  Yes, it may reflect.

1          MR. NAIR:  Thank you.

2  BY MR. NAIR:

3  Q    And then based upon what surveillance told you occurred at

4  10:30, what, if anything, did you learn happened next?

5  A    Well, I contacted Trooper Reed after the surveillance

6  agents confirmed that the individual at the time -- again, the

7  defendant was not identified, who was driving this red Hyundai,

8  registered to the defendant, had picked up what the surveillance

9  agents believed was the 200 grams and was now leaving that area,

10 leaving 928 West Wyoming Street, Mr. Correa's house.

11         So I contacted Trooper Reed believing again that he would

12 head back to Reading, because I believed he was from Reading,

13 and then again once we ran the license plate, confirmed that the

14 address on the license plate also came back to Reading, that was

15 another clue that my suspicions were correct.  And Trooper Reed

16 established -- parked his car, his marked police car, at a

17 position kind of in-between Allentown and Reading so that he was

18 able to pick up the defendant once he was driving back towards

19 that area, the area of Reading.

20 Q    And what particular information did you relay to Trooper

21 Reed so that he knew which car --

22 A    Oh, I told Trooper Reed the license plate of the car, the

23 make of the car, and who the vehicle is registered to and I told

24 him where I suspected it was going; to Reading.  We had

25 discussed most of those things the night before.  Obviously, I

1  didn't have the license plate or the make and model of the

2  vehicle until that morning.  But once I had that, the

3  surveillance officers were instructed to maintain surveillance

4  without being detected of the car as it traveled, not lose

5  eyesight of it, just in case he didn't go back to Reading, and

6  then Trooper Reed was waiting in order to make the car stop.

7       I told Trooper Reed to attempt to get his own -- develop

8  his own probable cause to search that car so that he wouldn't

9  have to mention, at least initially in his reports, that DEA

10  told him to stop the car.  In actuality, DEA meaning me, told

11  him to stop the car.  Not only did I tell him that he was going

12  to stop the car no matter what, I also told him that he was

13  going to search that car no matter what because I felt that I

14  had probable cause -- that there were drugs in that car based on

15  everything we just talked about and what the surveillance

16  officers saw that morning with the hood being popped up, I felt

17  we had probable cause no matter what.

18       But I told Trooper Reed hopefully you can develop your own

19  probable cause so that way in the state paperwork when the

20  defendant is charged, he won't have to be -- it won't have to be

21  mentioned that DEA gave him the tip, which would've in effect

22  ruined our investigation against Mr. Correa and all of his

23  associates.

24  Q    Now, the defendant wasn't intercepted in the two calls we

25  just played, correct?

1  A     No, he was not.

2  Q     And on the phone that you were intercepting on Santiago

3  Correa, was he ever intercepted on target telephone number

4  three?

5  A     He was not.

6  Q     What did you learn about Santiago Correa and the defendant

7  after Trooper Reed had stopped the defendant and recovered a

8  phone?

9  A     We -- my partner, Damian Murray, obtained a search warrant

10  for both of the phones that were in the car.  One was a flip

11  phone and one was a smart phone.  So the smart phone, we weren't

12  able to get inside the phone.  It was password protected.  The

13  flip phone we were able to access after the search warrant, and

14  the -- there was contacts in that phone between the defendant

15  and Santiago Correa on a second phone number for Santiago

16  Correa, not target telephone three that we were intercepting.

17      So in other words, Santiago Correa had a second phone, and

18  the defendant was calling him on that phone.  In the phone, it

19  actually had the name stored as Correa, C-O-R-R-E-A, with the

20  phone number next to it.

21  Q     Whose phone?

22  A     In the defendant's phone, the flip phone that was in the

23  defendant's vehicle.

24  Q     Based upon you learning that Santiago Correa had a second

25  telephone number, what, if anything, did you do?

1  A    We used the information from the events that we just talked

2  about from the arrest of the defendant, Angel Luis Concepcion-

3  Rosario, used the fact that Mr. Correa's number was stored in

4  his phone and was called that morning in conjunction with the

5  seizure of 200 grams of what at the time I suspected was heroin,

6  later determined to be Fentanyl.  We used that information to

7  get another wiretap, which we call a spin, to Santiago Correa's

8  newly identified phone, which was the phone that was in the

9  defendant's flip phone.

10  Q    And based upon investigation that you did and your partner,

11  Task Force Officer Damian Murray did, did you learn there had

12  been other contacts with that phone that the defendant had

13  between Correa's up at that time unknown phone?

14  A    Yes, correct.

15  Q    (indiscernible).

16  A    Yes.

17  Q    So it wasn't just one contact that morning.

18  A    No, that's correct.

19  Q    And when you -- you eventually went back to the

20  Pennsylvania State Police Barracks.  Is that correct?

21  A    I did.  Once Trooper Reed arrested the defendant after he

22  had seized the drugs from the air filter, he arrested the

23  defendant and one of the troopers, not Trooper Reed, transported

24  the defendant back to the state police barracks in Reading.

25  Q    And did there come a time where you were able to look into

1  the defendant's car?

2  A    Yes.

3  Q    What, if anything, did you observe?

4  A    There was a significant amount of air fresheners in the

5  vehicle.  You know, car wash air fresheners, the gas station air

6  fresheners that you buy at the -- it had a very, very strong

7  smell.  I actually drove the vehicle back two days later, June

8  19th from the Pennsylvania state police barracks where it was

9  secured.  I drove it to the Lehigh County detective's parking

10  garage to forfeit the vehicle, so that Lehigh County detectives

11  could forfeit the vehicle because there were drugs in it, and

12  the smell was actually overwhelming.  I had to roll the windows

13  down even though it was a hot June day because the smell of the

14  air fresheners was so strong.

15  Q    And I assume you had the air conditioning on?

16  A    Yes.

17  Q    Okay.  What -- where were the air filters?

18  A    Air fresheners.

19  Q    Fresheners.

20  A    The air filter is in the engine block.

21  Q    Yeah.

22  A    The air fresheners were in the car.  Some of them were

23  underneath the seat and I'm not sure if there were even more

24  scattered about the vehicle.

25          MR. NAIR:  I have no further questions at this time.

1    THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3    BY MR. CLARK:

4    Q    Agent Romig, I just have a few questions.  You didn't

5    transcribe this yourself.  An expert did that.  Is that right?

6    A    That is correct.

7    Q    Now, you testified that you believe that the perp was

8    coming from Reading, but it doesn't say Reading.  It says from

9    R.

10   A    That the individual coming to purchase the drugs were from

11   Reading, not that the drugs were coming from Reading.

12   Q    But you put from R, but in parentheses, it says possibly

13   Reading.  So is that the official translation from the person

14   who listened to the tape?

15   A    No.  The official translation is R.  Just the letter R.

16   Q    How did that get into this document that you offered to me

17   as the translation from the conversation?  This is a summary

18   then?

19   A    No, that's the transcript. When it's in parentheses, that's

20   the interpretation.

21   Q    Who put that there?

22   A    Well, the monitor directly put it there, but I'm the one

23   that most likely suggested that that's what the R stands for or

24   --

25   Q    So this is not what the recording said then.  This is

1  something that was recorded but you added something to it,

2  correct?

3  A    If it's in parentheses, correct.

4  Q    Did you add anything else to that from your experience and

5  so forth?

6  A    Again, just to let you know.  I didn't add it.  I didn't

7  physically type it, but --

8  Q    I understand.

9  A    -- if you go down to the bottom of the call, yes, there is

10  something additional to that.

11  Q    All right.  And that was -- you didn't type it, but you

12  added it.  Is that correct?

13  A    Correct.  So in other words, the voices overlap.

14  Obviously, that's not part of the official transcript, and also

15  chuckles isn't part of the official transcript, and also end of

16  conversation is not part of the official transcript.  And then

17  certainly, the ones at the bottom would be the initials of the

18  monitor is not part of the official transcript.

19  Q    And how about here, where it says, Correa, he'll be here

20  around 8:30 to 9:00 (indiscernible).  In parentheses --

21  A    A.m., correct.

22  Q    Is that added?

23  A    That is correct.

24  Q    What does Fentanyl smell like?  Does it have an odor?

25  A    Yes, it's a chemical.  It's a -- it's a -- that's a hard

1  thing to explain because it's a chemical -- it smells like

2  Fentanyl.  It doesn't smell like anything else.  Same thing with

3  heroin. Same thing with cocaine.  They're very specific smells.

4  Same thing with marijuana.  Very specific smells.  It would be

5  hard for me to pinpoint a comparison.

6  Q    Does it have a strong odor?

7  A    Yes, sometimes it does, depending on the amount, the

8  strength of the substance -- the purity of the substance.

9  Q    You guys -- you recovered 200 grams of it?

10 A    Yes, sir.

11 Q    199 grams.  Does that have a strong odor?

12 A    It did have an odor to it.  Absolutely, yes.

13 Q    It had an odor to it. Strong or mild?  Can you describe it?

14 A    I've had -- I've seized heroin and Fentanyl before that

15 have had less of an odor.  I've seized Fentanyl and carfentanil

16 and heroin before that had a stronger, medicinal odor to it.

17 Q    Now, but this substance was recovered from not the

18 compartment of the car and of the passenger compartment, but

19 under the hood.  Is that right?

20 A    Correct.

21 Q    So what would be the point of having the air fresheners if

22 the drug is under the hood?

23 A    I would technically agree with your point.  I don't think

24 that was a very bright idea.  I would only be guessing that it

25 would generally be to throw off the scent of a dog, or at least

1 that's what the people who do that believe. And, again, I'm not

2 saying the defendant believed that in this case.

3 Q   Now, you said that you're familiar with the voice of Mr.

4 Correa, right?

5 A   Yes, sir.

6 Q   Now, but Mr. Correa -- did you talk to him personally, or

7 were you listening to him over the wire?

8 A   Both.

9 Q   Okay.  So how often had you spoken to him in person?

10 A   I had spoken with him on two separate occasions in person

11 back in 2015.

12 Q   So two times you spoke to him in person.  2015.  No

13 personal conversation with him since that time.  Is that right?

14 Is that safe to say?

15        MR. NAIR:  Your Honor, I'm going to object.  Can I see

16 you at sidebar?

17        THE COURT:  Yes.

18      (Sidebar commenced at 11:38 a.m.)

19        MR. NAIR:  I would ask (indiscernible) times after

20 this incident because (indiscernible) potentially would be

21 information between Santiago Correa and Agent Romig.

22        MR. CLARK:  Judge, all I'm trying to do is

23 (indiscernible) foundation (indiscernible).

24        MR. NAIR:  I can put it on the (indiscernible) -- I

25 can say there have been conversations after where he's spoken

1  face to face with Santiago Correa after -- in September.

2      MR. CLARK:  Okay.  So I would (indiscernible)

3  September or before September?

4      MR. NAIR:  Including September.

5      MR. CLARK:  (indiscernible).

6      THE COURT:  I will sustain the objection, but then

7  (indiscernible).

8      MR. NAIR:  Perfect.  Thank you, Judge.

9      (Sidebar concluded at 11:39 a.m.)

10      THE COURT:  I'm going to sustain the objection.

11  BY MR. CLARK:

12  Q    And how many times did you speak to Navarette?  Now, I want

13  to keep it limited.  I'm just trying to talk about leading up to

14  June or so.

15  A    Correct.  So in June -- I'm sorry.  In 2015, I spoke with

16  her in person on two occasions and on the telephone at least

17  once possibly twice, and then again, that's up until we began

18  intercepting her over Correa's phone in June 2017.

19  Q    And, once again, keeping the timeframe approximately June -

20  -

21  A    Yes, sir.

22  Q    --2017, I'm trying to find out now -- so then -- I know

23  there were a number of wires that we talked about.  You've

24  already laid that out.  How many times did you hear over the

25  wire up to --

1   A    Prior to June 17th?

2   Q    Yes.

3   A    -- or June 16th?

4   Q    Yes.

5   A    I would be venturing a guess.  I'm not certain.  I would

6   have to go back and look if we've intercepted her or how many

7   times we intercepted her on Bierga Colon's phone and how many

8   times we had intercepted her on Santiago Correa's phone prior to

9   that June 16th calls, but it was -- it was a fairly decent

10  amount of times.  I knew her voice.

11  Q    Would it be fair to say that some of the times that you

12  heard her on the wire it would be a circumstance where it's

13  relatively brief?

14  A    Correct.

15  Q    Same thing with Mr. Correa.  That same timeframe, prior to

16  June, it would be a brief conversation or some short duration of

17  conversation?

18  A    Some of the conversations were short.  Some of the

19  conversations that were let's say more personal in matter were

20  more lengthy.

21  Q    And on these wires -- these conversations that you've

22  outlined, you had no evidence that my client was on those wires.

23  Is that correct?

24  A    Quite the opposite.  Your client was not intercepted on

25  these wires.  That is correct.

1  Q    In fact, I think you testified on direct that you only

2  became aware of my client on either the 16th or 17th, the date

3  of his arrest.

4  A    The 17th.  That is correct, sir.

5  Q    And it's true, is it not, that the substance that you were

6  investigating was either heroin or for cocaine.  Is that right?

7  That's what you were looking for based on the conversations?

8  A    The substances that we were investigating this wire were

9  yes predominantly heroin and cocaine.  And that -- to answer

10 your question, yes, sir.  I was suspecting that this was going

11 to be heroin.  Yes, sir.

12 Q    In fact, that's what you advised Trooper Reed that you

13 expect to find heroin that day.

14 A    I did, indeed.  Yes, sir.

15 Q    Now, you told Trooper Reed on the day my client was

16 arrested on the 17th of June that he was to develop his own

17 probable cause to stop him.  Is that right?

18 A    I asked him if he could attempt to develop his own probable

19 cause to stop the vehicle.  That is correct.

20 Q    You told him I don't care what happens, but stop the

21 vehicle, number one, correct?

22 A    Correct.

23 Q    And you told him to search that vehicle.  Is that correct?

24 A    Yes.

25 Q    I believe you testified that on the day that this recording

1 -- I think it was on the 16th of June. Is that right?

2 A    Yes, sir.

3 Q    And then there was a shorter conversation -- let's get back

4 to the exhibit. Exhibit 3A, those two conversations occurred on

5 the same day within minutes of each other. Is that right?

6 A    I'm not sure when the first call was. If you move the

7 sheet down, I can tell you. The second call was at 10:24 p.m.

8 on the same day.

9 Q    Same day. One was at it looks 10:10 --

10 A    And the first one at 10:06.

11 Q    10:06.

12 A    So the first call occurs -- I'm sorry. Yeah, you're right.

13 10:10 and six seconds, and then the next call is at 10:24 p.m.

14 Q    And from those calls -- strike that.

15     Did you surveil Mr. Correa between those two calls, the two

16 timeframes?

17 A    I did not personally no, but surveillance units did.

18 Q    The agents did that?

19 A    Yes.

20 Q    You had mentioned in your testimony something about money

21 laundering. That has nothing to do with my client, right?

22 A    Nothing.

23         MR. CLARK: Your Honor, may I have a few minutes?

24         THE COURT: Yes.

25         MR. CLARK: Your Honor, I have no further questions of

Redirect Examination - Romig

1  Agent Romig at this time.  I would like to reserve the right to

2  recall him.

3        MR. NAIR:  Your Honor, I do expect to recall Agent

4  Romig at the end of the case.

5        THE COURT:  Very good.  Any redirect?

6        MR. NAIR:  Just briefly.

7                    REDIRECT EXAMINATION

8  BY MR. NAIR:

9  Q    You had talked about pings on direct and briefly brought up

10 that you were aware of surveillance on the night of June 16th

11 where Mr. Correa was followed by surveillance agents leaving his

12 house, going over to Norma Navarette's house and going back.  Is

13 that correct?

14 A    Yes, sir.

15 Q    You're also aware of electronic surveillance with pings

16 being conducted on Mr. Correa's phone, correct?

17 A    Yes, which gave us his location.  General location.

18 Q    Okay.  What, if anything, do you remember -- what did they

19 indicate?

20 A    Again, they confirmed what the calls were and confirmed

21 what the surveillance observations were that Mr. Correa left his

22 house, went to 877 North Jasper Street and then went back to his

23 house.

24        THE COURT:  Any recross?

25        MR. CLARK:  I guess --

1                    RECROSS-EXAMINATION

2   BY MR. CLARK:

3   Q    Agent Romig, had he taken a package or something from the

4   Jasper Street to Wyoming?

5   A    From the calls, yes.

6   Q    From the calls, you could see that.

7   A    I --

8   Q    Or they told you that?

9   A    The calls led me to believe that he had taken 200 grams of

10  what I suspected was heroin from Jasper Street back to his house

11  at 928 West Wyoming.  Yes.

12  Q    And you had your surveillance team.  Did the surveillance

13  team witness him having any packaging or anything like from

14  Jasper to Wyoming?

15  A    Did they witness the actual package go from -- no.

16  Q    Yes.

17  A    Not to my knowledge, no.

18           MR. CLARK:  No further questions.

19           MR. NAIR:  No further questions.

20           THE COURT:  You may step down, sir.  You may call your

21  next witness.

22           MR. NAIR:  United States calls Adriana Elhyani.

23       (ADRIANNA ELHYANI, Witness, is Sworn)

24           THE COURT:  Can you please state your full name

25  spelling your last name?

1    THE WITNESS:  Adrianna Elhyani, E-L-H-Y-A-N-I.

2    MR. NAIR:  May I proceed, Your Honor.

3    THE COURT:  Yes.

4                    DIRECT EXAMINATION

5  BY MR. NAIR:

6  Q    Ma'am, by whom are you employed?

7  A    Medlang (phonetic).

8  Q    And what type of company is that?

9  A    It is a company who hires translators to do government

10 jobs.

11 Q    And do you have special qualifications or background in

12 making translations?

13 A    Yes.  Spanish speaking native.  They test -- they gave us

14 different tests like proficiency tests in Spanish like read in

15 Spanish, read in Spanish, listen in Spanish, and also in

16 English.

17 Q    And what is your native language?

18 A    Spanish.

19 Q    And when did you learn English?

20 A    When I was about 20 years old.

21 Q    And what country were you born in?

22 A    I was born in Bogota, Columbia.

23 Q    And you had to pass a proficiency test.  Is that correct?

24 A    Yes.

25 Q    And were you a participant or monitor working for the Drug

Direct Examination - Elhyani

1    Enforcement Administration through your company in this

2    investigation?

3    A    Yes.

4    Q    And have you ever testified before?

5    A    No.

6    Q    This is your first time testifying.

7    A    Yes.

8    Q    How many -- how long have you been doing this?

9    A    Approximately like three years.

10   Q    And how many calls -- how many investigations have you been

11   hired to work for the DEA?

12   A    For DEA like six.

13   Q    And who else through the Government?

14   A    For Homeland Security.  About ten cases.

15   Q    So roughly 16 cases.  And they had varied different times -

16   -

17   A    Different times, different locations.

18   Q    And did you --

19            MR. NAIR:  If I could play -- I'm sorry.  If there's

20   no objection, I'm going to offer her as a person who's

21   proficient in both Spanish and English language and able to make

22   translation from both languages back and forth unless there's

23   any objection.

24            MR. CLARK:  No objection.

25            THE COURT:  All right.  Witness is accepted as

1    indicated.

2              MR. NAIR:  If I could play Government Exhibit number

3    2, please.

4         (Audio played in Court from 11:52:06 a.m. until 11:52:49

5    a.m.)

6    BY MR. NAIR:

7    Q    If you could take a look on your monitor what's been

8    previously marked as Government Exhibit 2A.  Are you familiar

9    with what this document is?

10   A    Yes.

11   Q    Please tell the ladies and gentlemen of the jury what it

12   is.

13   A    It is a transcription of the conversation that I just heard

14   and the conversation that took place that day at a time.

15   Q    And did you review this transcript after listening to what

16   you just heard, the call, and did you review this transcript to

17   make sure that it was an accurate transcribed or transcription

18   from the Spanish language to the English language?

19   A    Yes.

20   Q    If I could point out in the conversation itself, the

21   transcription, where you see parentheses, that's not what's

22   being transcribed.  Is that correct?

23   A    No.  It's just like what it supposed according to the

24   investigation what the (indiscernible).

25   Q    So any inferences that are in there that aren't part of the

1  actual words in Spanish are put in parentheses.  Is that

2  correct?

3  A    Yes.

4  Q    And then, of course, at the bottom of the transcript, there

5  are initials that appear there.  Is that correct?

6  A    Yes.

7  Q    And whose initials are those?

8  A    My initials, but it says revised by.

9  Q    Okay.

10         MR. NAIR:  If we could play Government Exhibit 3,

11  please.

12      (Audio is played in Court from 11:54:41 a.m. until

13  11:54:58)

14  BY MR. NAIR:

15  Q    Did you have an opportunity to review that call?

16  A    Yes.

17  Q    And your initials appear on this transcription, too?

18  A    Yes.

19  Q    And were you able to review this transcription and listen

20  to the call and make sure to the best of your knowledge it was

21  an accurate transcription from the Spanish language to the

22  English language?

23  A    Yes.

24  Q    And, once again, anything in brackets are things that are

25  added and to know when the conversation begins and it ends.  Is

1  that correct?

2  A    Yes.

3  Q    And you also used brackets here.  Is that for background

4  conversation, not the actual intercepted conversation?

5  A    No, the -- yes.

6  Q    Thank you.  And in here where it says UI, what does that

7  stand for?

8  A    Unintelligible.

9  Q    And that would mean that you couldn't hear what exactly

10 what the speaker was saying.

11 A    I couldn't hear it or understand what they were saying.

12 Q    And then CB.  What is that?

13 A    Those are the initials of the actual person who summarized

14 the call.

15 Q    Okay.  And then you reviewed it.

16 A    Yes.

17       MR. NAIR:  I have no further questions on direct, Your

18 Honor.

19       THE COURT:  Any cross-examination?

20       MR. CLARK:  Just briefly, Judge.

21                    CROSS-EXAMINATION

22 BY MR. CLARK:

23 Q    On June the 16th at about 10 o'clock at night is when the

24 call came in.  Is that right?

25 A    Yes.

1  Q    When I say a call came in, court authorized recording of a

2  conversation.

3  A    Yes.

4  Q    Right?  And so how did you identify this conversation as

5  one that you would alert the DEA agents to?  How do you do that?

6  A    I didn't do it because I actually wasn't listening to the

7  call at that moment.  The next day I review it.  But my co-

8  workers who are actually monitoring the calls are in the same

9  capacity than me to know that the call -- what the call was

10 saying.

11 Q    The call came in to your center, the monitoring center,

12 correct?

13 A    To the -- yeah, the wire room.

14 Q    Okay.  To the wire room, and someone else gave this to you

15 to transcribe that or translate?

16 A    No.  Someone else did it.  Someone else translated and --

17 Q    It wasn't you that translated it.

18 A    I revise it.

19 Q    Who translated it?  Do you know?  If you know.  Only if you

20 know.

21 A    Yeah, the initials on the translation, CB.

22 Q    CB.  Who is that person?

23 A    Conchita Brown (phonetic throughout).

24 Q    Conchita.

25 A    Brown.

1  Q    Brown.

2  A    Yes.

3  Q    So she transcribed it.  You reviewed it.  So my question is

4  was it Conchita Brown who alerted the DEA agents to this

5  message?

6  A    Yes.  The DEA agents were -- I mean they are always in the

7  wire room.

8  Q    Okay.  So the wire room is where?  Where is that physically

9  or geographically located?

10  A    Here in Allentown.

11  Q    Oh, in Allentown.  Okay.  In Allentown.  And then sometimes

12  agents are there.  Other times they're out doing investigations.

13  They're moving around doing various things.

14  A    No.  There is always -- there is always somebody in charge

15  in the wire room present from the DEA.

16  Q    Did Conchita Brown translate this document on the evening

17  of June 16th?

18  A    Yes.

19  Q    Okay.  So how long after it was recorded did she translate?

20  If you know.

21  A    Probably like one minute after.  One or two minutes after

22  is usually right away.

23  Q    They do kind of -- they do it in real time?

24  A    Yes.  Because she listens to the call live.

25  Q    Do you know how many calls Conchita Brown transcribed that

1  evening?

2  A    No, I don't recall it.

3  Q    How about -- how many recordings did you accrue or review

4  on the evening --

5  A    All of them.

6  Q    I'm sorry.

7  A    Not that evening, but all of the cases of the case.  Pretty

8  much all of them I review.

9  Q    Okay.  Not that evening.  So when did you review --

10  A    The next day.

11  Q    The next day.  Do you know approximately what time of day

12  that was?

13  A    9 o'clock in the morning.

14  Q    9 o'clock.  So when you say that you review it, do you have

15  to make sure that it is accurate?

16  A    Yes.

17  Q    Do you get a copy to the agents after you approve and make

18  sure that it's an accurate translation?

19  A    Yes.  They can see it.

20  Q    Do you know when this transcription was communicated to the

21  agents?

22  A    I don't know exactly.  I believe it was right away.

23  Q    Okay.

24  A    Even like while the call is live, like she -- like we --

25  what we have to do is like communicate and pretty much interpret

1 right away what is going on to the agents.

2 Q    That's your protocol.  When you're in the wire room, you

3 get these telephone conversations, and you're trying to

4 translate them as fast as you can to get information --

5 A    To interpret -- yes.

6 Q    So at the time this call is coming in, around 10 o'clock.

7 I apologize.  It's on the document.  I'm old.  I can't see as

8 far anymore.  June 16th and it looks like 10:24.  I think this

9 is numbered Exhibit 3. When this is coming in, other calls are

10 coming in as well?

11 A    Sometimes after that.  Like minutes after.  It can take one

12 hour until another call comes in.  It depends.

13 Q    And with Exhibit 2, which is the longer version -- not to

14 say the version.  It's not even a version.  And this is

15 Government Exhibit 2A.  So with respect to Government Exhibit

16 2A, this came in around 10:10 and six seconds.  When this

17 communication comes through, were agents there at that time?

18 A    I believe so.

19 Q    Okay. Do you have a record or report that would reflect

20 that?

21 A    Because I mean that's the protocol and they always -- they

22 are always there in the wire room.  There always has to be --

23 Q    Don't you have a log or some kind of documentation to show

24 which calls are coming in and what you will be transcribing?

25 A    Yes, and everything is on the system.  It's what time the

1    call comes in, what time the person is transcribing, everything

2    is in the system.

3    Q    But you don't have anything today?

4    A    No.

5              MR. CLARK:  I have no further questions, Judge.

6              THE COURT:  Any redirect?

7              MR. NAIR:  No, Your Honor.  Thank you.

8              THE COURT:  All right.  You may step down.  You may

9    call your next witness.

10             MR. NAIR:  May the witness be excused?

11             MR. CLARK:  I have no objection.

12             THE COURT:  In the absence of objection, yes.

13             MR. NAIR:  We're getting the next witness.  United

14   States calls Task Force Officer John Casella.

15             MR. CLARK:  Can we approach just for one second?

16        (Sidebar commenced at 12:05 p.m.)

17             MR. CLARK:  (indiscernible).

18             THE COURT:  Agreeable?

19             MR. NAIR:  Agreeable.

20             THE COURT:  All right.

21        (Sidebar concluded at 12:05 p.m.)

22        (JOHN CASELLA, Witness, is Sworn)

23             THE CLERK:  Can you please state your full name,

24   spelling your last name?

25             THE WITNESS:  It's John Michael Casella, C-A-S-E-L-L-

1  A.

2                       DIRECT EXAMINATION

3  BY MR. NAIR:

4  Q    Task Force Officer Casella, by whom are you employed?

5  A    I'm employed by the City of Bethlehem Police Department.

6  Q    How long have you been employed by them?

7  A    I've been employed with the City of Bethlehem since January

8  of 2007.

9  Q    And when did you start employment as a full-time task force

10 officer with the Drug Enforcement Administration?

11 A    November of 2015.

12 Q    So you report to the DEA every day as part of your duties.

13 Is that correct?

14 A    That is correct.

15 Q    But you also remain a City of Bethlehem police officer.  Is

16 that also correct?

17 A    Correct.

18 Q    And on June 16th of 2017 at approximately 10:09 at night or

19 I'm sorry.  10:06 at night, were you working as a task force

20 officer with the DEA in the wire room?

21 A    I was.

22 Q    And were you aware of a call that was intercepted that

23 night with Santiago Correa and Norma Navarette?

24 A    I was.

25 Q    Based upon the call that was intercepted, what, if

1   anything, did you do?

2   A    Based upon the intercepted call, I had notified our

3   physical surveillance units that were out on the street.  I

4   directed one of them to conduct physical surveillance at 877

5   North Jasper Street and I asked another physical surveillance

6   unit to conduct surveillance at 928 West Wyoming Street.

7   Q    And were you also, yourself, monitoring electronic

8   surveillance for global positioning, GPS location information,

9   on Santiago Correa's telephone that was being intercepted?

10  A    I was, yes.

11  Q    And based upon information that you received from the

12  electronic surveillance and in addition to other things you may

13  have learned through physical surveillance agents, what, if

14  anything, did you learn?

15  A    We determined that at some point Santiago Correa following

16  that call traveled from 928 West Wyoming Street to 877 North

17  Jasper Street.  Once at North Jasper, apparently remained there

18  for a short amount of time, and then he returned back to 928

19  West Wyoming Street.

20  Q    And you're getting this information from wiretap intercepts

21  that are in Spanish.  Is that correct?

22  A    Correct.

23  Q    And is there a monitor who is a translator working in the

24  room -- in the DEA wire room with you?

25  A    Yes.

1 Q    And is that DEA wire room located in the federal

2 courthouse?

3 A    Yes, it is.

4 Q    So you're in the same physical room with the person that's

5 making -- receiving the calls.  Is that correct?

6 A    Correct.

7 Q    Now, you don't -- do you wait for the person to actually

8 transcribe the call, or do they turn around and tell you what

9 they think they just heard?

10 A    They immediately advise me of what they're hearing between

11 the two people talking or the individuals speaking, and then at

12 some point, they will physically transcribe that call verbatim.

13 Q    And based upon what you are being told by the translator,

14 that's why you did what you did.  Is that correct?

15 A    Absolutely, yes.

16 Q    Now, if I could direct your attention to June 17th at

17 approximately 10:30 in the morning, at 928 Wyoming Street in

18 Allentown, were you working surveillance?

19 A    I was.

20 Q    And had you been directed to that location earlier?

21 A    I was.

22 Q    And who directed you there to that location?

23 A    Based on the intercepted telephone call the previous night

24 when I was in the room, we determined that there was possibly

25 criminal activity going to occur at 928 West Wyoming Street in

Direct Examination - Casella

1  the morning hours on June 17th.  Myself and other task force

2  officers and agents determined that we were going to conduct

3  surveillance at that location first thing in the morning.

4  Q   do you see anyone in court today that you saw arrive on

5  that -- at that location at that time and date?

6  A   I do.

7  Q   Please point to that individual.

8  A   He's seated at the table to the right here, in between

9  defense counsel and the interpreter.

10        MR. NAIR:  Your Honor, may the record reflect that the

11 witness has identified the defendant seated next to counsel?

12        THE COURT:  Yes.

13 BY MR. NAIR:

14 Q   And please tell the ladies and gentlemen of the jury what

15 you observed.

16 A   Well, I was out on surveillance on that June 17th.  At

17 approximately 10:35, I observed a maroon in color Hyundai Sonata

18 arrive in the 900 block of West Wyoming Street and park just

19 east of 928 West Wyoming.  Once parked, the vehicle remained

20 stationary for a few minutes.  Following that, I observed the

21 defendant exit the driver seat of the maroon Hyundai.  He got

22 out of the vehicle, kind of looked around, walking around the

23 vehicle, looked up and down the street, and then he returned to

24 the driver seat of the vehicle, moved the vehicle approximately

25 two car lengths ahead, and again, just stopped and parked.

1    While that was going on, several minutes later, I observed

2  a BMW sedan that we had associated was being operated by

3  Santiago Correa arrive in the 900 block of West Wyoming Street.

4  As the vehicle -- as the BMW traveled through the 900 block of

5  West Wyoming Street, the maroon Hyundai pulled out behind that

6  BMW and followed it to the end of the block of West Wyoming,

7  made a right-hand turn going towards the rear of 928 West

8  Wyoming, and then made a second right-hand turn to the roadway

9  directly south of West Wyoming, which would be behind 928 West

10 Wyoming.

11 Q    Were you able to at any point during your observations to

12 determine the license plate of the vehicle?

13 A    Yes, I was.  When it had traveled to the end of the block

14 on West Wyoming and then made the right-hand turn, the --

15 unfortunately, the name of the street escapes me right now, but

16 I had a direct view of the rear of the vehicle.

17 Q    And what did you do with that information -- the license

18 plate?  What activities did you conduct?

19 A    At some point, that vehicle registration was ran through

20 the Pennsylvania Department of Transportation.  We obtained

21 registered owner information.

22 Q    And do you remember what that information came back to?

23 A    That vehicle was registered to Angel Concepcion-Rosario at

24 a Reading address.

25 Q    And did you have an opportunity to see the defendant again?

Direct Examination - Casella

1   A    I did.

2   Q    Where was that?

3   A    That would've been I believed it was the PSP Reading

4   barracks.  I'm not sure if it has a different name, but it's a

5   Pennsylvania State Police troop barracks located in Reading,

6   Pennsylvania.

7   Q    And approximately how much time from the time that you saw

8   the defendant initially on Wyoming Street to the point that you

9   got to see him at the Reading barracks?  Was that a matter of

10  minutes, hours?  Can you give us a timeframe?

11  A    It was over an hour, but probably less than three, so

12  somewhere between one and three hours.

13  Q    The information that you had -- you sighted the defendant

14  when he goes behind the Wyoming Street address of Correa --

15  Santiago Correa.  Is that correct?

16  A    Correct.

17  Q    Did you give that information to someone else that you were

18  working with?

19  A    Right.  There were to my recollection at least four --

20  three or four other surveillance units out in that immediate

21  area, obviously all covering different angles.  So what I'm

22  seeing, I'm immediately relaying to all the other units via

23  radio what I'm seeing and where cars are traveling.  And they

24  were picking up -- other units were picking up surveillance from

25  different angles.

1  Q    And you were not able to take any photographs or video

2  where you were conducting surveillance.  Is that correct?

3  A    I was not, no.

4  Q    And after -- did there come a time that you became aware

5  that the defendant had left the area?

6  A    Yes.

7  Q    And what did you do?

8  A    We conducted physical surveillance on the defendant's

9  vehicle as he left the area.

10 Q    And did you participate in that?

11 A    I did.

12 Q    Did there come a time that you ended your participation in

13 following the defendant?

14 A    Yes, there was.

15 Q    When was that?

16 A    When a marked Pennsylvania State Police troop vehicle

17 conducted a traffic stop on the defendant's vehicle on Route

18 222, I believe.

19 Q    And was that Trooper Reed?

20 A    That was Trooper Dan Reed, yes.

21 Q    And did you lose at any time that you can remember sight of

22 the defendant's vehicle where you weren't able to pick it up

23 again from the time that you left Allentown to the time that he

24 was stopped --

25 A    No, not to my recollection, between myself and the three

1  other units that were out there, that vehicle was under constant

2  surveillance.

3          MR. NAIR:  Thank you.  I have no further questions.

4          THE COURT:  Cross-examination.

5                    CROSS-EXAMINATION

6  BY MR. CLARK:

7  Q    Officer, who were the persons who were with you on that

8  surveillance team that morning?

9  A    So that morning, to my recollection, was Task Force Officer

10  Vasa Faasuamalie.  Don't ask me how to spell that.  Our resident

11  agent in charge, Philip Bernal (phonetic throughout), and a

12  detective from Lehigh County, Andrew Arto (phonetic throughout).

13  Q    Where were you positioned when you first observed the

14  maroon-colored vehicle that you described?

15  A    So I was positioned east of the 900 block of West Wyoming

16  Street.  So how my car was parked, I was looking out my

17  windshield, the right side of my windshield and my passenger

18  window where I could have a clear view of 928 West Wyoming.

19  Q    So you were in a vehicle, correct?

20  A    I was seated in a vehicle, yes.

21  Q    All right.  So when you saw the maroon vehicle, as you

22  looked back, you're gesturing with your right side windshield

23  window, correct?

24  A    Yes.

25  Q    So as you are seated in looking out your vehicle, were

1  there any other vehicles on the street at that time?  Do you

2  remember?  Any cars parked there?

3  A    That I can't recall.

4  Q    Any traffic -- any other vehicles passing by while you were

5  there?

6  A    It wasn't very busy time from my recollection.  It wasn't a

7  heavy traffic area by any means.

8  Q    How long were you there?

9  A    I believe I established surveillance at approximately 8:00

10 a.m.

11 Q    And you say you saw this vehicle around 10:35 p.m. (sic).

12 A    Roughly 10:35 a.m.

13 Q    Okay.  Was anyone else in the vehicle with you?

14 A    No.

15 Q    Did you use any binoculars or any other device to help you

16 see?

17 A    I can't recall.  I may have used binoculars.  I can't

18 recall.

19 Q    Was there -- so at 10:30 in the morning -- strike that.

20      And I think you already testified on direct you -- strike

21 that.

22      You didn't take photographs.

23 A    I did not.

24 Q    No video.

25 A    No video.

1   Q    Is there a reason you didn't do that?

2   A    No.  We had no particular reason, no.

3   Q    When you're in the wire room, which one of the interpreters

4   were you communicating with, if you recall?

5   A    That I can't recall.

6   Q    And the information from Exhibit 2 and 3, that was

7   communicated to you verbally?

8   A    Could you refresh me of what 2 and 3 is?

9   Q    Okay. Sure.

10         MR. CLARK:  Judge, may I approach?

11  BY MR. CLARK:

12  Q    Have you seen those documents before, sir?

13  A    Yes, I have.

14  Q    And so -- I'm just trying to establish if I can that the 2

15  and 3 you have verbal communication with somebody in the wire

16  room with respect to that information.  Is that right?

17  A    Correct.

18  Q    And then you -- when you got that information, what, if

19  anything, did you do in response to that?

20  A    As I testified to on direct, given the information

21  everything you know put together, I communicated with physical

22  surveillance units that were actually out on the street, and I

23  advised them to establish surveillance on both 877 North Jasper

24  and 928 West Wyoming Street.

25  Q    So who went to North Jasper?

1  A    North Jasper would've been Lehigh County detective, Adam

2  Noblock (phonetic throughout).

3  Q    Was he the only person who was there -- assigned to go to

4  that area?

5  A    To my recollection, yes.

6  Q    And then to Wyoming Street?

7  A    Would've been City of Bethlehem police detective Patrick

8  Matzgo (phonetic throughout).

9  Q    And was anyone with him to your knowledge?

10 A    Not to my knowledge, no.

11          MR. CLARK:  May I approach, Your Honor?

12          THE COURT:  Yes.

13          MR. CLARK:  Judge, I have no further questions.

14          THE COURT:  Any redirect?

15          MR. NAIR:  No, Your Honor.  Thank you.

16          THE COURT:  You may step down, sir.  You may call your

17 next witness.

18          MR. NAIR:  United States calls Task Force Officer Vasa

19 Faasuamalie.

20          THE COURT:  May the witness be excused, Counsel?

21          MR. CLARK:  Yes, Your Honor. I have no objection.

22          THE COURT:  All right.  Very good.

23      (VASA FAASUAMALIE, Witness, is Sworn)

24          THE CLERK: Can you please state your full name,

25 spelling your last name for the record?

1    THE WITNESS:  Vasa Faasuamalie.  Last name is F-A-A-S-

2  U-A-M-A-L-I-E.

3    MR. NAIR:  May I proceed, Your Honor?

4    THE COURT:  Yes.

5    DIRECT EXAMINATION

6  BY MR. NAIR:

7  Q    By whom are you employed?

8  A    I'm a sergeant with Palmer Township Police Department.

9  Q    And in June of 2017, were you working as a full-time task

10  force officer with the Drug Enforcement Administration?

11  A    Yes, I was.

12  Q    And how long have you been a law enforcement officer?

13  A    Approximately 15 years and 12 years as a task force officer

14  with the DEA.

15  Q    If I could direct your attention to the morning of June

16  17th of 2017 at about 10:35, 10:40 in the morning, were you

17  working on that date?

18  A    Yes, I was.

19  Q    And that time?

20  A    Yes.

21  Q    And were you working in the area of 928 West Wyoming Street

22  in Allentown?

23  A    I was assigned to conduct surveillance at that residence.

24  Q    And were you conducting surveillance behind that residence?

25  A    Yes.

1  Q    And whom, if anyone, did you see arrive in a vehicle on

2  that date?

3  A    Approximately 10:30 a.m. that day I observed the main

4  target of the investigation walk down the steps in the back of

5  the house, enter a silver BMW that was previously identified and

6  left the area heading I believe that was east in the alleyway

7  just behind the house.

8  Q    And did you see that person do anything?

9  A    No, I just saw him getting into the car and leaving.

10 Q    Okay.  And did that person come back at a certain point?

11 A    Probably a couple minutes later, the car came back around,

12 entered the alley again followed by a red sedan.

13 Q    And what did you see happen next?

14 A    I saw the silver BMW parked parallel in the alley to the

15 right side of the alley facing east, and then I also saw the red

16 Hyundai sedan pull into a parking spot which was kind of

17 directly behind the residence -- the target residence.

18 Q    And do you see the person in court who was driving that

19 second vehicle, the red vehicle?

20 A    Yes.

21 Q    Can you please point that person out?

22 A    The gentleman sitting right there in the middle.

23        MR. NAIR:  May the record reflect that the witness has

24 identified the defendant?

25        THE COURT:  Yes.

1   BY MR. NAIR:

2   Q    And what, if anything, did you see either this person do,

3   the defendant, or the other person that was associated with the

4   silver BMW?

5   A    Shortly after the vehicle was parked, I saw the gentleman

6   over there Mr. Rosario -- Concepcion-Rosario exit his vehicle

7   and open the hood of the car.  All I could see was the hood.  I

8   couldn't tell what he was doing behind the hood from my vantage

9   point. Right around the same time, I saw the target, Mr. Correa,

10  exit the BMW and walk towards Mr. Rosario's location.

11  Q    Were you able to observe anything about Mr. Santiago Correa

12  when you see him walking towards the defendant's location?

13  A    Yes.  I was able to observe him carrying a grocery bag and

14  it appeared weighted with something, like something was in the

15  bag, and he was carrying it.

16  Q    And do you remember the bag -- was it clear?  Did you see

17  into the bag, or was it opaque?  Was it white?  Do you remember?

18  A    I couldn't see in the bag.  I could just tell the bag was

19  weighted with an item.

20  Q    Okay.  And what, if anything, did you see next?

21  A    I saw Mr. Correa again went to the location of Mr. Rosario.

22  They were behind the hood of the Hyundai.  I don't know what

23  they were doing, but they were behind there for a couple of

24  minutes, at least three or four minutes.

25  Q    And after three or four minutes, what, if anything, do you

1  observe?

2  A    A short time later, the hood of the car was shut.  Mr.

3  Rosario got back in his car, and Mr. Correa walked back into the

4  house -- the back of the house.  During the whole time, we were

5  relaying all that information to other surveillance units around

6  the immediate area.

7  Q    And was Mr. Correa carrying anything after he left the

8  defendant?

9  A    No, he wasn't.

10 Q    And did you participate in following the defendant when he

11 left the area?

12 A    Yes, I did.

13 Q    And was that part of the surveillance team that followed

14 the defendant leaving Allentown and traveling towards Reading?

15 A    Yes.

16 Q    And did there come a time that you terminated your

17 surveillance?

18 A    Yes.

19 Q    And when was that?

20 A    I believe it was when the marked unit was able to initiate

21 a traffic stop somewhere on 222 I think.

22         MR. NAIR:  Nothing further at this time, Your Honor.

23         THE COURT:  Cross-examination.

24         MR. CLARK:  Thank you.

25 //

1                              CROSS-EXAMINATION

2    BY MR. CLARK:

3    Q    Where were you positioned at 928 Wyoming Street when you

4    made your first observation of the silver BMW?

5    A    Yes.  I'm not sure the name of the street, but there's a

6    street parallel to the alleyway, directly behind the target

7    residence.

8    Q    Okay.

9    A    So I was closer to the intersection.

10   Q    And did you have a clear vision of the area that you're

11   describing?  Were there any obstructions, trees, fences?

12   A    No.  I was familiar with the area from prior surveillance.

13   We had conducted surveillance there numerous other times prior

14   to that incident.

15   Q    So you tried to position in a place -- position yourself in

16   a location where you would not be readily observed.  Is that

17   fair to say?

18   A    Can you repeat that?

19   Q    You were trying to position yourself at a place where you

20   would not readily be observed by the people --

21   A    Yes, yes.  Correct.

22   Q    So I'm trying to find out, where was that in relationship

23   to say distance from where you make your observation, when you

24   saw the red car or burgundy car and the BMW?

25   A    I couldn't tell you the distance.  If you pull up a map,

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1  I'd be able to point it out specifically roughly where I was

2  sitting.  Again, I've sat sort of the similar location to prior

3  observations, so I was able to -- from prior surveillances, I

4  could tell where I could get a good eye view and where it would

5  be obstructed.

6  Q    Now, the bag that you observed, did you observe -- did you

7  see any markings on the bag?

8  A    No, I didn't.  I just thought it was a bag.  It was

9  weighted, the way he was carrying it.

10 Q    Could you tell what color it was or did you see a color?

11 A    Not sure.  I'm not positive, so.

12 Q    And how long did you make your -- how long were you at the

13 location at Wyoming Street -- strike that.

14     After you made this observation around 10:30 or so, was

15 that when the burgundy car arrived, around 10:30 or so?

16 A    I would -- maybe 10:40, somewhere around there.  10:40.

17 Without looking at the report, I couldn't tell you the specific

18 time.

19 Q    I don't necessarily need specific -- short time.  There was

20 a reasonable period of time, correct?

21 A    Yes.

22 Q    You weren't there for hours.

23 A    No, I wasn't there for hours.

24 Q    You weren't there at 8 o'clock.

25 A    Possible.  I was --

1   Q    (indiscernible) --

2   A    Yes.  It's possible I was there at least an hour before.

3   Q    Maybe an hour.  Okay.  Or more.

4   A    Uh-huh.

5   Q    So all I'm trying to get to is where you were in terms of

6   when you made your observations about what you testified to to

7   the jury.  That's all I'm trying to get to.  So you don't have

8   an idea how far you were from the vehicles that were in the

9   alley?

10  A    Not distance-wise.  I can't tell you if it was 50 yards or

11  40 yards.  I could just tell you from my vantage point I was

12  able to identify Mr. Correa walking down the steps.

13  Q    Now, you had not --

14  A    So -- I was not the only one there, either.

15  Q    All right.  But had you ever seen Mr. Correa -- strike

16  that.

17       You had seen Mr. Correa before, right?

18  A    Yes.

19  Q    Had you seen my client before?

20  A    No.

21  Q    Have you seen my client since June 17th?

22  A    No.

23  Q    To your knowledge?  No.  Did you also go to the barracks?

24  A    Yes.

25  Q    At Reading?

1   A     Yes, I did.

2   Q     Were you in the room when he was being questioned by the

3   investigators?

4   A     I wasn't in the room.  No, I wasn't.

5   Q     You were not?

6              MR. CLARK:  Thank you, Judge.

7              THE COURT:  Any redirect?

8              MR. NAIR:  One brief question, Your Honor.

9                        REDIRECT EXAMINATION

10  BY MR. NAIR:

11  Q     When you were at the barracks, you got to the see the

12  defendant again.  Is that correct?

13  A     Correct.

14             MR. NAIR:  Nothing further.

15             THE COURT:  You may step down, sir.  Thank you.

16             THE WITNESS:  Thank you.

17             THE COURT:  You may call your next witness.

18             MR. NAIR:  Your Honor, I have not had enough time to

19  see if Trooper Reed has arrived yet.

20             THE COURT:  How long do you expect -- once he takes

21  the stand, how long do you think you'll be?

22             MR. NAIR:  I would expect he would be approximately an

23  hour.

24             THE COURT:  All right.  Why don't we take our lunch

25  break then at this time?

1    Ladies and gentlemen, we're going to recess for lunch.

2  We're going to take one hour for lunch.  Let's say we'll be back

3  here at 1:35 p.m.  And Mr. Wood will accompany you back into the

4  jury room, and he can certainly answer any questions you have

5  about lunch options here in the area.

6    And as you recall my instruction to you, do not

7  discuss this case with anyone, do not look anything up about

8  this case.  Keep an open mind until you've heard all the

9  evidence and I've given you the instructions on the law.

10    Mr. Wood, would you declare a recess until 1:35 p.m.,

11  please?

12    DEPUTY CLERK:  All rise.  Court is in recess until

13  1:35.

14    (Jury out at 12:33 p.m.)

15    (Recess is taken from 12:33 p.m. to 1:36 p.m.)

16    THE COURT:  Counsel, are we ready for the jury?

17    MR. NAIR:  I'm sorry, Your Honor.  I have DEA getting

18  two exhibits out of the evidence room for the next witness.

19  He'll be up shortly.

20    THE COURT:  All right.

21    (Pause)

22    THE COURT:  Are we all set at this point?

23    MR. NAIR:  Yes.

24    THE COURT:  Bring the jury in, please.

25    (Jury in at 1:38 p.m.)

1    DEPUTY CLERK:  All rise.  Court is again in session.

2  You may be seated.

3    THE COURT:  Mr. Nair, you may call your next witness.

4    MR. NAIR:  Thank you, Your Honor.  For the record,

5  Your Honor, I do have a chemist in the room. There's no

6  objection to him being present.

7    THE COURT:  Thank you.

8    MR. NAIR:  Your Honor, do you want me to move that

9  easel?

10    THE COURT:  I'd like to be able to see it.  On the

11  other hand, the most important thing is for the jury to see it.

12  I can get up and walk around if I have to.

13    MR. NAIR:  United States calls Pennsylvania State

14  Trooper Dan Reed.

15    (DANIEL REED, Witness, is Sworn)

16    THE CLERK:  Can you please state your full name

17  spelling your last name?

18    THE WITNESS:  May name is Trooper Daniel Reed, R-E-E-

19  D.  Badge number is 10302.

20    THE CLERK:  Thank you.

21    MR. NAIR:  May I proceed, Your Honor.

22    THE COURT:  Yes.

23                    DIRECT EXAMINATION

24  BY MR. NAIR:

25  Q    Beginning with your employment history, could you please

1  tell the ladies and gentlemen of the jury when you started

2  employment with the Pennsylvania State Police?

3  A    I started October 17th, 2005.

4  Q    And what was your first assignment?

5  A    I was in the -- I went to Troop K Media patrol unit.

6  Q    And did you eventually promote or transfer to a different

7  unit or group?

8  A    Yes, I did.  I ended up transferring to the Belmont Station

9  in patrol.

10 Q    And what was your next assignment?

11 A    From there, I was in the Troop K vice narcotics unit.

12 Q    How long were you in the vice or narcotics unit?

13 A    Over three years.

14 Q    And then where did you go after that?

15 A    Bureau of Gaming.

16 Q    And how long were you with the Bureau of Gaming?

17 A    I was with them for approximately a year and a half.

18 Q    That's still within the Pennsylvania State Police?

19 A    Yes.

20 Q    And then after being with them for a year and a half, who

21 did you work for -- I mean, what division --

22 A    I transferred back to the road and was there for

23 approximately four months or five months or so, and I was at

24 Troop K Media.

25 Q    And what if any information did you receive from the Drug

1    Enforcement Administration Special Agent Joshua Romig on Friday,

2    June 16th of 2017?

3    A    That there was -- they had a drug trafficking investigation

4    going.

5    Q    Okay.  And was that to see if you were available?

6    A    Yes.

7    Q    And then on Saturday, June 17th of 2017, what if any

8    information was relayed to you from Special Agent Romig?

9    A    Was this the next day?

10   Q    Yes.  Sorry.

11   A    That there was a drug trafficking investigation going on

12   and that he needed me to assist in the investigation.

13   Q    And did you get further information about a vehicle and a

14   car registration?

15   A    Yes.  Once I was in the area, I was advised that there was

16   a red Sonata Hyundai, 2011, I believe and the registration plate

17   was a Pennsylvania registration JKK718 I believe.

18   Q    If you reviewed your report, would that help?

19   A    Yes, it would.

20           MR. NAIR:  I'm approaching, Your Honor, with the

21   Court's permission --

22           THE COURT:  Yes.

23           MR. NAIR:  -- Trooper's reports.

24           THE WITNESS:  It was KKJ7188.

25   BY MR. NAIR:

1  Q    That information came directly from DEA agents.  Is that

2  correct?

3  A    Yes, it did.

4  Q    And did you position your vehicle at the Lehigh Berks

5  county line on Route 222 at approximately -- sometime between

6  10:45 and 11:00 a.m. that morning?

7  A    Yes, I did.

8  Q    And were you in a marked patrol vehicle and in uniform?

9  A    I was.

10 Q    What type of vehicle was that?

11 A    It's a Ford Explorer SUV.

12 Q    And what did you do -- did there come a time that you saw

13 that vehicle pass you?

14 A    I did.

15 Q    And what did you do?

16 A    I proceeded to follow the vehicle.

17 Q    And approximately how long did you follow that vehicle?

18 A    Between five to seven miles I believe.  Six miles, roughly.

19 Q    And approximately how much time transpired from the point

20 that you first saw to the point to -- continue to follow him to

21 the point you stopped following him?

22 A    Traffic was stop and go in some spots, but I believe 15

23 minutes or so.  I can't recall exactly the time.

24 Q    Did there ever come a time where you lost sight of the

25 vehicle?

AEQUUM LEGAL TRANSCRIPTION SERVICES
480-241-2841

1  A    No.

2  Q    And at approximately 11:09 a.m. on June 17th, did you have

3  an opportunity to stop that vehicle on the Route 222 Kutztown

4  bypass approximately a half mile north of the Route 737 exit?

5  A    I did.

6  Q    And what if anything did you observe prior to that

7  concerning traffic code violations?

8  A    I observed the red Sonata, it's called roadways laned for

9  traffic, and come off a road multiple times.

10  Q    And you saw an additional traffic code violation before you

11  pulled the vehicle over?

12  A    Yes.  It was a black border that is around the actual

13  registration plate that covers the state.  That's actually

14  illegal as well.  You cannot have any kind of border obstructing

15  the registration plate.

16  Q    And what did you do to pull the vehicle over that you've

17  already described?

18  A    I turned my lights and sirens on.

19  Q    Okay.  And what happened then?

20  A    At the time, the vehicle pulled to the right side of the

21  road and I pulled directly behind him.

22  Q    And what did you do next?

23  A    At that point in time, I approached the vehicle on the

24  passenger side.

25  Q    And did you see the person that was driving that vehicle in

1  court today?

2  A    I do.  It's the gentleman left of counsel.  Looks like a

3  blue coat on.

4           MR. NAIR:  Your Honor, may the record reflect that the

5  witness has identified the defendant seated next to counsel?

6           THE COURT:  Yes.

7           MR. NAIR:  Thank you.

8  BY MR. NAIR:

9  Q    And as you approached or saw the defendant, what if

10 anything did you notice concerning the vehicle?

11 A    With the vehicle itself?  Inside the vehicle, I observed a

12 flip phone inside the center console and then also another phone

13 that was in the passenger seat.

14          THE INTERPRETER:  Counselor, the interpreter requests

15 that you have the witness speak into the microphone.

16          THE WITNESS:  There's just an echo.

17          MR. NAIR:  Me or the witness?  The witness is okay.

18          THE COURT:  Why don't you try it anyway?  Move it a

19 little closer to you.  Up a little bit.  Let's see how that

20 works.

21          THE WITNESS:  All right.  Can I finish the question?

22 I apologize.  I wasn't finished with the question.

23 BY MR. NAIR:

24 Q    I'm sorry.  Yes.

25 A    And then also -- I also observed an overwhelming smell of

1  air fresheners and that was emanating from the vehicle.

2          MR. NAIR:  I'm going to approach the witness with

3  what's been marked as Government 9 and 9A.

4  BY MR. NAIR:

5  Q    Could you please take a look and review the first phone

6  that appears as a black phone?  Do you recognize that phone?

7  A    I do.  This was in the center console.

8  Q    Can you hold that up for the ladies and gentlemen of the

9  jury?  And you refer to that as a flip phone?

10 A    I personally refer to it as a burner phone.

11 Q    What do you mean by burner phone?

12 A    Basically, from my training, education and experience being

13 in over 13 years and being involved in multiple narcotics-types

14 of investigations, these types of phones right here for criminal

15 activity or organized crime, they like to use these types of

16 phones and/or build layers to make sure it evades like law

17 enforcement.

18         So these types of phones here what they do is they're

19 prepaid, so you don't necessarily have to have the actual person

20 that has the phone's information on this phone.  So that built a

21 layer for that person.  So if they're intercepted, have like a

22 wiretap investigation going, you're not -- it's going to be hard

23 for law enforcement to figure out who this actual person is off

24 this phone.

25         So by having two phones is indicative of drug trafficking -

1 - of having two types of phones here.  So this right here makes

2 me scratch my head and say hey, what's going on with this; why

3 does this person have two phones.

4 Q   And for the record, you're holding another phone --

5 A   Yes.

6 Q   -- that came out of that evidence bag, and I'll refer to

7 that as Government Exhibit 9A.  Where, first of all, was that

8 flip phone in the vehicle, do you remember?

9 A   The flip phone was in the center console.  It was sitting

10 right there in plain view.

11 Q   And what about the other phone?

12 A   It was sitting on the passenger front seat.

13 Q   And I'm sorry, if you've already mentioned it, and I missed

14 it, do you notice anything else about the vehicle itself as you

15 approached?

16 A   Just the overwhelming smell of the air freshener odor. And

17 basically what that is to me shows that, one, I'm a K-9 handler,

18 but, two, through my experience with drug narcotics work, what

19 they're doing once again is they're trying to mask the odor of

20 drugs, either through for law enforcement to smell and/or K-9s

21 to smell.

22 Q   And if I didn't cover this in your training, how long have

23 you been working with K-9 troop?

24 A   I've been over three years. September was three years.

25 Q   And have you been working with the same dog?

1  A    Yes.

2  Q    And what is the dog's name?

3  A    K-9 Edo.  E-D-O.

4  Q    And during the traffic stop, what if anything else did you

5  notice about the defendant?

6  A    He was overly nervous.

7  Q    And did you -- what did you say to the defendant when you

8  approached him?

9  A    When I first approached the vehicle, I typically always

10  explain who I am, so I identify my name and the reason why I'm

11  stopping the person.  I ask for the license, registration and

12  insurance which the defendant did so, gave me -- that's how I

13  was able to identify him through his driver's license, and then

14  ownership of the vehicle, he gave me his registration I believe

15  to identify that it was his actual vehicle.  At that point in

16  time, I advised him what the reason why I stopped him for the

17  roadways laned for traffic and obstruction of the registration

18  plate. And then from there, I explained to him you don't need to

19  be nervous at this point in time.  I plan on giving you a

20  warning, so you're not going to get a citation or any kind of

21  fine.  I just want to explain to you that you have to stay

22  within the lanes and then also make sure you can't have the

23  border on the registration plate.

24  Q    And your encounter with the defendant, was that all

25  recorded?

1  A    It --

2  Q    By video?

3  A    It was by video, yes.

4  Q    And how does that video work?  How does it record?

5  A    So it's called the MVR, so mobile video recorder I believe

6  is actually the term.  As soon as you activate the lights, that

7  recorder automatically starts, and it starts 30 minutes -- not

8  30 minutes.  Correct.  Thirty seconds prior to the actual of you

9  activating those lights.  And the camera is as I'm sure most

10  people have seen is like right there in the front of the

11  vehicle, so you get kind of the front of the vehicle there.  You

12  see like the hood of the vehicle.

13  Q    And if you could please at this point -- and you are aware

14  that a copy of that video was made, correct?

15  A    Yes.

16  Q    And you secured that into evidence?

17  A    I did.

18  Q    And you eventually turned a copy of that over to drug

19  enforcement agent Joshua Romig.  Is that correct?

20  A    I did.

21        MR. NAIR:  Please bring up Government -- what's

22  previously been marked, Your Honor, as Government Exhibit 4.

23  BY MR. NAIR:

24  Q    And the video itself is approximately 35 minutes?

25  A    Yes.

1   Q    And the -- it's just video, not audio.  Is that correct?

2   A    Yes, no audio.

3   Q    And are you aware of why audio didn't work in this

4   particular case?

5   A    I had technical difficulty malfunctioning with the mic

6   unfortunately.

7          MR. NAIR:  For the record, Your Honor, I've talked to

8   counsel and he's agreeing to play it four times normal speed and

9   at appropriate times, the Government will slow it down, and

10  counsel will have availability to do the same thing.

11         THE COURT:  Very well.  You may proceed when ready.

12         (Video is played in Court at 1:55 p.m.)

13  BY MR. NAIR:

14  Q    Trooper Reed, is this from your vehicle?

15  A    Yes, it is.

16  Q    And that's the view out the front window, right?

17  A    It is, yes.

18  Q    Yeah and it's going at four times.  Okay.  For the record,

19  it's approximately 11:08 a.m. on June 17th.  Is that correct?

20  At the top.

21  A    Yes.

22  Q    You can slow it down.  And this is you pulling over the

23  defendant's vehicle?

24  A    It is.

25  Q    Is that you approaching on the left-hand side of the

1  vehicle or right-hand side, the passenger side?

2  A    Yes, it is.

3  Q    And please tell the ladies and gentlemen of the jury the

4  best of what you can remember you were doing right there.

5  A    As I stated before, when I approached the vehicle, I state

6  who I am with the Pennsylvania State Police.  I explain why I'm

7  pulling the person over for what violation it is, and then also

8  I'm asking for their documentation like their registration plate

9  or registration, their driver's license --

10           THE COURT:  Excuse me.  One of the jurors cannot hear

11  you.  We can try turning the lights off to see if we can get a

12  better view of the video.  Let me try -- we'll see how that

13  works.

14           MR. NAIR:  Thank you, Your Honor.

15           THE COURT:  So you may continue.

16           THE WITNESS:  So at that point in time, I asked for

17  the driver's license, registration and proof of insurance.  And

18  what he's doing at this point in time he's gathering that

19  information for me.

20  BY MR. NAIR:

21  Q    During this period is when you noticed the air freshener

22  smell?

23  A    I -- as I walked up, I immediately smelled it.

24  Q    And is this the defendant getting out of the vehicle?

25  A    It is.

1  Q    And if you know what you're doing or based on what you're

2  observing, please tell the ladies and gentlemen of the jury.

3  A    So at this point in time I get him outside the vehicle.  As

4  you can see right here, his vehicle is almost on the fog line

5  right here which is somewhat dangerous right there, so I pull

6  him out of the vehicle and we're on the right side there of the

7  vehicle, just kind of keep space in between both vehicles just

8  for safety wise as well and be able to talk to the individual.

9       At this point, I ask basic questions. Where are you coming

10  from; where are you going to; the standard type questions who

11  the person is.

12  Q    What language are you speaking to the defendant in?

13  A    English.

14  Q    What language was he talking to you in?

15  A    English.

16  Q    Were you having any problem in communicating with him or

17  understanding him?

18  A    I knew that it appeared that his first language was

19  probably Spanish, but I had no issues whatsoever of speaking to

20  him.  If I have issues at all, I have a work phone, so I use

21  like Google translator, so I have no issues whatsoever when I

22  have someone that speaks Spanish or German or whatever it may

23  be, I grab my phone, have Google translator.  It just takes

24  longer because I have to go back and forth with the person so

25  I'm able to communicate with them.  I had no issues whatsoever.

1   You can see here I'm not doing that whatsoever, and we also have

2   a trooper -- actually it was Trooper Rosata (phonetic

3   throughout) that was working -- he is a Spanish speaker.  So if

4   I needed an actual Spanish speaker, Trooper could come to the

5   scene or traffic stop, I can utilize that if I need to.  It just

6   makes it a lot easier if I have issues speaking to somebody.

7   Q    Now, the defendant and you are off camera at this point,

8   correct?

9   A    Yes.

10  Q    Is that his arm appearing there?

11  A    It is.  We're having a conversation.

12  Q    For the record, that was at approximately 11:20, 11:19.

13  And you're continuing to talk with him during this period.

14  A    Yes.  Once I started -- I asked the question of where are

15  you coming from, where are you going to, he was explaining

16  basically that he was coming from Sands Casino at that point in

17  time.

18  Q    Okay.  But you had information that was different.  Is that

19  correct?

20  A    Yes.  So that's my job. So when I pull people over, I'm

21  supposed to ask questions.  So I ask the questions.  Every

22  traffic stop, I ask the same kind of questions.  Each person has

23  their own different answers given to me.

24       So the defendant proceeded to tell me that he lived in

25  Reading.  He left Reading, went to Sands Casino, which that's

1  approximately an hour and 20 minutes to an hour and 30 minutes

2  away from his residence, so round trip, that's three hours

3  there, and that he only played for 45 minutes, he says.  It just

4  wasn't making sense.  It just wasn't jiving with me I guess you

5  could say.  It just wasn't making any sense.  It wasn't very

6  consistent with like a normal person going to a casino, because

7  I did work at a casino before.  We're still having that

8  conversation there.

9       (Pause)

10  BY MR. NAIR:

11  Q    You just motioned towards the license plate. Do you explain

12  the potential violation there?

13  A    Yes, you can see the black border around the registration

14  plate.  I typically give warnings for that, but it is a

15  violation.

16  Q    That's not the only violation, correct?

17  A    That is not.  No.  The first violation that I observed was

18  the roadways laned for traffic.  He came out of his lane

19  multiple times.

20  Q    But that's not on the video because you hadn't activated

21  your --

22  A    Exactly.  At this point in time, I came back in the vehicle

23  and then now I'm back out of the vehicle.  Am I supposed to

24  explain?

25  Q    If there's something that's relevant, yes.

Direct Examination - Reed

1  A    So what was I going --

2  Q    There was a point there where you had something in your

3  hand.  What, if anything, do you remember doing?

4  A    Yes.  What I have in my hand there is the consent form, and

5  you see him motioning over to the vehicle.  So as I'm explaining

6  my typical thing when I establish what's called reasonable

7  suspicion, I have a consent form, and then I ask the people the

8  same type of questions.  Do you have any contraband inside the

9  vehicle; do you have any cocaine inside the vehicle; do you have

10  marijuana inside the vehicle; heroin inside the vehicle,

11  methamphetamine inside the vehicle; large amounts of US currency

12  inside the vehicle; stolen goods whatsoever inside the vehicle.

13  And then they answer.  As I was doing that, he says you can go

14  ahead and search.  He voluntarily told me hey, I don't have

15  anything, go ahead and search.  That's when he walked over to --

16  he says here you go.  You can come in.  I said no, no.  Just for

17  officer safety, sir, come back over here and then I appreciate

18  you being cooperative with me, and yes, I would like to search

19  the vehicle at this point in time.

20      So I explained the consent form and I had -- what I had was

21  both sides, so I had the Spanish side and then I have an English

22  side, so they're both exactly identical except one is in Spanish

23  and one is actually in English.  And it's on the same piece of

24  paper.  I print them out.  So he decided to sign the Spanish

25  side and -- but I explained everything as far as he doesn't have

1  to have me search the vehicle.  He can have me stop the search

2  at any time if he wishes.  That's what I'm doing right now,

3  explaining his rights right there, and then he agreed to do so.

4  He was fine with me searching.

5  Q    He actually signed the Spanish side --

6  A    He signed the Spanish side.  Yes, sir.  Now, I pulled the

7  vehicle --

8  Q    Why was the vehicle pulled over?

9  A    I pulled the vehicle over for -- you see it was on the fog

10  line, so I am a K-9 handler and you'll see here in a second with

11  my K-9, we actually have to walk around -- walk around the

12  entire vehicle.  So just for officer safety, we pull the vehicle

13  over a little bit more so that there's more of a buffer for me

14  to be able to work with the K-9 just for safety.

15      And what I'm doing right now is I'm looking inside the

16  vehicle for any safety issues as far as the K-9 is going to go

17  inside the vehicle and what I mean by safety issues is if

18  there's a knife or a gun or if there's a needle that's inside

19  there or like any kind of -- any kind of thing that's dangerous.

20  I can basically get that out of there and make sure that he's

21  safe, so he's not going to get hurt.

22  Q    He meaning K-9, Edo.

23  A    K-9 Edo, yes.

24  Q    For the record, the time of the video at this point is

25  11:38.  And can you please describe for the record what's

1  occurring here at approximately 11:38?

2  A    I'm bringing K-9 Edo out to start the search of the

3  vehicle.  I put him on the down.  That means he lays down in

4  front of the vehicle, and what we're going to do right here

5  first is called a first pass.  So we're going to go counter

6  clockwise around the vehicle first, and what this is doing

7  getting the K-9 Edo to know his search area, and also he's going

8  to be searching at this point in time.

9       And what I mean by searching, he's searching with his nose

10 as you can see.  And then we flow into what's called a

11 systematic search, so this is me and the K-9 working as a team,

12 so I cast productive areas, so I have an open hand, and when I

13 cast that area, the K-9 is trained to come over to that area

14 that I want him to come to and he searches that area by

15 sniffing.

16 Q    And is that when the hood came up?

17 A    Excuse me?

18 Q    The hood of the vehicle came up?

19 A    Yes.  At that point in time, I observed the K-9 alert which

20 an alert is a change in body posture and increased respiration

21 when the dog first encounters an odor he's been trained to

22 detect. So this is a natural behavior the dog does.  We can't

23 train that natural behavior. That is very crucial with these

24 dogs and why they're so special is they're able to do this one

25 their own, that part.

1   Q    Now you're taking K-9 Edo where?

2   A    And now he's going inside the vehicle.

3   Q    You can't see it on the video, but what if anything did you

4   see K-9 Edo do behind the hood?

5   A    So as I was explaining, so K-9 Edo alerted on that vehicle

6   so I opened the hood of the vehicle up.  He jumps up on to the

7   actual engine block.  He traces the odor -- the trained odors

8   that he's trained on, which the trained odors that he's trained

9   on is marijuana, cocaine, methamphetamine and heroin

10  derivatives. So derivatives meaning if you have heroin oxycodone

11  pills or if you have marijuana hashish, the derivatives.

12       So he alerts on the vehicle.  I open the hood.  He traces

13  it, come in and he what's called an indication on the air

14  filter.  So he actually -- an indication is an -- an ideal

15  indication is a fixed stare point.  Indication is described as a

16  trained behavior that pinpoints source. What that is telling me

17  the K-9 is saying hey, dad, this is where it's at right here.

18  This is where I want to start searching first. So we teach them

19  to have the passive aggressive stare point at the actual source

20  of where he can smell best.  So if there's something there that

21  he can really smell good, he's going to sit there and point at

22  it.

23       Now, K-9 Edo jumped up, came in, hit that air filter and

24  had a good stare right at that air filter.  So at that point in

25  time, I kept continuing to search as we're trained to do, just

1  in case there could be multiple spots that these narcotics could

2  be at, so we float inside the vehicle and at that point in time,

3  the K-9 did alert also to the vents -- the air vents.  Now, he

4  didn't indicate which was telling me hey I need to go back to

5  that actual filter.  That was the best spot where he came and he

6  actually sat at, so it was a good spot to start.  And what that

7  does is like I said for the indication, for an officer, that's

8  just more -- more for being more efficient and effective of

9  where to start the search at first.

10  Q    So explain that.  He doesn't give the alert to the air

11  filters inside.  Is that where the heat and air conditioning

12  would come out on to the driver or passenger?

13  A    Yes.

14  Q    But he gave you what kind of indication to that?

15  A    So yes.  So when a K-9 first -- if he smells the actual

16  odors that he's trained in, that's called an alert.  A change in

17  body posture and increased respiration.  So I'll explain that

18  real quick.  He's going to snap his head.  He's going to turn

19  his ears a little bit.  He's going to get more excited kind of

20  wiggling his body, wiggling his tail.  This is what my dog

21  typically does.  And that's -- and then you hear the breathing

22  change from -- I can't teach him to do that. It's just a natural

23  thing the dog does.  He starts breathing -- his respiratory

24  changes, so it goes from like normal to like (sound effect), and

25  he starts to breathe real good.  So now I know he's alerting, so

1  that's what I do need for the dog to know that there's a trained

2  odor that he's trained on that he's smelling.

3       At that point in time, he's trained to trace it to the best

4  area of where he could smell the best, and that's where the

5  actual source is at.  And then when he jumped up onto the actual

6  engine block, he came in and traced it and smelled the air

7  filter, and at that point in time, he recognized that this is

8  the best spot where I can smell it, and that's where he's

9  trained to sit and stare point, and that's called an indication.

10 Q    So he indicates in the air filter in the engine compartment

11 --

12 A    And inside the actual vehicle, he didn't indicate.  He

13 alerted.  So he snapped his head, and came in, and started going

14 back through it, so he was -- an odor again so that was

15 consistent for me saying okay, well he's alerting, which is

16 good, but he wanted to get back to the main source of like where

17 that was actually at.

18 Q    So in your knowledge of vehicles and based on K-9

19 indication, are you trying to work back to where the source is

20 of what's coming through the air filter in the vehicle to where

21 the drugs could possibly be?

22 A    Yes.  What he was basically showing me was that the first

23 spot I needed to go was the air filter.  Absolutely.

24 Q    And what did you do to make sure that the engine -- what do

25 you do normally to make sure that the engine isn't too hot

1  before you bring your K-9 around?

2  A    I put my hand on the engine before I let me dog touch.

3  They have obviously pads, but I'm not going to have my dog -- if

4  I can't touch it and it's hot, I'm not going to put my dog on

5  something that's dangerous.

6  Q    At this point, it's approximately 11:41 a.m. and at this

7  point you're searching the -- or K-9 Edo is in the trunk of the

8  defendant's vehicle.  Is that correct?

9  A    Yes.

10 Q    And did he alert there?

11 A    No, I don't believe so, no.

12 Q    And what are you doing here?

13 A    At this point, now I'm securing K-9 Edo.  So he has a cage.

14 The whole back seat of the SUV.  There's no back seat.  It's his

15 spot, so he has his entire huge spot for where he's at and it's

16 like a nice cage for him to basically be at for safety purposes.

17 And you'll see right now, the first spot I'm going to is that

18 air filter.

19 Q    And this is approximately 11:42.

20 A    Yes.  And what gets me excited about it is through my

21 training, education and experience is as I said for 13, 14 years

22 now, it is known for --

23        (Break in audio from 2:16:26 p.m. until 2:17:57 p.m.)

24        THE COURT:  You may proceed, Mr. Nair.

25        MR. NAIR:  Thank you, Your Honor.

1  BY MR. NAIR:

2  Q    What, if anything, had you seen or heard at that point that

3  you're returning to your vehicle?  Is that the point where you

4  actually open the air filter?

5  A    Yes.

6  Q    And we'll get to this a little bit later, but were you also

7  able to take pictures of what you were viewing?

8  A    Yes, I did.

9  Q    And what, if anything, did you do based upon what you saw?

10 A    I'm sorry.  As far as coming back to --

11 Q    Coming back to the vehicle.  Based on what you saw in that

12 vehicle, what are you doing?

13 A    Placing him into custody at this point in time.

14 Q    And is there another trooper with the defendant right now?

15 A    Yes, there is.

16 Q    What, if anything, are you doing here?

17 A    I'm about to seize the contraband.

18 Q    And this is approximately 11:46?

19 A    Yes, it is.

20 Q    Were you on your phone there?

21 A    I was.

22 Q    Do you remember who you were talking to?

23 A    I believe I was talking to Special Agent Romig.

24 Q    Do you remember about what at this point?

25 A    Explaining what I was able to get.

Direct Examination - Reed

1    Q    What are you doing there if you know with your hands?

2    A    I'm putting gloves -- I can't tell what I'm doing there.  I

3    just know that I'm pulling the narcotics out I believe.  I'm

4    putting gloves on.  I can see it now.  I apologize.

5    Q    And you're thinking you're being recorded, you're talking,

6    right?

7    A    Yes, you can see the mic on my right shoulder, and I'm

8    speaking into it explaining -- explaining what I have.  I

9    proceeded to take pictures.

10        (Break in audio from 2:22:57 p.m. until 2:23:12 p.m.)

11            MR. NAIR:  Your Honor, at this point, I don't plan on

12    showing -- it's just a few extra seconds (indiscernible).  It's

13    going to be (indiscernible).

14            THE COURT:  All right.

15            MR. NAIR:  Thank you, Your Honor.

16    BY MR. NAIR:

17    Q    And you also talked about taking pictures of what you saw.

18    Is that correct?

19    A    Yes.

20            MR. NAIR:  I'm going to approach the witness with

21    permission Government's Exhibit 7A.

22            MR. CLARK:  No objection.

23            THE COURT:  Yes, you may proceed to approach.

24            MR. NAIR:  Thank you.

25    BY MR. NAIR:

Direct Examination - Reed

1    Q    Do you recognize what appears in Government Exhibit --

2    what's been previously marked as Government Exhibit 7?

3    A    Yes.

4    Q    Did you take that photograph?

5    A    I did.

6    Q    Is it a fair and accurate representation of what you saw

7    that day?

8    A    It is.

9         MR. NAIR:  If I -- without objection, may I publish

10   Government Exhibit 7 to the jury?

11        MR. CLARK:  No objection, Your Honor.

12        THE COURT:  You may proceed.

13   BY MR. NAIR:

14   Q    And what is that a picture of?

15   A    That is the air filter for the Hyundai Sonata.

16   Q    I'm actually going to approach.  The air filter is where?

17   Right here?

18   A    Yes, sir.

19   Q    Okay.  Indicating for the record about midway through the

20   picture.  Please take a look at what's been previously marked as

21   Government 7A.  Do you recognize it?

22   A    I do.

23   Q    Is that also a photograph you took?

24   A    It is.

25   Q    And is that a fair and accurate representation of what you

1    saw that day?

2    A    Yes.

3              MR. NAIR:  If I may publish 7A to the jury, Your

4    Honor.

5              THE COURT:  Any objection?

6              MR. CLARK:  No, Your Honor.

7              THE COURT:  You may proceed.

8              MR. NAIR:  Thank you.

9    BY MR. NAIR:

10   Q    And what's that a picture of?

11   A    That is the air filter.  You can see the white portion.

12   That's the actual filter itself.

13   Q    Is that where your thumb appears to be?

14   A    Yes, that's where the actual air filter is, and the black

15   portion is the container where the filter is at.  And underneath

16   that is an area where the contraband is at.

17   Q    If you could please take a look at what's been previously

18   marked as Government Exhibit 7B.  Do you recognize that?

19   A    I do.

20   Q    Did you take that photograph?

21   A    Yes.

22   Q    Is that a fair and accurate representation of what you saw

23   that day?

24   A    It is.

25             MR. NAIR:  And if we could publish 7B.

1          THE COURT:  Any objection?

2          MR. CLARK:  No, Your Honor.

3          THE COURT:  You may proceed.

4   BY MR. NAIR:

5   Q    And what's that a picture of?

6   A    That is a white shopping market type bag, plastic, that

7   contains the contraband.

8   Q    And you took that photograph after it had been removed from

9   where?

10  A    From the air filter.

11  Q    Please take a look at what's been previously marked as

12  Government Exhibit 7C. Did you take that photograph?

13  A    I did.

14  Q    And is that a fair and accurate representation of what

15  appears in that photograph on June 17th, 2017?

16  A    Yes.

17          MR. NAIR:  If 7C can be published to the jury.

18          THE COURT:  Any objection?

19          MR. CLARK:  No objection, Your Honor.

20          THE COURT:  You may proceed.

21          MR. NAIR:  I'm going to skip 7C here.  In a moment,

22  Your Honor, I'm going to have to go to the ELMO for that.  If we

23  can go -- don't publish yes.

24  BY MR. NAIR:

25  Q    But do you recognize what's been previously marked as 7D?

1    A    Yes.

2    Q    And what is that a photograph of?

3    A    That's K-9 Edo.

4              MR. NAIR:  Can you bring up 7D?

5    BY MR. NAIR:

6    Q    Is that a picture of K-9 Edo?

7    A    That is my partner, K-9 Edo.

8    Q    And if you could next take a look at what's been previously

9    marked as Government Exhibit 7G.  Do you recognize it?

10   A    I do.

11   Q    Did you take that photograph?

12   A    I did.

13   Q    Is that a fair and accurate representation of the documents

14   that appear here?

15   A    Yes.

16             MR. NAIR:  If I may publish that to the jury.

17             THE COURT:  Any objection.

18             MR. CLARK:  No objection.

19             THE COURT:  You may proceed.

20             MR. NAIR:  We'll go to the ELMO.  If you could enlarge

21   the top of that exhibit, please.

22   BY MR. NAIR:

23   Q    The top of that exhibit which has been previously marked

24   as 7G, what document is up top?

25   A    That is the registration for the Hyundai Sonata registered

1   to the defendant.

2   Q    At what address?

3   A    903 A as in Alpha, N as in North, 9th Street, Reading, PA

4   19604.

5   Q    And what license or car registration plate is associated

6   with that vehicle?

7   A    That's KKJ7188.

8           MR. NAIR:  Now if we could move Government Exhibit G7G

9   (sic) to show the bottom, lower left-hand corner, please.  Other

10  left.

11  BY MR. NAIR:

12  Q    And what document is that?

13  A    That is the insurance, financial responsibility.

14  Q    And is that the same address and same name as the defendant

15  that you just mentioned for the car registration, same vehicle.

16  Does that all appear there?

17  A    Under insured, yes.

18          MR. NAIR:  And if you could show the lower right-hand

19  corner of that exhibit.

20  BY MR. NAIR:

21  Q    And is that the defendant's driver's license?

22  A    It is.

23  Q    And his name at the same address in Reading?

24  A    Yes, it is.

25          MR. NAIR:  If we can go back to 7C, Government Exhibit

1  7C.

2  BY MR. NAIR:

3  Q    You've already said you took that picture.

4  A    Yes, I did.

5  Q    And what is that a picture of?

6  A    That is the contraband that I pulled from the air filter

7  and it's on a digital scale reading 208 grams.

8  Q    And that includes the packaging material that's holding --

9  A    Yes.  That's -- it's going to be a little more there

10  because of the packaging and the plastic and stuff.  It does

11  weigh something, so it's going to be less because it's just the

12  powder.

13  Q    So it's not the net weight of the drug?

14  A    Very well put.  Yes, no.

15  Q    I'm sorry. And the photo we just saw, where was that taken?

16  A    That was in the Reading barracks.

17  Q    Okay.  And the items I think you referred to as contraband,

18  if we can next take a look at what's been previously marked as

19  Government Exhibit G6.

20          MR. NAIR:  If I may approach.

21          THE COURT:  Yes.

22  BY MR. NAIR:

23  Q    Do you recognize what is marked on the outside of the

24  evidence bag as Government's Exhibit G6?

25  A    Yes.

Direct Examination - Reed

1    Q    Now, what did you do with what appears in G6, the

2    contraband that you recovered -- after you weighed it and

3    secured it in an evidence bag, who if anyone did you turn it

4    over to?

5    A    I eventually relinquished it over to Agent Romig.

6              MR. NAIR:  If I may approach, Your Honor?

7              THE COURT:  Yes.

8    BY MR. NAIR:

9    Q    For the record, I'm approaching with Government Exhibits 5

10   and 5A.  Do you recognize Government Exhibit 5?

11   A    I do, yes.

12   Q    And what is it?

13   A    This is our consent form.

14   Q    And it's filled out.  Is that correct?

15   A    Yes, it is.

16   Q    And what is -- what language is Government 5 -- Exhibit 5

17   in?

18   A    Spanish.

19   Q    And what is -- do you recognize Government Exhibit 5A?

20   A    I do.

21   Q    And what is that?

22   A    That is the same form, but in English.

23   Q    And the forms are separated into two pieces of paper as

24   they appear in front of you.  Is that correct?

25   A    Yes.

1  Q    Is that the way you handed it to the defendant, or was he

2  handed one piece of paper?

3  A    It's one piece of paper.

4  Q    That's the full form, correct?

5  A    Yes, this is it, on both sides.

6  Q    So that's how it would've been handed to the defendant?

7  A    This is how -- yes.

8  Q    The copy you have here in Spanish that's been filled in is

9  just the side that --

10 A    That's just a copy, yes.

11          MR. NAIR:  If I may publish Exhibit 5 to the jury?

12          THE COURT:  Any objection?

13          MR. CLARK:  No, Your Honor.

14          THE COURT:  You may proceed.

15 BY MR. NAIR:

16 Q    The items that are filled in at the top are the location.

17 Is that correct? Roughly --

18 A    Number four.

19 Q    Yes, number four.

20 A    That is the location of the traffic stop.

21 Q    And then in number six, the defendant's name?

22 A    Yes, in print.

23 Q    And then if you could go down lower.  And there's a box

24 checked there below number six where your name and his name

25 appears.  Right here.

1  A    Yes, that right there is explaining that he owns the

2  vehicle. There's three different ones.  You can either lease a

3  vehicle, own a vehicle or borrow a vehicle type thing.  I

4  believe that's what they're saying.  But the one that is checked

5  is that he owns the vehicle.

6  Q    And then at the bottom does a signature appear roughly

7  below the number eight?

8  A    Yep. That's my signature.

9  Q    And what date is it dated?

10 A    6-17-17.

11 Q    And at the bottom, does there also appear a signature in

12 number 11?

13 A    Yes, that's the defendant's signature.

14 Q    And was that signed -- what we saw in the video, was that

15 signed by him?

16 A    That was what was signed, yes.

17       MR. NAIR:  If we could show Government Exhibit 5N or

18 publish to the jury.

19 BY MR. NAIR:

20 Q    On the side that appears with the Government Exhibit 5A, is

21 that the -- what your understanding is the English translation

22 of the Spanish side of that form?

23 A    It is.

24       MR. NAIR:  If you could turn it over, please.

25 BY MR. NAIR:

1  Q    And that would be similar to the form, it's not exactly the

2  same other than being filled in, with the defendant's name of

3  what we just saw in Exhibit 5.  Is that correct?

4  A    Yes.

5  Q    Now, if I could direct your attention to the Pennsylvania

6  State Police Redding barracks located in Berks County on that

7  same date, did you have an opportunity to see the defendant

8  again when he was transported back there?

9  A    Yes.

10 Q    And what, if anything, did you do as far as getting ready

11 to go back to the barracks or when you actually arrived at the

12 barracks?  Did you contact another trooper?

13 A    Trooper Quesada.

14 Q    And did there come a time where you took a statement from

15 the defendant?

16 A    Yes.

17 Q    I'm sorry.  You asked the defendant a question.

18 A    Yes.

19 Q    And was that after he had been given his Miranda rights

20 warning?

21 A    Yes.

22 Q    And did he -- and was that given in both English and in

23 Spanish?

24 A    Yes.

25       MR. NAIR:  If I may approach with --

1       THE COURT:  Yes.

2       MR. NAIR:  -- G8 and G8A.

3  BY MR. NAIR:

4  Q    Do you recognize Government Exhibit 8?

5  A    Yes.  This is the rights warning waiver -- Miranda rights.

6  Q    In Spanish.

7  A    In Spanish.

8  Q    And if you could take a look at Government Exhibit G8A.  Do

9  you recognize it?

10 A    Yes, that's in English.

11      MR. NAIR:  If we could publish G8 to the jury.

12      THE COURT:  Any objection?

13      MR. CLARK:  No objection.

14      THE COURT:  You may proceed.

15 BY MR. NAIR:

16 Q    For the waiver of rights, whose signatures appear at the

17 bottom?

18 A    On the bottom left, that's Special Agent Joshua Romig.

19 Q    And he's appearing as a witness?

20 A    Yes.

21 Q    And that was signed in front of you?

22 A    Yes.

23 Q    And where does your signature, if any, appear on there?

24 A    I'm on the bottom right.

25 Q    And whose signature is directly above it?

Direct Examination - Reed

1  A    That is the defendant.

2  Q    And is there a time that this rights warning waiver was

3  given?

4  A    13:00 hours approximately.  13:00 hours, yep.

5  Q    So that would be approximately 1:00 p.m.?

6  A    That is 1:00 p.m., yes.

7         MR. NAIR:  If you could show Government Exhibit G8A.

8  BY MR. NAIR:

9  Q    And that's the rights warning waiver, is that correct, in

10  English?

11  A    Yes, it is.

12  Q    After the defendant agreed to speak to you, what if

13  anything do you remember him telling you about the drugs in this

14  case?

15  A    That the drugs were his.

16  Q    And that was it?

17  A    And he said he didn't want to speak anymore.  That was it.

18  Q    And was that in English or in Spanish?

19  A    That was in English.

20         MR. NAIR:  I have no further questions at this time,

21  Your Honor.

22         THE COURT:  Cross-examination.

23         MR. CLARK:  Thank you.

24  //

25  ///

1                          CROSS-EXAMINATION

2    BY MR. CLARK:

3    Q    Good afternoon, Trooper.

4    A    Good afternoon.

5    Q    Can you take me through a portion of your testimony where

6    you initially stop the vehicle on Route 222 as it relates to

7    what you did first?

8    A    I'm sorry.  I misunderstood.

9    Q    What did you do first once you stopped the car?

10   A    I initiated a traffic stop.

11   Q    Yes.

12   A    I approached the vehicle on the driver's side, or passenger

13   side.

14   Q    And you got the information, his driver's license, his

15   insurance, was that still why you were standing to the right of

16   the vehicle?

17   A    Yes, I did.  My initial approach, yes.

18   Q    So when you received those documents, the next thing that

19   you did was did you take it back to your cruiser, run the

20   information and check his information?

21   A    I got him out of the vehicle.

22   Q    You got him out first?

23   A    Once he gave me the documentation.

24   Q    Once he -- and you received the documentation, the purpose

25   for which you had stopped him, roadways laned for traffic, the

1  thing around a license plate, you were finished investigating at

2  that point.  Is that correct?

3  A    (No audible response).

4  Q    Had you finished -- had you finished your investigation as

5  it relates to the reason that you stopped him?

6  A    I wasn't finished with my investigation, but I explained to

7  him that yes, he was going to be receiving a warning for those

8  two violations.  Yes.

9  Q    So you told him that early on while you were talking to

10 him, correct?  That he was going to receive a warning, but no

11 citation, correct?

12 A    Yeah, I advised him that he doesn't need to be nervous

13 anymore at this point in time.  I'm going to be giving him a

14 warning.

15 Q    Okay.  And so after you told him you're going to give him a

16 warning, you continued your investigation.  Is that right?

17 A    I can't understand.  Go ahead and say that one more time.

18 Q    When you finished -- when you told him you were going to

19 give him a warning, you continued your investigation, correct?

20 A    I continued the traffic stop, yes.

21 Q    All right. And then you asked him to search his vehicle,

22 right?

23 A    Eventually, yes.  Actually, correction.  He gave me consent

24 on his own accord.

25 Q    So when you say consent of his own, was that in English?

1  A     He gave me consent in English.

2  Q     In English.  So now you told us that when you were talking

3  to him -- strike that.

4        Did he appear to be fluent in English when you were talking

5  to him?

6  A     He spoke English, yes.

7  Q     Did he appear to be fluent -- strike that.

8        Did he appear to understand what you were saying to him?

9  A     Absolutely, yes.

10 Q     Was he speaking with what we call broken English when he

11 responded to what you were talking to him about?

12 A     He had an accent.

13 Q     No broken words, no broken words, no broken English; is

14 that what you're saying?

15 A     I don't recall it being -- I just remember recall him

16 having an accent, a Spanish accent, speaking English.  That's

17 what I remember.

18 Q     That's all you remember?

19 A     Yes.

20 Q     So now you spoke to him in English, correct?

21 A     Yes.

22 Q     You didn't call the Spanish-speaking officer, Trooper

23 Quesada, right?

24 A     I did eventually yes, but not at that point.

25 Q     You called him eventually.  When did you call him?

1    A    Once we got back to the barracks I believe.

2    Q    So was it clear to you that his first language would be

3    Spanish?  Was it clear to you then?

4    A    Yes.  His first language was Spanish.  Yes.

5    Q    And as I'm looking at the exhibits the Government has

6    offered, in time that he signed a waiver -- we actually have a

7    waiver signed, it's in Spanish, though, isn't it?

8    A    Yes.

9    Q    But all the time that you talked to him was in English.

10   A    Yes.

11   Q    Did you know -- strike that.

12        Did you know that Trooper Quesada testified in a previous

13   hearing that he was summoned back to the barracks because there

14   was a problem back at the barracks in communicating with my

15   client in English?

16   A    From my understanding -- from what I recall, the defendant

17   once I placed him into custody he no longer wanted to speak

18   English.

19   Q    Was that at roadside or at the barracks?  When you placed

20   him into custody, that was on roadside, correct?

21   A    Yes.

22   Q    Right.  So he didn't want to speak English anymore once you

23   placed him under arrest?

24   A    At that point in time we didn't really discuss anything too

25   much at that point in time.

1  Q    My question is a little bit different.  Were you aware that

2  your fellow trooper, who speaks Spanish, was summoned to the

3  barracks because there was a problem communicating with Mr.

4  Concepcion-Rosario?

5  A    It wasn't a problem with communication.  He was refusing to

6  speak English at that point in time with us.

7  Q    Now, you said that my client volunteered to have you search

8  his vehicle.  Is that right?

9  A    Yes.

10 Q    Do you recall at a prior proceeding I asked you if he had

11 volunteered to speak to you and you said, and I'm talking about

12 a transcript of proceedings, Judge, on October 11, I believe.

13 And I asked you a question and your response was, "I asked him

14 for consent to search" and you go on and explain the

15 conversation you had with him at that time.  Do you recall that?

16 A    What was your question?

17        MR. CLARK:  Judge, may I have a second?

18        THE COURT:  Yes.

19     (Pause)

20        MR. CLARK:  Judge, may I move on to another question?

21        THE COURT:  Yes, you may.

22 BY MR. CLARK:

23 Q    So then there came a point that you had your dog come from

24 your vehicle.  I'm assuming he was in the back, as you

25 described, correct?

1   A    Yes.

2   Q    Had been in the back.  Is that right?

3   A    Yes.

4   Q    And so when you brought the dog out, you had him walk on

5   the right side as you walked down the vehicle driven by my

6   client.  Is that right?

7   A    For safety, yes.

8   Q    Now as he was walking, was he alerting to anything while he

9   was walking along the car?

10  A    To approach the vehicle?  I did not see any observations of

11  alert from K-9 Edo.

12  Q    And was he in (indiscernible) to examine that vehicle -- as

13  he's walking down the side, or did he go right to the front of

14  the car?

15  A    On traffic stops, what I do is take K-9 Edo and go to the

16  front of the vehicle, put him down which is lay down in front of

17  the vehicle facing the vehicle, and we go in a counter

18  clockwise.  At that point in time, we walk counter clockwise

19  around the vehicle which is called a first pass.

20  Q    Okay.

21  A    If that's what you're asking.

22  Q    Right.  I'm asking you that.  So when you went to the front

23  of the vehicle driven by my client, you had Edo lay down.  Is

24  that right?

25  A    Yes.

1    Q    Okay.

2    A    He's approximately ten feet away at that point in time.

3    Q    Would you say he's ten feet away from you?

4    A    From the search area.

5    Q    From the search area.

6    A    Yes, he's outside the search area.

7    Q    Doesn't that indicate to him that's where you're going to

8    be looking for something when you have him lay down?

9    A    At that point in time, we -- he knows when we're going to

10   search the area as we come up to it and I give him a command to

11   find it.  So if I give the command find it, then he starts the

12   search.

13   Q    In this instance, you already had him lay down in front of

14   the vehicle, and that's where you started the search, correct?

15   A    Not where he's laying down.  As I said, he's ten feet --

16   approximately ten feet away from the search area -- before we go

17   into the search area.

18   Q    In any event, it's true, is it not, that the dog will

19   follow your lead in terms of where he's going to search.  Is

20   that right?

21   A    The K-9 -- what we do is what's called a first pass.

22   Q    Yes.

23   A    So as he's going around that vehicle, that first pass right

24   there is for him to say okay, this is the area we're going to be

25   searching.  Yes.

1   Q    And so -- but I'm not talking about the area you were going

2   to search.  We're talking about finding some drugs, right?  He's

3   not there just to walk around the car.

4   A    Well, he's -- for the trained odors, yes.

5   Q    So then there was a period of time, I think it was around

6   11:44, he was in the trunk of the car for a period of time.  Is

7   that right?

8   A    Yes.

9   Q    Why was he there?

10  A    Because we were still searching.

11  Q    Because what?

12  A    We were still searching.

13  Q    You were still searching?

14  A    As I stated before, sir, typically what I like to do is to

15  continue the search, if a K-9 alerts and indicates one spot

16  doesn't mean we're going to stop the search at that point in

17  time.  As me as a handler, I decide if we are going to continue

18  the search and/or stop the search at that time.  At this point

19  in time, I felt comfortable that it was okay for me to continue

20  the search because I was able to do what's called a pre-visual

21  search of the vehicle, so I did a safety check of that vehicle.

22  So I felt comfortable that I was safe to be able to continue the

23  search because there were being multiple spots that contraband

24  meaning narcotics or drugs that are inside that vehicle in

25  different hidden spots.

1     So it's more efficient for my team to continue the search.

2   We went to the interior of the vehicle at that point in time.

3   As I stated before, the dog did alert to the vents at that point

4   in time on the dashboard, and we continued to search the rear

5   trunk area.  At that point in time, I felt comfortable that he

6   was finished.  He did not alert to the trunk of the vehicle.  So

7   I secured K-9 Edo at that point in time.

8   Q    But you already had a suspicion anyway that the drugs or

9   contraband would have been in the front, under the hood, right?

10  You already knew that.

11  A    I was advised that -- I didn't know where the drugs, if

12  there was going to be 100 percent of drugs being there.

13  Q    All right.

14  A    But I was advised that the trunk -- not the trunk, the hood

15  was open at one time prior.  That doesn't tell me that -- once

16  the dog alerted to that, I felt very comfortable at that point

17  in time yes, there's one of the trained odors inside that air

18  filter.

19  Q    When you had the -- strike that.

20       You know what the term "cap (phonetic) back" means?

21  A    The term "cap back"?

22  Q    Cap back.  Do you know what that means?

23  A    So if I understand what you're trying to say is when you

24  come in and you're casting productive areas and the K-9 from

25  what I'm understanding -- the K-9 is coming in in what's called

1  a systematic search, so I'm casting productive areas, so

2  (indiscernible) because he's not -- going to be searching

3  (indiscernible).  So if you search like scene areas, so I take

4  my hand and I cast the scene areas of that vehicle.  Okay.

5      As we're coming around, it's called a systematic search, as

6  we're coming around and I'm casting productive areas, his nose

7  is going to come in and search through his actual nostrils

8  smelling those areas that I'm coming into.  Doesn't mean he's

9  not still searching, which he does.  He continues to search, but

10  I want a certain area searched, I come in and I cast.  His nose

11  comes there.  I move to the next spot.  If that dog is coming

12  through and his nose is straight forward and not searching the

13  vehicle itself, it's called back cast, so you come back in and

14  then you back cast that area of where you want him to actually

15  search. There's different ways of doing it.  That is definitely

16  official way -- I actually use back cast to come back through if

17  the K-9 does not search that area.  His nose is straight out.  I

18  don't feel comfortable that he's searched very well right there,

19  I'll back cast, and come back through and the dog will turn back

20  and come back and honor that cast.

21      If he doesn't do that, then we do what's called a reverse

22  and/or circle spin.  I don't like to do circle spins.  That's

23  when you come around and walk the dog around and come back to

24  that area and cast that area.  On the side of the road, it's not

25  the best move because you only have so much room and you don't

1  want the dog if you're circling around like that, the dog could

2  go inside the lane.  So I don't typically like to do the circle

3  spin at that point in time.  So what I do is what's called a

4  reverse.  So you come in and reverse.  The dog comes back

5  through and you just come back and I cast with the opposite hand

6  to the proper area, I reverse back, and then I start casting

7  productive areas with good speed all the way through the whole

8  vehicle is what we're supposed to do.

9  Q    And did you do that -- did you use those techniques here?

10 A    I want to say when he alerted to the vehicle, I believe I

11 did a reverse on the front of the vehicle.

12 Q    And just so that we're clear, what you're describing to the

13 jury is if the dog is not finding what you think should be

14 there, you can direct him.  In other words, you may pass it, but

15 you can direct him back.  Is that it?

16 A    No, sir.  That's not what I'm saying.

17       So I want to make it very clear.  The dog is trained --

18 okay indication.  He is not trained as far as an alert behavior.

19 An alert behavior is a trained behavior -- correction.  An alert

20 behavior is a change of body posture and increased respiration

21 when a dog first encounters the odors he's been trained to

22 detect.  As I stated those four.  Okay.

23       That behavior is very crucially important for the Court

24 that they see -- that right there is because it's a natural

25 behavior for the dog.  As I stated before, if the dog's nose is

1  going straight, he's not smelling at that point.  He's not

2  searching the area.  So what we do is we call a back cast or you

3  could do a reverse, or you could do a circle spin.  Okay.  To

4  get the dog to come back and you want that area searched.

5      At this point in time, as I came through after the first

6  pass, I came in and casted the front of the vehicle.  The dog at

7  that point in time alerted on the vehicle, meaning that he

8  snapped his head, changed his body posture and increased

9  respiration (sound effect).  This is what he was doing.

10     As I casted again, he came through and started walking so I

11 reversed him back to that spot and he wanted to go in.  He was

12 showing that he was -- basically tracing the odor.  He wanted to

13 get to that -- the actual source of the trained odors that he's

14 trained on.

15     So at that point in time, I moved in by opening the hood of

16 the vehicle.  K-9 Edo -- I placed my hand on the engine first

17 before I let him up there.  He jumped up on the engine block.

18 He traced that odor to the actual filter, and was coming in

19 pretty good -- taking his nose in, increasing the respiration

20 and excitement of that air filter.  At that point, he had a

21 beautiful stare point right at that air filter.  That's what he

22 did.

23 Q    So when he alerted to the front of the car --

24 A    Yes.

25 Q    -- engine block, did he sit?

1   A    No, because at that point, he's not going to necessarily --

2   indication is a trained behavior that pinpoints source.

3   Pinpointing source, meaning he wasn't -- he's in odor, but he

4   wants to get as close as possible to that odor before he

5   actually sits.

6        So that's an indication.  That's a trained behavior to

7   pinpoint source.  All that's telling me is hey, dad, this is

8   where I want to start the search, and that's what he was trying

9   to do for me.  He was wanting to get inside that, open that up,

10  and jump up in there and trace the odor.

11  Q    Now, did you want him to go inside each compartment?

12  A    Yes.

13  Q    (indiscernible) --

14  A    I placed my hand first to make sure it wasn't hot and he

15  jumped up on top and traced the odor's source and he indicated

16  with the ideal indication.

17  Q    So he did not sit.  You didn't give him a treat once he

18  found -- one he alerted at the front of the car.  Is that right?

19  A    In the front of the car?  Exterior of the car?

20  Q    Yeah.

21  A    He did alert on the vehicle, but he did not indicate at

22  that point.  He was tracing that odor.

23  Q    Now what was the wind direction like that day?  Did you

24  make a note of the wind direction?

25  A    I did not, no.

1    Q    Wind direction can have an effect on him finding the drugs.

2    Is that right?

3    A    For him to be able to get an odor, wind direction can be,

4    yes.

5    Q    But you didn't make a note of it back then, correct?

6    A    I did not.

7    Q    And during the process that Edo is working, he is supposed

8    to be searching all the time, right?  He's supposed to be

9    looking, smelling, all the time.  Is that right?

10   A    While he's in the search pattern?

11   Q    Yes.

12   A    Yes, he's supposed to be searching.

13   Q    He's supposed to be searching.

14   A    Yes.

15   Q    And so if he's --

16        MR. CLARK:  Judge, can we see the portion of the video

17   again?  I guess I should ask Mr. Nair if it's all right with

18   Your Honor, that portion where he's walking around the vehicle.

19   Can you play that for me?  Appreciate it.

20        Your Honor --

21        THE COURT:  Yes, Mr. Clark.

22        MR. CLARK:  I'd like to show the jury that portion of

23   that video when he's walking the dog around.

24        THE COURT:  You want to turn the lights off?

25        (Video is played in Court at 3:09 p.m.)

1  BY MR. CLARK:

2  Q    Trooper, is this the portion where he is sitting down in

3  front of your vehicle about ten feet away?

4  A    He was laying down.

5  Q    Laying down.

6  A    Yes.

7  Q    Is this the portion that will reflect the one that we just

8  saw?

9  A    I'm sorry.  This is where he's doing the first pass.  Is

10 that what you're asking?

11 Q    Right.

12 A    Yes, this is the first pass.

13 Q    So you haven't had him lay down in front of the vehicle

14 yet.  Is that right?

15 A    We already did.

16 Q    You already did that.

17 A    We already did that initial -- about ten feet away if you

18 saw at the very beginning.  Right here, you can see that he's --

19 Q    So now the hood is up, right?

20 A    Yes.

21 Q    What is he doing now?

22 A    At this point in time, he jumped into the engine block and

23 traced the odor to the air filter and then indicated -- sits

24 stare point.

25 Q    Now I note that he turned back toward the roadway portion

1  before he got into the car.  Is that just because you had to

2  maneuver him?

3  A    That was -- that was his movement, yes.  I don't know

4  exact.  I'm sorry.

5  Q    So is he now searching the interior of the car?

6  A    He is.

7  Q    How does he indicate to you that he wants to search the

8  trunk?

9  A    I'm sorry.  What was that?

10  Q    How does he indicate to you that he wanted to search the

11  trunk?

12  A    No, sir.  That's -- working as a team, you start a

13  systematic search, what we do is as I'm casting productive

14  areas, the first part I start at is the front of the vehicle,

15  and I cast those productive areas all the way through, and then

16  I go -- once I finish the front, I move to the interior of the

17  vehicle on the driver's side, and then I flow to the trunk area

18  of the vehicle, and then at that point in time I felt

19  comfortable at that point to be able to stop the search.

20          MR. NAIR:  Your Honor, I think we can put the lights

21  back on.

22          THE COURT:  All right.

23  BY MR. CLARK:

24  Q    Did there come a time that you gave him what would be a

25  reward?

1    A     When the K-9 -- there's two types of scenarios here.  One

2    is in the field which is a non-controlled environment, and then

3    there is a controlled environment which is for training.  So for

4    you to understand here.  For the training -- we have training

5    quite a bit.  We typically do it at least twice a month.  In

6    that training, we have all types of scenarios of structures or

7    traffic stops or whatever they may be, kind of stuff that we

8    always do, but we have different thresholds where the actual --

9    A, he's going to have one of the odors that the K-9 is trained

10   on.  Okay.  And there are various types of amounts that's a

11   threshold, so it would be like a small half gram of cocaine all

12   the way to 20 pounds of cocaine or something like that.  I'm

13   just giving numbers.  Not exact.  But that's the threshold.

14        As I said, he's trained on those four odors.  So we have

15   that side (indiscernible)**3:14:42.  Now, when we're actually

16   doing training, we have what's called a reward for the K-9.

17   That's what the actual K-9 is looking for.  He's searching for

18   an actual toy.  Okay.  So his toy is approximately 11 inches

19   long.  It's cylinder-shaped.  It's like a PVC pipe.  Actually,

20   we use a PVC pipe.  I think it's a one-inch PVC pipe, size of my

21   finger, round and it's about this long.  And we use PVC pipe,

22   wood, and rubber.  You can different types of things as well

23   besides those three materials, but that's typically what we like

24   to use.

25        What the dog is doing once he finds that trained odor and

1  indicates on the source of it, the source that he's trained on,

2  and he indicates, sits there pointing, then we take the reward

3  and we palm it out so he can't see it so he thinks it's actually

4  coming from the source.  We palm it out.  The dog thinks oh,

5  wow, there it is.  We let him grab it and we play with him.

6  Have high-pitched sounds, get him all excited and stuff like

7  that.  Because you've got to understand.  He wants to get

8  excited.  He's having fun playing.

9      So when you're actually out in the field, we don't actually

10  give him the reward out in the field as far as a physical

11  reward, because for various reasons.  It's a non-controlled

12  environment.  You don't know how much actual product -- meaning

13  product meaning narcotics, drugs -- the product that's actually

14  there.  So what we like to do is give a verbal praise.  Good

15  boy, good boy, that's good.  Find some more.  Find some more. So

16  he knows now that hey, he did good -- did a good job and now

17  we're going to continue to search and move forward to the next

18  item.

19      So we move on forward and we go to the next spot on the

20  search.

21  Q    And he's -- Edo is certified.  Is that right?

22  A    K-9 Edo is certified, yes.

23  Q    Okay.  So tell the jury what that means.

24  A    Certification?  So what happens is certification happens

25  once a year.  You want me to explain each thing that we do and

1  stuff or --

2  Q    Not too much detail.  Just so we have an idea.

3  A    Certification is basically -- there are four types of odors

4  and various types of searches.  Like I said the structure

5  search, the vehicle, parcels, luggage, open areas, and we have

6  all these different types of searches, and then various types of

7  amounts of the trained odors that we have, and we do that once a

8  year to recognize that the K-9 is still qualified to alert on

9  those trained odors.

10 Q    So how do you determine who gets certified and who does

11 not?

12 A    That's a great question.  So what I like about our program

13 with the Pennsylvania State Police, we actually go through US

14 Customs Borders and Protection.  That is the cream of the crop.

15 They're one of the best programs for K-9s.  They're awesome.

16     So what we do is we actually have troopers go down to

17 either Virginia or El Paso, Texas and actually train with the US

18 Customs and Borders to become an actual instructor.  It's a 12

19 week program.  It's a very extensive program.  They come back to

20 the Pennsylvania State Police and as a handler, as a new

21 handler, they're instructing us -- so we have a ten to 12 week

22 program the same way, except it is the instructor side of

23 things.  It's just for the handler side for us.

24     So they are very qualified when they come back as

25 instructors to become instructors for us.

1  Q    Let's talk a little bit about the statement.  You took the

2  statement from him at the barracks?

3  A    I was present.

4  Q    You were present.  And what you told us was that even

5  though you had your mic on and it looked like you were talking

6  into the mic, it was a malfunction.  Is that correct?

7  A    Yes, unfortunately, yes.

8  Q    Does that have any recording capability so that you can

9  still retrieve what was on it -- what was discussed -- what was

10 being spoken into the machine?

11 A    Not from my knowledge.  If there is a way to find a

12 recording on this, I would love it.  Trust me.

13 Q    So now once you get to the barracks and were you present

14 when Trooper Quesada came?

15 A    Yes, I was.

16 Q    Another trooper was with you when you were at roadside.  Is

17 that correct?

18 A    Yes, there was.

19 Q    And when you did this search with Edo, was my client still

20 present at the scene, or had he been transported already?

21 A    Oh, no.  He was in custody at that point in time.

22 Q    I understand that, but was he still with you at roadside,

23 or had he been transported?

24 A    He was standing right there.

25 Q    He was right there.

1  A    Uh-huh.  On the side of the road.

2  Q    And was he there throughout the duration of time that you

3  were there during your investigation on the 222?  Was he there

4  all the time?

5  A    Oh, absolutely.  You saw me -- I found it, I ended up --

6  placing him in custody at that point.

7         MR. CLARK:  That's all I have.  Thank you.

8         THE COURT:  Ladies and gentlemen, we're going to take

9  our midafternoon break now.  Again, I remind you do not discuss

10 this case among yourselves, no independent research.  You've

11 heard me give that instruction before.  I'd ask you to continue

12 to follow it.  We'll take a 10-minute recess.  Mr. Wood, would

13 you declare a short recess, please?

14         DEPUTY CLERK:  All rise. Court is in recess.

15      (Jury out at 3:21 p.m.)

16      (Recess is taken from 3:21 p.m. to 3:36 p.m.)

17         THE COURT:  Get the jurors lined up.  Mr. Nair, are

18 you going to have any redirect for the witness?

19         MR. NAIR:  Brief.

20         THE COURT:  Why don't you have a seat?

21         THE WITNESS:  Yes, sir.

22         DEPUTY CLERK:  Judge, are we ready?

23         THE COURT:  Yes.

24         DEPUTY CLERK:  All rise.

25      (Jury in at 3:38 p.m.)

1    DEPUTY CLERK:  Court is again in session. You may be

2  seated.

3    THE COURT:  Are we on the record?

4    DEPUTY CLERK: Yes, sir.

5    THE COURT:  Mr. Nair, any redirect?

6    MR. NAIR:  Just briefly, Your Honor.

7    REDIRECT EXAMINATION

8  BY MR. NAIR:

9  Q   Trooper Reed, the odors that your K-9 is trained to detect.

10  You said something I think on direct about oxycodone or pills.

11  Is that correct?

12  A    The derivatives.  Yes.

13  Q    Derivatives of.  So derivatives of heroin.  So not just

14  heroin itself, but if it's synthetic heroin such as oxycodone or

15  Fentanyl.

16  A    Yes.

17  Q    Okay.

18    MR. NAIR:  Thank you.

19    THE COURT:  Any recross?

20    MR. CLARK:  No, Your Honor.

21    THE COURT:  You may step down, sir.  May the witness

22  be excused from the trial?

23    MR. CLARK:  Yes, Your Honor.

24    THE COURT:  You may step down, sir.

25    MR. NAIR:  May I just have one moment with the

1   trooper?

2              THE COURT:  Yes.

3              MR. NAIR:  The United States next calls chemist --

4   Drug Enforcement Administration chemist, Jonathan Duffy.

5         *(Specific witness testimony of Jonathan Duffy previously*

6   *transcribed and incorporated herein)*

7              MR. NAIR:  At this point, Your Honor, I would move to

8   admit Government Exhibit 12 and 12A.

9              THE COURT:  Any objection?

10             MR. CLARK:  No objection, Your Honor.

11             THE COURT:  They're admitted.

12        (Plaintiff's Exhibit 12 and 12A admitted into evidence)

13             THE COURT:  You may call your next witness.

14             MR. NAIR:  United States calls Trooper Mark Quesada.

15  May chemist Duffy be excused?

16             THE COURT:  Any objection?

17             MR. CLARK:  No.

18             THE COURT:  He may be excused then.

19        (MARK QUESADA, Witness, is Sworn)

20             THE CLERK:  Can you please state your full name,

21  spelling your last name?

22             THE WITNESS:  May name is Trooper Mark Quesada.  Q-U-

23  E-S-A-D-A.

24             THE CLERK:  Thank you.

25             MR. NAIR:  May I proceed, Your Honor?

1    THE COURT:  Yes.

2                    DIRECT EXAMINATION

3  BY MR. NAIR:

4  Q    Good afternoon.

5  A    Good afternoon, sir.

6  Q    By whom are you employed?

7  A    By the Pennsylvania State Police.

8  Q    And how long have you been employed by them?

9  A    A little over two years.

10 Q    And what are your current assignments?

11 A    My current assignment is patrol out of the Reading

12 barracks.

13 Q    I'd like to direct your attention to June 17th of 2017.  Do

14 you see anyone in court that you encountered on that date?

15 A    I do, Your Honor.  I see the defendant who's sitting in the

16 middle right there in the black suit.

17         MR. NAIR:  May the record reflect that the witness has

18 identified the defendant?

19         THE COURT:  Yes.

20         MR. NAIR:  Thank you.

21 BY MR. NAIR:

22 Q    And Trooper Quesada, were you present when the defendant

23 was given Miranda rights form?

24 A    I was, sir.

25         MR. NAIR:  If I may approach the witness with

1  Government Exhibit 8.

2              THE COURT:  Yes.

3  BY MR. NAIR:

4  Q    Trooper Quesada, do you recognize what's been previously

5  marked as Government Exhibit 8?

6  A    I do.

7              MR. NAIR:  May I publish this to the jury?

8              THE COURT:  Any objection?

9              MR. CLARK:  No objection.

10             THE COURT:  You may proceed.

11 BY MR. NAIR:

12 Q    What, if anything, were you asked to do by Trooper Reed

13 regarding that form that appears in Government Exhibit 8?

14 A    I was asked to read that form out loud to the defendant.

15 Q    And in what language?

16 A    In Spanish.

17 Q    And were you present for any of the signatures that appear

18 in that exhibit?

19 A    I was.  Yes, sir.

20 Q    And the signature that appears in the lower right, not the

21 bottom, but where it says signature above signature of officer,

22 do you recognize that signature?

23 A    I don't.

24 Q    Okay.  But were you there when --

25 A    I was there.

178

Direct Examination - Quesada

1  Q    So you don't remember whether the defendant -- you didn't

2  see the defendant sign it?

3  A    I saw the defendant sign it, and I saw Trooper Reed sign

4  it.

5  Q    You were not there --

6  A    I'm not familiar with Trooper Reed's signature.  That's

7  all.

8  Q    Okay.  Oh, you mean where it says signature of officer?

9  A    Yeah.

10  Q    I'm sorry.  Above that.  I wasn't being clear.  You were

11  present for when the defendant signed that, correct?

12  A    Yes, sir.

13  Q    Were you also present -- was Agent Romig there, too?

14  A    He was.  He just walked in the room.  That's why I didn't

15  acknowledge him earlier.

16  Q    And when he was there, he wasn't there announcing that he

17  was a DEA agent, was he?

18  A    No, I had no knowledge that the DEA was involved in this at

19  all.

20  Q    So you didn't hear him say to anyone in there that I'm with

21  DEA, did you?

22  A    No, sir.

23  Q    And were you present when the same warnings were read to

24  the defendant in English?

25  A    I was.

1  Q   And who read them to the defendant, if you remember?

2  A   Trooper Reed read the warnings in English.

3  Q   And then you did it in Spanish?

4  A   Yes, sir.

5  Q   And based upon your observations of the defendant and his

6  responses, did he communicate in English or in Spanish?

7  A   He communicated in English, sir.

8  Q   And do you remember whether he answered in English or in

9  Spanish?

10  A   As far as to which question?

11  Q   I'm sorry.  To questions posed to him by either Trooper

12  Reed or by Special Agent Romig.

13  A   He answered in both English and in Spanish, sir.

14  Q   Okay.  In particular, did he answer in English and Spanish

15  to them or to you?  Which language?  I'm sorry.

16  A   In English.

17  Q   In English.

18  A   Yes, sir.

19  Q   And what, if anything, did he say in English?

20  A   The drugs are mine he said.  That he didn't want to

21  cooperate.

22  Q   And were you aware of any videotape in the barracks at that

23  location?  In other words, was that conversation being

24  videotaped?

25  A   That conversation specifically wasn't being videotaped.

1    There is video that covers the control room -- control room, but

2    the camera is not directed to that location, no.

3    Q    Is there audio that you're aware of for that location?

4    A    No, sir.

5    Q    Now, if you could take a look at what's been -- you've

6    already looked at Government Exhibit -- I'm sorry.  Have you

7    looked at Government Exhibit 8A?

8    A    No, I haven't.

9    Q    Do you recognize that form?

10   A    I do.

11        MR. NAIR:  If I may publish this to the jury.

12        THE COURT:  Any objection?

13        MR. CLARK:  No, Your Honor.

14        THE COURT:  You may proceed.

15   BY MR. NAIR:

16   Q    You've had an opportunity to read the Spanish version of

17   the Pennsylvania State Police Miranda rights waiver -- warning

18   and waiver form.  Is that correct?

19   A    Yes, sir.

20   Q    I'd like you to take look at 8A, please.  Have you had an

21   opportunity to read the English version and compare it with the

22   Spanish version?

23   A    Yes, sir.

24   Q    Are the warnings the same -- other than translation of

25   certain words, are they in essence the same form provided by the

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1  Pennsylvania State Police so that Miranda warnings in English

2  are given in what you saw in Exhibit 8 the same as they appear

3  in Exhibit 8A when they're in English?  In other words, are the

4  Spanish and English versions similar?

5  A   Yes, sir.  They are.

6       MR. NAIR:  If I may approach with Government Exhibits

7  5 and 5A.

8       THE COURT:  Yes.

9       MR. NAIR:  In particular, I'm going to show the

10 witness 5A.

11 BY MR. NAIR:

12 Q   Do you recognize that form?

13 A   I do.  Yes, sir.

14 Q   What is it?

15 A   It's the waiver of rights to consent, sir.

16 Q   And on where it says Government Exhibit 5A, is that in

17 English or Spanish?

18 A   This is in English, sir.

19 Q   And then when you flip the form over, what language is it

20 in?

21 A   This is in Spanish, sir.

22 Q   And have you had an opportunity to review this form before?

23 A   Yes, sir.

24 Q   And when -- I'm sorry.  I should have asked you this.  You

25 speak both Spanish and English.  Is that correct?

1  A    That's correct.

2  Q    Do you read -- can you read both languages?  In other

3  words, in the written form in addition to speaking?

4  A    I can read and write both languages, sir.

5  Q    And have you been speaking Spanish your entire life?

6  A    Yes, sir.

7  Q    And what is your -- where are you from originally?

8  A    I'm from New Jersey, but my father is from Costa Rica.  He

9  moved here from Costa Rica.

10  Q    So you grew up in a family of speaking Spanish.

11  A    My whole family lives in Costa Rica.  My grandma, all my

12  family lives over there.

13  Q    And you've been to Costa Rica and had the opportunity to

14  speak Spanish there?

15  A    Yes, multiple times a year, sir.

16  Q    And in the Spanish form, is that a fair and accurate

17  representation of what appears in the English form on the

18  consent or waiver form for Pennsylvania State Police?

19  A    It is.  Yes, sir.

20  Q    And you weren't present -- if you could take a look at

21  Exhibit number 5, you weren't present when the defendant signed

22  this form. Is that correct?

23  A    No, sir.

24          MR. NAIR:  If I could just briefly publish 5A.

25          THE COURT:  Any objection?

1    MR. CLARK:  No objection.

2    THE COURT:  You may proceed.

3  BY MR. NAIR:

4  Q    The jury has seen this before, but this is 5A and that

5  would be the English side.  Is that correct, Trooper?

6  A    Yes, sir.  That's the English side.

7  Q    And if you could reverse it.  And that would be the Spanish

8  side?

9  A    That is the Spanish side.  Correct.

10    MR. NAIR:  I have no further questions on direct.

11    THE COURT:  Cross-examination.

12                    CROSS-EXAMINATION

13  BY MR. CLARK:

14  Q    Good afternoon, Trooper.

15  A    Good afternoon, sir.

16  Q    I just have a few questions for you.  It is my

17  understanding -- my recollection that you were out on patrol on

18  June 17th and you were summoned to return to the barracks.

19  A    Yes, sir.  I was.

20  Q    And when you were summoned to return to the barracks, what

21  was your understanding or the reason that you are being asked to

22  come back?

23  A    I was asked to come back because there was a Spanish-

24  speaking individual and my assistance may have been requested.

25  Q    Okay.  And did you -- was it your understanding that there

1  seemed to be a communication barrier at the time that you had to

2  address?

3  A    No, sir.  I was just strictly told to come back. No

4  questions were asked.  No other information was given.

5  Q    Well, you have previous testimony in a similar proceeding -

6  - in another proceeding and in response to a question, do you

7  recall being asked, "What was your purpose -- or what was the

8  reason for your encounter with the defendant?"  And you

9  responded, "I was asked to come back to the station to help

10 translate.  There seemed to be a communication barrier at that

11 time."  Do you recall that?

12 A    I recall saying that.  Yes, sir.

13 Q    That's all I was really asking.  No trick question.  I just

14 wanted to ask you that question.

15     And so that when you returned to the barracks, did you

16 learn what the problem was in terms of the communication

17 barrier?

18 A    Yes, sir.

19 Q    What was that, Trooper?

20 A    I wouldn't call it a problem, but I was asked to help

21 translate in Spanish from English if need be if the defendant

22 didn't understanding anything that was being provided in

23 English.

24 Q    And so who asked you to perform that responsibility at that

25 time?

185

Cross-Examination - Quesada

1   A    I spoke with Agent Romig and with Trooper Reed, sir.

2   Q    Okay.

3   A    They briefed me briefly before the interview.

4   Q    And, Trooper, do you also recall testifying previously that

5   you were not sure if he understood everything in English,

6   referring to my client?

7   A    I'm sorry.  What are you asking me?  Can you say it again?

8   Q    You stated previously that you were not sure whether my

9   client understood everything that was being said to him in

10  English.

11  A    In context to what part of the interview?

12  Q    The part in the interview where they're offering him a

13  statement that he said that the drugs were his.  That's why you

14  were asked, right, so that you can communicate with him?

15  A    Right.

16  Q    And you communicated with him about his Miranda rights,

17  correct?

18  A    Correct.

19  Q    And so you read the form in Spanish to him.

20  A    Correct.

21  Q    And you tried to make sure that he understood his rights.

22  A    That's correct.

23  Q    That's what you did.

24  A    That's correct.

25  Q    And that's why you were asked.  And so I'm asking you is

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1  whether or not you said that you thought that you were not sure

2  that he was understanding the English part of what was being

3  said.

4  A    Well, that's why I was there.

5  Q    Okay.

6  A    To make sure that he understood.

7  Q    Make sure he understood.  Now, in your experience as a

8  trooper, you -- obviously your services are needed from time to

9  time because you're bilingual, correct?

10  A    Yes, sir.

11  Q    And you had an occasion to interview or provide information

12  to or communicate with Spanish-speaking persons, correct?

13  A    Yes, sir.

14  Q    And is it safe to say that sometimes even when dealing with

15  you that they don't completely understand when you're speaking

16  to them in English?  Is that your experience?

17  A    When I'm speaking to a Spanish-speaking --

18  Q    Person.

19  A    -- in English?

20  Q    Yeah.  Who's primarily a Spanish-speaking person, isn't it

21  true that sometimes they don't fully understand what you are

22  saying to them in English?

23  A    Sometimes.

24  Q    And then you would make sure that you would speak to them

25  in Spanish just so that there would be certainty about their

1  level of understanding, their level of comprehension.  Is that

2  fair to say?

3  A    I'd like to continue asking them questions in English to

4  gauge whether they're lying to me before I confront them in

5  Spanish.  Yes, sir.

6  Q    Okay.  But you do do that on occasion.

7  A    Yes, sir.

8  Q    Is that right?

9  A    Yes, sir.

10 Q    And sometimes they're lying to you, and sometimes they're

11 not.

12 A    Right.  Right.

13 Q    So on those occasions when they're not lying to you, that

14 just indicates that they misunderstood or did not understand

15 completely what you wanted to inquire about.  Is that right?

16 A    Right.

17 Q    And that's your experience as a trooper, correct?

18 A    That's my experience.  Yes, sir.

19         MR. CLARK:  Judge, may I have a second?

20         THE COURT:  Yes.

21 BY MR. CLARK:

22 Q    When you spoke to my client at the barracks, did he ever

23 give an indication to you that he might not have understood

24 everything that was being spoken to him in English?

25 A    He never -- no, sir.

1  Q    I'm sorry?

2  A    No, sir.

3  Q    You said he didn't ask?

4  A    Rephrase the question for me.

5  Q    No, I'm just asking you.  When you were speaking to him at

6  the barracks, did you ever have an indication that he may not

7  have understood things that were being spoken to him in English?

8  A    No, he seemed to understand everything what was being asked

9  in English, sir.

10 Q    Do you recall testifying that he's nodding and shaking his

11 head and I don't know if he understood everything. Do you

12 remember saying that?

13 A    Yeah, his body language was confirming that he was

14 understanding what was being asked in English. But, of course,

15 naturally, I'm not going to know just by his body language if he

16 understands it.  That's why I said that.

17           MR. CLARK:  Thank you, Judge.

18           THE COURT:  Any redirect?

19           MR. NAIR:  No, nothing further.

20           THE COURT:  You may step down.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  You may call your next witness.

23           MR. NAIR:  United States calls Task Force Officer

24 Murray.  May Trooper Quesada be excused?

25           THE COURT:  Any objection?

1    MR. CLARK:  No objection.

2    THE COURT:  Witness may be excused from the trial.

3    (DAMIAN MURRAY, Witness, is Sworn)

4    THE CLERK:  Can you please state your full name

5 spelling your last name?

6    THE WITNESS:  Yes.  It's Damian Murray.  M-U-R-R-A-Y.

7    THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9 BY MR. NAIR:

10 Q    Detective Murray, by whom are you employed?

11 A    The city of Allentown police department.

12 Q    How long have you been employed by them?

13 A    Since February of 2007.

14 Q    And prior to that, do you have any other law enforcement

15 experience?

16 A    More like security stuff.  No like military police or

17 anything, no.

18 Q    But security stuff.

19 A    Yes.

20 Q    And that was in the Marines?

21 A    Yes.

22 Q    And when did you become a full-time task force officer with

23 the Drug Enforcement Administration?

24 A    In May of 2016.

25 Q    And were you the co-case agent and at times, the affiant,

1   involved with the investigation that Special Agent Romig

2   testified to earlier today?

3   A    Yes.

4   Q    You were there from the beginning of the investigation.

5   A    Yes.

6   Q    And you're still involved in the investigation as it

7   continues.  Is that correct?

8   A    Yes.

9   Q    If I could direct your attention --

10          MR. NAIR:  First of all, if I may approach of what's

11  been previously marked as Government Exhibit --

12          THE WITNESS:  They're in the bag in the back.

13          MR. NAIR:  Thanks.  If I may approach, Your Honor --

14          THE COURT:  Yes.

15          MR. NAIR:  -- with Government Exhibits 9 and 9A.

16  BY MR. NAIR:

17  Q    First of all, do you recognize 9 and 9A?

18  A    I do.

19  Q    What are they?

20  A    One is a smartphone and one is a flip phone that was seized

21  from the defendant on June 17th, 2017.

22  Q    And G-9 is the -- has been previously marked as the flip

23  phone.

24  A    Yes.

25  Q    And 9A as the other phone that's white in appearance.

1  A    It's a Samsung smartphone.  Yes.

2  Q    A smartphone?

3  A    Yes.

4  Q    And how did they come into your custody?

5  A    Special Agent Romig transferred custody of the phones to me

6  after he got them from state police barracks in Reading.

7  Q    And did you obtain a federal search warrant for those

8  phones?

9  A    I did.

10  Q    And did you search those phones as a result of obtaining

11  that federal search warrant?

12  A    Yes.

13  Q    Were you able to -- let's start with the white phone, G-9A.

14  Were you able to get into that phone?

15  A    Through traditional and non-traditional means, no.

16  Q    Let's talk about traditional means.

17  A    Just trying to open the phone, powering it on, going to the

18  home screen.  It was password protected, so no.

19  Q    What's the non-traditional means?

20  A    Non-traditional is basically hardware or software, both,

21  called Celebrite, where you can plug in the phone itself.  It

22  tries to crack the passcode and gives you access to deleted

23  items and anything on the phone itself.  But it's not always --

24  it doesn't always work.

25  Q    And in this case it did not work.

Direct Examination - Murray

1  A    It did not, no.  The Celebrite wouldn't support the phone.

2  Q    If I can direct your attention to G9, what if anything did

3  you do with that traditional or non-traditional?

4  A    Same thing.  We -- I was able to access the phone.  This

5  one was not password protected.  I turned it on.  I was able to

6  access everything.  I did attempt to use Celebrite, not me

7  personally, but someone who actually knows what they're doing.

8  That was Detective Brubaker (phonetic throughout) of Allentown

9  police, tried to plug it in to try to download the contents of

10 the phone in a more readable format instead of like flipping

11 through it, and you know, possibly losing anything.

12      Again, because it's such an antiquated device, Celebrite

13 didn't support it.

14          MR. NAIR:  Your Honor, if I may approach with what's

15 been previously marked as Government's Exhibit 10, 10A and 10B.

16          THE COURT:  Yes.

17          MR. NAIR:  Thank you, Your Honor.

18 BY MR. NAIR:

19 Q    Detective Murray, do you recognize what's been marked as

20 10, 10A, and 10B?

21 A    I do.

22 Q    And did you take those photographs?

23 A    I did.

24 Q    And they are a fair and accurate depiction of the exhibit

25 in G9 when it was powered up.

1  A    Yes, once you access the call log, yes.

2  Q    And they're in sequential order.  G10 starts with what

3  date?

4  A    June 4th, 2017.

5  Q    And 10B ends with what date?

6  A    June 17th, 2017.

7        MR. NAIR:  If we could publish Government Exhibit 10

8  to the jury.

9        THE COURT:  Any objection?

10        MR. CLARK:  (indiscernible).

11        THE COURT:  Yes.

12        MR. CLARK:  Judge, may I (indiscernible).

13        THE COURT:  Yes.

14  BY MR. NAIR:

15  Q    Detective Murray, before we get into publishing anything to

16  the jury, how do you know -- you know who the phone was

17  allegedly taken from.  Let's go to what appears in front of you

18  in 10B, the phone number at the top, the 267-372-9914 number,

19  whose number is that?

20  A    That was identified -- well initially through this phone as

21  the number for Correa, just the last name, and later confirmed

22  to be an alternate phone for Santiago Correa.

23        MR. NAIR:  With that, if I could publish Government

24  Exhibit 10.

25        MR. CLARK:  I have to object, Your Honor, only to the

1  extent that there isn't sufficient foundation linking the phone

2  -- the phone that's making the call to Mr. Correa is this

3  gentleman's phone.

4        MR. NAIR:  That's a good point.  I'll withdraw that at

5  this time.

6        MR. CLARK:  I have to object to it.

7        THE COURT:  I'll sustain the objection.

8  BY MR. NAIR:

9  Q    So to bring up the record details, how did you do that?

10 A    I went into the phone's contact log, found the number for

11 Correa, and hit options and saw the phone number and the amount

12 of times that this device called the 267 number.

13 Q    If you could go to G9, power it up.

14 A    Uh-huh.  Menu.  Address book.  I'm sorry.  I messed that

15 up.  Now that I see how I did it.  I went to -- I hit the call

16 button to bring up the recent calls.  I'm sorry.  I apologize.

17 There is a recent call. It's the fourth one down that says

18 Correa with a number nine in parentheses next to it.  I hit view

19 and that brought me to --

20 Q    Record details?

21 A    Yes, 10, 10A, and 10B are all under record details.

22 Q    So put it in layman's language, you basically hit a bunch

23 of buttons and came up with that screen.

24 A    Yes, I accessed the call log which I showed that there was

25 a recent call.  I was able to find the details of that phone

1  number through that recent call, which led me to these exhibits.

2          MR. NAIR:  With that, if I can publish G10.

3          THE COURT:  Any objection?

4          MR. CLARK:  No objection.

5          THE COURT:  You may proceed.

6  BY MR. NAIR:

7  Q    I know we're working in chronological order, but that

8  eventually we'll see Correa as we work through this.  Is that

9  correct?

10  A    That's correct.

11  Q    So the first call, according to record details of G9, was

12  at 3:21 p.m. on June 4th, 2017 with a call time of 0 minutes and

13  16 seconds.

14  A    Yes.

15  Q    Now this doesn't tell you the content of the call.  Is that

16  correct?

17  A    No.  And also this is only phone calls from the device to

18  Correa.

19  Q    So you wouldn't know if Correa called back on this device?

20  A    Not on that --

21  Q    Not that you found?

22  A    No, not on that device, no.

23  Q    Now you had pulled detailed records.

24  A    That's correct.

25  Q    But you did that after the fact --

Direct Examination - Murray

1    A    Yes.

2    Q    -- when you were trying to figure out Correa's new phone --

3    A    Exactly, yes.

4    Q    Then also on 2:14 p.m., there's another call, June 4th,

5    2017 and that is for 0 minutes, 0 seconds, correct?

6    A    That's correct.

7    Q    And that could be anything; a failed call.

8    A    It could be nobody answered or he could have hung up

9    before.  Yes.

10    Q    And then also appearing in this exhibit at 9:15 p.m. on

11    June 3rd of 2017, what if any call appears?

12    A    You have e 1 minute and 1 second.

13    Q    And then what's the next thing that appears?

14    A    At 6:52 p.m., on June 3rd, 2017, there's --

15    Q    It says number location at the bottom?

16    A    Yes.

17    Q    So we don't have call detail information below that,

18    correct?

19    A    No.

20    Q    So the chronological order really reads from bottom to top.

21    Is that correct?

22    A    Yes, that actually -- now that I see it, you're right.  So

23    the call on June 3rd, 2017 at 6:52 p.m. was the 1 minute and 1

24    second, and it reads up.

25    Q    Okay.  That's my fault.  All right.

1    MR. NAIR:  If I may approach the witness, Your Honor?

2    THE COURT:  Yes.

3    MR. NAIR:  Your Honor, if we could publish 10A.

4    THE COURT:  Any objection?

5    MR. CLARK:  No objection.

6    THE COURT:  You may proceed.

7  BY MR. NAIR:

8  Q    Going in chronological order again?

9  A    You had a call time of 0 minutes and 16 seconds at 3:21

10 p.m. on June 4th, 2017; call time 0 minutes and 5 seconds at

11 3:42 p.m. on June 5th, 2017.  You had a call time of 0 minutes

12 and 0 seconds at 8:36 p.m. on June 6th, 2017, and you had a call

13 time of 0 minutes and 4 seconds at 12:28 p.m. on June 11th,

14 2017.

15    MR. NAIR:  And if I may publish Government Exhibit

16 10B?

17    THE COURT:  Any objection?

18    MR. CLARK:  No objection.

19    THE COURT:  You may proceed.

20 BY MR. NAIR:

21 Q    And then if we could start in chronological order.

22 A    Absolutely.  You had a call time of 0 minutes and 15

23 seconds on -- at 2:09 p.m. on June 11th, 2017.  You had a call

24 of 0 minutes and 6 seconds on 10:28 a.m. June 17th of 2017.

25 Q    And a total of nine call times?

1   A    Yes.  And, again, that's just calls from the device to the

2   number marked as Correa.

3   Q    And then the number Correa in G9 under contacts, correct?

4   A    Yes, that's what we call a clue.

5   Q    Now this number that comes up here, this 267-372-9914 --

6   A    Yes.

7   Q    -- what did you learn about that number?

8   A    I mean like Special Agent Romig said, it's not -- it's not

9   immediate that you can, you know, run a phone, run a wiretap, so

10  clearly, we had to confirm that, you know, we had to look at

11  other contacts on that phone, pulled call details records for

12  it, you know, subscriber information.  Ultimately, we were able

13  to get court authorization to wiretap or get electronic and wire

14  intercepts for that phone confirmed, of course, that it was a

15  secondary phone for Santiago Correa.  I don't know -- clearly,

16  in the call detail records, we also saw the exact times that

17  there was contact between Santiago Correa on that phone number

18  and the flip phone which was a 484 number, which was clearly

19  more than what is shown on the screen, to include text messages

20  and voicemails.

21        MR. NAIR:  Your Honor, I would move to admit

22  Government Exhibits G10, G10A, G10B, and G9 and G9A.

23        THE COURT:  Any objection?

24        MR. CLARK:  Judge, may we approach?

25        THE COURT:  Yes.

1    (Sidebar commenced at 4:31 p.m.)

2    (The beginning of the sidebar is inaudible and not able to

3  be transcribed)

4    MR. NAIR:  Your Honor, I think there's a question

5  (indiscernible) for cause, but certainly a foundation has been

6  presented to admit exhibit.  The exhibit came from

7  (indiscernible) and G10 isn't some sort of -- I'm not admitting

8  the call records.  I'm admitting what's found within G9

9  (indiscernible).  Now, yeah, I can't say the defendant made

10  these other calls.  Maybe someone else had that.  The last call

11  that was made in the circumstantial evidence the jury should

12  consider.  10:23 on June 17th (indiscernible).  I think that's a

13  pretty strong presumption at least that call was made, he's in

14  possession of the phone, why not the other calls.  I think I'll

15  agree there's no evidence that he made every call.  There

16  certainly (indiscernible).

17    THE COURT:  I'm going to (indiscernible) the objection

18  (indiscernible).

19    (Sidebar concluded at 4:33 p.m.)

20    THE COURT:  There was a request to admit I believe it

21  was Exhibits 10, 10A and 10B into evidence.  Is that correct,

22  Mr. Nair?

23    MR. NAIR:  It is, along with G9 and G9A.

24    THE COURT:  Let's deal with 10, 10A, and 10B first.

25  Mr. Clark, you had an objection, correct, and you stated the

 1  basis?

 2          MR. CLARK:  Your Honor, I think I already made an

 3  objection to those and Your Honor (indiscernible).

 4          THE COURT:  I'm going to overrule the objection, and

 5  I'll grant their admission.  Was there -- I think you mentioned

 6  some other exhibits too you wanted to admit?

 7          MR. NAIR:  Yes.  G9, the black flip phone, and G9A

 8  which is the white Samsung phone.

 9          THE COURT:  Any objection?

10          MR. CLARK:  Judge, I thought we already agreed that

11  would be admissible --

12          THE COURT:  All right.

13          MR. NAIR:  I just don't know if I admitted them in the

14  record.

15          MR. CLARK:  I think so.  In any event, no objection.

16          THE COURT:  They're admitted.

17       (Plaintiff's Exhibit 9 and 9A admitted into evidence)

18       (Plaintiff's Exhibit 10, 10A and 10B admitted into

19  evidence)

20          MR. NAIR:  I have no further questions at this time on

21  direct.

22          THE COURT:  Cross-examination.

23                        CROSS-EXAMINATION

24  BY MR. CLARK:

25  Q    Detective Murray, I just have a few questions.  You're

1  testifying with respect to what you found on the black flip

2  phone.  Is that correct?

3  A    That's correct.

4  Q    Now, on the black flip phone, you can't tell who purchased

5  that phone.

6  A    No, there's no subscriber information, payor information on

7  the account.

8  Q    And therefore when calls are made, or outgoing calls are

9  made, you don't know who is making those calls.

10 A    If I may, technically, that's correct.  But in this case --

11 Q    I don't want you to speculate.

12 A    I'm absolutely not speculating.  In this case, there is an

13 outgoing call on June 17th at 10:28 a.m. where the defendant was

14 the only person in the car.

15 Q    We're talking about other calls at other times.

16 A    Absolutely.  That's fair.  Fair to say.

17 Q    So we don't know who owns the phone, correct?

18 A    That's correct.

19 Q    Okay.  On those cellphone calls, even on the 17th you don't

20 know what was discussed, correct?

21 A    No.  That's correct.

22 Q    And on those other diverse dates and times that the

23 Government has referred to -- some of these calls are at 0

24 minutes 0 seconds.  I mean, somebody is trying to reach

25 somebody, right?

1   A    Absolutely.

2   Q    One minute 1 second, correct?

3   A    That's correct.

4   Q    So I'm just picking out a couple to make a point you don't

5   know what was discussed.  You don't know what was going on with

6   that.

7   A    Of course not.

8            MR. CLARK:  That's all I have, Judge.  Thank you.

9            THE COURT:  Any redirect?

10           MR. NAIR:  No, Your Honor.  Thank you.

11           THE COURT:  You may step down.

12           THE WITNESS:  Thank you, Your Honor.

13           THE COURT:  You may call the next witness.

14           MR. NAIR:  May I see the Court at sidebar?

15           THE COURT:  Yes.

16       (Sidebar commenced at 4:36 p.m.)

17       (Sidebar is inaudible and not able to be transcribed)

18       (Sidebar concluded at 4:36 p.m.)

19           MR. NAIR:  May I just have one moment, Your Honor?

20           THE COURT:  Yes.

21           MR. NAIR:  The Government recalls Agent Romig.

22       (JOSHUA ROMIG, Witness, Previously Sworn)

23           THE COURT:  Mr. Romig, you've already been

24   administered the oath, and so you're still under oath.  Do you

25   understand that?

1        THE WITNESS:  Yes, Your Honor.

2        THE COURT:  Very good.

3                         DIRECT EXAMINATION

4  BY MR. NAIR:

5  Q    Agent Romig, you were -- you eventually went back to

6  Pennsylvania State police barracks in Reading.  Is that correct?

7  A    I went to the Pennsylvania State police barracks after the

8  defendant was arrested, yes.

9  Q    And were you identifying yourself as a DEA agent or

10 something else?

11 A    No.  I pretended to be a Pennsylvania state police vice

12 narcotics trooper who was called in by Trooper Reed because of

13 the seizure of drugs that he made.

14 Q    And were you present during the Miranda warnings that were

15 and waiver that was done on defendant and the exhibits that the

16 jury has already seen?

17 A    Yes.

18 Q    And were those done both in English and in Spanish?

19 A    They were.

20 Q    And did the defendant, based upon his responses, indicate

21 that he was willing to talk to you?

22 A    Yes.

23 Q    And what, if anything, did he say to you?

24 A    Not much.  He said that they were his drugs, and that he

25 didn't get them from anyone.

1  Q    And when he said that to you, what did you say?

2  A    I interpreted that to mean that he didn't want to cooperate

3  any further.

4  Q    What did you do?

5  A    That was the end of the interview.  It was a two-question

6  interview.  I explained to the defendant that I wanted him to

7  cooperate, that I wanted him to tell me who his source of supply

8  was, and I wanted him to help the government and help our case,

9  or at the time, help the Pennsylvania state police with their

10  case.  I'm using air quotes for the record.  As I was pretending

11  to be a Pennsylvania state police officer, and based on the

12  defendant's answer to the question that they were his drugs and

13  he got them from no one, I determined that to be his answer;

14  that he did not want to cooperate with law enforcement.  So the

15  interview was stopped at that point.

16     The only other interaction that the defendant had at the

17  barracks was to provide biographical data to Trooper Reed, who

18  was sitting behind a computer terminal typing the information

19  while he was looking over the terminal at the defendant, who was

20  seated on a bench kind of next to me.

21  Q    Now, you didn't request DNA evidence or fingerprints in

22  this case.  Is that correct?

23  A    I did not.

24  Q    Why?

25  A    Well, for a few reasons.  One, I didn't believe based on

1    the evidence that we had that we needed them.  I thought the

2    evidence was strong enough that it stood on its own.  That's

3    number one.  Number two, we -- I'm not certain what we would

4    have gotten DNA evidence or fingerprint evidence from.  And,

5    again, based on the surveillance observations of the guys on the

6    street, the intercepted wiretap call, what people witnessed, and

7    the statement I thought even requesting it would've been a bit

8    overkill.  I can tell you in 19 years I'm not certain that I've

9    ever requested DNA evidence, and I can probably count

10   (indiscernible) times I requested fingerprint analysis on an

11   exhibit, and that was if the case was a who-done-it, maybe a

12   USPS mail case where I had no idea who the source of supply was.

13        In this case, not only we did already have the source of

14   supply identified, we were days away from identifying Mr.

15   Correa's source of supply and only a month away from identifying

16   the ultimate source of supply from Mexico.

17   Q    And to be clear you didn't know anything about the

18   defendant until he showed up on June 17th.  Is that correct?

19   A    I did not.

20        MR. NAIR:  If I could approach with what's been

21   previously marked as Government's Exhibit 7E.

22        THE COURT:  Yes.

23   BY MR. NAIR:

24   Q    Do you recognize that photograph?

25   A    I do.

1   Q    Is that a fair and accurate depiction of what it purports

2   to show?

3   A    Yes.

4   Q    What is it showing?

5   A    This is showing the Fentanyl outside of the white grocery

6   bag sitting on a certified scale in our (indiscernible) on the

7   second floor of this building that I took.

8           MR. NAIR:  If I may publish that to the jury?

9           THE COURT:  Any objection?

10          MR. CLARK:  No objection.

11          THE COURT:  You may proceed.

12  BY MR. NAIR:

13  Q    It's not the greatest because of the lighting, but --

14  A    I believe we have a bigger photo in the case sitting right

15  there, the leather case and an easel to set the case on.

16  Q    Same thing (indiscernible).

17  A    Yes, sir.

18  Q    So basically you get it back to the DEA in this building.

19  Is that correct?

20  A    Yes, on June 19th.

21  Q    You weigh it.

22  A    Yes, sir.

23  Q    Comes up with packaging material 202.5 grams?

24  A    Yes, sir.

25  Q    And then what happens to it?

1  A    At that point, Detective Murray and I -- Task Force Officer

2  Murray and I processed the evidence as an exhibit inside a self-

3  sealing evidence envelope, which you heard the chemist testify

4  to was an SSEE, and we put that in the capable hands of the

5  United States Postal Service to be delivered to the MidAtlantic

6  Laboratory for further analysis.

7  Q    Now, when you got back -- I'm sorry.  When you were at the

8  Pennsylvania state police barracks, you tested some of this.  Is

9  that correct?

10  A    Correct.

11  Q    What's the procedure for testing in the field?

12  A    We have field test kits that we use that are primarily from

13  two companies.  One of the companies has fractured off in recent

14  years into two separate companies, so really three companies

15  now, ODV Incorporated, which is also now Narco Pouch and then

16  the other company is Nik, N-I-K, Nik Test Kits for drugs.  So

17  they're very basic kits that we use in the field in order to get

18  what's called a presumptive test.  I don't claim to be a

19  chemist, but at least these test kits allow us to test a small

20  amount of the drugs, confirm that we believe that they are, in

21  fact, a controlled substance and what that controlled substance

22  is, so that we can then send it to the lab and say we would like

23  you to test this for heroin, Fentanyl, cocaine, crack cocaine,

24  whatever the presumptive test comes up with a positive.

25  Q    And you conducted a presumptive test?

1  A    I did.  I did two of them as a matter of fact.

2  Q    Why?  What were the results and why?

3  A    The first test that I conducted was a standard heroin test.

4  Each test kit is fairly small, about the size of maybe a garage

5  door opener, and the test kit has glass ampules in them.  So you

6  put a small amount of the substance inside of the test kit, make

7  sure it gets to the bottom, you break that ampule, and then if

8  the drug is what you suspect it is, or what the test kit is

9  testing for, it will turn the color of whatever the test kit

10  says it's supposed to turn.  They make it very simple for law

11  enforcement.

12       So in the test kit that I used, the initial test kit

13  suspecting that it was heroin, I used a standard heroin test

14  kit, and the color did not immediately turn green like it's

15  supposed to if it was a strong amount of heroin.

16       I then switched to a broader test kit which tests for

17  heroin, opiates and oxycodone, and then there's like a general

18  opiate test, and I did get a very weak result for heroin at that

19  point.  Based on my experience with hundreds and hundreds and

20  hundreds of heroin cases, I suspected, which I actually even

21  noted in my report, that because of the weak field test, I

22  suspected that the substance may, in fact, be Fentanyl.  And

23  that's because of the times that I thought I've seized heroin

24  and it's been Fentanyl, where I've seized heroin and it's been

25  cut with Fentanyl, in this case as the chemist testified to,

1  there was no heroin in the substance.  It was all Fentanyl.

2          MR. NAIR:  May I approach with Government Exhibit G6?

3          THE COURT:  Yes.

4  BY MR. NAIR:

5  Q    Now, if you had known this was Fentanyl, was there a

6  different procedure for getting it to the lab?

7  A    Yes, we would have to hand-deliver it to the lab.  We would

8  have had to transport it to the lab.  There's also a different

9  procedure for testing it.  We now have vented hoods that we're

10  supposed to use, a giant contraption about the size of the box

11  that I'm in testifying from right now, where we have to

12  basically test the Fentanyl underneath this glass box to ensure

13  we're properly vented, because Fentanyl is more dangerous than

14  heroin.

15          MR. NAIR:  If I may approach with Government Exhibit

16  G6?

17          THE COURT:  Yes.

18  BY MR. NAIR:

19  Q    And you currently have in front of you Government Exhibit

20  G6 in front of you.  Is that correct?

21  A    I do.

22  Q    Now, how do you keep track of chain of custody, to make

23  sure that the same drugs that you send to the lab are the same

24  drugs you're holding now?

25  A    Well, we initially assign the drug an exhibit number, so

1  our exhibit number for DEA purposes is Exhibit 3, even though in

2  the purposes of this trial, it's Exhibit G6.

3      So I can tell that there's an exhibit number on there of 3,

4  which I wrote.  Each case has a case number.  In this instance,

5  the case is CY, which indicates the office of Allentown, and

6  then 16 which is the year, and then just it goes in sequential

7  order.  So it was 0023, which basically means we were the 23rd

8  case of 2016 in Allentown.

9      That's also on here.  It has who acquired the exhibit,

10  which was me.  I acquired it from Trooper Reed at the barracks.

11  It has who it was sealed by which was me, and it has who

12  witnessed it, which was TFO or Detective Damian Murray, my

13  partner.

14      Each self-sealing evidence envelope also has a number on

15  it, so you can see the number, and they're arbitrary for me, but

16  they each all have a number on it which is recorded on what's

17  called my form DEA7.  DEA7 and there are a lot of DEA forms, but

18  a DEA7 is a request for lab analysis.  So when we send these

19  drugs to the lab, we send the drugs, we send the DEA form 7

20  which is the request for analysis, which basically says among

21  other things the weight with the packaging where we weighed it,

22  so that when the lab receives it, they know that it's the same

23  weight when they weight it on their scale. And also it has the

24  suspected exhibit.  So we'll put on there what we suspect it to

25  be, which in this case, I'm fairly certain on the DEA7 I put

1  heroin, because I thought it was heroin or at least contained

2  some form of heroin.

3       And then you can see at the top of the self-sealing

4  evidence envelope, the seal which it used to be heat-sealed, but

5  now they're just fold-over seals, and you can see my signature.

6  You can see TFO Murray's signature, and then our names and dates

7  of when we actually processed the exhibit.  Which sometimes is

8  the same date that we send it and sometimes we'll keep it in a

9  temporary drug facility here -- holding facility here for a day

10  or two before we actually send it.  In this case, I believe we

11  sent it on the same date.

12       And then at the bottom, this actually was not here.  This

13  is the seal from the chemist and you can feel the heat seal here

14  where he obviously opened the bag or someone opened the bag, and

15  it was resealed at the bottom, which is why he has the DEA

16  sticker here at the bottom.

17            MR. NAIR:  If I may approach, Your Honor, with what's

18  been previously marked as Government Exhibit 7F?

19            THE COURT:  Yes.

20  BY MR. NAIR:

21  Q    Do you recognize 7F?

22  A    I do.  This is the picture again of the Fentanyl, the 200

23  grams, Exhibit 3 by DEA, but Exhibit G6.  This is actually a

24  photo of inside the SSEE and the SSEE is not yet filled out,

25  which means it's not yet sealed, but it's the same SSEE number

1   that ends in 8258 that I have here currently in my hand.

2           MR. NAIR:  May I publish that to the jury, Your Honor?

3           THE COURT:  Any objection?

4           MR. CLARK:  No objection.

5           THE COURT:  You may proceed.

6   BY MR. NAIR:

7   Q    And that's the number you were talking about

8   (indiscernible), the 568258?

9   A    Correct. There are numbers on each self-sealing evidence

10  envelope.

11  Q    Now, in your investigation of Correa, and I think we

12  touched on this earlier, but during the period of the

13  investigation in 2017, was he a person who dealt or distributed

14  substances, cocaine and heroin, out in the open, or was it done

15  another way, in your investigation?

16  A    No, from my investigation of Correa, he utilized other

17  people to distribute his drugs.  He was careful about how he

18  distributed his drugs.

19  Q    And what's been previously marked as Government Exhibit 9,

20  the phone that led to -- I'm sorry.  Let me rephrase that.

21          Before Government Exhibit number 9 was recovered from the

22  defendant's car allegedly, did you know about that second phone

23  number that Santiago Correa was using?  Were you aware of it in

24  any particular way?

25  A    Well, we knew that Santiago Correa had a second phone that

1   we were unable to listen to from prior calls where we could hear

2   him, either a phone ringing in the background, or we could hear

3   him discussing things with other people in the background where

4   it sounded like he was on a second conversation.  So we did know

5   that there was a second phone.

6        I don't believe we had that phone number specifically

7   identified for Correa until we arrested the defendant.  So I

8   don't think we had that 267 number identified for Correa until

9   we actually physically saw it in the defendant's phone, but I'm

10  not certain.  It may have come across -- during a wiretap

11  investigation, we constantly are running call detail records,

12  issuing subpoenas for -- to the telephone companies for call

13  detail records, to try the very thing we did, to identify second

14  and third phones for drug traffickers.

15       I've intercepted drug traffickers before they carried six

16  or seven phones, so if you only have one of those phones that

17  you're intercepting, you're not nearly getting a complete

18  picture of what that individual is doing.

19  Q    What do you mean by call detail records?

20  A    So the incoming and outgoing calls from your phone and

21  incoming and outgoing text messages.  It doesn't tell me the

22  content of those messages, but it tells me what numbers are

23  calling and what numbers are being called and the time and the

24  date that those numbers are being called and are calling the

25  target's telephone.

1    So I may have -- to answer your question, and I don't

2  remember, but I may have identified that number, or that number

3  may have come across one of the other phones in the

4  investigation, and I wasn't able to determine that it was

5  Correa's second phone at that point, up until we identified it

6  in the defendant's phone.  But, again, that wasn't Correa's --

7  the testimony -- I keep hearing testimony about that was

8  Correa's second phone.  That was Correa's second phone that we

9  identified during the course of this investigation.  Santiago

10  Correa had numerous other telephones, after that phone and

11  before that phone.

12          MR. NAIR:  I have nothing further at this time, Your

13  Honor.

14          THE COURT:  All right.  Mr. Clark, how long do you

15  think your cross-examination will be?

16          MR. CLARK:  I think just a few minutes, Judge.

17          THE COURT:  Why don't we see if we can finish it then?

18  Go ahead.

19                       CROSS-EXAMINATION

20  BY MR. CLARK:

21  Q    Agent Romig, when you were at the barracks --

22  A    Yes, sir.

23  Q    -- you described to the jury you did a what we'll call a

24  field test.

25  A    Yes, sir.

1  Q    To see if you can determine if the substance was heroin.

2  And initially, it was negative.  Is that correct?

3  A    The first test that I did was a negative test, yes.

4  Q    And the ampule that you used to do the test, you thought

5  heroin was the substance you were seizing.

6  A    Correct.

7  Q    But it still turned up it was negative.

8  A    Correct.

9  Q    Then you did another test.

10 A    I did a different test, correct.

11 Q    And that different test was weak, still not giving you a

12 strong indication of what the substance is.

13 A    Correct.

14 Q    How many total tests did you do?

15 A    I believe only those two.

16 Q    And so when you determined that the substance -- or at

17 least you did in the field testing that it was not heroin.  You

18 thought you had an arrest for heroin.  Nonetheless, you kept my

19 client with these charges.  Is that correct?

20 A    I still thought it was heroin, just to be clear.  Even when

21 I sent it to the lab, I thought it was heroin.  I've had

22 numerous cases before dating back to 2002 where I've gotten a

23 negative on a presumptive field test and it turned out that the

24 substance was, in fact, heroin once it was tested by the

25 laboratories.

1  Q    So you have -- I guess one thing I don't understand.  You

2  had brought the -- you keep telling us about this guy

3  (indiscernible) and whatever Correa.

4  A    Yes, sir.

5  Q    And even with that, no matter what he does, how many phones

6  he's got, all that stuff, you can only say that on June 17th it

7  would appear that my client had some contact with him about a

8  drug transaction.  Is that correct?

9  A    I'd go a little further than to say it would appear that

10  way.  I would say it definitely happened that way.

11  Q    Well, that's for the jury to figure out.

12  A    Okay.

13  Q    But I understand your position.  My question to you is you

14  really don't have anything else.  You keep talking about Correa,

15  so one day, June 17, you have my guy, your investigation shows

16  came and had drugs, and you stopped him with the car on 222.

17  A    That's correct.

18          MR. CLARK:  Thank you, Judge.

19          THE COURT:  Any redirect?

20          MR. NAIR:  No, Your Honor.  Thank you.

21          THE COURT:  Thank you.  You may step down.

22          We're going to adjourn for the day, ladies and

23  gentlemen.  As you know, the White House has declared tomorrow a

24  national day of mourning due to the death of the late President

25  George H.W. Bush, and so the courthouse will be closed for one

1  day, tomorrow, so we will not be calling you here tomorrow, but

2  we will be calling you to return on Thursday morning, when we

3  will continue the case.

4          As is common with almost all judges, we have many

5  other cases in addition to this one, and I have one that I have

6  to take up briefly Thursday morning, so we're going to convene

7  at 9:30 a.m. instead of 9:00 a.m.

8          So let me repeat that.  On Thursday morning, we're

9  going to reconvene at 9:30 a.m. here.  I know there was a

10 question from one of the jurors whether you have to go to work

11 tomorrow.  I don't make that decision.  That will be up to you

12 and your employer and how your employer interprets the White

13 House statement, and I'm not going to interpret it for them. All

14 I know is we won't be here.

15         Before we send the jury home to report again Thursday

16 morning at 9:30, is there anything else, Counsel, to take up?

17         MR. CLARK:  I do have one item.

18         THE COURT:  Should we do that after we excuse the

19 jury?

20         MR. CLARK:  I don't think we need the jury for that.

21         THE COURT:  Very good.

22         Mr. Wood, would you excuse the jury, please?  We will

23 -- however, the rest of us will remain here in court.  And one

24 last thing.  I have to give you the usual instruction and that

25 is do not discuss this case with anyone, including your fellow

1    jurors, other people involved in the trial, members of your

2    family, friends or anyone else.  Do not speak at all with any of

3    the parties, the witnesses or the attorneys.  (indiscernible)

4    discuss the case with you, if anyone approaches you and tries to

5    talk to you about the case, please report that to me through my

6    courtroom deputy, Mr. Wood, immediately.

7            While I do not know whether there is any news coverage

8    of this case, and I don't think there is, but if there is, do

9    not watch or listen to any news reports concerning this trial on

10   television or on radio and do not read any news accounts of this

11   trial in any newspaper or on the internet.  Do not use the

12   internet to search for information about the parties, witnesses,

13   lawyers or anyone else associated with the trial. Don't do that.

14           The only information you are to consider in deciding

15   this case is what you learn in the courtroom.  Remember to keep

16   an open mind. Do not make up your mind about the verdict until

17   you've heard all the evidence and until I've given you the final

18   instructions about the law at the end of the trial, and after

19   you've discussed the case with your fellow jurors during

20   deliberations.  So please keep an open mind. Don't discuss the

21   case.

22           Thank you, and you may be excused now.

23           DEPUTY CLERK:  All rise.

24       (Jury out at 5:01 p.m.)

25           THE COURT:  You may be seated.  Mr. Clark.

1      MR. CLARK:  Yes, Your Honor.  Judge, based on the

2   testimony of Agent Romig, he made a statement during the course

3   of his testimony that my client had a desire to remain silent,

4   and I'm making a motion to declare a mistrial because any

5   comment by a defendant to exercise his right to remain silent in

6   the course of a trial is grounds for a mistrial.  So that's the

7   motion I'm making on behalf of Mr. Concepcion-Rosario.

8      THE COURT:  Mr. Nair.

9      MR. NAIR:  I would agree with Counsel had he invoked

10  in the beginning, but at that point, that was the way the

11  defendant terminated the interview.  He didn't want to talk

12  anymore.  He chose to remain silent.  So it's not a comment so

13  much on the fact that he had something to say that he would

14  refuse to continue to talk, but just the natural way the

15  interview ended.

16      Had this occurred with no Miranda waiver, I would be a

17  little bit more concerned as to the -- what Counsel is saying of

18  course, but I don't think is Agent Romig commenting on the

19  defendant's silence overall.  This is how the interview ended.

20  At that point, he didn't want to say anything anymore.

21      THE COURT:  Counsel, I'm going to ask both of you if

22  you have any legal authority on this to submit it.  I'm going to

23  reserve judgment on this until later, until probably Thursday.

24  I will tell you this is the first that I've had to encounter

25  this legal issue, so I invite you to submit any legal points and

1   authorities that you feel may be helpful in making a decision.

2                MR. NAIR:  Thank you.

3                MR. CLARK:  Thank you.

4                THE COURT:  Anything else before we recess?

5                MR. CLARK:  No, Your Honor.  Not from the defense.

6                MR. NAIR:  Not from the Government.

7                THE COURT:  For planning purposes on Thursday, let me

8   ask the Government, who do you expect will be testifying?  I

9   know you have the right to change that, but do you --

10               MR. NAIR:  Not at all.  The Government anticipates the

11  following on Thursday morning; the two troopers for the 404(b),

12  Troopers Carlson and Everett, and then narcotics expert, Scott

13  Errington, and then the Government would be resting.  I

14  anticipate their testimony to take somewhere around 45 minutes

15  for direct and cross for the two troopers total and then about

16  the same 45 minutes to an hour for the narcotics expert.

17               THE COURT:  Very good.  All right.  We will see you

18  then Thursday morning.  9:30 a.m.  Mr. Wood, would you adjourn

19  Court, please?

20               DEPUTY CLERK:  All rise. Court is adjourned.

21       (Proceedings adjourned at 5:05 p.m., recommencing on

22  December 6th, 2018)

23

24

25

**CERTIFICATION**

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

EILEEN DHONDT, CET 807
Aequum Legal Transcription

Dated: February 22, 2023