UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATE OF AMERICA,    . Case No. 5:18-cr-00181-JFL-1

       Plaintiff,    .
                    504 West Hamilton Street
    v.    . Allentown, PA 18101

ANGEL LUIS CONCEPCION-    .
ROSARIO,           December 6, 2018
            . 10:20 a.m.
       Defendant.    .

. . . . . . . . . . . . .


CRIMINAL JURY TRIAL - DAY 3
BEFORE HONORABLE JOSEPH F. LEESON, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff          KISHAN NAIR, ESQ.
UNITED STATES OF      US ATTORNEY'S OFFICE
AMERICA:            615 Chestnut Street, Suite 1250
                Philadelphia, PA 19106


For Defendant         GLENNIS L. CLARK, ESQ.
ANGEL-LUIS CONCEPCION-  LAW OFFICE OF GLENNIS L. CLARK
ROSARIO:            1101 Hamilton Street, Suite 351
                Allentown, PA 18101



Audio Operator:       Justin Wood

TRANSCRIBED BY:       Eileen Dhondt, CET-807
                Aequum Legal Transcription Services
                6934 East Almeria Road
                Scottsdale, AZ 85257


Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

**INDEX**
**December 6, 2018**

| THE COURT | PAGE: |
|---|---|
| Motion for Mistrial Denied | 5 |
| Rule 609 Motion Findings | 66 |
| Motion for Acquittal Denied | 78 |

**WITNESSES:**

**FOR THE PLAINTIFF:**
WILLIAM EVERETT
    Direct Examination by Mr. Nair      14

JOSEPH CARLSON
    Direct Examination by Mr. Nair      24
    Cross-Examination by Mr. Clark      26
    Redirect Examination by Mr. Nair      28

JILLIAN HUMMER
    Direct Examination by Mr. Nair      29
    Cross-Examination by Mr. Clark      32

SCOTT ERRINGTON
    Direct Examination by Mr. Nair      34
    Cross-Examination by Mr. Clark      51
    Redirect Examination by Mr. Nair      55
    Recross-Examination by Mr. Clark      56
    Further Redirect Examination by Mr. Nair      56

**FOR THE DEFENDANT:**

ANGEL LUIS CONCEPCION-ROSARIO
  Previously transcribed and incorporated      79

**EXHIBITS:**

| FOR THE PLAINTIFF: | MARKED | ENTERED |
|---|---|---|
| Exhibit 14 | 29 | 29 |
| Exhibits 1 through 14 | | 63 |

**FOR THE DEFENDANT:**

None

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1              PROCEEDINGS

2         (Call to the Order of the Court)

3         (Proceedings commence at 10:20 a.m.)

4         (Out of the Presence of the Jury)

5         DEPUTY CLERK:  All rise.  United States District Court

6  for the Eastern District of Pennsylvania is now in session.  The

7  Honorable Joseph F. Leeson, Jr. presiding in criminal action

8  number 18-181, United States of America v. Angel Concepcion-

9  Rosario.  Please be seated.

10         THE COURT:  Good morning, everyone.

11         IN UNISON:  Good morning, Your Honor.

12         THE COURT:  Just a friendly reminder to the

13  interpreters that they are still under oath with respect to

14  their obligations.

15         On Tuesday, the defense made a motion for a mistrial,

16  and I want to get a ruling issued on that.  I gave Counsel an

17  opportunity to look for any legal points and authorities that

18  they wished to bring to my attention.  Let me see if there is

19  anything else either counsel wants to add, either by way of

20  argument or legal points and authorities.

21         Let's turn to defense counsel, first.  Mr. Clark.

22         MR. CLARK:  With respect to the motion that I made for

23  a mistrial, first, it is -- when the record was played back, I

24  was incorrect in the statement made by Agent Romig, and so the

25  basis of that -- the factual basis for my argument was negated

1  by that.  I did a limited amount of research.  The research

2  suggests to me that when it is a clear invasion of the right to

3  remain silent -- not -- saying he doesn't want to cooperate, but

4  if there's clearly a statement by the police or investigators

5  that he exercised his right to remain silent, then that would

6  automatically trigger a violation of the constitution and

7  entitle my client to a mistrial.  But I do not have a factual

8  basis to make that argument, so in that regard, Your Honor, if

9  that's -- if you're going to make a ruling, just so that the

10  issue is preserved for the record, but I'm not going to make any

11  argument any further on that.

12       THE COURT:  Anything you wish to add beyond what's

13  already been said on Tuesday, Mr. Nair?

14       MR. NAIR:  Just briefly, my research yesterday it

15  seems from Anderson v. Charles (phonetic) which is a follow-up

16  to Doyle (phonetic), they're both Supreme Court cases.  Anderson

17  v. Charles is 1980.  It would've been much more problematic had

18  Special Agent Romig commented directly on the defendant invoking

19  his rights and even more of a problem if I were to comment -- if

20  were to have elicited that type of testimony from Agent Romig or

21  said something to the jury in my opening or closing in

22  commenting on that.  I don't think that's the factual case that

23  we have here, so I would ask that the Court obviously note

24  initially the objection or the motion that counsel had, but I

25  think there's clear basis to deny it, both factually and

1  legally.

2        THE COURT:  All right.  I'm going to deny the motion.

3  For the record, though, I'm going to put in my reasoning.

4        On Tuesday, the previous day of trial after the jury

5  was excused, defense counsel motioned for a mistrial based upon

6  previous testimony by the Government's witness, Special Agent

7  Joshua Romig.  Defense counsel argued that Agent Romig

8  improperly commented upon the defendant's invocation of his

9  right to remain silent.

10        Under the Fifth Amendment, defendant has the right to

11  remain silent and not cooperate with law enforcement, and the

12  prosecution may not comment on the defendant's invocation of

13  those rights at trial.  A remark is directed to a defendant's

14  refusal to testify when the language used was manifestly

15  intended or was of such character that the jury would naturally

16  and necessarily take it to be a comment on the failure of the

17  accused to testify.  And that's a quote from the case United

18  States v. Lynn, a Third Circuit case 515, Fed. Appx. 79, Third

19  Circuit 2013 which cites United States v. Brennan, also a Third

20  Circuit case, 326 F. 3rd 176 from 2003.

21        I reviewed and listened to the recording of Agent

22  Romig's testimony from Tuesday.  When asked what the defendant

23  said at the state police barracks, Agent Romig responded, quote,

24  and I believe this a direct quote, "not much.  He said that they

25  were his drugs and that he didn't get them from anyone."  Agent

1  Romig gave his interpretation of the statement and explained,

2  quote, "I interpreted that to mean that he didn't want to

3  cooperate any further."

4        He explained what happened next, stating that after

5  defendant's two statements that, quote, "that was the end of the

6  interview.  It was a two-question interview.  I explained to the

7  defendant that I wanted him to cooperate, that I wanted him to

8  tell us who his source of supply was, and I wanted him to help

9  the government and help our case.  Based on defendant's answer

10  to the question, that they were his drugs and he got them from

11  no one, I determined that to be his answer; that he did not want

12  to cooperate with law enforcement.  So the interview stopped at

13  that point."

14        These comments do not appear manifestly intended or of

15  such character that the jury would naturally and necessarily

16  interpret them as directed to the defendant's invocation of his

17  right to remain silent.  I note that there was no testimony that

18  the defendant actually invoked his right to remain silent or not

19  to cooperate.  Agent Romig simply testified to his own

20  interpretation of the responses that he did get from the

21  defendant.

22        Moreover, the concern underlying the prohibition on

23  comments about a defendant invoking his Fifth Amendment rights

24  is that a jury will infer from a defendant's refusal to speak or

25  cooperate that he has something to hide.  That concern is not

1  present in this situation because Agent Romig testified that the

2  defendant admitted the drugs were his.  In fact, Agent Romig

3  concluded that the defendant did not want to cooperate because

4  he took full responsibility for the drugs and did not want to

5  reveal his source of supply.

6        Agent Romig's comments reflect his own understanding

7  of his conversation with the defendant, and he explained why

8  that conversation concluded, only after a brief exchange.  I

9  conclude that they were not impermissible comments on the

10  defendant's exercise of his Fifth Amendment rights.

11  Accordingly, defendant's motion for mistrial is denied.

12        And we're also relying upon the case of United States

13  v. Williams, 556 F2d 65, a DC circuit case from 1977 in making

14  this ruling.

15        Counsel, one other thing that came up, some of the

16  jurors said to Mr. Wood that they would like to have me re-read

17  the elements of the offense.  Of course, that's going to happen

18  at the end of the trial during the charge anyway.  Do counsel

19  want me to re-read the elements during the middle of the trial,

20  which would basically be this morning, or just wait until the

21  jury charge?  I wanted to get your thoughts on the subject.

22        Let's hear from Government and then Mr. Clark.

23        MR. NAIR:  Your Honor, if they feel the desire to hear

24  that now, I have no objection.  It might be appropriate if all

25  they're asking to basically do is to repeat since they haven't

1  been able to take notes, not that notes were necessary, but they

2  may -- it may be important to them as they're sorting through

3  the evidence.  Did the Government prove the possession?  Did the

4  Government prove the possession with intent to distribute?

5          THE COURT:  Mr. Clark, what are your thoughts?

6          MR. CLARK:  Your Honor, may I have your indulgence for

7  a second?

8          THE COURT:  Sure.  Go ahead.

9      (Pause)

10         MR. CLARK:  Judge, we have no objection.  I have

11 consulted with my client.  He indicated that he's in agreement

12 with the Government's position that you can re-read the elements

13 of the offense.

14         THE COURT:  All right.  I'll be right back.  Please

15 remain seated.

16     (Pause)

17         THE COURT:  All right, Counsel, let me show you what I

18 read to them initially and see if this is satisfactory to read

19 again.

20         Mr. Schuster (phonetic), would you pass this down to

21 both counsel so they can read it?

22         MR. NAIR:  Your Honor, the only thing I'm wondering if

23 we should -- and I don't know if the Court instructed them on

24 aiding and abetting, the elements of those, because that's an

25 alternative theory they're allowed to consider.

1    THE COURT:  I did not.  I don't think we did that

2  initially, Mr. Schuster.

3    MR. NAIR:  I think Your Honor it may make it too

4  confusing at the moment since this is all what they've asked for

5  and that certainly will be addressed at the time -- when the

6  jury is charged.

7    THE COURT:  Is that satisfactory to both counsel?

8    MR. NAIR:  Yes.

9    MR. CLARK:  Yes.

10    THE COURT:  It being satisfactory to both counsel,

11  I'll read it then when the jury comes in.  The only change I

12  made is I didn't read the chemical formula the first time

13  around, and I just refer to Fentanyl.

14    MR. CLARK:  And, Judge, I would suggest recommending -

15  - just that --

16    THE COURT:  Yes.

17    MR. CLARK:  -- that whole part with the chemical

18  compound is confusing.

19    THE COURT:  Yeah.  I agree.  That's what we'll do.

20  Mr. Wood, before -- before you bring the jury in, anything else?

21    MR. CLARK:  Yes.  We had -- there's an issue disclosed

22  to me by the Government that with respect to the 2015 arrest and

23  convictions of my client for possession with intent, I think it

24  was in Chester County, there is a statement by a Trooper Robert

25  S. Kirby.  Trooper Kirby noted in his report that when he was

1  talking to Mr. Concepcion-Rosario, and I don't think I'm going

2  to mention anything about requesting an attorney, but he said he

3  spoke a little English.  That's the point I'm going to object

4  to, so that the prior arrest which Your Honor has already

5  authorized that will be in support of 404B and any 609 material.

6  In that statement, the officer noted that Mr. Concepcion-Rosario

7  spoke a little English.

8       THE COURT:  Mr. Nair, are you going to use that --

9  propose to use that reference to English?

10      MR. NAIR:  Yeah, I'm going to stipulate that that's

11 what the report says.  I think Counsel will bring that in as a

12 stipulation.  The only thing I would like -- in the context,

13 obviously I'm not going to ask that the jury see it because it

14 talks about his Miranda rights and that he invoked them on that

15 prior case.

16      THE COURT:  Mr. Clark, are you saying you don't want

17 any reference to -- reference to speaking or not speaking

18 English?

19      MR. CLARK:  I just want to make the Court aware of it.

20 I'm not asking for this or a stipulation.  I will work out some

21 language.  I'll show it to Mr. Nair, and then we'll present it

22 to Your Honor at the appropriate time.

23      THE COURT:  All right.  That sounds fine.  Very good.

24 Anything else before we bring the jury in?

25      MR. NAIR:  Sorry.  One other thing, Your Honor.

1  Because of the Court's ruling on 404B, I'm going to at one point

2  lead Trooper Everett when it comes close to the point of the

3  drug seizure, because I have to work around the fleeing since

4  that can't come before the jury.

5          THE COURT:  Let me know when that time comes.

6          MR. NAIR:  Thank you.

7          THE COURT:  Very good.  Mr. Wood, would you bring the

8  jury in, please?

9          MR. CLARK:  Judge, may I step out for a moment?

10         THE COURT:  Yes.

11      (Jury in at 10:37 a.m.)

12         DEPUTY CLERK:  All rise.  Court is again in session.

13 You may be seated.

14         THE COURT:  Ladies and gentlemen, I apologize for

15 keeping you and for the delay.  As I mentioned to you the other

16 day, sometimes matters in my other cases arise that require

17 immediate attention that can't be delayed, and sometimes those

18 things take time.  So I've been working since I got here this

19 morning, so the delay is on me, and I apologize to you for

20 keeping you.

21         Mr. Wood, my courtroom deputy, mentioned that some of

22 you had made a verbal request to him that the Court re-read the

23 elements of the offense charged.  I've consulted with both

24 sides, and they've consented to me doing that, so we're going to

25 do that right now.

1       The defendant, Angel Luis Concepcion-Rosario, is

2   charged in the indictment with committing the offense of

3   possession with intent to distribute and aiding and abetting the

4   possession with intent to distribute of 40 grams or more; that

5   is, approximately 199 grams of Fentanyl, a Schedule 2 controlled

6   substance.

7       To help you follow the evidence, I will now give you a

8   brief summary of the elements of that offense, each of which the

9   Government must prove beyond a reasonable doubt in order to

10  convict Angel Luis Concepcion-Rosario of the offense charged.

11      The elements are, and there are four of them.

12      First, that the defendant possessed a mixture or

13  substance containing a controlled substance.

14      Second, that he possessed the controlled substance

15  knowingly or intentionally.

16      Third, that he intended to distribute the controlled

17  substance; and

18      Fourth, that the controlled substance was Fentanyl.

19      What I've just told you is only a preliminary outline

20  of the elements of the offense charged.  At the end of the

21  trial, I will give you final instructions on the elements of the

22  offense charged and on other matters of law.  Those final

23  instructions will be more detailed.  They will guide you in

24  reaching your verdict in this case.

25      Very good.  Are we ready to proceed?

1          MR. NAIR:  Yes, Your Honor.

2          THE COURT:  Mr. Nair, you may call your next witness.

3          MR. NAIR:  Thank you.  The United States calls Trooper

4    Everett.

5        (WILLIAM EVERETT, Witness, is Sworn)

6          MR. CLARK:  Your Honor, before we begin, can I just

7    have a point of order.  I apologize.  Your Honor had asked me if

8    I had anything to say, but may I approach --

9          THE COURT:  Yes.  Uh-huh.

10       (Sidebar commenced at 10:40 a.m.)

11          MR. CLARK:  (indiscernible).

12          MR. NAIR:  The conviction I believe is certified, but

13    he can get into facts.  I'm not going to ask him -- I'm going to

14    ask him if he's aware of (indiscernible).

15          MR. CLARK:  I'm not saying (indiscernible) certified

16    copy (indiscernible).

17          MR. NAIR:  I have a certified (indiscernible).  I'll

18    have them dig it out.

19          THE COURT:  You going to show it to me right now?

20          MR. NAIR:  Well, I'll have to dig it out, Judge.

21       (Sidebar concluded at 10:41 a.m.)

22       (Pause)

23       (Sidebar commenced at 10:42 a.m.)

24          THE NAIR:  I'm going to mark this, but I don't think

25    the jury should see it (indiscernible).  I don't have the

1  transcribed record.  I don't know whether the interpreter is

2  sitting next to him.  I have no idea.  I mean he signed it

3  (indiscernible) along with the official court transcript -- not

4  transcript, sentence (indiscernible) certified record.

5        (Sidebar concluded at 10:43 a.m.)

6            THE COURT:  You may proceed.

7            MR. NAIR:  Thank you, Your Honor.

8            THE CLERK:  Sir, can I have you state your full name,

9  spelling your last name?

10            THE WITNESS:  William M. Everett, Everett, E-V-E-R-E-

11  T-T.

12                      DIRECT EXAMINATION

13  BY MR. NAIR:

14  Q    Trooper Everett, by whom are you employed?

15  A    I'm employed by the Pennsylvania State Police.

16  Q    And how long have you been employed by the Pennsylvania

17  State Police?

18  A    Just almost six years.

19  Q    And what is your current assignment?

20  A    I am a patrol trooper for the Pennsylvania State Police.  I

21  am also a member of our special emergency response team which is

22  our SWAT team.

23  Q    And where is your current assignment?

24  A    Troop J Embreeville, which is located in Chester County.

25  Q    Let me direct your attention back to July 24th of 2014 at a

1   little after midnight.  Were you traveling -- were you in the

2   area westbound on Route 322 in -- near Honey Brook Township in

3   Chester County?

4   A    Yes, we were on Route 322, Honey Brook Township, Chester

5   County, routine patrol.

6   Q    And what, if anything, happened?

7   A    I was a passenger.  My partner, Trooper Carlson, was the

8   operator of the marked patrol unit.  He observed a moving

9   violation on a vehicle and we initiated a traffic stop on that

10  vehicle.

11  Q    Can you see the person who was driving that vehicle in

12  court today?

13  A    I do.

14  Q    Could you please point to that person?

15  A    The operator of that vehicle is seated at defense counsel's

16  table in the middle in the dark colored suit with an unbuttoned

17  shirt.

18          MR. NAIR:  May the record reflect that the witness has

19  identified the defendant, Mr. Concepcion-Rosario?

20          THE COURT:  Yes.

21          MR. NAIR:  Thank you, Your Honor.

22  BY MR. NAIR:

23  Q    And please tell the ladies and gentlemen of the jury what

24  happened from there.

25  A    It was Trooper Carlson's traffic stop, so he made approach

1   to the vehicle.  I radioed over to our dispatch of our traffic

2   stop and the relevant information to that.  Once I did that, I

3   made my approach to the vehicle on the passenger side --

4           MR. CLARK:  Your Honor, I object.  May I approach?

5           THE COURT:  Yes.

6      (Sidebar commenced at 10:45 a.m.)

7           MR. CLARK:  (indiscernible).

8           MR. NAIR:  The Court's ruling would be the facts

9   leading up to a seizure of the drugs to show the intent to

10  control the drugs in this case.  Those are all relevant.  What

11  is not relevant is the form and the statements.

12          MR. CLARK:  I'm going to object, Judge.

13  (indiscernible)

14          THE COURT:  Can you limit it to just what's there?

15          MR. NAIR:  The reason I feel it's important is and as

16  a proffer, Trooper Everett is going to say that Trooper Carlson

17  was getting the information from the defendant.  He was in a

18  position where he could tell by where the defendant was looking

19  in his rearview or sideview mirror.  His entire attention was on

20  Trooper Carlson.  Doesn't realize he's there and that's when he

21  sees him grab the bag.  That's what I'm leading up to.  He grabs

22  the bag and gives it to the female passenger and she puts it in

23  her pants.

24          THE COURT:  (indiscernible).

25          MR. CLARK:  (indiscernible) any factual basis

1  (indiscernible).

2       MR. NAIR:  But it also shows how he controlled the

3  drugs then and why he's controlling in a different manner now

4  and that is exactly 404 (indiscernible).  Those facts are very

5  important.  And yes, they're prejudicial but they're more

6  probative (indiscernible).

7       MR. CLARK:  (indiscernible).

8       MR. NAIR:  I can tell the Court that I've done this

9  procedure before in front of Judge (indiscernible).  The police

10  officer (indiscernible).

11       THE COURT:  (indiscernible)

12       MR. NAIR:  It would be (indiscernible).  This is so

13  much more.  This is to show how he (indiscernible).  It goes to

14  why (indiscernible).

15       THE COURT:  (indiscernible)

16       MR. CLARK:  (indiscernible).

17       MR. NAIR:  (indiscernible).

18     (Sidebar concluded at 10:51 a.m.)

19       THE COURT:  Thank you, Counsel, for your patience

20  while I looked something up.  I'm going to deny the objection.

21       MR. CLARK:  Very well, Your Honor.

22       THE COURT:  Overrule the objection.  And pardon me for

23  just a moment.

24       Counsel, I have a limiting instruction. Would you

25  prefer I read it now or after the testimony?

1        MR. CLARK:  I prefer to read it now.

2        THE COURT:  Very good.

3        Ladies and gentlemen, you've heard testimony that the

4   defendant on July 24, 2014 that the defendant knowingly and

5   intentionally possessed with the intent to distribute a

6   controlled substance, cocaine.

7        This is evidence of other acts is admitted only for

8   the limited -- only for limited purposes.  You may only consider

9   this evidence for the purpose of deciding whether the

10  defendant's knowledge and intent necessary to control the

11  controlled substance in the charged offense.  Do not consider

12  this evidence for any other purpose.

13       Of course, it is for you to determine whether you

14  believe this evidence, and if you do believe it, whether you

15  accept it for the purpose offered.  You may give it such weight

16  as you feel it deserves, but only for the limited purpose that I

17  described to you.

18       The defendant is not on trial for committing these

19  other acts.  You may not consider the evidence of these other

20  acts as a substitute for proof that the defendant committed the

21  crime charged.  You may not consider this evidence as proof that

22  the defendant has a bad character or any propensity to commit

23  crimes.

24       Specifically, you may not use this evidence to

25  conclude that because the defendant may have committed the other

1   act, he must have also considered -- committed the act charged

2   in the indictment.

3       Remember that the defendant is on trial here only for

4   knowingly and intentionally possessing with intent to distribute

5   40 grams or more of a mixture and substance containing a

6   detectable amount of Fentanyl, and aiding and abetting this

7   possession with intent to distribute charge, not for these other

8   acts.

9       Do not return a guilty verdict unless the Government

10  proves the crime charged in the indictment beyond a reasonable

11  doubt.

12      You may proceed.

13  BY MR. NAIR:

14  Q   Trooper, if you could continue with what you observed on

15  July 24th, 2014.

16  A   As I made my approach to the vehicle, I positioned myself

17  on the passenger side just behind the front passenger seat, I

18  observed the defendant as the operator and there was a female

19  passenger.

20      Trooper Carlson conversed with them and asked for --

21      MR. CLARK:  Note my objection to whatever Trooper

22  Carlson did.

23      MR. NAIR:  He's present, but I'll -- yes, he is.  He's

24  outside.

25      THE COURT:  Are you withdrawing the objection?

1          MR. CLARK:  Yes, Your Honor.

2          THE COURT:  Very good.  Objection withdrawn.

3          THE WITNESS:  As Trooper Carlson conversed with the

4  occupants, he obtained their relevant information.  They handed

5  that over to him at which point he then walked back to our

6  patrol vehicle.  Prior to doing that, he looked over at the top

7  of the vehicle at me.  I observed that there was something more

8  than just a regular traffic stop and what he portrayed from his

9  facial expression.

10          He went back to his vehicle, closed the door, went

11  inside.  I stayed at the vehicle and watched the occupants.  As

12  Trooper Carlson made his way back, the defendant looked in the

13  driver's side mirror and observed him until he sat in the

14  vehicle.  At which point shortly after that, he retrieved a

15  clear plastic bag with a white powdery substance with his right

16  hand.  That was located near his right thigh at the seat and

17  center console area.  At that point, he picked it up, had it

18  face up with his hand with his thumb pointed to the female

19  passenger, the clear plastic bag with the white substance on top

20  of his hand with a knot towards the bottom.  The female

21  passenger at that point reached over with her right hand,

22  obtained it from his hand, pulled her pants away from her body,

23  and then put it down her pants.

24          I observed that.  I tried to signal to Trooper Carlson

25  back up to the vehicle.  Trooper Carlson then did come back to

1  the vehicle, and the defendant observed me on the passenger side

2  of the vehicle.  At that point, I opened the door, I made

3  contact with the defendant and the female occupant.  I asked

4  them what they exchanged, and they described that nothing

5  happened.  I asked them again what was exchanged between the

6  two, and they said nothing happened.  I iterated to them what I

7  observed.  I observed that he pulled the clear plastic bag with

8  a white substance with his right hand from his right leg area,

9  put it over the center console, she grabbed it with her right

10  hand, pulled her pants away from her body and shoved it down

11  there.  And I explained to her that I could see the bulge in her

12  pants.

13  BY MR. NAIR:

14  Q    Let me stop you there.  Did you eventually or was it

15  recovered in your presence that bag with white powder that you

16  saw?

17  A    Yes.  I personally recovered that bag.

18  Q    And was that bag knotted on top?

19  A    Yes.

20  Q    And did that bag turn out to be cocaine?

21  A    It did.

22  Q    And you were aware that the defendant was found guilty of

23  possession with intent to distribute of that cocaine.  Is that

24  correct? Or deliver.  Sorry.  Pennslyvania State law and

25  possession with intent to deliver.

1  A    He was.

2  Q    Did he see you -- let me rephrase that.  Were you doing

3  anything to make yourself visible when you were standing behind

4  the car?

5  A    No.  I was trying to remain invisible in a sense.

6  Q    And explain that to the ladies and gentlemen of the jury.

7  A    So I positioned myself behind the front passenger seat I

8  consider it the B pillar, so I stood behind there where I could

9  observe both the driver and the front seat passenger, and it

10  would be hard for them to observe me.  It was at night.  I could

11  see within their vehicle due to our overhead lights and our

12  spotlight shining.  So it was our common practice that we would

13  do that.  Whoever was making the contact with the operators, in

14  this case, Trooper Carlson, he would go up.  The other person

15  would try to remain unseen on the side so that the occupants in

16  the vehicle would only think there's one trooper there.  And the

17  other trooper who made the contact would go back to the vehicle,

18  exaggerate the slam of the door, and turn the overhead light on,

19  so that the occupants in the vehicle would think that he's

20  already back in the vehicle.  He's obviously not caring too

21  much, and we can see what he's doing.

22      While that's going on, I'm standing behind the vehicle

23  watching their actions, and that's when the defendant made his

24  move to grab the clear plastic bag and hand it to the passenger.

25  Q    Do you speak Spanish?

Direct Examination - Everett

1  A    I do not.

2  Q    Did you have any problem in talking to the defendant in

3  English?

4  A    It was limited interaction.

5  Q    Let me back you up.  You could overhear the interaction

6  between Trooper Carlson and the defendant.

7  A    Somewhat with the traffic that night and the --

8  Q    What do you hear?  Was that in English or in Spanish?

9  A    It was in English. Trooper Carlson does not speak Spanish.

10          MR. NAIR:  I have no further questions.

11          THE COURT:  Cross-examination.

12          MR. CLARK:  No questions.

13          THE COURT:  You may step down, sir.

14          THE WITNESS:  Thank you.

15          THE COURT:  You may call your next witness.

16          MR. NAIR:  (indiscernible) when they're done?

17          MR. CLARK:  I have no objection.

18          THE COURT:  You may be excused sir so everyone

19  consents.

20          MR. NAIR:  Thank you, Your Honor.

21       (JOSEPH CARLSON, Witness, is Sworn)

22          THE CLERK:  Can you please state your full name,

23  spelling your last name?

24          THE WITNESS:  Yes.  Joseph W. Carlson, C-A-R-L-S-O-N.

25          MR. NAIR:  May I proceed, Your Honor?

Direct Examination - Carlson

1      THE COURT:  Yes.

2      MR. NAIR:  Thank you.

3                      DIRECT EXAMINATION

4  BY MR. NAIR:

5  Q      Trooper, by whom are you employed?

6  A      The Pennsylvania State Police.

7  Q      And how long have you been employed by them?

8  A      Approximately six years.

9  Q      And what is your current assignment?

10  A      I currently work for the Bureau of Emergency and Special

11  Operations in the tactical operations division.  I'm assigned to

12  the K-9 section.

13  Q      Back on July 24th of 2014, what was your assignment?

14  A      I was assigned to the patrol unit at Troop J, Embreeville

15  barracks in Chester County.

16  Q      And were you working a little bit after midnight in the

17  area of Route 322 in Chester County in Honey Brook Township?

18  A      Yes.

19  Q      And do you see anyone in court today that you saw on that

20  date and time?

21  A      Yes, I do.

22  Q      Please point to that individual.

23  A      In the middle (indicating).

24      MR. NAIR:  Your Honor, may the record reflect that the

25  witness has pointed or indicated towards the defendant, Mr.

1   Concepcion-Rosario?

2           THE COURT:  Yes.

3           MR. NAIR:  Thank you, Your Honor.

4   BY MR. NAIR:

5   Q    Please tell the ladies and gentlemen the encounter you had

6   with the defendant.

7   A    I observed a traffic violation, initiated a traffic stop

8   and made contact with the operator who is this individual.

9   Q    And when you approached, what if any conversation do you

10  remember having with the defendant?

11  A    I notified him as to the reason for the stop and asked him

12  for identifying documents, license, registration, and insurance.

13  He was able to give me all those documents.

14  Q    And were you talking to him in English or in Spanish?

15  A    In English.

16  Q    Do you speak Spanish?

17  A    No, I do not.

18  Q    Did he have any problem responding to you in producing

19  those documents?

20  A    No.

21  Q    Did you have any further conversations?

22  A    The only further conversation I had was on the same topic.

23  There was an issue with one of the documents.  I brought that to

24  his attention, and he was able to understand that.

25  Q    Was it clear to you whether English was his native language

1   or not?

2   A    In my interaction with him, I did not believe that English

3   was his first language.

4   Q    Did you have any problems communicating with him in

5   English?

6   A    No, I did not.

7           MR. NAIR:  I have no further questions, Your Honor.

8           THE COURT:  Cross-examination.

9                        CROSS-EXAMINATION

10  BY MR. CLARK:

11  Q    Trooper, you said you had no problems communicating with

12  him, but you don't know whether or not he understood everything

13  you were saying to him, correct?

14  A    Can you repeat that and maybe speak up a little bit?

15  Q    You said you had no problem communicating with him, but you

16  have no way of knowing whether or not he understood everything

17  that you were saying, correct?

18  A    Well, I would imagine that he would based on the fact he

19  was able to comply with what I was requesting of him.

20  Q    So the car is stopped, right.  And you ask, insurance card,

21  registration, insurance, right?  Nothing complicated about that

22  once you stop the car, right?  So you want his papers.  Yes?

23  A    Correct.

24  Q    Every stop, same thing, correct?

25  A    Correct.

1   Q     So you didn't have any other conversation with him other

2   than about the papers and one of the documents you had a

3   question about.  Is that right?

4   A     That's correct.

5   Q     So how long was this conversation that you had with him?

6   A     I don't know exactly.  It was brief.

7   Q     Now, you said that you -- did you review any photographs or

8   anything like that about what Mr. Concepcion-Rosario looks like

9   before you testified today?

10  A     Can you repeat the question?  I'm sorry.

11  Q     I'm asking you whether or not you reviewed a photograph of

12  something with Mr. Concepcion-Rosario before you testified

13  today.

14  A     I've seen him before.  I've seen photographs of him, yes.

15  Q     I'm sorry.

16  A     I've seen him before.  I have seen photographs of him as

17  well, yes.

18  Q     Before you testified today, did you happen to review the

19  photographs?

20  A     Today?  No.

21  Q     So you remember him from July 24, 2015, correct?

22  A     I'm not sure if that was the date, but I do remember him

23  from my interaction.

24  Q     Now, how many people have you stopped and/or arrested since

25  July 24, 2015?

1   A    I'm not sure.  Quite a few.

2   Q    Quite a few?  A hundred?

3   A    I would imagine so, yes.

4   Q    And you remember all those hundred people -- if they sit in

5   this chair over here rather than sitting next to me, you'd

6   recognize all those people, correct?

7   A    Not necessarily.

8          MR. CLARK:  No further questions.

9          THE COURT:  Any redirect?

10         MR. NAIR:  Just briefly.

11                    REDIRECT EXAMINATION

12  BY MR. NAIR:

13  Q    It was 2014, right?

14  A    I believe it was 2014, yes.

15         MR. NAIR:  Thank you.

16         THE COURT:  Any recross?

17         MR. CLARK:  No, Your Honor.

18         THE COURT:  All right.  You may step down.  May the

19  witness be excused?

20         MR. CLARK:  No objection.

21         THE COURT:  You may be excused, sir.  Government may

22  call its next witness.

23         MR. NAIR:  Your Honor, the United States will mark the

24  certified records conviction as G-14 and move to admit it -- to

25  not publish it?

1    THE COURT:  Any objection?

2    MR. CLARK:  No, Your Honor.

3    THE COURT:  All right.  Admitted, but not published.

4    (Plaintiff's Exhibit 14 marked and admitted)

5    MR. NAIR:  Agent Romig is getting the next witness.

6    (JILLIAN HUMMER, Witness, is Sworn)

7    THE CLERK:  Can you please state your full name,

8    spelling your last name?

9    THE WITNESS:  Jillian Hummer, H-U-M-M-E-R.

10                   DIRECT EXAMINATION

11   BY MR. NAIR:

12   Q    Ms. Hummer, do you see anyone in court today that you know

13   in a professional capacity?

14   A    I do.

15   Q    Could you please point to that person?

16   A    The individual in the black blazer.

17        MR. NAIR:  May the record reflect the witness has

18   identified the defendant, Mr. Concepcion-Rosario?

19        THE COURT:  Yes.

20   BY MR. NAIR:

21   Q    And in your professional capacity, when did you first meet

22   the defendant?

23   A    My first initial contact with the defendant was on November

24   18th of 2016.

25   Q    And how long did that initial -- and how long was that

1  initial contact?

2  A    That initial contact lasted approximately 23 minutes.

3  Q    During that 23 minute contact, first of all, do you speak

4  Spanish?

5  A    I do not.

6  Q    Only English.

7  A    Correct.

8  Q    Okay.  And during that 23-minute contact, did you have to

9  review any documents as far as your professional capacity with

10 the defendant?

11 A    I didn't in the initial contact.  I did issue him one

12 document that was written in English.  However, at a later date.

13 It was three days later.  I did complete a 12-page document with

14 him that was written in only English.

15 Q    And so the 23-minute meeting with the defendant was

16 entirely you and him talking?

17 A    Correct.

18 Q    And was that -- was that completely in English?

19 A    Yes.

20 Q    And did you have any problems understanding the defendant?

21 A    I did not.

22 Q    Did he seem to have any problems understanding you?

23 A    He did not.

24 Q    Would you please tell the ladies and gentlemen of the jury

25 the next time when you met him was that when you had him review

1  a document in English?

2  A    He did the initial document on 11/18 and then on 11/21 was

3  when the 12-page document was completed between him and I, and

4  then we again had a meeting on 12/2 and then several times after

5  that.

6  Q    How many meetings did you have with him roughly up to June

7  17th, 2017?

8  A    Just a moment, please.  Between the seven contacts, that

9  would be about an hour total meeting times between us.

10 Q    During that hour total, did at any did the defendant ask to

11 have someone come in to interpret for him?

12 A    He did not.

13 Q    Did you need to interpret anything he was saying like using

14 Google on your phone or something like that?

15 A    I did not.

16 Q    Now, as part of your professional capacity, you do have

17 some people that you encounter within your work load that do

18 speak entirely Spanish and have not learned English.  Is that

19 correct?

20 A    Correct.

21 Q    And that would be just several out of 70 roughly?

22 A    Correct.

23 Q    Would it be fair to say that those people at least you can

24 remember them, they stick out in your mind, because of the

25 communication barrier?

1    A    Correct.

2    Q    Does the communication barrier ever stick out in your mind

3    as it pertains to the defendant and the encounters that you had

4    with him?

5    A    It did not.

6         MR. NAIR:  Thank you.  I have no further questions.

7         THE COURT:  Cross-examination.

8                        CROSS-EXAMINATION

9    BY MR. CLARK:

10   Q    When you first met with him on the 18th, that was like an

11   intake?

12   A    That was his initial contact with me, yes.

13   Q    Was anyone else present?

14   A    No.

15   Q    And fair to say it was about 23 minutes or so that you had

16   the conversation with him?

17   A    Correct.

18   Q    But you hadn't prepared the document three days later on

19   the 21st.

20   A    Correct.

21   Q    All right.

22   A    Because that was when the documents were completed with him

23   that needed to be completed.

24   Q    And this 12-page document, what document was that -- what

25   was (indiscernible)?

1   A    No.

2   Q    What was it called?  The document that you --

3            MR. NAIR:  Your Honor, may I have just one moment?

4   BY MR. CLARK:

5   Q    The document that you're referring to all of the writing in

6   that document was done by him?

7   A    It was done by computer and then he -- it was written in

8   English and he signed where he needed to sign.

9   Q    So information or data was taken from him and placed into a

10  computer.

11  A    It's paperwork that is already pre-calculated for --

12  everyone who is on my case load has the same exact paperwork.

13  So they all have to sign the same paperwork, so he got a generic

14  copy of what everyone else on my case load has.

15  Q    And so then he signed it is what you're saying?

16  A    Correct, and initialed.

17  Q    Signed and initialed it?

18  A    Correct.

19  Q    So this is a generic form that everybody gets --

20  A    Yes.

21  Q    -- and he signed it.

22  A    Yes.

23  Q    So he didn't prepare it.  He didn't fill it out.

24  A    He signed his name and then I went through each individual

25  section, and then I asked him to acknowledge that he understood

1  what I was saying, repeat it back to me that he understood what

2  I was saying, and then he would initial each detailed section

3  and then sign the bottom that he agreed to everything that he

4  just read.

5  Q    Thank you.

6            MR. CLARK:  Thank you, Judge.

7            THE COURT:  Any redirect?

8            MR. NAIR:  No, Your Honor.  May the witness be

9  excused?

10           THE COURT:  Any objection?

11           MR. CLARK:  No objection, Your Honor.

12           THE COURT:  You may be excused, ma'am.  Thank you.

13  Government may call its next witness.

14           MR. NAIR:  United States calls Detective Scott

15  Errington.

16      (SCOTT ERRINGTON, Witness, is Sworn)

17           THE CLERK:  Can you please state your full name,

18  spelling your last name?

19           THE WITNESS:  Scott Errington, E-R-R-I-N-G-T-O-N.

20                        DIRECT EXAMINATION

21  BY MR. NAIR:

22  Q    Detective Errington, why are you here to testify?

23  A    I'm here to render my opinion on a certain quantity of

24  drugs, whether in my experience it was consistent with someone

25  who possessed it for simple possession or personal use, or

1    someone who's involved in distribution of drugs.

2    Q    And by whom are you employed?

3    A    The Berks County District Attorney's Office.

4    Q    And is that as a county detective?

5    A    Yes.

6    Q    And have you been employed there since May of 1997?

7    A    Yes.

8    Q    And what is your current assignment?

9    A    Currently, since August 2008, I've been assigned to the

10   Allentown resident office of the Drug Enforcement

11   Administration.

12   Q    And in what capacity?

13   A    As an investigator to investigate federal violations of the

14   drug laws.

15   Q    And did you prepare a curriculum vitae for court today?

16   A    Yes.

17   Q    And --

18            MR. NAIR:  May I approach, Your Honor?

19            THE COURT:  Yes.

20   BY MR. NAIR:

21   Q    Showing you what's previously been marked as Government

22   Exhibit 13.  And is that a copy of your CV?

23   A    Yes.

24   Q    And prior to your assignment with the DEA in Allentown,

25   what was your assignment as a Berks County detective?

1  A    I was also assigned to the narcotics unit since my date of

2  employment, May of 1997, to investigate narcotics violations on

3  the state level.  From 2001 to 2012, I was also a supervisor.  I

4  supervised a 10-man unit.  Even when I came up here in 2008, I

5  was still a supervisor until 2012.

6  Q    And do you have any other current duties that you

7  participate as far as training?

8  A    I'm also on the faculty of Top Gun which is operated by the

9  PA State Police and the Attorney General's Office to train new

10  or inexperienced drug investigators.

11  Q    And prior to joining Berks County District Attorney's

12  Office, how were you employed?

13  A    I was a patrol officer with the borough of Pottstown,

14  Montgomery County.  During that time, from the date of my

15  employment, I initially went undercover out of the academy.  I

16  remained with Montgomery County narcotics enforcement team up

17  until it was like March of 1993.  I then went back to patrol,

18  but I also remained as a collateral duty.  I remained on the PA

19  Attorney General's drug task force and continued to investigate

20  drug crimes as a collateral duty.

21  Q    And prior to your employment with the borough of Pottstown,

22  did you have any other law enforcement experience?

23  A    Yes.  I was also -- I was in the Navy from 1987 until 1991.

24  For two of those years while I was in the Navy, I was also sworn

25  federal Navy police officer.

1 | Q   Do you have any special training in the field of narcotics?

2 | A   Yes.

3 | Q   And what did your training consist of?

4 | A   Do you want me to go through all of it?

5 | Q   Yes.

6 | A   Okay.  Well, this is the majority of it I think.  I think

7 | every police officer initially going through the academy

8 | receives a block instruction on drugs, what they look like, you

9 | know, how to investigate drug crimes.  So I had that initial

10 | training in the police academy as well as in the Navy I was also

11 | trained.

12 | After that, May of 1993, I received 40 hours of instruction

13 | in narcotics investigation from the PA Attorney General's Bureau

14 | of Narcotics Investigation.

15 | October 1995 I received 40 hours of instruction in

16 | electronic surveillance from the PA State Police.  I received

17 | what's called your A certification which is -- it's a wiretap

18 | class relevant to how to conduct wiretap investigations and

19 | other electronic surveillance techniques involved

20 | investigations.

21 | In the fall of 1995, I attended search and seizure class at

22 | the Montgomery County Community College.

23 | June of 1997, I received 80 hours of instruction in

24 | narcotics investigation by the Drug Enforcement Administration.

25 | July of 1997, four hours of instruction in narcotics

 1  identification and field testing by the PA Attorney General's

 2  Office.

 3      May of 1998, 24 hours of instruction by McLaughlin

 4  (phonetic) and the Drug Enforcement Administration relative to

 5  clandestine laboratories.

 6      March 1999, 40 hours of instruction on general

 7  investigations including narcotics investigations by the FBI.

 8      September 1999, 40 hours of instruction in narcotics

 9  investigation by the PA State Police and Attorney General's --

10  and the National Guard Top Gun school which, as I stated

11  earlier, is where I'm a faculty member now.  I'm providing

12  instruction.

13      December 1999, 40 hours of instruction in electronic

14  surveillance by a private firm called Tactical Technologies.

15      January of 2000, 8 hours of instruction in drug

16  investigation and prosecution by the Montgomery County DA's

17  Office.

18      April into May of 2000, 120 hours of instruction in

19  electronic surveillance by the PA State police where I received

20  my B certification which is different.  As I previously stated,

21  the A certification is one level; B certification is another, a

22  second level of wiretap training where you're allowed to do a

23  little bit more.

24      March 2003, 40 hours of instruction on clandestine

25  methamphetamine labs by the PA National Guard Counter Drugs

1  Unit.

2      April 2003, 40 hours of instruction and certification by

3  the DEA to enter and seize clandestine labs.

4      April 2003, 8 hours of instruction certification as a drug

5  field testing instructor by ODV, which is a company that

6  produces field testing kits.

7      April 2004, 8 hours of instruction, certification as a drug

8  field testing instructor by Searchy (phonetic) Laboratories

9  which is also another competitor of the other company that

10  produces field testing kits.

11      October 2006, 8 hours of instruction on first line

12  supervising.

13      May 2007, 8 hours of instruction on the essentials of

14  leadership and supervision.

15      June 2007, 40 hours of instruction on supervising by the

16  Command Institute for Police Executives again on first line

17  supervising.

18      October 2007, 40 hours of instruction on leadership and

19  performance management by the PA National Guard Counter Drug

20  Unit.

21  Q    Have you ever participated in the investigation of illegal

22  narcotics activities?

23  A    Yes.

24  Q    How many times?

25  A    Thousands of times.

Direct Examination - Errington

1  Q    And have you ever had occasion to speak with individual

2  engaging in illegal narcotics distribution or activities, excuse

3  me?

4  A    Yes.  Yes.

5  Q    How many times?

6  A    Thousands.

7  Q    How many times have you been qualified as a narcotics

8  expert?

9  A    Between 40 and 50.

10 Q    In what courts?

11 A    Common Pleas -- Pennsylvania Common Pleas Court in Berks

12 County; Pennsylvania Common Pleas Court in Lehigh County; Common

13 Pleas Court in Montgomery County and as well as in federal court

14 in the Eastern District of PA as well as the Middle District of

15 PA.

16      MR. NAIR:  And at this point, Your Honor, I'd move to

17 have Task Force Officer Errington recognized as an expert in the

18 field of narcotics distribution.

19      THE COURT:  You may cross-examine.

20      MR. CLARK:  No objection to his qualifications.

21      THE COURT:  Then the expert is accepted.  You may

22 proceed.

23 BY MR. NAIR:

24 Q    As part of your preparation for your testimony today, did

25 you have an opportunity to review the laboratory analysis for

Direct Examination - Errington

1  the controlled substance in this case?

2  A    Yes.

3  Q    If the witness could be shown G6.  (indiscernible)

4         MR. NAIR:  If I may approach, Your Honor.

5         THE COURT:  Yes.

6  BY MR. NAIR:

7  Q    Do you recognize the laboratory analysis the results from

8  the chemist in this case what's previously marked and admitted

9  as G12?

10  A    Yes.

11  Q    And you've also actually been able to see the drug itself

12  in this case which has previously been marked as G6.  Is that

13  correct?

14  A    Yes.

15         MR. NAIR:  If we could publish G6 to the --

16  (indiscernible).

17  BY MR. NAIR:

18  Q    Now, that's -- in Government Exhibit 7B, that's a

19  photograph of the drugs being weighed with the packaging in the

20  DEA's office here in the courthouse.  Is that correct?

21  A    Yes.  It appears to be our scale.

22  Q    And based upon your experience, training, and working as a

23  narcotics investigator, have you formed an opinion as to whether

24  the 199 grams of Fentanyl is in an amount that is consistent

25  with the purpose of distribution or transfer to others?

1  A    Yes.

2  Q    What is your opinion?

3  A    It's my opinion that it's more consistent with someone

4  who's involved in distribution of drugs, or Fentanyl,

5  specifically.

6  Q    And what do you base that opinion on?

7  A    Usually, there's a lot of factors that go into it.  In this

8  case, it's primarily just the weight.  That amount of Fentanyl

9  can produce thousands of doses.  A typical dosage unit of

10 Fentanyl is approximately 200ths of a gram.  They're sold in

11 small, glassine baggies.  So if you were to multiply or divide -

12 - I believe the lab report said it was 199 grams total, a little

13 over 199 grams, and if you divided by 200ths of a gram, you'd

14 come up with between 9 and 10,000 dosage units.  I think it's --

15 I did the math actually before I got the stand.  I think it's

16 9,950.

17 Q    And those -- to the user on the street of the drug, how

18 much would they be paying for that small little .02 of a gram?

19 A    An individual bag is usually -- goes for around $10.

20 Q    And how much would have to pay for 199 -- I'm sorry.

21 What's the going rate for someone to buy in bulk 199 grams of

22 Fentanyl?

23 A    On the low end, I'd say probably between 55 and $65 per

24 gram.

25 Q    But even possibly lower at $50 per gram.  Is that correct?

1  A    Yes.

2  Q    So someone would have to pay approximately $9,950 if it was

3  at $50 a gram for 199 grams of Fentanyl?  I'm saying per gram.

4  A    If that's what the math is, yeah.  I haven't done the math

5  exactly, but yes.

6  Q    It would come out to be close to $10,000.

7  A    Yes.

8  Q    Is that correct?

9  A    Yes.

10  Q    And if they were the people -- that person sat there -- if

11  you could describe for the ladies and gentlemen of the jury how

12  does it get from that bag to the point where you can distribute

13  it in those little small packets on the street?

14  A    It's a pretty time and labor intensive production.

15  Usually, you might have one person or multiple people sit in we

16  call them heroin mill.  They divvy out -- the amount in the

17  dosage unit is actually too small to even weigh on a scale, so

18  you usually -- they kind of eyeball it or use like a small

19  spoon, place it in a bag.  Those bags are then folded up.

20  Sometimes they're stamped.  Sometimes they're placed inside a

21  secondary plastic bag and sealed, but as you can imagine, to

22  make that many bags would take hours, maybe days.

23  Q    And what is Fentanyl?

24  A    It is a synthetic opioid.

25  Q    And what was it developed for as far as pain management?

1  A    It's a pain reliever used with people with severe illnesses

2  like cancer, things like that.

3  Q    And when one compares heroin to Fentanyl, which is a

4  synthetic opioid, how are they alike as far as potency?

5  A    Heroin --  Fentanyl is approximately 50 to 100 times more

6  potent than heroin.

7  Q    And does it -- Fentanyl as compared to morphine, which is

8  more potent?

9       MR. CLARK:  Your Honor, I object to this line of

10 questioning.  It's not relevant to the prosecution.

11      MR. NAIR:  Your Honor, it absolutely is relevant

12 because the call was intercepted and the investigation into the

13 drug supplier the Government alleges to the defendant was

14 distributing in Agent Romig's experience heroin, and I'm trying

15 to put this in context through the expert who is qualified to

16 give this opinion as to the differences between heroin and

17 Fentanyl, how it is distributed, does the ultimate user of

18 Fentanyl end up believing they're getting Fentanyl, they're

19 getting heroin; how does it all work.  When it ultimately hits

20 the streets, it all goes into whether that 199 grams is for

21 someone's personal use, or whether it's going to be turned into

22 thousands of doses on the street.

23      MR. CLARK:  First of all, I think it's relevant, but

24 if nothing else, (indiscernible) what Agent Romig already

25 testified to.

1      THE COURT:  Objection overruled.

2   BY MR. NAIR:

3   Q    Compared to morphine.

4   A    It's 80 to 100 times more powerful than morphine.

5   Q    And you've already talked a little bit about heroin mill.

6   If the person possessing the Fentanyl in this case was not going

7   to be the person actually bagging up the Fentanyl, not sitting

8   there for hours if not days putting it in the bags, please tell

9   the ladies and gentlemen how this would be redistributed based

10  upon your experience.

11  A    Depending on the level of the hierarchy in the

12  organization, it could be broken up into quantities of 5 grams,

13  10 grams, 20 grams, and sold in bulk like that in smaller

14  quantities to people who actually do the processing for street-

15  level sales.

16  Q    And assume for the moment that the person possessing this

17  199 grams was not going to break down into 10,000 doses, was not

18  going to turn it into 5 gram amounts to make a profit off of,

19  was actually just a courier of the drug and was getting it from

20  -- on behalf of one person at point A to another person at point

21  B, would that person be also expected to be paid based upon your

22  experience for being the courier?

23  A    The person who is transporting it?

24  Q    Yes.

25  A    Yes.  Yes, it's very common for people involved in

Direct Examination - Errington

1  distribution of drugs to pay someone to transport drugs to

2  insulate themselves from being caught by police.

3  Q    But that person, the courier, still ultimately taking the

4  drug and distributing it to another person.  Is that correct?

5  A    Yes.

6  Q    They're not going to sit there and use 199 grams of

7  Fentanyl in the car, in the house, at one time, how long would

8  that take to use 199 grams of Fentanyl?

9  A    A long time, and that's considering -- you could also

10 depending on the potency you could break it down and make more

11 than 9,950 bags.  So it would take quite a long time.  In my

12 experience, I've never seen anybody with that amount of Fentanyl

13 possess it for the purposes of using it themselves.

14 Q    Let's talk about a heavy user of Fentanyl or heroin.  Based

15 upon your experience, your interviews, what you learned through

16 your investigations, what's the most that you've ever seen

17 someone purchase at one time?

18 A    For personal use?

19 Q    Yes.

20 A    Maybe three bundles, which a bundle is 10 bags, so maybe 30

21 bags.  And that's a heavy user. That's somebody who is really

22 afflicted.

23 Q    Explain that.  Why aren't they buying more?  Why aren't

24 they asking someone who has 199 grams for 5 grams

25 (indiscernible) to use?

1  A    An addict is usually concerned with getting their next fix.

2  They're not planning to get their fix for today and tomorrow and

3  next week.  They usually don't have any money because of their

4  addiction, so they're -- they spend their day trying to get

5  their next fix.  If they can go out in the street corner and buy

6  a bundle, 10 bags, 20 bags, to get them through that day, then

7  that's what they do, and then you know worry about the next

8  dosage or the next fix the next day.

9  Q    And based upon your experience, what are air fresheners in

10 a car used for?  And I don't mean just to make the car smell

11 better, or let's say there was drugs in the car.  What is your

12 experience?  Why would the air fresheners be there?

13 A    They're commonly used by those who are transporting drugs

14 to throw off the scent of the drugs in the event they were

15 stopped by police and a narcotics dogs.  There's a belief that

16 they can throw off the drug -- the dog from smelling the drugs

17 inside the car.

18 Q    And that belief is based upon drug dealers that you've

19 interviewed.  Is that correct?

20 A    Yes.  And experience I mean stopping cars and more often

21 than not, there's air fresheners in the car, multiple air

22 fresheners.  Not like -- an ordinary person might have one

23 hanging in their car.  I've seen sometimes 10, 12 air fresheners

24 spread throughout the car in the belief it will throw off the

25 dog.

1  Q    And what are burner phones?

2  A    Burner phone is a phone that you can go into Walmart or

3  these little corner stores, purchase a phone without having to

4  show identification.  You can put that phone in any name you

5  want or not put it in any name at all.  They're used by persons

6  doing illegal activities, in particular, drug distribution,

7  because law enforcement when they check the ownership of that

8  phone as part of their investigation, it'll come up to a fake

9  name or no name at all.  So it helps insulate people involved in

10 illegal activities from being detected by law enforcement.

11 Q    In your experience, is it common for drug dealers to try

12 and insulate themselves from being caught by law enforcement

13 have more than one phone?

14 A    Yes.

15 Q    Is it also common for drug dealers to keep people that

16 aren't involved in the drug world on a separate phone, friends

17 and family?

18 A    Yes.

19 Q    Assume the drug supplier, not the person who's possessing

20 the 199 grams, but the drug supplier of the 199 grams of

21 Fentanyl, who normally sold cocaine in kilograms and 500 gram

22 quantities and heroin in 100 gram quantities at a stash house,

23 and the only person that that drug supplier would meet during an

24 investigation is maybe one person, two people at his house.

25 Otherwise, he would send his customers to a stash house.

1    First, let's explain what a stash house is to the ladies

2  and gentlemen of the jury.

3  A    A stash house is another tool used by drug dealers to

4  insulate themselves. They don't want to keep the drugs at their

5  house to have people -- customers in and out.  It's going to

6  look suspicious.  Neighbors might call the police if they see

7  people in and out.  So usually they will -- whether they use a

8  friend's house or a customer's house that they can pay to stash

9  the drugs there, they'll try to further insulate themselves by

10 keeping the drugs at a separate location where it can't be

11 linked to them.

12 Q    And based upon your experience, is drug dealing a safe

13 business?

14 A    No.

15 Q    And would a stash house eliminate the possibility of the

16 person who's ultimately in control of those drugs from himself

17 getting robbed, killed, anything -- or arrested?

18 A    Yeah.

19        MR. CLARK:  Objection, Your Honor.  None of this has

20 anything to do with the facts of our case.  I don't think it's

21 relevant.  I don't think it's probative, and I don't think it

22 helps the jury at all.

23        MR. NAIR:  Respectfully, Your Honor, it absolutely

24 does.  There's testimony that Santiago Correa and the drugs

25 acquired for those drugs used a stash house to keep those drugs.

1  That the night before that the person who was coming in from

2  Redding, he had to go over to pick those drugs up.  Normally,

3  throughout the five-month investigation, he only sold those

4  drugs cocaine, heroin --

5        THE COURT:  Let me see counsel by sidebar.

6     (Sidebar commenced at 11:40 a.m.)

7        MR. CLARK:  (indiscernible).  It has nothing to do

8  with this case.  (indiscernible) trying to prove that certain

9  factual evidence (indiscernible).  I get it, but

10 (indiscernible).  It has nothing to do with our case.

11       MR. NAIR:  It's a hypothetical, Your Honor, and a

12 hypothetical is if you have a drug dealer who uses a stash house

13 to insulate himself and then what -- no one is even allowed to

14 come to his house if he's using throughout the investigation a

15 stash house (indiscernible) and then all of a sudden he lets

16 someone come to his house.  That's going to show based upon the

17 narcotic expert's experience that is a little bit more unusual

18 and that there was a basis of trust.  Not saying between this

19 defendant, but in the hypothetical.  And I'm allowed to pose a

20 hypothetical.

21       MR. CLARK:  (indiscernible) facts around the case.

22 (indiscernible).

23       MR. NAIR:  (indiscernible).

24       MR. CLARK:  (indiscernible) evidence (indiscernible).

25       MR. NAIR:  I made it clear.  I'm talking about the

1 drugs (indiscernible), not the (indiscernible).

2          THE COURT:  (indiscernible) far afield, too far.

3          MR. NAIR:  I'll move on.

4          THE COURT:  I'm going to sustain the objection.

5     (Sidebar concluded at 11:41 a.m.)

6 BY MR. NAIR:

7 Q    Detective Errington, to reiterate, the Fentanyl in this

8 case, the 199 grams based upon your experience would be

9 possessed for the purpose of what?

10 A    Distribution.

11 Q    Any doubt based upon your experience and all the training

12 that you've had, the almost 30 years law enforcement experience

13 you have, that anyone would possess that amount for their

14 personal use?

15 A    No.

16          MR. NAIR:  Thank you.

17          THE COURT:  Cross-examination.

18          MR. CLARK:  Thank you.

19                    CROSS-EXAMINATION

20 BY MR. CLARK:

21 Q    You said that one of the factors that you used to reach

22 your conclusion primarily in this case anyway has to do with the

23 weight of the substance.  Is that correct?

24 A    That's the main factor, yes.

25 Q    That's the main factor. And there are other factors

1  (indiscernible)?

2  A    Yeah.

3  Q    Or not in this case.

4  A    Well, there's the fact that a burner phone was also found.

5  The fact that it was found inside the air filter compartment and

6  the engine compartment of the car.

7  Q    Let me ask you this.  You were telling us a little bit

8  about the substance as it relates to being packaged and so forth

9  and so on.  You said that when you package it, it's almost

10  infinitesimal.  You can barely see in it such as a small amount

11  --

12  A    No, I didn't say you could barely see it.  I say you don't

13  use a scale, because it's 200ths of a gram.  It's kind of hard

14  to measure 200ths of a gram.  It's kind of eyeballed.

15  Q    In terms of measuring it?

16  A    Yes.

17  Q    So you indicated to us that the air fresheners would be an

18  indicator of drug dealing, correct?

19  A    Yes.

20  Q    But there is a legitimate use for air fresheners, correct?

21  A    Certainly.

22  Q    Many people have air fresheners and not have anything to do

23  with selling drugs.

24  A    Correct.

25  Q    (indiscernible).

1   A    Correct.

2   Q    You said cell phone.  Having more than one cell phone.

3   Many people have more than one cell phone.  (indiscernible) You

4   have more than one cell phone, right?

5   A    Depending on their occupation, I suppose it's possible yes.

6   Q    In fact, you might even have more than one cell phone.

7   A    I do.

8   Q    Now, when you -- strike that.

9        Is there a rule of thumb that you use to determine when a

10  substance is for personal use or for drug trafficking as it

11  relates to Fentanyl?

12  A    A rule of thumb?  No.  Usually, it's the totality of all

13  the circumstances.  There's things like how much money they

14  have.  Whether they had a scale.  Whether they had packaging

15  material.  In other cases, this one in particular, the mere

16  weight of it is a clear indicator to me that it's possessed with

17  the intent to distribute.

18  Q    Now sometimes a clear indicator too would be, would it not,

19  be the amount of money that was paid to obtain the substance,

20  correct?  The purchase price.

21  A    The purchase price?  In relation to the amount of drugs?  I

22  mean it's more the amount of drugs.

23  Q    Well, let me ask you this.  Let me put it a different way.

24  Usually, when there's going to be a drug transaction or a drug

25  deal, right, there's a negotiation or some discussion about

 1  price, right?

 2  A    Yes.

 3  Q    This for that.

 4  A    Usually.  Yes.

 5  Q    You would expect that in most of your investigations isn't

 6  that true?

 7  A    Yes.

 8  Q    And the amount of quid pro quo, money for the drugs, that

 9  would vary depending upon the kind of drug?  Cocaine versus --

10  A    Yes, oh yes.

11  Q    Cocaine versus marijuana versus cocaine.

12  A    Yes.

13  Q    They would all be dependent upon what substance is being

14  involved.  Is that right?

15  A    It's different prices for different drugs, yes.

16  Q    So with respect to the price -- the price that could be

17  negotiated for heroin versus the price to be negotiated for

18  Fentanyl, that would not be the same.

19  A    Actually, it's pretty consistent in my experience for

20  Fentanyl and heroin, because a lot of times Fentanyl is being

21  sold as heroin and the person purchasing it doesn't even know

22  they're getting Fentanyl. They believe they're getting heroin,

23  but the Fentanyl has similar effects as heroin, so they really

24  don't even know what they're getting.  So the prices are kind of

25  consistent.

1    I would say if they know they're purchasing Fentanyl, it

2  might be slightly lower, but in my experience, it's pretty

3  consistent with the price for heroin.

4         MR. NAIR:  Judge, thank you.  I have no further

5  questions.

6         THE COURT:  Any redirect?

7         MR. NAIR:  Briefly, Your Honor.

8                   REDIRECT EXAMINATION

9  BY MR. NAIR:

10 Q    Counsel was talking about paying for the drugs.  Based upon

11 your experience, please explain to the ladies and gentlemen of

12 the jury what fronting the drugs means.

13 A    It's getting drugs on consignment.  Usually -- it's usually

14 reserved for people who have closer relationship with his

15 supplier, they will give the drugs we call fronting the drugs.

16 The person will go to the supplier, get the drugs on

17 consignment, and then pay for them after they've sold them and

18 recouped their money.

19 Q    Would also be fair to say that in fronting the drugs,

20 there's less exposure?  You're not driving to meet your drug

21 supplier with cash.  You can get caught by law enforcement and

22 also you're only risking the drive back, or the picking up of

23 the drugs.

24 A    Yes.

25         MR. NAIR:  Thank you.  I have no further questions.

1            THE COURT:  Any recross?

2                    RECROSS-EXAMINATION

3   BY MR. CLARK:

4   Q    I don't recall, but I know you've given us a sum, something

5   like $10,000 per gram (indiscernible).

6   A    Not per gram, no.  In total.  In total, not per gram.

7   Q    In total?

8   A    Yes.

9   Q    499 grams would be $10,000.

10  A    I believe it's 199 grams.

11  Q    I'm sorry.

12  A    It's 199 grams I believe is what we're talking about.  If

13  you -- yeah, in bulk, if you -- estimating what you would pay

14  per gram, but yeah, around there.

15  Q    Are you telling me that 199 grams of Fentanyl, the price

16  would be around $10,000 or am I wrong?

17  A    I'd have to have a calculator, but I'm guessing between

18  like 50, 60, 65 as gram depending on who you're getting from,

19  and prices vary from supplier to supplier, so I'm just guessing.

20  And when whatever that math would be, 199 times that.

21            MR. CLARK:  Thank you.

22            MR. NAIR:  Just want to clarify one thing.

23                FURTHER REDIRECT EXAMINATION

24  BY MR. NAIR:

25  Q    You're talking about wholesale.  In other words, what you

1  would pay for as a bulk of this, correct?

2  A    Correct.  It would be worth a lot more if you broke it down

3  into individual dosage units and sold it for $10 per 200ths of a

4  gram, you're talking a lot more.

5  Q    So somewhere in the neighborhood between 9 and $10,000 to

6  purchase 199 grams of Fentanyl, but if you were to sit there and

7  break -- as bulk, from the wholesaler, if you break it down into

8  individual dosages, you could retail it up to $100,000, correct?

9  A    At least or more if you were to cut with a cutting agent,

10  and you know, double your quantity.

11  Q    The lab results you have in front of you, caffeine,

12  ibuprofen, are those some cuts?

13  A    Yes, caffeine and ibuprofen are both used in my experience

14  as a cutting agent for heroin or cocaine.

15  Q    The other word that begins with a D.

16  A    I am not familiar with that, dipirum (phonetic).  I'm not

17  familiar with what that is.

18  Q    But it's possible that that's a cut too?

19  A    Could be.

20          MR. NAIR:  Thank you.

21          THE COURT:  Anything else?

22          MR. CLARK:  No, Your Honor.

23          THE COURT:  You may step down.  May the witness be

24  excused?

25          MR. CLARK:  Yes, Your Honor.  No objection.

1          THE COURT:  Very good.  You're excused, sir.

2          Government may call its next witness.

3          MR. NAIR:  The Government has no further witnesses to

4  offer at this time, and we'd move all exhibits into evidence

5  that the Government has not.

6          THE COURT:  Ladies and gentlemen of the jury, what

7  we're going to do is I have some work I need to do just with the

8  lawyers and so what we're going to do is excuse you for a

9  recess.  We're going to send you out for an early lunch.  Why

10  don't you report back here?  It's 11:52 a.m.  How about you

11  report back at 1:00 p.m.?

12          And again I reissue my cautionary instruction to you.

13  Do not discuss this case with anyone.  Do not try to do any

14  research on your own.  No communications electronically about

15  this case.  It would be very serious if someone were not to

16  follow that instruction, and I believe you will all follow it.

17          So, Mr. Wood, would you declare a recess, please?

18          DEPUTY CLERK:  All rise. Court is in recess.

19      (Jury out at 11:52 a.m.)

20          THE COURT:  You may be seated.

21          All right.  Let's start about the Government exhibits.

22  Government has moved to admit all exhibits.  Are there any

23  objections, Mr. Clark?

24          MR. CLARK:  Your Honor, in reviewing the exhibit list

25  yesterday, I think all the objections I made, I made them on the

1  record.  Your Honor made the rulings with respect to the

2  admissibility (indiscernible) shown to the jury, so I have

3  nothing in addition to (indiscernible) we already have.  I don't

4  -- well, I guess we had a couple this morning.  One was the

5  certified record.

6          MR. NAIR:  Yes. G14.  I think that should be admitted

7  but not published.  I think Counsel and I are in agreement with

8  that.

9          THE COURT:  So if I understand you, Mr. Clark, your

10  objections to exhibits have already been stated and ruled upon,

11  so you have no additional objections.

12          MR. CLARK:  Correct.

13          THE COURT:  So Mr. Nair's current request to admit all

14  other exhibits that have not been ruled upon, there are no

15  objections to those, correct?

16          MR. CLARK:  That's right, Judge.

17          THE COURT:  Then they're admitted.

18          MR. NAIR:  Thank you, Your Honor.  I'll state them for

19  the record just so we --

20          THE COURT:  If you would.

21          MR. NAIR:  G1 which was the CV from Agent Romig, G2

22  which I have here and I believe I'll end up retaining a copy of

23  it, but it's the thumb drive that contains the call that the

24  jury heard.

25          The transcript has already been admitted as G2A by the

1  Court. The same for G3, that was the second call, and I do have

2  the disk for a thumb drive that will be the exhibit and the

3  Court has already admitted G3A which is the transcription.

4         G4 was the dash cam recording, and I will submit that

5  in the same type of form that I'm doing with G2 and G3. That

6  will be on a disk.

7         G5 was the consent in English. I'm sorry, the consent

8  signed allegedly by the defendant, consent to search, and G5A

9  was the consent form in English.

10        The G6 was the Fentanyl itself. Obviously, DEA with

11  the court's permission will retain control of that exhibit.

12        THE COURT: Any objection, Mr. Clark, to that?

13        MR. CLARK: No.

14        THE COURT: All right.

15        MR. NAIR: G7 was the photo of the engine block of the

16  defendant's car. G7A was the air filter and the Fentanyl, the

17  photograph of it. G7B was the Fentanyl on top of the

18  defendant's car. G7C was the Fentanyl on a scale. G7D was a

19  photograph of K-9 Edo. G7F was another photo. Sorry E was a

20  photo of the drugs that DEA office in Allentown. G7F was the

21  photograph of the drugs and the laboratory, unique laboratory

22  number that was used to submit it into evidence. And G7G was a

23  photograph of the car documents -- vehicle documents that were

24  taken from the defendant including his driver's license, a

25  financial responsibility card, and a car registration.

1       G8 was the Miranda waiver signed by the defendant in

2  Spanish.  G8A is the form in English.

3       G9 has already been admitted I believe which was the

4  black flip phone.  G9A was the white Samsung phone that has

5  already been admitted, and with the Court's permission and if no

6  objection from Counsel, the Government will retain control over

7  that.

8            THE COURT:  Any objection, Mr. Clark?

9            MR. CLARK:  No objection.

10           THE COURT:  Very good.

11           MR. NAIR:  G10 was photos.  G10A and G10B were photos

12  of the flip phone screen, or basically screen shots.  They have

13  already been admitted.

14       G11 is the curriculum vitae of Chemist Jonathan Duffy.

15       G12 is the lab report which has already been admitted,

16  and G12A is the supporting documentation.

17           UNIDENTIFIED SPEAKER:  Your Honor, I heard G11.  I

18  don't think that was ever made into the record.

19           MR. NAIR:  He described his experience, so I'm not

20  going to move G11 into evidence.

21           THE COURT:  I'm sorry.  Is that the CV?

22           MR. NAIR:  Yeah, it was his CV.

23           THE COURT:  Mr. Clark, do you have any objection if we

24  put that in just for the record?

25           MR. CLARK:  No.

1          THE COURT:  All right.

2          MR. NAIR:  So I'll mark a copy.

3          And that would bring me to G13 which was the CV for

4    Detective Errington, and I'd move to admit that into evidence.

5          And then G14 was the certified record and conviction

6    that the Court has already ruled upon.

7          Thank you.

8          THE COURT:  Very good.  That covers all the Government

9    exhibits.  Anything else from the Government?

10          MR. NAIR:  No, Your Honor.

11          UNIDENTIFIED SPEAKER:  Your Honor, I will need copies

12    of those for the Court.

13          (Plaintiff's Exhibits 1 through 14 admitted)

14          THE COURT:  In a moment, we're going to turn to the

15    defense position and defense case.  I just want to put something

16    on the record, though, to supplement a ruling I made earlier.

17          Counsel -- defense objected to testimony by the state

18    trooper about the incident in Chester County.  I overruled the

19    objection.  I just want to put something in the record on that.

20          The Government had proposed to present evidence that I

21    believed was relevant for the non-propensity purpose of showing

22    the defendant's knowledge and intent.  And our research shows

23    the Courts routinely admit evidence of prior drug involvement to

24    rebut claims of innocent association and to prove criminal

25    intent.  And that's based on the case of United States v. Lopez,

1   340 F3d 169, a Third Circuit case from 2003.

2           The Government presented testimony to indicate that

3   the defendant supposedly admitted that the drugs belonged to

4   him, and I believe under Third Circuit precedent his prior drug

5   conviction and the circumstances relating to that therefore

6   became relevant to the non-propensity purpose of demonstrating

7   that he intended to distribute the Fentanyl found in his car.

8   And in this regard, we find the case of United States v.

9   Ranalli, from the Middle District, 2015 West Law 539 729 from a

10  case from 2015 to be persuasive.  And in that case, the Court

11  admitted evidence of prior convictions of manufacture, delivery,

12  or possession with intent to distribute in a trial for

13  possession with intent to distribute where the defendant had

14  already admitted ownership of the drugs.

15          And so as a result, that was the basis for my -- in

16  large measure form my ruling and also we rely upon the earlier

17  written opinion dated November 29, 2018 addressing the

18  Government's motion in limine pursuant to 404(b).  So I just

19  wanted to put that on the record.

20          So I just want to put that on the record.  Let's now

21  turn to the defense position in this case.  And I also want to

22  put something on the record about the defendant's right to not

23  testify at trial.  And also address the Government's motion to

24  Rule 609.

25          Mr. Clark, have you had a chance to consult with your

1  client about whether he intends to testify or not?

2      MR. CLARK: I have, Your Honor. I had spoken to him

3  yesterday for a period of time and also again this morning and

4  his final decision, he indicated to me that he wanted to

5  testify, so that's where he stands this morning. He's

6  testifying. So that's where we stand, Judge.

7      THE COURT: Very good.

8      MR. CLARK: Your Honor, I think -- I don't want to

9  tell the Court what to do, but I think we need to give him a

10  colloquy on that.

11      THE COURT: Okay. Very good. All right. Mr. Wood,

12  would you administer an oath to the defendant, please?

13      (The Defendant is Sworn)

14      THE COURT: Mr. Concepcion-Rosario, I have several

15  questions for you. I want to make sure that you understand a

16  few things for the record.

17      Have you and your lawyer, Mr. Clark, discussed your

18  options about whether to testify or not testify?

19      THE DEFENDANT: Yes.

20      THE COURT: I'm not asking you to tell me what Mr.

21  Clark told you. I'm not asking that, but has Mr. Clark advised

22  you of what the advantages and disadvantages of testifying are?

23      THE DEFENDANT: Yes.

24      THE COURT: Similar to the decision to plead guilty or

25  to go to trial, the decision to testify at trial is ultimately

1  yours.

2          THE DEFENDANT:  What was that again?

3          THE COURT:  Like the decision to plead guilty or to go

4  to trial, the decision to testify at trial is ultimately your

5  decision.

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you understand?

8          THE DEFENDANT:  I do.

9          THE COURT:  Your lawyer, Mr. Clark, can give you

10  advice but the final decision must be yours and yours alone.  Do

11  you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  The United States constitution gives you

14  the absolute right not to testify.  Do you understand that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  In addition, if you choose not to testify,

17  no one can use that decision against you.  Do you understand?

18          THE DEFENDANT:  Yes.

19          THE COURT:  The Government may not comment on your

20  decision not to testify and the jury cannot use that fact to

21  infer that you are guilty.  Do you understand?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Do you intend to testify on your own

24  behalf?

25          THE DEFENDANT:  Yes.

1        THE COURT:  You are making this decision voluntarily

2   and of your own free will?

3        THE DEFENDANT:  Yes.

4        THE COURT:  Finding that the defendant intends to

5   testify on his own behalf, I will now rule on the Government's

6   motion under Rule 609 to admit evidence of prior convictions.

7        I will now read my decision.

8        Presently before the court is the Government's motion

9   to admit evidence of two prior felony convictions to impeach the

10  defendant's credibility as a witness in the event he chooses to

11  testify.

12       The Government seeks to admit evidence the defendant's

13  1999 conviction in the District of Puerto Rico for possession of

14  contraband, specifically heroin, in prison and defendant's 2015

15  Pennsylvania State conviction for possession with intent to

16  deliver a controlled substance, felony conspiracy, and felony

17  third degree fleeing to elude a police officer.

18       I previously ruled that the Government could introduce

19  the 2015 conviction -- convictions as evidence of intent and

20  purpose under Rule 404(b), except for the fleeing to elude a

21  police officer charge.  The Government now seeks to use the

22  conviction to impeach defendant's credibility as a witness as

23  well.

24       Rule 609 permits evidence of a prior felony conviction

25  to be offered to impeach a testifying witness's character for

1  truthfulness.  However, when the testifying witness is also the

2  defendant in a criminal trial, the prior conviction is admitted

3  only if the evidence passes a heightened balancing test, and the

4  probative value of the evidence outweighs its prejudicial effect

5  to that defendant.

6          The Third Circuit Court of Appeals recognizes four

7  factors that a court must balance when weighing the probative

8  value of a prior conviction against its prejudicial effect.

9          First, the nature of the prior crime.

10          Second, when the prior conviction occurred.

11          Third, the importance of the defendant's testimony to

12  the case.

13          And, fourth, the importance of the defendant's

14  credibility.

15          I recognize the defendant's argument that his 1999

16  conviction is not subject to Rule 609(a) because it is more than

17  10 years old.  Defendant was convicted in 1999 and released from

18  custody in November 2008.  He argues that his subsequent period

19  of supervised release, which expired in May 2011, does not count

20  as confinement.  Therefore, his 1999 conviction is subject to

21  the presumptive exclusion and heightened balancing test of Rule

22  609(b).

23          I won't address the merits of this argument though

24  because I conclude that defendant's 1999 conviction is

25  inadmissible; that is to say inadmissible even under the lesser

1  Rule 609(a)(1)(b) standard.

2         When evaluating the first factor, the kind of crime

3  involved, courts consider both the impeachment value of the

4  prior conviction as well as its similarity to the charged crime.

5  I find that the defendant's 1999 conviction has some impeachment

6  value because of the offense of possessing contraband in prison

7  suggests that defendant acted with deceit by concealing heroin

8  in prison.

9         This deceptive conduct speaks to his credibility and

10  truthfulness as a witness.  However, the 1999 conviction poses a

11  large risk of prejudice.  The jury might infer from the

12  conviction that the defendant possessed heroin in prison for

13  personal use, conclude that he is a drug user, and draw

14  conclusions of that aspects of his character other than his

15  truthfulness.

16         Moreover, through hearing that the defendant was

17  convicted of possession of contraband in prison, the jury will

18  learn that the defendant was in prison for another previous

19  crime when he was caught with heroin and may be tempted to

20  speculate about what the crime was or draw unfair inferences

21  from it.

22         This prejudice cannot be remedied by admitting only

23  the fact that the defendant had a drug conviction in 1999,

24  because admitting the mere conviction without the underlying

25  facts would strip the evidence of much of its relevance to the

1 defendant's truthfulness and credibility as a witness.

2          Accordingly, I find that the first factor weighs
3 against admitting the defendant's 1999 conviction.

4          With respect to the second factor, the age of the
5 conviction, the passage of time, combined with changed character
6 may weigh in favor of exclusion.  Conversely, the probative
7 value of an older conviction may remain undiminished if the
8 defendant was recently released from confinement or has multiple
9 intervening convictions.

10          Although defendant's 1999 conviction is remote in
11 time, the defendant was only released from prison in 2008 and
12 his supervised release ended as recently as May 2011.
13 Afterward, defendant lived a crime-free life for only a little
14 less than four years until his conviction in February of 2015
15 for the Pennsylvania State offenses.

16          Defendant's continued involvement with the criminal
17 justice system suggests his character has not improved.  Thus,
18 the second factor weighs slightly in favor of admitting the 1999
19 conviction.

20          The third factor requires me to consider the
21 importance of the defendant's testimony to his defense at trial.
22 At least as far back as the suppression hearing, defendant,
23 through counsel, has contested the Government's version of
24 events surrounding his arrest and advanced the theory that the
25 Government planted evidence.

1    If the defendant plans to pursue this strategy at

2 trial, he is the only witness available to offer his version of

3 events.  Therefore, his testimony is important to his defense,

4 and the third factor weighs against inclusion.

5    However, to the extent that the defendant is the sole

6 witness presenting his version of events, the fourth Caldwell

7 (phonetic) factor, the significance of the defendant's

8 credibility to the case, weighs in favor of it, including the

9 prior testimony.  Therefore, the third and fourth factors

10 balance out.

11    On the whole the Caldwell factors weigh against

12 admitting defendant's 1999 conviction.  I conclude that the

13 probative value of the evidence does not outweigh its

14 prejudicial effect, and I will exclude it.

15    That's the 1999 conviction.

16    And now turning to the defendant's 2015 Pennsylvania

17 convictions.

18    You now set the importance of defendant's testimony

19 and the significance of his credibility as the same as with the

20 1999 conviction, so I will address only the first and second

21 Caldwell factors in reverse order.

22    The second factor favors admitting the 2015

23 convictions given the recency.  The first factor weighs slightly

24 in favor of admitting defendant's possession with intent to

25 distribute and conspiracy convictions but against admitting

1  defendant's conviction for fleeing to elude a police officer.

2         Although the possession and conspiracy convictions are

3  similar to the present charge against defendant, the Third

4  Circuit Court of Appeals has held that previous drug convictions

5  can be used as impeachment evidence in trials for drug charges.

6         Additionally, I've already weighed the risk of

7  prejudice from these two convictions under Rule 404(b) and

8  concluded that the prejudicial value was not substantially

9  outweighed by the risk of unfair prejudice.

10        Given that the jury has already heard about these

11 convictions in the Government's case in chief, the risk of

12 additional prejudice from the evidence being used again as it

13 relates to defendant's credibility as a witness is low.

14        Defendant's conviction for fleeing to elude a police

15 officer, while less similar to the instant charge than the

16 previous drug crimes, has low probative value with respect to

17 defendant's credibility as a witness because fleeing from police

18 does not involve deceit or dishonesty.  Instead, it involves

19 recklessness and possible disregard for human life.  Thus, this

20 conviction falls closer to the category of violent crimes which

21 courts generally consider to have lower probative value to

22 impeach a witness.

23        Additionally, I previously precluded evidence of this

24 conviction under Rule 403, finding that its risk of unfair

25 prejudice to the defendant outweighed its probative value of his

1  knowledge and intent.

2       Rule 609(a)(1)(b) is a higher standard than Rule 403,

3  and I conclude that fleeing to elude a police officer conviction

4  fails to clear that higher bar as well.  Although Rule 609

5  relates to the evidence as offered to impeach defendant's

6  credibility instead of to show his intent and knowledge, I find

7  that the conviction still poses too great a risk of prejudice

8  for the reasons discussed in my previous opinion.

9       Therefore, to conclude, the Government may impeach the

10  defendant's credibility under Rule 609 with evidence of his 2015

11  Pennsylvania State convictions for possession with intent to

12  distribute a controlled substance and conspiracy.

13       The Government's motion is denied in all other

14  respects.

15       And we'll get a copy of this for both counsel for your

16  files.

17       Now, Counsel, before we adjourn for lunch -- excuse

18  you for lunch, is there anything else to take up at this time?

19       MR. NAIR:  Just anticipated scheduling, Your Honor,

20  which counsel and I can do at sidebar.

21       THE COURT:  All right.  You want to approach?

22    (Sidebar commenced at 12:16 p.m.)

23       MR. NAIR:  (indiscernible).  Does the Court anticipate

24  us closing and giving the charge to the jury?

25       THE COURT:  (indiscernible).

1    MR. CLARK:  I was thinking about calling Agent Romig

2  on just a few things, but I mean (indiscernible).

3    THE COURT:  (indiscernible)

4    MR. CLARK:  (indiscernible) Agent Romig and even if I

5  did, it would be about five or ten minutes.  I make a motion for

6  judgment for acquittal.  (indiscernible)

7    THE COURT:  (indiscernible)

8    (Sidebar concluded at 12:18 p.m.)

9    (Pause)

10    THE COURT:  I understand Mr. Clark you have a motion

11  on behalf of your client.

12    MR. CLARK:  Yes, Your Honor.  Judge, I would like to

13  make a motion for judgment of acquittal on behalf of Mr.

14  Concepcion-Rosario.

15    The basis of my motion is this.  Right from the start

16  of the Government's case, they outlined a set of facts and

17  circumstances, some of which they want us to make an inference

18  that my client is guilty of possession with intent to deliver

19  Fentanyl.

20    But if you actually look at the actual facts, I submit

21  to you that the evidence is insufficient.  Number one, their

22  evidence is that on June 17th -- strike that.  On June 16th,

23  there was communication between this Mr. Correa and a lady known

24  as Navarette about some 200 something that is to be transferred,

25  transacted, somebody is going to get it, somebody is going to

1  pick it up.  Nothing in that transcript relates to Mr.

2  Concepcion-Rosario, not by name, not by nickname, not by

3  anything.

4          And so at that time that the Government's evidence

5  supports my statement that they had no knowledge of or

6  participation in any precursor to a drug transaction involving

7  my client.

8          On the next morning around 10:30 in the morning, a

9  couple of -- members of the surveillance team now find what

10 their observations were.  Merely, that my client arrived.

11 Merely, that Mr. Correa, who we've heard a lot about, came

12 outside presumed to be carrying something.  The lid of my

13 client's car goes up.  They don't see any transaction.  Money

14 for drugs or anything like that.  One of the surveillance team

15 said there was a little bit of conversation between my client at

16 the rear of my client's vehicle.  And it went down.

17         So when they're on Wyoming Street I believe, we see

18 nothing other than the hood goes up, the hood goes down. What

19 happened to the bag that Mr. Correa might have possessed based

20 on the evidence from the Government, we don't know what that is.

21 I asked one of the surveillance team whether or not he could

22 tell us anything about that bag.  Was there writing or some

23 other indication that would link it up to what item was

24 ultimately removed from my client's vehicle over on 222.

25         And my client has an explanation for that, which is

1  not in the record, of course.  But what's going to happen here,

2  what I'm going to argue, Judge, is that my client is convinced

3  and he will state that those drugs are not his.  That he was not

4  participating in any drug transaction, but when we get him

5  stopped -- when the officers get him stopped along 222, he

6  denies understandably knowing he voluntarily signed the waivers,

7  he denies signing it knowingly, voluntarily -- understand he's

8  signing the consent form or the waiver form for Miranda back at

9  the barracks, that he denies making any statement whatsoever to

10 the Government with respect to ownership -- admitting possession

11 of those drugs.

12        He is adamant that because the Government has failed

13 to produce any evidence by videotape or by photograph that he's

14 not guilty of these offenses, and he's adamant that when you

15 hear testimony from the investigating officers in and of itself

16 is insufficient to meet the burden.

17        From my perspective as his counsel, I would suggest

18 that he -- the position of my client is one that he's entitled

19 to take, but I've advised him that they may not carry the day in

20 terms of the preliminary decision that I'm asking Your Honor to

21 make.

22        But I think when we look at all the facts and the

23 circumstances, on behalf of my client's interest, I'm making a

24 motion, and I ask Your Honor to consider granting his motion for

25 judgment of acquittal.

1        THE COURT:  Mr. Nair.

2        MR. NAIR:  Just on the following evidence Your Honor

3   is enough in the light most favorable to the United States which

4   is what is what the Court has to do at this point upon such a

5   motion.  Defendant had a vehicle, had a car with drugs in it.

6   Those drugs were recovered.  They were resulted from a chemist

7   who testified it was Fentanyl.  The defendant admitted the drugs

8   were his and there was expert testimony that that quantity alone

9   had to be possessed with intent to distribute.

10        All of those facts make up the elements of the crime

11  in this case.  In addition, there's an aiding and abetting

12  theory.  That's really what the testimony that counsel is

13  referring to in aiding and abetting where Santiago Correa would

14  be the principal and the defendant would be aiding and abetting

15  him and carrying on the elements of possession with intent to

16  distribute because he is aiding the ultimate distribution of

17  those drugs.

18        So Government has shown under both theories that each

19  element has been satisfied to meet its burden on its case in

20  chief.  Thank you, Your Honor.

21        THE COURT:  Thank you.  It's well-argued by both

22  sides.  I'd like to think about this carefully over the lunch

23  hour, so we're going to adjourn for lunch.  Do you want to

24  report back at 1:00 or 1:15?  How much time do you need for

25  lunch, because we sent the jury out at 12:00, but I held you for

1    a while.

2            MR. NAIR:  Would 1:15 be okay?  Because I'd like to

3    prepare --

4            THE COURT:  Yeah, 1:15.  Mr. Clark, is that

5    satisfactory?

6            MR. CLARK:  That's satisfactory.

7            THE COURT:  Why don't you report back at 1:15 p.m.?

8    Mr. Wood, would you recess the Court, please?

9            DEPUTY CLERK:  All rise.  Court is adjourned until

10   1:15.

11       (Recess is taken from 12:25 p.m. to 1:26 p.m.)

12       (Out of the Presence of the Jury)

13           DEPUTY CLERK:  All rise.  Court is again in session.

14   You may be seated.

15           THE COURT:  Before the lunch break, defense counsel

16   made a motion for judgment of acquittal pursuant to Federal Rule

17   of Criminal Procedure 29A.

18           Under the law, a trial judge can grant a motion for

19   judgment of acquittal only when the evidence as a whole is

20   insufficient to support a conviction as a matter of law.  Where

21   there is evidence upon which a jury may reasonably base and find

22   guilt beyond a reasonable doubt, the trial judge cannot intrude

23   on the function of a jury as the trier of fact.

24           The evidence need not be of such overwhelming

25   magnitude that the jury must inevitably find guilt beyond a

1   reasonable doubt.  There need only be sufficient legal evidence

2   which, when viewed in the light most favorable to the

3   Government, a jury can reasonably and in good faith make a

4   finding of guilt beyond a reasonable doubt.

5         And that's based on the case of United States v.

6   Cerilli, 418 F Supp 557, a 1976 case, citing other cases.

7         In making such a determination, the Court must view

8   the evidence in the light most favorable to the Government.  It

9   is not for the trial judge to assess the credibility of

10   witnesses nor to weigh the evidence in order to draw inferences

11   of fact from the evidence, and that's based on the case of

12   United States v. Cohen, 455 F Supp 843, case from 1977.

13         And I do find that there is sufficient legal evidence

14   when viewed in a light most favorable to the Government a jury

15   could reasonably and in good faith could make a finding of guilt

16   beyond a reasonable doubt.  And so, therefore, I'm going to deny

17   the motion.

18         Anything else before we bring the jury in?

19         MR. NAIR:  Not on behalf of the United States.

20         MR. CLARK:  Not from the defense, Your Honor.

21         THE COURT:  Very good.  Mr. Wood, would you get the

22   jury, please?

23         Just one note for the record, the denial -- partial

24   denial of the 609 motion was without prejudice.  If something

25   comes up during the course of the testimony of the defendant,

1    the Government can renew its motion at sidebar as to those

2    matters that were denied in the motion.

3           MR. NAIR:  Your Honor, there's also certain

4    information that came to the Government's attention yesterday

5    that I've informed Counsel about.  If there is an area of

6    impeachment, I'll ask for a sidebar.

7           (Jury in at 1:30 p.m.)

8           DEPUTY CLERK:  All rise.  Court is again in session.

9    You may be seated.

10          THE COURT:  Ladies and gentlemen of the jury, welcome

11   back from the lunch break.  We have been working here in court,

12   so I thank you for your patience.  I know you've been waiting

13   for us.  We're now ready to proceed with the defense side of the

14   case.

15          You heard before the lunch break that the Government

16   had concluded its side of the case.  Now, it's the defendant's

17   turn, and so now we will turn to Mr. Clark.

18          Mr. Clark, you may call your first witness.

19          MR. CLARK:  Thank you, Your Honor.  I call Angel Luis

20   Concepcion-Rosario.

21          *(Specific witness testimony of Angel Luis Concepcion-*

22   *Rosario previously transcribed and incorporated herein)*

23          THE COURT:  Again, ladies and gentlemen.  The usual

24   instruction.  Do not discuss the case.

25          (Jury out at 3:26 p.m.)

1        THE COURT:  You may be seated.  You may step down,

2   sir.

3        Let the record reflect that on all occasions when the

4   defendant was taking the stand and leaving the stand that the

5   jury was not present in the courtroom, and the jury had been

6   removed from the courtroom.  Correct, Counsel?

7        MR. NAIR:  That's correct.  Thank you.

8        THE COURT:  Thank you.  Mr. Clark, anything else to be

9   presented by the defense?

10        MR. CLARK:  No, Your Honor.

11        THE COURT:  The defense rests?

12        MR. CLARK:  (indiscernible).

13        THE COURT:  Will there be --

14        MR. CLARK:  Nothing further.

15        THE COURT:  So the defense rests, correct?

16        MR. CLARK:  Yes, Your Honor.

17        THE COURT:  Is there going to be rebuttal?

18        MR. NAIR:  No, Your Honor.  Thank you.

19        THE COURT:  And there was no stipulation.

20        MR. CLARK:  We talked about the stipulation, Judge,

21   but I would at this point (indiscernible).

22        THE COURT:  All right.

23        MR. CLARK:  It's already in (indiscernible).  It's

24   been discussed (indiscernible) both sides.

25        MR. NAIR:  And, Your Honor, just for the record, I was

1  willing to stipulate to the report but it's -- counsel is saying

2  -- you know, for the record it was a report from Pennsylvania

3  State Police from the 2014 thousand (sic) arrest where someone,

4  another trooper that wasn't called to testify but I was willing

5  to stipulate that he said by the time he got to the -- I'll read

6  the exact --

7          MR. CLARK:  (indiscernible)  Why don't we do this,

8  Judge?  We'll just put it in there and that way (indiscernible).

9  I think we did a brief (indiscernible).

10         MR. NAIR:  Yes, we did.

11         MR. CLARK:  (indiscernible)  May we approach?

12         THE COURT:  This is for a sidebar or?

13         MR. CLARK:  Yeah.  I want to see what the stipulation

14  is if that's all right.

15         THE COURT:  That's fine.

16         MR. CLARK:  Let's see.  The Government and defense

17  agree that on July 24, 2017 -- '14 (indiscernible), on July 24,

18  2014, Trooper Robert S. Kirby, K-I-R-B-Y, noted in his report,

19  quote, "no interview was conducted on Angel Concepcion-Rosario"

20  dot, dot, dot, that he spoke little English.  So stipulated.

21         THE COURT:  All right.

22         MR. NAIR:  And that's (indiscernible).

23         THE COURT:  I'm going to call upon one of you to make

24  a statement and to read that to the jury.

25         THE CLERK:  Counsel (indiscernible).

1        THE COURT:  Maybe, Mr. Clark, if you could go back to

2  counsel table and repeat what you just told us.

3        MR. CLARK:  Judge regarding the stipulation that we

4  reached with the Government, it will be as follows.

5        The Government and the defense agree that on July 24,

6  2014, Trooper Robert S. Kirby, K-I-R-B-Y, noted in his report,

7  quote, "no interview was conducted on Angel Concepcion-Rosario"

8  dot, dot, dot.  He spoke little English.

9        THE COURT:  All right. When we call the jury back, I'm

10  going to call upon one of you to read that to the jury.  Who

11  will be doing that?

12        MR. NAIR:  I think it will be the defense and I will

13  be agreeing that the Government stipulated.

14        THE COURT:  All right.  I'll instruct the jury that

15  this is an agreed-upon statement of facts.  Both parties agree

16  it's true.

17        MR. NAIR:  That's what the Trooper would say --

18        THE COURT:  That's what the Trooper would have said if

19  he was called to the stand.  Just so we get it right, why don't

20  you say --

21        MR. CLARK:  I will say it.  If the trooper were called

22  to testify --

23        THE COURT:  If you would say those words, because

24  that's the purpose of it.

25        Counsel, for planning purposes, since we were wrapping

1 up the evidentiary portion of the case, we have to do a charge

2 conference.  Let me ask you, do you have an estimate as to how

3 long your closings will be?  Mr. Nair, do you have an estimate?

4 A range.

5 　　　　　MR. NAIR:  Your Honor, I would say probably a half

6 hour.

7 　　　　　THE COURT:  Mr. Clark, do you have an estimate?

8 　　　　　MR. CLARK:  I would say 15 to 20 minutes, Judge.

9 　　　　　THE COURT:  Let's do this.  We'll try to get as much

10 done as we can this afternoon.  I'm not sure how far we'll get.

11 For now, though, we'll call the jury back in.  Mr. Clark, you

12 can read the stipulation.  Then I'll explain to the jury that we

13 have work just for the lawyers to do, and we're going to send

14 the jury for an extended recess.  And as soon as we're ready,

15 we'll call them back.

16 　　　　　MR. CLARK:  Judge, may I suggest that we let them go

17 and we open and we charge them all at the same time in the

18 morning.  We should be able to do that I think by mid-morning.

19 Because otherwise if we actually close and do the instructions,

20 I don't know how long you estimate, but we're going to be here

21 today.  I don't think they're going to be happy trying to

22 deliberate at the end of the day after hearing -- I know we had

23 all yesterday, but it seems to me that it would be a better

24 approach.  They'll be fresh.  They'll hear argument.  They'll

25 hear the jury instructions.  They make their decision.

1          THE COURT:  What are your thoughts, Mr. Nair?

2          MR. NAIR:  I agree, Your Honor. Either that or we end

3   up asking them to deliberate tonight and that might be a lot to

4   ask at this point.

5          THE COURT:  All right.  I'll follow your suggestions

6   then.  We'll call them back in.  We'll read the stipulation.

7   I'll send them home for the day to return tomorrow morning at

8   9:00 a.m., but all of us are to remain when the jury leaves.

9   Very good.

10          Mr. Wood, would you get the jury?

11          Mr. Clark, I just found the standard instruction on

12   stipulations.  What was the name of the witness?

13          MR. CLARK:  Robert S. Kirby.  K-I-R-B-Y.

14          THE COURT:  Thank you.

15      (Jury in at 3:35 p.m.)

16          DEPUTY CLERK:  All rise. Court is again in session.

17   You may be seated.

18          THE COURT:  Ladies and gentlemen, you are about to be

19   presented with a piece of evidence known as a stipulation.  That

20   means that both the Government and the defendant agree on this.

21   And a stipulation is the following.

22          The parties have agreed that Trooper Robert Kirby, his

23   testimony -- what his testimony would be if he were called as a

24   witness on the witness stand.  You should consider that

25   testimony in the same way as if he had been here and had been

1  given here in court by the witness, as if he had come in person.

2          Mr. Clark, you may now read that stipulated testimony.

3          MR. CLARK:  Thank you, Your Honor.

4          Ladies and gentlemen, if Trooper Mark S. Kirby were

5  called to testify, the Government and the defense agree that on

6  July 24, 2014, Trooper Kirby noted in his report that, quote,

7  "no interview was conducted on Angel Concepcion-Rosario," dot,

8  dot, dot.  He spoke little English."

9          THE COURT:  Thank you.  And for the record, Mr. Clark,

10  I understand the defense rests.  Is that correct?

11          MR. CLARK:  That is correct.

12          THE COURT:  From the Government perspective, is there

13  any rebuttal testimony?

14          MR. NAIR:  No, sir.

15          THE COURT:  Very good.

16          Ladies and gentlemen, we've reached a point at the

17  trial where all the testimony, all the evidence has been

18  submitted to you.  There are obviously several remaining parts

19  of the case.  We have closing arguments from the lawyers, and we

20  also have the what's called the jury charge, which is the

21  instructions from me as to what the law is that I will give to

22  you.

23          At this point in time, I have some work that the

24  lawyers and I need to get done before we're ready to proceed to

25  the next stages of the case.  So what we're going to do is we're

1  going to send you home early today, and we're going to ask you

2  to report tomorrow morning at 9:00 a.m. and at that time, it is

3  our expectation, our hope, that we'll be ready to proceed with

4  closing arguments, and then to be followed by the jury

5  instruction on the law from me, and then you will get the case

6  to deliberate on a verdict.

7         Again, a friendly reminder.  You are not to discuss

8  the case with anyone.  You are not to engage in any

9  communications about the case electronically, no text messaging,

10 no emails, nothing. No research online or research anywhere

11 else.  You must decide this case solely based on what you hear

12 in the courtroom both as to the facts that you've heard already

13 and the law as I will give it to you.

14        Everybody understands that instruction?  Everybody

15 agrees to abide by it?  Very good.  Because it's very important,

16 and there would be very serious consequences if you didn't, so I

17 thank you for that.

18        Mr. Wood, would you escort the jury to the jury room

19 please and then they're released to go home?

20        DEPUTY CLERK:  All rise.

21        THE COURT:  Remember, tomorrow morning 9:00 a.m.

22     (Jury out at 3:38 p.m.)

23        THE COURT:  Counsel, I believe I'm ready to go over

24 the submitted jury instructions that you've requested and

25 indicate what the Court's rulings are on those instructions --

1 requests of instructions.

2          Mr. Wood, would you close the outer doors of the

3 courtroom, please?  Everyone may be seated.

4          All right, Mr. Wood, we're still on the record as I

5 recall.

6          DEPUTY CLERK:  Yes, sir.

7          THE COURT:  All right.

8          Let me review now the Court's rulings on the jury

9 instructions submitted initially by the Government.

10          The Government has submitted a set of proposed jury

11 instructions.  All of the Government's proposed instructions are

12 based on the Third Circuit model criminal jury instructions with

13 the following exceptions.

14          Number two, jury recollection controls and number

15 three, penalty not to be considered, which are standard

16 instructions from federal jury practice and instructions and

17 finds support in Third Circuit case law.

18          Number 11, evidence obtained pursuant to search

19 warrant, which is based on Supreme Court precedent.

20          Number 20, indictment in the conjunctive state and

21 require proof in the disjunctive, which is based on Third

22 Circuit precedent.

23          Number 23, controlled substance offense, method of

24 proving knowledge, which is a standard instruction for modern

25 federal jury instructions and supported by Third Circuit

1  precedent.

2         Number 25, controlled substance offense, actual or

3  exact amount of controlled substance need not be proven, which

4  is a standard instruction from federal jury practice and

5  instructions.

6         The defendant has not objected to the Government's

7  jury instructions, and I find them supported by the applicable

8  law.  Therefore, I grant in part the Government's proposed

9  instructions with the following exclusions.

10         First exclusion, number 11, evidence obtained pursuant

11  to search warrant.  The Government did not introduce evidence

12  obtained pursuant to a search warrant, so this instruction is

13  unnecessary and is denied.

14         MR. NAIR:  I'm sorry, Your Honor.  We did.

15         THE COURT:  Oh, you did?

16         MR. NAIR:  Yeah, there was a federal search warrant

17  that Task Force Officer Murray testified to that he obtained

18  from defendant's flip phone, and then they got to see the

19  results of that.

20         MR. CLARK:  I agree, Your Honor.

21         THE COURT:  Mr. Clark, do you agree?

22         MR. CLARK:  I agree.

23         THE COURT:  Thank you for calling that to my

24  attention.  Then that will not be an exclusion.  Number 11 will

25  be granted.

1          Let's turn to the next -- actually, the first next

2    exclusion which I corrected myself on the first one.  This is

3    number 16, defendant's character evidence.  This instruction

4    pertains to evidence of character under Rule 404(a) which the

5    defendant did not present, so this is denied.

6          Number 31, audio recordings transcripts.  This

7    instruction presumes that both the audio and transcript were

8    English and states that the transcripts are not evidence.  In

9    this case, though, the recordings are in Spanish and the

10   transcripts are in English, which means that the transcript in

11   English is the substantive evidence on which the jury must rely.

12   And this is relying on a case.  It's United States v. Esteves

13   (phonetic) which is 2013 West Law, 319 6421, an Eastern District

14   case dated June 25, 2013 which states, "When an English language

15   recordings are played for the jury, the recording is the

16   evidence, and any transcript prepared by a party is given to the

17   jury merely as an aid."  But whereas, here, the recordings are

18   in a foreign language, the transcript in English is the

19   substantive evidence upon which the jury must rely.

20         MR. NAIR:  Your Honor, I'm not disagreeing with the

21   Court's ruling.  My confusion was when I submitted the one that

22   the Court is denying, part of -- they spoke a little English in

23   the recording, and I didn't know what to do with that, so that's

24   why that was included in there.

25         THE COURT:  Okay.  So then this requested jury

1   instruction is denied.

2           MR. NAIR:  Yes, Your Honor.

3           THE COURT:  Move to the next one.

4           Although number 14, defendant's choice not to testify

5   or to present evidence assumes that the defendant did not

6   testify.  In this case, he did testify.  Therefore, we propose

7   to read the following modified version of the instruction to

8   ensure that the jury understands that the Government burden has

9   not shifted.  Here's the proposed instruction.

10          Although the defendant, Angel Luis Concepcion-Rosario

11  testified in this case, the burden of proof remains with the

12  prosecution throughout the entire trial and never shifts to the

13  defendant.  The defendant is never required to prove that he is

14  innocent.

15          MR. NAIR:  Agreed.

16          THE COURT:  All right.

17          MR. CLARK:  We agree, Your Honor.

18          THE COURT:  Very good.  I believe that covers all of

19  the Government's requested jury instructions.

20          MR. NAIR:  Your Honor, there's one I did not submit,

21  but it was recommended by my supervisor in Philadelphia and he

22  successfully argued and obtained this instruction in a trial he

23  had in Philadelphia.  It's one where English and Spanish are

24  brought or any foreign language is brought to issue when there

25  are official court interpreters, the instruction that was given

1   by the Court is because the interpreters are present does not

2   mean that it is a fact one way or another that the defendant can

3   or cannot speak English or understand English.  And that's to

4   aid the jury in not accepting the fact that a neutral court

5   interpreter is a requirement necessarily.  It's up to them to

6   decide whether the defendant can speak or understand any English

7   at all.

8           THE COURT:  Mr. Clark -- by the way, do you have any

9   legal authority for that?

10          MR. NAIR:  I don't.  I did look -- I did a search

11  through West Law.  I found something in the Fourth Circuit.

12  I'll try to get it to you, but it's not on point.  It's not

13  exactly that type of language.

14          THE COURT:  Mr. Clark.

15          MR. CLARK:  Judge, it seems only fair.  We made an

16  issue about whether or not my client is fluent in English or

17  Spanish and spoke English and Spanish on various occasions, and

18  so though I'm not familiar with any case law in that area, it

19  seems only reasonable that we should tell the jury that the fact

20  that we have an interpreter doesn't necessarily mean anything.

21  That's something for them to decide.  I think that's fair.

22          THE COURT:  All right.  So you're in agreement?

23          MR. CLARK:  Yes.

24          THE COURT:  Then I'll grant that.  Mr. Nair, would you

25  write something up and deliver that to us today?

1          MR. NAIR:  I will.  I'm going to --

2          THE COURT:  Clear it by Mr. Clark, first.

3          MR. NAIR:  Yes.

4          THE COURT:  And it could be handwritten.  It doesn't

5    have to be word processed.  In fact, I'm going to direct that

6    you do that before the two of you leave today.  Reach agreement

7    on the language.

8          MR. NAIR:  I will.

9          THE COURT:  Let's turn to the defendant's proposed

10   jury instructions.  I note that most of the instructions do not

11   contain citations to model jury instructions or to legal

12   authorities to support them.

13         MR. CLARK:  And I apologize for that, Judge, because I

14   think these came out of one of my state court cases and not in

15   this case.

16         THE COURT:  Thus, I'm initially disinclined to use

17   them to instruct the jury.  However, I have compared the

18   substance of defendant's instructions with the Government's and

19   find that the Third Circuit model jury criminal instructions the

20   Government proposes largely cover already the points that

21   defendant's instructions include.

22         Defendant's instructions do offer slightly different

23   wording of reasonable doubt and sympathy.  Although I am going

24   to give the model instructions that address these points, you

25   are free to incorporate your own explanation of reasonable doubt

1  consistent with the law into your closing argument if you so

2  desire, but consistent with the law.

3          Accordingly, I'm going to grant the defendant's

4  proposed jury instructions as already covered.  I'm also going

5  to make three additions to the jury instructions.

6          First, because the defendant's past conviction was

7  used to impeach him under Rule 609, I will add language

8  consistent with Third Circuit model criminal jury instruction

9  4.36, impeachment of defendant.  Prior conviction under Federal

10  Rule of Evidence 609 to government request number 34, which is

11  model instruction 4.29, concerning 404(b) evidence.  To make

12  clear that the jury may also consider the evidence with respect

13  to defendant's credibility as a witness.

14          Second, because the jury verdict form contains an

15  interrogatory about the weight of the controlled substance in

16  the event of a guilty verdict, I will read instruction

17  6.21.841(c), special interrogatories and verdict forms for

18  weight of controlled substance.

19          Third, because counsel for defendant challenged the

20  translated transcript of the recorded calls from the wiretap, I

21  will supplement Government's request 32, model instruction 4.07

22  with the official comments recommended language which reads as

23  follows.

24          "Whether a transcript is an accurate translation in

25  whole or in part is for you to decide.  In considering whether a

1  transcript is an accurate translation of a conversation, you

2  should consider the testimony presented to you regarding how and

3  by whom the transcript was made.  You may consider the

4  knowledge, training and experience of the translator as well as

5  the nature of the conversation and the reasonableness of the

6  translation in light of all the evidence in the case."

7          Before I conclude, let me inquire.  Are there any

8  other requested jury instructions that the parties would like

9  for me to consider at this time?

10         MR. CLARK:  No, Your Honor.

11         MR. NAIR:  No, Your Honor.  Just the one I'm going to

12  go over with counsel.

13         THE COURT:  The parties submitted proposed jury

14  verdict sheets which are identical except for formatting and

15  style.  I'm going to accept the verdict sheets and will provide

16  the same sheet using its own formatting.

17         So now we've concluded the review of the jury

18  instructions.  I'm going to direct that counsel confer about

19  that one instruction that we talked about, and you're going to

20  write the language up for us.

21         Is there anything else to go over or to address before

22  we adjourn today?  The next step then will be we show up

23  tomorrow morning at 9:00 a.m.  We're going to right to closing

24  arguments.  Anything else before we do that?  Because I would

25  rather just get to it first thing in the morning, so if there's

1  anything else, I'd rather do it today.

2            MR. NAIR:  Nothing that I can think of, Your Honor.

3            THE COURT:  Mr. Clark, anything you can think of?

4            MR. CLARK:  (indiscernible).

5            THE COURT:  Very good.  Mr. Wood, I'm going to direct

6  that you recess court and that the lawyers have some work to do,

7  and we will of course be here until at least 5:00 and probably

8  beyond 5:00 so you can make the submission to us.

9            DEPUTY CLERK:  All rise. Court is adjourned.

10       (Proceedings adjourned at 3:54 p.m., recommencing December

11  7th, 2018)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


EILEEN DHONDT, CET 807
Aequum Legal Transcription


Dated:  February 22, 2023