```
              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    .  Case No. 5:18-cr-00181-JFL-1
                             .
         Plaintiff,          .
                             .  U.S. Courthouse
      v.                     .  504 W. Hamilton Street
                             .  Allentown, PA 18101
ANGEL LUIS                   .
CONCEPCION-ROSARIO,          .  December 7, 2018
                             .  9:35 a.m.
         Defendant.          .
                             .
. . . . . . . . . . . . . .  .

                 CRIMINAL JURY TRIAL - DAY 4
            BEFORE HONORABLE JOSEPH F. LEESON, JR.
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff          KISHAN NAIR, ESQ.
United States of       UNITED STATES ATTORNEY'S OFFICE
America:               615 Chestnut Street, Suite 1250
                       Philadelphia, PA 19106


For Defendant          GLENNIS L. CLARK, ESQ.
Angel Luis             LAW OFFICE OF GLENNIS L. CLARK
Concepcion-Rosario:    1101 Hamilton Street, Suite 351
                       Allentown, PA 18101


Audio Operator:        Justin F. Wood

TRANSCRIBED BY:        Eileen Dhondt, CET-807
                       Aequum Legal Transcription Services
                       6934 East Almeria Road
                       Scottsdale, AZ 85257


         Proceedings recorded by electronic sound
      recording, transcript produced by transcription service.
```

**INDEX**
**December 7, 2018**

**THE COURT**                                                    **PAGE:**

Plaintiff's Closing Argument
     By Mr. Nair                                                      6

Defendant's Closing Argument
     By Mr. Clark                                                    23

Plaintiff's Rebuttal Closing Argument
     By Mr. Nair                                                     32

Final Jury Instructions                                             35

Verdict                                                             87

**WITNESSES:**

None

**EXHIBITS:**

**FOR THE PLAINTIFF:**                    **MARKED**           **ENTERED**

None

**FOR THE DEFENDANT:**

None




**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

1          PROCEEDINGS

2          (Call to the Order of the Court)

3          (Proceedings commence at 9:35 a.m.)

4          THE DEPUTY CLERK:  -- for the Eastern District of

5     Pennsylvania is now in session.  The Honorable Joseph F. Leeson,

6     Jr. presiding in Criminal Action Number 18-181, United States of

7     America vs. Angel Concepcion-Rosario.  Please be seated.

8          THE COURT:  Good morning, everyone.

9          IN UNISON:  Good morning.

10          THE COURT:  Mr. Wood, is that the verdict slip you

11    have there on the bench -- lower bench?

12          THE DEPUTY CLERK:  Yes, it is.

13          THE COURT:  Let me see.  Thank you.

14       (Court and Clerk confer)

15          THE COURT:  Ladies and gentlemen, good morning.

16          IN UNISON:  Good morning.

17          THE COURT:  Welcome back.  I have one item I just want

18    to cover before we begin.

19          Mr. Concepcion-Rosario, I want to make sure that you

20    understand something before we move forward today.  Yesterday,

21    during your testimony, I instructed you that you should not talk

22    about anything you discussed with your lawyer.  By this

23    instruction, what I meant is that you should refrain from

24    attacking your lawyer in court.  You would be able to testify

25    concerning any matter relevant to your defense, even if you had

1  discussed it with Mr. Clark.  Do you understand this?

2            THE DEFENDANT:  (Via the interpreter throughout) Yes.

3            THE COURT:  Do you have any questions?

4            THE DEFENDANT:  No.

5            THE COURT:  Was there anything else you wanted to tell

6  the jury other than to criticize your lawyer?

7            THE DEFENDANT:  Yes, I want to explain to the jury --

8            THE COURT:  I'm sorry, ma'am.  I can't hear you.

9            THE INTERPRETER:  Oh, okay.

10           THE DEFENDANT:  Yes, I wanted to explain to the

11 jury -- oh, I want to explain to you.

12           THE COURT:  Okay.  Do you feel you had -- did you feel

13 you had an opportunity to say everything you wanted to say?

14           THE DEFENDANT:  No.

15           THE COURT:  Okay.  Is there anything else you would

16 like to say?

17           THE DEFENDANT:  Yes.

18           THE COURT:  All right.  Do you want to say it to me,

19 or do you want to say it to the jury?

20           THE DEFENDANT:  To the jury.

21           THE COURT:  Okay.  Counsel, why don't you take a

22 moment to confer with your client --

23           MR. CLARK:  Yes.

24           THE COURT:  -- and then let me know if we need to do

25 something else.

1       (Parties confer)

2               MR. CLARK:  Nothing further, Your Honor.

3               THE COURT:  All right.  Let me just -- I'll ask

4   Mr. Concepcion-Rosario.

5               Is there anything else that you want to say to the

6   jury that you have not already said?

7               THE DEFENDANT:  No.  Thank you.

8               THE COURT:  All right.  Thank you.

9               All right, counsel.  I understand you've had a chance

10  to take a look at the verdict slip.  Is that correct?

11              MR. NAIR:  Yes, sir.

12              THE COURT:  All right.

13              MR. CLARK:  Yes, Your Honor.

14              THE COURT:  And it's satisfactory to both parties?

15              MR. NAIR:  Yes.

16              MR. CLARK:  It is.

17              THE COURT:  All right.  Very good.  Is there anything

18  else before we bring the jury in and proceed to closing

19  arguments?

20              MR. NAIR:  Not on behalf of the United States.

21              MR. CLARK:  No, Your Honor.  Not for the defense.

22              THE COURT:  All right.  Very good.

23              Mr. Wood, would you get the jury, please?

24          (Pause)

25              DEPUTY CLERK:  All rise.

1    (Jury in at 9:42 a.m.)

2         DEPUTY CLERK:  Court is again in session.  You may be

3    seated.

4         THE COURT:  Ladies and gentlemen, good morning.

5    Welcome back to Allentown.  Again, apologize for the delay.  The

6    lawyers and I were working on some things to get ready for

7    closing arguments and jury instructions, so we have been working

8    diligently, and we are now ready to proceed.

9         We're now going to turn to closing arguments.  And I'm

10   going to call upon counsel for the Government, Attorney Kishan

11   Nair, to deliver a closing argument to you on behalf of the

12   United States.

13        Mr. Nair?

14        MR. NAIR:  Thank you, Your Honor.  Counsel.

15                  PLAINTIFF'S CLOSING ARGUMENT

16        MR. NAIR:  Good morning, ladies and gentlemen.  This

17   case has always been one about greed and deception, greed on the

18   defendant's part to make a profit, deception to hide the drugs,

19   keep the drugs from law enforcement to get them to their

20   ultimate destination.

21        What is the evidence showing?  That on June 17, 2017,

22   the defendant had $100,000 worth of fentanyl hidden in his car,

23   that that amount was 199 grams of a mixture and substance

24   containing a detectable amount of fentanyl in an amount so large

25   in and of itself that it had to be for the purpose of

PLAINTIFF'S CLOSING ARGUMENT

1   distribution. And the evidence has shown the defendant admitted

2   the drugs were his.

3          What else do we know? We know the defendant had a

4   burner phone in his car, that he used that phone to contact his

5   drug supplier. And we know that at 10:28 that morning, by his

6   own admission, he used that phone. We know that he arrived to

7   meet his drug dealer at 10:35 to 10:40 and that two law

8   enforcement officers saw the defendant arrive at the drug

9   supplier's house.

10         Both confirmed his identification when they saw him

11  within an hour, hour and a half later at the Pennsylvania State

12  Police barracks in Reading, and both of them testified in front

13  of you that they identified him in court. They also, when they

14  were at the residence of the drug dealer conducting

15  surveillance, passed on the license plate to Trooper

16  Reed -- well, through Special Agent Romig to Trooper Reed, so

17  Trooper Reed know -- knew to stop him.

18         There's no doubt that based on the observations, the

19  surveillance, what the law enforcement officers saw at Santiago

20  Correa's house, the drug supplier, that it was the defendant who

21  arrived in his car with that license plate that he was driving,

22  in a car registered in his name, and that they followed him all

23  the way out of Allentown to Reading -- on his way to Reading and

24  found those drugs in his car.

25         What did they see when he met his drug dealer? They

1  saw -- or supplier.  They saw the defendant put the hood of his

2  car up.  It's the defendant's choice where to put those drugs,

3  not Correa's.  The defendant had the hood of his car up before

4  Correa walked out of his residence with the bag -- the grocery

5  bag in his hands.  The agents told you that they saw both of

6  them just -- both Correa and the defendant disappear behind the

7  hood.  And then the hood goes down.  The defendant leaves.

8  Correa goes back into the house without the bag.

9       What do we know happened from the day before?  That

10  the drug supplier went to his stash house Norma Navarette's

11  house, to pick up 200 grams of the drug that Agent Romig, based

12  on the wiretap interception, at the time thought was heroin.  We

13  know from the call that Correa told Navarette that a guy from

14  the R, a guy from Reading, that Agent Romig determined, was

15  coming the next day, that morning, and that Correa was worried

16  about Navarette oversleeping, so he went to come get the drugs

17  the night before and get ready.  And, of course, we know who

18  showed up the next morning: the defendant.

19       The actions of the defendant on the day of his arrest,

20  what do they tell us?  Well, the opening of the hood, what does

21  that tell us?  That tells us that he knew Correa was bringing

22  drugs over to him.  Where he put the drugs, what does that tell

23  us?  It tells us that he knew it was drugs.  Otherwise, why not

24  take the item and put it in your glove compartment or in your

25  console next to your burner phone or at your feet?  That's not

1  what the defendant did in this case.

2        Why the excessive amount of air filters spread

3  throughout the car?  In and of themselves, maybe nothing.

4  Coupled with the drugs in the car, there's a purpose for the air

5  filters.  It's to mask the detection from a K-9, from a drug

6  dog, from Edo.

7        The burner phone we learned from Detective Errington

8  that that's to layer you from law enforcement.  It's a phone

9  that you can dispose of.  It's prepaid.  It's cheap.  You

10  can -- you don't have to put your name in it.  You don't have

11  to -- when you subscribe, when you active that phone, you don't

12  to use your name.  It's one more level to hide and to deceive

13  law enforcement.

14        Why tell Trooper Reed that you're going to the Sands

15  Casino?  It's one more story to -- that the defendant concocted

16  at the scene to explain his trip.  But what the defendant didn't

17  know when he made that statement is that law enforcement had

18  already told Trooper Reed that the defendant was in Allentown

19  and that that Sands Casino gambling story didn't make sense.

20  You heard Trooper Reed testify that he knew it didn't make

21  sense, because the defendant said he left Reading at 8:30 in the

22  morning.  And then who goes to play, travels an hour, hour 45

23  minutes, to gamble for all of 45 minutes and turn around?  The

24  story itself is impossible.  You knew where he was in Allentown

25  at 10:35.

1    Why consent to the search of his car?  Why did the

2  defendant do that?  He had the air fresheners.  He thought that

3  would help him, throw off the dog.  He offered to consent to the

4  search of his car, hoping Trooper Reed would not look, that he

5  would just give him the warnings and send him on his way.  He

6  also had no idea that law enforcement had just seen him a matter

7  of 20 minutes earlier with the hood of his car open, meeting his

8  drug supplier.  That's why he consented to the search of his

9  car.

10    Why admit the drugs were his?  Because he was going to

11  take it on the chin.  He was going to admit the drugs were his,

12  but he wasn't going to help Agent Romig with where he got the

13  drugs or what he was going to do with them.  But what he didn't

14  know is the DEA already knew who the drug supplier was, that

15  Agent Romig was testing him to see if the defendant was of any

16  value to Agent Romig's investigation.

17    Does it matter whether the defendant knew what drug he

18  was hiding in his car?  You're going to hear instructions from

19  the Court on the law that all the Government has to prove beyond

20  a reasonable doubt is that the defendant knew it was a

21  controlled substance, not what the controlled substance -- what

22  the defendant thought it was, not that the defendant thought it

23  was fentanyl, just that he knew it was a controlled substance.

24    How do we know that the defendant intended to

25  distribute the controlled substance?  We know that from the

1  narcotics expert, Detective Errington, who testified to you

2  yesterday.  The amount itself is so large that in his almost 30

3  years' experience, no one would purchase that amount for their

4  own personal use.  That amount is intended to be distributed to

5  others.  Whether the defendant was going to be the person that

6  sat in a house, in a heroin mill bagging up small little

7  packets, $10 packets, enough to make up the 10,000 doses, or

8  whether he was going to flip the drugs, whether he was going to

9  break it down into 100-gram quantities and quickly sell it to

10  two other drug dealers or even break it down into 5-gram

11  quantities, the amount itself, the value of the drug shows that

12  it had to be for the purpose of distribution.  That's what you

13  heard from the expert.

14        The greed involved in the drug distribution -- if he

15  is going to be the person to bag this up, he stands to make

16  almost 90,000 in profit.  You heard from Detective Errington

17  that on a wholesale level, this amount of drug would have cost

18  him $10,000.  And he had the ability to make up the 90,000 if he

19  was going to do the hard work and then, ultimately, stand on a

20  corner somewhere and distribute it to someone or meet someone,

21  thousands of buyers, hundreds of buyers that were buying what

22  they thought was heroin or thought was fentanyl.

23        In this case, the defendant's motive was greed.  And

24  the deception on his part was not to get caught by law

25  enforcement.  So the deception had to continue up until his

1 arrest.  It had to continue when he was talking to Agent Romig.

2 And it continued yesterday when you heard him testify.

3 　　　　Yesterday, he even tried to deceive you about

4 Ms. Hummer who has no axe to grind in this case when she told

5 you that he has no problem from the point that he became her

6 client -- or her person that she had part of her caseload in

7 2016 up until 2017 of his arrest, she had no problem talking to

8 him in English.  He had no problem in understanding her.  He had

9 no problem in reading a document that she made him go paragraph

10 by paragraph and confirm that he understood it.  But he's asking

11 you to find that she lied, she lied to you.

12 　　　　What else do we know from the defendant himself?

13 Well, we know that from his testimony that he was friends with

14 Correa.  He told you that.

15 　　　　But we already knew there was a trust.  We didn't need

16 him to tell that to us.  We already knew there was a trust

17 between him and his drug supplier.  Because you heard from Agent

18 Romig that during that five-month investigation, the defendant

19 was the only one that he could remember that came to Correa's

20 house and didn't go to the stash house to pick up the drugs.

21 　　　　You also know that there's at least an amount of

22 communication going back and forth between Correa, the drug

23 supplier, and the defendant for several weeks based on the phone

24 that the defendant admitted to having, the flip phone.  Of

25 course they're friends.  They're friends in a drug distribution

1   relationship.

2          As I told you when I had the opportunity to open to

3   you, the evidence in this case is clear.  It has been

4   convincing.  It has been compelling.

5          Let me talk to you about the elements.

6       (Parties confer)

7          MR. NAIR:  I want to talk to you about the elements

8   that the Government has to prove beyond a reasonable doubt on

9   possession with intent to distribute.  The Court will instruct

10  you on the law, but I want to comment on -- or -- and show you

11  how the evidence fits to prove these elements.

12      (Parties confer)

13         MR. NAIR:  Okay.  Possession with intent to

14  distribute.  First, the Government has to prove the defendant

15  possessed -- each of these elements have to be proved beyond a

16  reasonable doubt.  First, the defendant possessed a mixture or

17  substance containing a controlled substance.  And then, second,

18  the defendant possessed the controlled substance knowingly or

19  intentionally.

20         So we know the defendant possessed the substance,

21  because he's the one that decided where to put it when he met

22  his drug dealer, when he opened the hood of his car.  That was

23  the possession of the substance.

24         We have to also show that it was knowingly or

25  intentionally done.  What is the evidence that shows you that?

1   Well, his decision, not Correa's, where to put the drugs tells

2   you that he knows that it's illegal, that it's a drug.  We know

3   that because of the air fresheners.  We know because of the

4   burner phone.  We know because of those factors and the things

5   that he said to Trooper Reed and his actions on that date that

6   he knew those were drugs, that he intentionally wanted to

7   possess those drugs.  You will also hear that being in close

8   proximity to something -- to a large amount of drugs is also

9   something that will help you know what his intent was, that he

10  knowingly or intentionally possessed those drugs.

11          It's also a mixture or substance containing a

12  controlled substance.  What that means is the Government has to

13  prove to you that there's fentanyl in that entire mixture.  And

14  that's what you heard from the chemist, that there was fentanyl

15  in that entire mixture of 199 grams.  Were there other things in

16  there?  Of course.  There were things in there to cut the

17  fentanyl.  But it's a mixture and -- or it's a mixture or

18  substance containing a detectable amount of a controlled

19  substance, fentanyl in this case.

20          How else do we know the possession -- or how else did

21  the Government prove the defendant possessed the drug?  Well, we

22  know that because he admitted the drugs were his.  That's how

23  you know he possessed the drugs.

24          Let me give you an example.  Let's say you go to a

25  hardware store where you have an account and you want either a

PLAINTIFF'S CLOSING ARGUMENT

1  bag of concrete or a bag of grass seed.  And you go to the

2  counter, and you tell them what you want, and they tell you to

3  come around the back.  You open the trunk to your car, and they

4  put the grass seed in.  They put the concrete -- the bag of

5  concrete in, and you drive away.  It's obvious common sense that

6  you now possess what's in your trunk.

7         That's what the defendant did on June 17th of 2017.

8  He's the one that chose where to put it in his car, and he

9  possessed it.

10        Once again, how do we know that he did it

11 intentionally or knowingly?  The steps that he took.  The burner

12 phone to call the drug supplier, the use of the air fresheners

13 to mask the drugs, that he came up with the false story about

14 being at the casino, that he misled the trooper about his prior

15 conviction, saying it was only for possession of cocaine,

16 offering consent, hoping the trooper didn't actually take him up

17 on it, admitting the drugs were his when all else failed but not

18 giving up who supplied the drugs to you or where you were going

19 to take them.  That's how we know he possessed the drugs.

20        (Parties confer)

21        MR. NAIR:  The Government has to prove beyond a

22 reasonable doubt that the defendant intended to distribute the

23 controlled substance.  I talked to you about the narcotics

24 expert, Detective Errington, the amount of the drug.  That's how

25 the evidence has shown that he intended to distribute this drug.

PLAINTIFF'S CLOSING ARGUMENT

1    This drug was not for his personal use.  It was not an amount

2    that he was going to take home and use for days if not months.

3    This was going to eventually end up as up to 10,000 doses, even

4    if not more cut was added to it.  That's what was going to

5    happen to this drug sold in $10 little bags.

6          The fourth element, that the controlled substance

7    itself was fentanyl.  That's why you heard from the chemist.

8    The chemist told you that that substance, there was a detectable

9    amount of fentanyl in there and that the entire substance had a

10   net weight of 199 grams.  That's also why you saw the

11   photographs of the drug on a scale and the scale itself.

12        (Parties confer)

13        MR. NAIR:  Okay.  Well, you did see the pictures of

14   the scale.  They're in the exhibits.  You'll be able to look at

15   those for your deliberations.

16        The Court is also going to find -- define for you

17   knowingly and intentionally.  And the phrase knowingly or

18   intentionally as used in this offense that he's been charged

19   with requires the Government to prove beyond a reasonable doubt

20   that the defendant knew what he possessed with the intent to

21   distribute was a controlled substance.  That's what I've been

22   talking about.  That he had to know it was a drug.  And in

23   addition, the Government must prove beyond a reasonable doubt

24   that the defendant knew -- or prove beyond a reasonable doubt

25   that the defendant knew that what he possessed with intent to

1  distribute was a controlled substance and that you need not find

2  that the defendant knew the controlled substance was fentanyl.

3         The Judge is going to instruct you on that.  And he'll

4  -- breaking up those elements that I just put up there.  We have

5  to show that it's a drug that he thought he was going to

6  distribute and that once that drug's recovered, that it was

7  actually fentanyl.  Not that he knew it was fentanyl but that it

8  was fentanyl, and you're convinced beyond a reasonable doubt.

9  And that all comes from the chemist.

10        I also anticipate the Court's going to instruct you on

11  the definition of possession.  And possession does not mean that

12  the defendant had to have it in his actual possession, holding

13  it in his hand when Trooper Reed arrived, having it hidden under

14  his leg when Trooper Reed arrived.  The Government doesn't have

15  to prove the actual possession.

16        And that brings me back to my analogy with the

17  hardware store.  He has control over his car.  The car is

18  registered in his name.  He's the only one in the car.  And he

19  decided where to put the drugs in the car.  That is his

20  possession of the drugs.  It's not anyone else's car.  It's his

21  air filter, his decision.

22        You are also going to hear from the Court that you can

23  still find the defendant guilty of possession with intent to

24  distribute if he was an accomplice to the possession with intent

25  to distribute.  And I'm going to go through the elements of

1 that. It's an alternative theory that you can find the

2 defendant guilty of.

3 In this case, if you believed that Correa -- or, I'm

4 sorry, that the defendant was not going to take that

5 methamphetamine and sit there and divide it up himself for a

6 day, two days, put it into 10,000 packets, but he was a courier,

7 getting if from point A to point B on behalf of his drug

8 supplier, well then he aided and abetted that drug supplier,

9 Correa. Correa would be the principal. He would be the aider

10 or abettor.

11 I'll go through the elements of that with you that I

12 anticipate the Court is going to discuss with you. First, the

13 Government would have to show beyond a reasonable doubt that the

14 principal committed each of the elements in the offense charged.

15 You just saw the elements for possession with intent to

16 distribute.

17 How do we know Correa, the principal, was going to do

18 that? Easily. The call that he made the night before, I've got

19 to get the 200 grams of drug ready, and what you heard about

20 what happened the next day. Not only did law enforcement follow

21 Correa over to his stash house after that call when it was clear

22 to Agent Romig that he was picking up drugs but you then heard

23 that he went back to his house with that drug or at least the

24 idea of what he was doing, based on that call, he went back to

25 his house with that drug. And sure enough, that's what we see

1  Correa do the next day, walk out of his house with the 200 grams

2  of -- or 199 grams of fentanyl in the bag.

3       So Correa is guilty himself of possession with intent

4  to distribute.  There's no doubt about that from the wiretap.

5  But the defendant would have to have the underlying -- excuse

6  me.  The principal has to commit those offenses.  And then,

7  second, that the defendant knew that the offense that he was

8  charged with was committed -- that the offense was committed by

9  the principal.

10      How do we prove that the defendant knew that Correa

11 was distributing drugs?  Those are the factors that I talked to

12 you about already, the clear -- it was clear from the

13 defendant's actions and words when he raise the hood of his car

14 that he was -- expect -- that he knew that Correa had the drug

15 in his hand, and he was about to give it to him.  He also

16 saw -- had to have seen Correa walk over with the bag.  And we

17 all know from even his own admission that he called Correa just

18 minutes before he arrived on his burner phone.

19      Plus, the defendant took steps to thwart off law

20 enforcement that I discussed with you, the air fresheners, the

21 hiding of the drugs, and coming up with the false story about

22 where he had been coming from.  Not only did he take those

23 steps, he admitted the drugs were his.  So even if he was a

24 courier, he knew that he was aiding Correa by getting that drug

25 from point A to point B.

1    Third, he had to have done some act further to aid or

2  abet what Correa wanted to do.  And we know what the act is.

3  Put the drug in his -- the air filter and drove away.

4    And fourth, the defendant performed the act in

5  furtherance of the offense charged.  Well, those are the two

6  acts that I've just mentioned to you: hid the drug and drove

7  away.

8    You're going to get a special verdict sheet, and

9  the -- the special verdict sheet is first going to ask you

10  whether you find the defendant guilty beyond a reasonable doubt

11  of possession with intent to distribute a detectable amount of

12  fentanyl.  After you decide that, you're then going to be asked

13  a second thing -- or second decision to make, and it has to be

14  unanimous, whether the Government has proven beyond a reasonable

15  doubt that that mixture and substance of fentanyl was more than

16  40 grams.  Well, that was the reason for Errington and the

17  chemist with seeing the photographs of the drug being laid out.

18  You know that this fentanyl, the entire mixture, was almost five

19  times the amount on the special verdict slip of 40 grams.

20    The Court's going to instruct you on reasonable doubt.

21  Reasonable doubt simply does not mean proof beyond all doubt or

22  proof beyond -- or proof to a mathematical certainty.  It's a

23  reasonable doubt.

24    You're also going to hear an instruction from the

25  Court that -- about the requirements of the Government need not

1  prove that all tests were done.  And that's why you've heard

2  questions from the witnesses: well, why didn't you photograph or

3  take video when you saw the drug supplier come out of his house

4  and meet the defendant.  First of all, it's common sense.  Law

5  enforcement had to scramble.  They had to set up surveillance

6  quickly, within a matter of 12 hours.

7         And they're sitting in front of the drug supplier

8  they're focusing on, and they then want to further that

9  investigation.  They want to find out who Correa's drug supplier

10  was.  And once they found that out, they wanted to find else who

11  else was supplying Correa's drug supplier.  And as you heard

12  from Special Agent Romig, he followed that back to the Mexican

13  source of the drug.

14         That investigation wasn't going to end on June 17th of

15  2017 because this defendant showed up to pick up 199 grams of

16  fentanyl.  It was going to continue.  And that's why the law

17  enforcement officers you heard from are not going to sit there

18  and look out the window with a camera or their phones, trying to

19  video in front of Correa's house.  That would have ended

20  everything that Agent Romig and Task Force Officer Murray were

21  trying to do if Correa discovered that he was being watched.

22  But their purpose in being there was to identify the car,

23  identify the person who was meeting with Correa and then, if

24  possible, pass that information off to Trooper Reed and safely

25  take off the defendant and either see if he'll cooperate against

1    Correa or, if not -- well, we know the result.

2            Once again, the Government doesn't have to prove that

3    every test, that every photograph was taken.  You have to be

4    convinced from the testimony that you heard.  And you also know

5    from cross-examination of the defendant yesterday that the

6    report -- that everything that you heard these agents testify to

7    was put into a report.  That's the evidence of what happened in

8    this case.

9            As I said to you from the beginning of this case, the

10   law enforcement in this case was smart in how Agent Romig

11   determined that call.  They were swift in how quickly they

12   responded and how they set up surveillance.  And they were safe

13   when they took those 10,000 doses -- potential 10,000 doses of

14   fentanyl off the streets, a drug that is 50 to 100 times more

15   potent than heroin.

16           I'm going to ask you, based upon the clear,

17   convincing, compelling evidence which is overwhelming in this

18   case, that you find the defendant guilty of possession with

19   intent to distribute a mixture or substance containing a

20   detectable amount of fentanyl and that that substance was more

21   than 40 grams.  Thank you.

22           THE COURT:  I'm now going to call upon Attorney Glenn

23   Clark to deliver a closing argument on behalf of the defendant,

24   Angel Luis Concepcion-Rosario.

25           Mr. Clark?

1    MR. CLARK:  Your Honor.  Mr. Nair.

2                DEFENDANT'S CLOSING ARGUMENT

3         Ladies and gentlemen of the jury, this hasn't been a

4    long trial, but I know that it's been a trial that's caused you

5    to be away from your homes and your jobs and other

6    responsibilities that you have, and so we appreciate that.  And

7    we appreciate that because it's the very hallmark of our justice

8    system that people are willing -- people like yourselves are

9    willing to sacrifice some of your time and some of your life to

10   hear the facts and evidence in a case.

11        Now, we're going to talk about -- and the Judge is

12   going to give you instructions again.  But the burden of proof

13   on every issue of this case is on the Government to prove each

14   and every required element beyond a reasonable doubt.  And

15   you've already indicated that you would follow the Judge's

16   instructions in that regard.

17        There's another important fact that I want to bring to

18   your attention, and that is this: even after all the evidence

19   has been heard, even after all the cross-examination, all the

20   exhibits have been marked, as Mr. Concepcion-Rosario sits here

21   this morning, he's still innocent.  He's still innocent until

22   you, ladies and gentlemen of the jury, make a determination that

23   the Government has proved its case beyond a reasonable doubt.

24   And that has not happened.

25        You have to hear the Judge's instructions on the law.

1   He'll give you instructions on the evidence.  He'll give you

2   instructions on things such as expert testimony, the relevancy

3   and how to weigh that out.  So there's a lot more to be done

4   before you can render a decision in this case.

5          So now let's talk about the case.  Now, the facts of

6   this case -- it hasn't been -- has not been a particularly long

7   trial, thank goodness.  But the facts of this case are in

8   dispute.  They're in dispute in a number of significant ways.

9          Number one, Mr. Concepcion-Rosario says the drugs were

10  not his, that he was not a courier or otherwise, and he

11  testified and told you that from the witness stand.  So let's

12  take a look at the testimony.

13         First of all, I don't think there's any question that

14  Mr. Concepcion-Rosario has a distrust of the Government.  So now

15  why would he have a distrust of the Government?  Let's go back

16  to the time on the 17th of June when he was allegedly on Wyoming

17  Street.  You remember the testimony from the surveillance

18  officers who told you that they eyeballed him on that street.

19         Mr. Concepcion-Rosario just simply says this: if I was

20  committing a crime on that day on that street, I was picking up

21  drugs or delivering drugs or getting paid, why didn't they

22  arrest me?  He says, why didn't they arrest me?  But they let me

23  go.

24         Now, he testifies and tells you, ladies and gentlemen,

25  he wasn't even there.  So then how could he not be there and the

1  officers testify that he was there?  And then

2  Mr. Concepcion-Rosario says, well, this is why I wasn't there.

3  They have no video.  They have no proof.  All they have is the

4  verbal testimony of the officers.  Should they have not more

5  than just have a visual from an officer but rather hard proof

6  that he was there?  That's his right to assert that to you,

7  ladies and gentlemen of the jury, because he is distrustful of

8  the Government, distrustful of the police.

9  So then he says they keep talking about this guy,

10  Correa.  And I don't know that he knows Correa.  I know he had

11  the number that came up in the phone.  All I know for certain is

12  that there's no evidence that he set a price, agreed to pick up

13  anything from Mr. Correa, or do anything of an illegal nature

14  with Mr. Correa.

15  Now, the evidence shows from the Government that at

16  the time that there was a hood going up and a package being

17  transferred, apparently.  But even then we don't hear anything

18  about any money.  We don't hear anything about anything else

19  that happened in that -- at that time other than I think the

20  evidence showed that they appeared to have away from the hood of

21  the car some short conversation, I think (indiscernible).

22  So what I'm submitting to -- what I submit to you,

23  ladies and gentlemen, if the police -- and what

24  Mr. Concepcion-Rosario is saying, if he was guilty of something,

25  they should have arrested him.  They didn't do that.  They did

1   not document the arrest with other than verbal testimony. And,

2   consequently, he's relying upon you, he's asking you to say to

3   them, to say to the Government that they have not proved their

4   case beyond a reasonable doubt.

5        But there's more. So then what happens -- you will

6   recall that they stopped him on Route 222. And it was Trooper

7   Reed who made that stop part of the investigation. My client

8   says why are they stopping me on Route 222 if they already

9   believe I committed a crime in Allentown? The Government says,

10  well, we wanted to wait and see if he was going to lead us to

11  something bigger, if there's going to be something better.

12       And within 45 minutes, 40 minutes, maybe an hour, hour

13  or two, that calculus had changed in what significant way? What

14  had happened in the hour or two when they set up the

15  surveillance officers that caused them now to say, well, call

16  Trooper Reed, have him do a independent probable cause. Was

17  that because there wasn't probable cause in the first place? If

18  there's no probable cause in the first place that he committed

19  no crime on Wyoming Street, then from that you can find and you

20  can infer that he not only did not commit a crime, he did not

21  possess any drugs on Wyoming Street.

22       Now, we had a lot of conversation, testimony about the

23  bag, the infamous bag. You know, the officers were not that

24  clear about that bag. They said it looked like it was a

25  weighted bag. Remember, I asked one of the officers did you see

1   any writing on it.  You know, I think it was a shopping bag or a

2   grocery store bag, something like that.  It had writing on the

3   bag.  They didn't see that.  So they were not in a position to

4   even be able to see that.

5       Then going back to Route 222 when he's stopped by

6   Trooper Reed -- and I heard a lot of testimony about does he

7   speak English and then (indiscernible).  You know, ladies and

8   gentlemen, I'm sure you'll have to find (indiscernible) that

9   that bag is an issue in this case is because the Trooper says he

10  consented to searching the vehicle.  So if he consents to

11  searching the vehicle, you have to knowingly consent to search

12  (indiscernible).  And if you're going to give up your Miranda

13  rights, you have to know that you've given those rights up.

14      So it doesn't matter what the trooper thinks he

15  understood.  There has to be evidence to show that he did

16  understand those rights.  That's why they have a consent form,

17  right?

18      But guess what?  Whether it's a consent form at

19  roadside or a consent form at the police barracks, they always

20  gave him the consent form in Spanish.  You recall the testimony

21  from the -- I think it was Trooper Quesada, the tall, young

22  trooper.  You recall his testimony that he was summoned to the

23  barracks because there was something of a language barrier issue

24  back at the barracks.  I respectfully submit to you that that's

25  evidence upon which you can rely to reach a conclusion that he

 1 | did not understand the rights that were being read to him.  But

 2 | there is a consent form in Spanish.  And I think Trooper Quesada

 3 | said that he had given him the rights in Spanish, and he could

 4 | understand.

 5 | But I also want you to recall the testimony when I was

 6 | cross-examining the trooper about whether he really did

 7 | understand.  And he said -- I think the trooper said he did

 8 | appear to understand, but he wasn't sure.  One thing he did say

 9 | was he -- he wasn't sure that he understood the English part of

10 | it.  And what that goes back to -- now it goes back to Route

11 | 22 -- 222 when there is no Spanish interpreter, there is no one

12 | there to assist in the conversation that Trooper Reed outlined

13 | for you ladies and gentlemen of the jury.

14 | So my client's asking you to consider all those things

15 | along with the evidence presented by the Government, and then

16 | you weigh and you decide what's facts or what's true and what's

17 | accurate.  And I think that's the instruction and it's a

18 | substantial part what the Judge will give you.

19 | My client also takes the position that they have a

20 | weak case (indiscernible).  They had a weak case against him.

21 | And the weakness of the case lies with their failure of them to

22 | document either in writing or otherwise if he confessed and said

23 | the drugs were his.  He says why there's no camera, why there's

24 | no photograph at the state police barracks.  In fact, no

25 | written -- nothing written by my client.  They could have had

1  him write a statement.

2  And then after he allegedly waived his rights, then he

3  doesn't talk.  So he says, why would I do that?  Why would I

4  waive my rights, my Miranda rights, and basically say nothing

5  but, oh, the drugs are mine.  How convenient.  The drugs are

6  mine.  Oh, but I don't want to say anything else.  I don't know

7  where I got them from.  I don't know who gave them to me,

8  nothing like that.  How much sense does that make?

9  So that's what he's arguing and submitting to you for

10 your consideration as jurors in this case.  So now, but there's

11 more to this case.  The more to this case has to do with

12 evidence that's offered by the Government to -- with respect to

13 a prior conviction in 2015.  The Judge will tell you the sole

14 purpose for which that evidence can be considered by you.

15 But I want to ask you something, and I want you to

16 think about it.  When you heard it, did you think my client

17 should be -- is guilty of something, because he did it before?

18 Didn't you think that?  Be honest.  You thought that, even

19 though legally -- and I'm not suggesting that anything is

20 improper about that.  The rules allow it.  I don't agree with

21 that rule, but the rule -- the rules allow it.  The Judge said

22 it's okay.  That's all fine and dandy.

23 But the reality of it is that each and every one of

24 you had a different feeling about that.  You had a different

25 feeling about my client when you hear that he has a prior

1 conviction.  So then they can use that to impeach his testimony

2 when he takes the stand.  And, you know, the Government didn't

3 make a big issue about that, but still available to use that for

4 more than one purpose.  But the Judge, you know, once again

5 ruled and that's fine.  That's permitted in our rules and law.

6 So let's talk about the testimony -- this expert

7 testimony from Agent Errington who says, basically, okay, it's a

8 large quantity; that's pretty much why I say it's for

9 distribution.  Ladies and gentlemen, I'm going to leave that to

10 you.  Because, you know, if you really recall and you listen

11 carefully to the testimony of Mr. Concepcion-Rosario, there

12 wasn't an issue about was it for distribution or was not.  He

13 said was it not.

14 Now, that's a tough sell to this jury, because you

15 heard testimony from the officers about how they came into

16 possession of the drugs.  But the defendant says that's not how

17 they came in possession of the drugs, because they did not get

18 those drugs from me.  They did not show those drugs to me when

19 I'm at roadside.  They're not my drugs.

20 The statement that was allegedly made at the barracks

21 where they said that he said the drugs were his, he vehemently

22 denies that he said that to them.  Once again, this goes back to

23 did he knowingly and voluntarily waive his right -- his Miranda

24 rights and give a statement.  If you find that he didn't, then

25 that statement is inadmissible.  So that's one of the things you

1  as jurors have to decide when you -- when the Judge gives you

2  the instruction, and you go -- and you retire to deliberate.

3       So as we go through the facts of the case, and

4  I -- and once again, you know, I've been doing this a long, long

5  time.  I'm not in the habit of calling -- telling

6  (indiscernible) that the police are -- sometimes we disagree

7  what the facts are. (indiscernible)  Because that's what he

8  suggested, isn't it?  He suggested that that -- those drugs were

9  not the drugs -- were not his drugs.

10      He also says that drugs, which they claim that they

11 were setting up the sting operation for, were supposed to be

12 heroin.  My client is adamant, is adamant that when they were

13 trying to do the field test for the substance, they were telling

14 him that was -- it was negative.  Now, Agent Romig testified as

15 well -- I think he had a slight reading on maybe the second or

16 third attempt -- or second or third effort to find out what the

17 substance is.

18      Now, in that regard, the question becomes with all

19 their investigation for five months they have a -- have

20 information there's going to be a heroin transaction, and they

21 find out -- so it's not -- you know, what he says about the

22 (indiscernible) heroin, fentanyl, marijuana, I don't care what

23 it is.  The question, though, is how does that happen?  They

24 said they're tracking him down.  They said he picked up heroin.

25 And now it's fentanyl, some other substance.

PLAINTIFF'S REBUTTAL CLOSING ARGUMENT

1    Well, in my client's mind, he's saying what's up with

2    that?  Why isn't it what they said that it was that they were

3    looking for?  So and I think you can see that there's a basis

4    upon which he testified the way he is.  But you and you alone

5    will decide what the facts are in this case.

6    And one of the overarching themes is simply this: the

7    Government has the resources, short term or long term, something

8    evolving and happening quickly or things that are happening over

9    time, they have the resources to get photographs, to get the

10   video, to get more concrete evidence to present to you ladies

11   and gentlemen that, in fact, Mr. Concepcion-Rosario was selling

12   the drugs.  He says, well, that he got a picture of the dog.

13   Why don't they have a picture of me?  Thank you, ladies and

14   gentlemen.

15   Mr. Nair, will you be presenting rebuttal?

16   MR. NAIR:  Yes.

17   THE COURT:  All right.  You may proceed.

18   MR. NAIR:  Thank you.

19   PLAINTIFF'S REBUTTAL CLOSING ARGUMENT

20   MR. NAIR:  We do have a picture.  We have a video.

21   There it is.  Where did that come from?  The defendant's car.

22   Of course, counsel on behalf of the defendant does not take any

23   issue whether that was possession with intent to distribute

24   because of the defendant's story that it's not my drugs, it

25   didn't come from me.

1    Let's just put it to rest.  This is it right here.

2  This is what came out of this car.  You watched 30, 40 minutes

3  of video sped up, stopped at the right time.  You know where

4  those drugs came from.

5    What happened with the investigation?  That was to let

6  you know that this wasn't a sting operation like counsel said.

7  This was a long-term investigation.  When the defendant showed

8  up that day in the middle of the investigation and -- Agent

9  Romig and Task Force Officer Murray did everything right.  They

10  didn't jeopardize the long-term investigation.

11    They kept wiretap after wiretap going.  How did they

12  even know to go to the next phone of the drug supplier, Correa?

13  They didn't pull that number out of the air.  It came from that

14  guy's phone.  That's where it came from.

15    He led to the furtherance of the investigation.  Maybe

16  he didn't want to say it, but he did it.  He did it with his

17  phone.  That phone, that burner phone, kept Agent Romig's

18  investigation on Correa going.

19    So this isn't a sting operation to catch this guy.

20  It's an investigation to follow the drugs back to the source,

21  the Mexican source, and to keep it going.  That's why

22  (indiscernible) not going to sit there in front of Correa's

23  house with a camera or a videotape and ruin a long-term

24  investigation.

25    The defendant has this great mistrust of the

 1  Government.  He doesn't -- he's distrustful, distrustful of the

 2  Government.  No.  He's deceiving.  Everything he does is about

 3  deception.  From testifying to you yesterday to what he

 4  testified -- or what he told Trooper Reed at the scene and all

 5  the steps he took were a matter of deception.  It's so he can go

 6  on with his greed and distribute fentanyl.

 7          Oh, okay.  Fentanyl.  You know, he didn't know it was

 8  fentanyl.  We heard from Detective Errington that the drug user

 9  a lot of times doesn't even know what they're getting.  He's not

10  the one using the drug.  It's the people buying it on the

11  streets, the 10,000 doses.  Fentanyl is a substitute for heroin,

12  but unfortunately a much more potent substitute.

13          There's no doubt those drugs came from the defendant's

14  car.  There's no doubt that they were intended to be

15  distributed.  Thank you.

16          THE COURT:  Thank you, counsel.

17          Ladies and gentlemen, that concludes the presentation

18  of the closing arguments.  As you can see, the format is the

19  Government goes first, the defense goes, and then the Government

20  is allowed rebuttal.  And that concludes closing arguments.

21          We now are going to turn to my instructions to you on

22  the law.  I'm estimating it's about 45 to 60 minutes' worth of

23  material.  So rather than have you sit through another 45, 60

24  minutes without a break, I think we'll take our

25  midday -- midmorning break now.

1          So, Mr. Wood, would you declare a recess for ten

2    minutes, and then we will reconvene.

3          THE DEPUTY CLERK:  Yes.  All rise.  Court is in

4    recess.

5          THE COURT:  And remember, do not discuss the case.

6    Keep an open mind until you've heard everything.

7          (Recess is taken from 10:32 a.m. to 10:43 a.m.)

8          DEPUTY CLERK:  All rise.  Jury entering.

9          (Jury in at 10:43 a.m.)

10         DEPUTY CLERK:  Court is again in session.  You may be

11   seated.

12         THE COURT:  Members of the jury, you've seen and heard

13   all the evidence and the arguments of the lawyers.  Now I will

14   instruct you on the law.  You have two duties as a jury.  Your

15   first duty is to decide the facts from the evidence you have

16   heard and seen in court during this trial.  That is your job and

17   yours alone.  I play no part in determining the facts.  You

18   should not take anything I may have said or done during the

19   trial as indicating what I think of the evidence or what I think

20   about what your verdict should be.  Your second duty is to apply

21   the law that I will give you to the facts.

22         My role now is to explain to you the legal principles

23   that must guide your decisions.  You must apply my instructions

24   carefully.  Each of the instructions is important, and you must

25   apply all of them.  You must not substitute or follow your own

1  notions or your own opinions about what the law is or ought to

2  be.  You must apply the law that I give to you, whether you

3  agree with it or not.

4          Whatever your verdict, it will have to be unanimous.

5  All of you will have to agree on it, or there will be no

6  verdict.  In the jury room, you will discuss the case among

7  yourselves, but, ultimately, each of you will have to make up

8  his or her own mind.  This is a responsibility that each of you

9  has and you cannot avoid.

10          During your deliberations, you must not communicate

11  with or provide any information to anyone by any means about

12  this case.  You may not use any electronic device or media such

13  as a telephone, a cell phone, smart phone, iPhone, Blackberry or

14  computer.  You may not use the internet, any internet service or

15  any text or instant messaging service, any internet chatroom,

16  blog, or website such as Facebook, LinkedIn, YouTube, or Twitter

17  to communicate to anyone any information about this case or to

18  conduct any research about this case.

19          In other words, you cannot talk to anyone on the

20  phone, correspond with anyone or electronically communicate with

21  anyone about this case.  You can only discuss the case in the

22  jury room with your fellow jurors during deliberations.  This is

23  a strict rule.  Only you can deliberate in the jury room.  You

24  cannot communicate with anyone outside the jury room during your

25  deliberations.  You may not use these electronic means to

1  investigate or communicate about the case, because it is

2  important that you decide the case based solely on the evidence

3  presented in this courtroom.

4         You are only permitted to discuss the case with your

5  fellow jurors during deliberations, because they have seen and

6  heard the same evidence you have.  In our judicial system, it is

7  important that you are not influenced by anything or anyone

8  outside of this courtroom.

9         Perform these duties fairly and impartially.  Do not

10  allow sympathy, prejudice, fear or public opinion to influence

11  you.  You should also not be influenced by any person's race,

12  color, religion, national ancestry, or gender, sexual

13  orientation, profession, occupation, celebrity, economic

14  circumstances, or position in life or in the community.

15         The jury recollection controls.  If any reference by

16  the Court, by me or by legal counsel to matters of testimony or

17  exhibits does not coincide with your recollection of that

18  evidence, it is your recollection which should control during

19  your deliberations and not the statements of the Court or of

20  legal counsel.  You are the sole judges of the evidence received

21  in the case.

22         The penalty is not to be considered in your

23  deliberations.  The punishment provided by law for the offense

24  charged in the indictment is a matter exclusively within the

25  province of the Court and should never be considered by the jury

1  in any way in arriving at an impartial verdict as to the offense

2  charged.

3        The presumption of innocence, the burden of proof, and

4  reasonable doubt.  The defendant, Angel Luis Concepcion-Rosario,

5  pleaded not guilty to the offense charged.  Every defendant is

6  presumed to be innocent.  He started the trial with a clean

7  slate with no evidence against him.  The presumption of

8  innocence stays with the defendant unless and until the

9  Government is presented evidence that overcomes that presumption

10 by convincing you that the defendant is guilty of the offense

11 charged beyond a reasonable doubt.   The presumption of

12 innocence requires that you find the defendant not guilty unless

13 you are satisfied that the Government has proved guilt beyond a

14 reasonable doubt.

15       The presumption of innocence means that the defendant

16 has no burden and no obligation to present any evidence at all

17 or to prove that he is not guilty.  The burden or obligation of

18 proof is on the Government to prove that the defendant is

19 guilty, and this burden stays with the Government throughout the

20 trial.

21       In order for you to find the defendant guilty of the

22 offense charged, the Government must convince you that the

23 defendant is guilty beyond a reasonable doubt.  That means that

24 the Government must prove each and every element of the offense

25 charged beyond a reasonable doubt.  The defendant may not be

1  convicted based on suspicion or conjecture but only on evidence

2  proving guilt beyond a reasonable doubt.

3  Proof beyond a reasonable doubt does not mean proof

4  beyond all possible doubt or to a mathematical certainty.

5  Possible doubts or doubts based on conjecture, speculation, or

6  hunch are not reasonable doubts.  A reasonable doubt is a fair

7  doubt based on reason, logic, common sense, or experience.  It

8  is a doubt that an ordinary, reasonable person has after

9  carefully weighing all of the evidence and is a doubt of the

10  sort that would cause him or her to hesitate to act in matters

11  of importance in his or her own life.  It may arise from the

12  evidence or from the lack of evidence or from the nature of the

13  evidence.

14  If having now heard all the evidence you are convinced

15  that the Government proved each and every element of the offense

16  charged beyond a reasonable doubt, you should return a verdict

17  of guilty for that offense.  However, if you have it -- if you

18  have a reasonable doubt about one or more of the elements of the

19  offense charged, then you must return a verdict of not guilty of

20  that offense.

21  Let's talk about evidence.  You must make your

22  decision in this case based only on the evidence that you saw

23  and heard in the courtroom.  Do not let rumors, suspicions, or

24  anything else that you may have seen or heard outside of court

25  influence your decision in any way.

1    The evidence from which you are to find the facts

2 consists of the following: first, testimony of witnesses;

3 second, documents and other things received as exhibits; and

4 third, any fact or testimony that was stipulated, that is

5 formally agreed to, by the parties.

6    The following are not evidence: first, the indictment;

7 second, statements and arguments of the lawyers for the parties

8 in the case; third, questions by the lawyers and questions that

9 I might have asked; fourth, objections by lawyers, including

10 objections in which the lawyers stated facts; fifth, any

11 testimony I struck or told you to disregard; and sixth, anything

12 you may have seen or heard about this case outside the

13 courtroom.

14    You should use your common sense in weighing the

15 evidence.  Consider it in light of your everyday experience with

16 people and events and give it whatever weight you believe it

17 deserves.  If your experience and common sense tells you that

18 certain evidence reasonably leads to a conclusion, you may reach

19 that conclusion.

20    As I told you in my preliminary instructions, the

21 rules of evidence control what can be received into evidence.

22 During the trial, the lawyers objected when they thought that

23 evidence was offered that was not permitted by the rules of

24 evidence.  These objections simply mean -- it meant that the

25 lawyers were asking me to decide whether the evidence should be

1 allowed under the rules.

2      You should not be influenced by the fact that an
3 objection was made.  You should also not be influenced by any of
4 my rulings on objections or any sidebar conferences you may have
5 overheard.

6      When I overruled an objection, the question was
7 answered, or the exhibit was received as evidence, and you
8 should treat that testimony or exhibit like any other.  When I
9 allowed evidence in the form of testimony or exhibits for a
10 limited purpose only, I instructed you to consider that evidence
11 only for that limited purpose, and you must do that.

12      When I sustained an objection, the question was not
13 answered, or the exhibit was not received in evidence.  You must
14 disregard the question or the exhibit entirely.  Do not think
15 about or guess what the witness might have said in answer to the
16 question.  Do not think about or guess what the exhibit might
17 have shown.

18      Sometimes a witness may have already answered before a
19 lawyer objected or before I ruled on the objection.  If that
20 happened, and if I sustained the objection, you must disregard
21 the answer that was given.  Also, if I ordered that some
22 testimony or other evidence be stricken or removed from the
23 record, you must disregard that evidence.  When you are deciding
24 the case, you must not consider or be -- influenced in any way
25 by the testimony or other evidence that I told you to disregard.

1       Although the lawyers may have called your attention to

2  certain facts or factual conclusions that they thought were

3  important, what the lawyers said is not evidence and is not

4  binding on you.  It is your recollection and your interpretation

5  of the evidence that controls your decision in this case.  Also,

6  do not assume from anything I may have done or I may have said

7  during the trial that I have any opinion about any of the issues

8  in this case or about what your verdict should be.

9       Let's talk about direct and circumstantial evidence.

10  Two types of evidence may be used -- may have been used in this

11  trial: direct evidence and circumstantial or indirect evidence.

12  You may use both types of evidence in reaching your verdict.

13      Direct evidence is simply evidence which if believed

14  directly proves a fact.  An example of direct evidence occurs

15  when a witness testifies about something the witness knows from

16  his or her own senses, something the witness has seen, touched,

17  heard, or smelled.

18      Circumstantial evidence is evidence which if believed

19  indirectly proves a fact.  It is evidence that proves one or

20  more facts from which you could reasonably find or infer the

21  existence of some other fact or facts.

22      A reasonable inference is simply a deduction or

23  conclusion that reason, experience, and common sense lead you to

24  make from the evidence.  A reasonable inference is not a

25  suspicion or a guess.  It is a reasoned, logical decision to

1  find that a disputed fact exists on the basis of another fact.

2          For example, if someone walked into the courtroom

3  wearing a wet raincoat and carrying a wet umbrella, that would

4  be circumstantial or indirect evidence from which you could

5  reasonably find or conclude that it was raining outside.  You

6  would not have to find that it was raining, but you could.

7          Sometimes different inferences may be drawn from the

8  same set of facts.  The Government may ask you to draw one

9  inference, and the defense may ask you to draw another

10 inference.  You and you alone must decide what reasonable

11 inferences you will draw based on all the evidence and your

12 reason, experience, and common sense.

13         You should consider all the evidence that is presented

14 in this trial, direct and circumstantial.  The law makes no

15 distinction between the weight that you should give to either

16 direct or circumstantial evidence.  It is for you to decide how

17 much weight to give any evidence.

18         Let's talk about not all evidence and not all

19 witnesses are needed.  Although the Government is required to

20 prove the defendant guilty beyond a reasonable doubt, the

21 Government is not required to present all possible evidence

22 related to the case or to produce all possible witnesses who

23 might have some knowledge about the facts of the case.

24         In addition, as I've explained, the defendant is not

25 required to present any evidence or produce any witnesses.  In

1  this case, the defendant produced a witness, himself.  The

2  defendant is not required to present all possible evidence

3  related to the case or to produce all possible witnesses who

4  might have some knowledge about the facts of the case.

5          Let's talk about credibility of witnesses.  As I

6  stated in my preliminary instructions at the beginning of the

7  trial, in deciding what the facts are, you must decide what

8  testimony you believe and what testimony you do not believe.

9  You are the sole judges of the credibility of the witnesses.

10 Credibility refers to whether a witness is worthy of belief.

11 Was the witness truthful?  Was the witness testimony accurate?

12         You may believe everything a witness says or only part

13 of it or none of it.  You may decide whether to believe a

14 witness based on his or her behavior and manner of testifying,

15 the explanations the witness gave, and all the other evidence in

16 the case, just as you would in any other important matter where

17 you are trying to decide if a person is truthful,

18 straightforward and accurate in his or her recollection.

19         In deciding the question of credibility, remember to

20 use your common sense, your good judgment, and your experience.

21 In deciding what to believe, you may consider a number of

22 factors: first, the opportunity and ability of the witness to

23 see or hear or know the things about which the witness

24 testified; second, the quality of the witness's knowledge,

25 understanding, and memory; third, the witness's appearance,

1  behavior, and manner while testifying; fourth, whether the

2  witness has an interest in the outcome of the case or any

3  motive, bias, or prejudice; fifth, any relation the witness may

4  have with a party in the case and any effect the verdict may

5  have on the witness; sixth, whether the witness said or wrote

6  anything before trial that was different from the witness's

7  testimony in court; seventh, whether the witness testimony was

8  consistent or inconsistent with other evidence that you believe;

9  and eighth, any other factors that bear on whether the witness

10  should be believed.

11         Inconsistencies or discrepancies in a witness's

12  testimony or between the testimony of different witnesses may or

13  may not cause you to disbelieve a witness's testimony.  Two or

14  more persons witnessing an event may simply see or hear it

15  differently.  Mistaken recollection, like failure to recall, is

16  a common human experience.  In weighing the effect of an

17  inconsistency, you should also consider whether it was about a

18  matter of importance or an insignificant detail.  You should

19  also consider whether the inconsistency was innocent or

20  intentional.

21         You are not required to accept testimony, even if the

22  testimony was not contradicted and the witness was not

23  impeached.  You may decide whether that witness is not worthy of

24  belief because of the witness here and demeanor or because of

25  the inherent improbability of the testimony or for other reasons

1  that are sufficient to you.

2          After you make your own judgment about the
3  believability of a witness, you can then attach to that
4  witness's testimony the importance or weight that you think it
5  deserves.  The weight of the evidence to prove a fact does not
6  necessarily depend on the number of witnesses who testified or
7  the quantity of evidence that was presented.  What is more
8  important than numbers or quantity is how believable the
9  witnesses were and how much weight you think their testimony
10  deserves.

11          Let's talk about credibility of witnesses and law
12  enforcement officers.  You have heard the testimony of law
13  enforcement officers.  The fact that a witness is employed as a
14  law enforcement officer does not mean that his or her testimony
15  necessarily deserves more or less consideration or greater or
16  lesser weight than that of any other witness.

17          At the same time, it is quite legitimate for defense
18  counsel to try to attack the believability of a law enforcement
19  witness on the ground that his or her testimony may be colored
20  by a personal or professional interest in the outcome of the
21  case.  You must decide, after reviewing all the evidence,
22  whether you believe the testimony of the law enforcement
23  witnesses and how much weight, if any, it deserves.

24          Let's talk about opinion evidence and expert witness
25  testimony.  The rules of evidence ordinarily do not permit

1  witnesses to state their own opinions about important questions

2  in a trial, but there are exceptions to these rules.

3  In this case, you heard testimony from Jonathan Duffy,

4  a forensic scientist from the Drug Enforcement Administration's

5  Mid-Atlantic laboratory.  You heard some testimony from Joshua

6  Romig, an agent with the Drug Enforcement Administration, and

7  from Scott Errington, a task force officer with the Drug

8  Enforcement Administration.  Because of their knowledge, skill,

9  training, or education in the field of chemical analysis for

10 Mr. Duffy and the methods of language of drug traffickers for

11 Agent Romig and Detective Errington, each was permitted to offer

12 an opinion in that field and the reasons for that opinion.

13 The opinions these witnesses state should receive

14 whatever weight you think appropriate given all the other

15 evidence in the case.  In weighing this opinion testimony, you

16 may consider the witness's qualifications, the reasons for the

17 witness's opinions, and the reliability of the information

18 supporting the witness's opinions as well as the other factors

19 discussed in these instructions for weighing the testimony of

20 witnesses.  You may disregard the opinion entirely if you decide

21 that a witness's opinion is not based on sufficient knowledge,

22 skill, experience, training, or education.  You may also

23 disregard the opinion if you conclude that the reasons given in

24 support of the opinion are not sound or if you conclude that the

25 opinion is not supported by the facts shown by the evidence or

1  if you think that the opinion is outweighed by other evidence.

2         Let's now talk about evidence obtained pursuant to a

3  search warrant.  Some of the evidence presented during the trial

4  was obtained pursuant to a search warrant authorized by a judge.

5  That evidence was obtained lawfully, and you may consider it in

6  your deliberation.

7         Let's talk about stipulated testimony and a

8  stipulation of fact.  The parties agreed what Pennsylvania State

9  Police Trooper Robert S. Kirby's testimony would have been if he

10  was called as a witness.  You should consider that testimony in

11  the same way as if it had been given here in court by the

12  witness.

13         The Government and the defendant have agreed that on

14  July 24, 2014, Trooper Robert S. Kirby noted in his report: "No

15  interview was conducted on Angel Concepcion-Rosario.  He spoke

16  little English."  You should, therefore, treat this fact as

17  having been proved.  You are not required to do so, however,

18  since you are the sole judge of the facts.

19         Let's now talk about specific investigation techniques

20  not required.  During the trial, you heard testimony of

21  witnesses and argument by the lawyers that the Government did

22  not use specific investigative techniques such as fingerprint

23  analysis and DNA analysis and the use of recording devices.  You

24  may consider these facts in deciding whether the Government has

25  met its burden of proof, because, as I told you, you should look

1    at -- look to all of the evidence or lack of evidence in

2    deciding whether the defendant is guilty.

3         However, there is no legal requirement that the

4    Government use any of these specific investigative techniques or

5    all possible techniques to prove its case.  There is no

6    requirement to attempt to take fingerprints or offer fingerprint

7    evidence, gather DNA evidence, or offer DNA analysis or use

8    recording devices or offer recordings in evidence.  Your

9    concern, as I have said, is to determine whether or not the

10   evidence admitted in this trial proves the defendant's guilt

11   beyond a reasonable doubt.

12        Let's talk about the defendant's choice to testify

13   or -- defendant's choice not to testify or present evidence.

14   Although the defendant, Angel Luis Concepcion-Rosario, testified

15   in this case, the burden of proof remains with the prosecution

16   throughout the entire trial and never shifts to the defendant.

17   The defendant is never required to prove that he is innocent.

18        Let's talk about the presence of the interpreter.

19   Because there are and were official court-appointed language

20   interpreters present for the defendant, it does not mean the

21   defendant speaks only Spanish and does not understand or speak

22   English.  That is for the jury to decide based on the evidence

23   presented during the trial.  That's for you to decide.

24        Let's talk about the defendant's testimony.  In a

25   criminal case, the defendant has a constitutional right not to

1  testify.  However, if he chooses to testify, he is, of course,

2  permitted to take the witness stand on his own behalf.  In this

3  case, the defendant, Angel Luis Concepcion-Rosario, testified.

4  You should examine and evaluate his testimony just as you would

5  the testimony of any witness.

6          Let's talk about motive.  Motive is not an element of

7  the offense with which the defendant is charged.  Proof of bad

8  motive is not required to convict.  Further, proof of bad motive

9  alone does not establish that the defendant is guilty, and proof

10 of good motive alone does not establish that the defendant is

11 not guilty.  Evidence of the defendant's motive may, however,

12 help you find the defendant's intent.

13         Intent and motive are different concepts.  Motive is

14 what prompts a person to act.  Intent refers only to the state

15 of mind with which the particular act is done.  Personal

16 advancement and financial gain, for example, are motives for

17 much of human conduct.  However, these motives may prompt one

18 person to intentionally do something perfectly acceptable while

19 prompting another person to intentionally do an act that is a

20 crime.

21         Let's stand for two minutes just to stretch our legs.

22 We're halfway through.  And then we're going to sit down again.

23 But why don't you stand, just take a tiny break.  Remain in your

24 places.

25         (Pause)

1        THE COURT:  All right.  Why don't we take our seats

2  again, and we'll continue.

3        Let's talk about the nature of the indictment.  As you

4  know, the defendant, Angel Luis Concepcion-Rosario, is charged

5  in the indictment with violating federal law, specifically

6  possession with intent to distribute a controlled substance and

7  aiding and abetting the possession with intent to distribute a

8  controlled substance.  As I explained at the beginning of the

9  trial, an indictment is just a formal way of specifying the

10  exact crime the defendant is accused of committing.  An

11  indictment is simply a description of the charge against the

12  defendant.  It is an accusation only.  An indictment is not

13  evidence of anything, and you should not give any weight to the

14  fact that Angel Luis Concepcion-Rosario has been indicted in

15  making your decision in this case.

16        Let's talk about the words "on or about."  You will

17  note that the indictment charges that the offense was committed

18  "on or about" a certain date.  The Government does not have to

19  prove with certainty the exact date of the alleged offense.  It

20  is sufficient if the Government proves beyond a reasonable doubt

21  that the offense was committed on a date reasonably near the

22  dates alleged.

23        Let's talk about indictment in the conjunctive,

24  statute and required proof in the disjunctive.  Before I discuss

25  elements of the offenses charged in the indictment, I want to

1  instruct you on the meaning of the word "and" when it is used in

2  statutes or indictments.  It is not uncommon that a given

3  criminal statute will prohibit not merely one form of action but

4  several related forms of action in what lawyers call the

5  disjunctive, that is, separated by the word "or."

6       For example, the federal drug statute, 21 U.S.C.

7  Section 841(a)(1) makes it illegal to knowingly or intentionally

8  manufacture, distribute, or dispense, or possess with intent to

9  manufacture, distribute, or dispense a controlled substance.

10 This statute prohibits six different actions: manufacturing,

11 distributing, dispensing, possessing with intent to manufacture,

12 possessing with intent to distribute, and possessing with intent

13 to dispense.  All six of these crimes are separated by the word

14 "or" in the statute.

15       Yet, when you look at the indictment, it is

16 permissible for the Government to charge all six in what lawyers

17 call the conjunctive, that is, separated by the word "and."

18 This, however, does not mean that if the Government does so, it

19 must prove that the defendant violated the drug statute in all

20 six ways.  If only one of those alternatives is proved beyond a

21 reasonable doubt, that is sufficient for a conviction.

22       As the United States Supreme Court has said, the

23 general rule is that when a jury returns a guilty verdict on an

24 indictment charging several acts in the conjunctive, the verdict

25 stands if the evidence is sufficient with respect to any one of

1  the acts charged.  Thus, for example, if the evidence proves

2  that a defendant possessed a controlled substance with intent to

3  distribute, it is irrelevant whether or not he also manufactured

4  it.

5        Let's talk about possession of a controlled substance

6  with the intent to distribute any essential elements.  Count 1

7  of the indictment charges the defendant with possessing 40 grams

8  or more, that is, approximately 199 grams, of a mixture of

9  substance containing a controlled substance, specifically

10  fentanyl, with the intent to distribute the controlled substance

11  which is a violation of federal law.

12        In order to find the defendant guilty of this offense,

13  you must find that the Government proved each of the following

14  four elements beyond a reasonable doubt as to that defendant:

15  first, that the defendant possessed a mixture or substance

16  containing a controlled substance; second, that he possessed the

17  controlled substance knowingly or intentionally; third, that he

18  intended to distribute the controlled substance; fourth, that

19  the controlled substance was fentanyl.

20        Let's now talk about controlled substance offense,

21  knowingly and intentionally, and the definitions.  To act

22  knowingly as used in the offense charged means that the

23  defendant was conscious and aware that he was engaged in the act

24  charged and knew of the surrounding facts and circumstances that

25  make out the offense.  Knowingly does not require that the

1  defendant knew that the acts charged and surrounding facts

2  amounted to a crime.

3          To act intentionally, as used in the offense charged,

4  means to act deliberately and not by accident.  Intentionally

5  does not require that the defendant intended to violate the law.

6          The phrase "knowingly or intentionally" as used in the

7  offense charged requires the Government to prove beyond a

8  reasonable doubt that the defendant knew that what he possessed

9  with intent to distribute was a controlled substance.  In

10  addition, the Government must also prove beyond a reasonable

11  doubt that the controlled substance was, in fact, fentanyl and

12  was 40 grams or more.  However, as long as you find that the

13  Government proved beyond a reasonable doubt that the defendant

14  knew what he possessed with intent to distribute was a

15  controlled substance, you need not find that the defendant knew

16  that the controlled substance was fentanyl or that the defendant

17  knew that the weight of the controlled substance was 40 grams or

18  more.  In deciding whether the defendant acted knowingly or

19  intentionally, you may consider evidence about what he said,

20  what he did, what he failed to do, how he acted, and all the

21  other facts and circumstances shown by the evidence that may

22  prove what was in his mind at that time.

23          Let's now talk about controlled substance offense,

24  method of proving knowledge.  Your decision whether the

25  defendant knew the material he possessed with intent to

1  distribute was a controlled substance involves a decision about

2  the defendant's state of mind.  It is obviously impossible to

3  prove directly the operation of the defendant's mind, but a wise

4  and intelligent consideration of all the facts and circumstances

5  shown by the evidence and the exhibits in the case may enable

6  you to infer what the defendant's state of mind was.

7        In our everyday affairs, we are continuously called

8  upon to decide from the actions of others what their state of

9  mind is.  Experience has taught us that frequently actions speak

10 louder and more clearly than spoken or written words.

11 Therefore, you may well rely in part on circumstantial evidence

12 in determining the defendant's state of mind.

13       For example, if the defendant was the sole occupant of

14 a residence or a vehicle, it is reasonable to conclude that the

15 defendant knew about items in the residence or vehicle.  The

16 defendant's behavior may also indicate knowledge.  Nervousness

17 in the presence of the drugs or flight from the site in which

18 authorities have identified drugs may indicate that the

19 defendant knew that the material in question was a controlled

20 substance.  Also, the possession of a large quantity of a drug

21 may indicate that the defendant knew what he had in his

22 possession.

23       These examples are neither exhaustive nor conclusive.

24 It is up to you and you alone, based on all the evidence,

25 including the testimony of others, to determine whether the

1  defendant knew that the material he possessed was a controlled

2  substance.

3        Let's talk about controlled substance offense -- the

4  term "controlled substance."  You are instructed that as a

5  matter of law, fentanyl is a controlled substance.  That is, it

6  is a kind of prohibited drug.  It is solely for you, however, to

7  decide whether the Government has proved beyond a reasonable

8  doubt that the defendant possessed with intent to distribute a

9  mixture and substance containing fentanyl as charged in the

10 indictment.

11       Let's now talk about controlled substance offense, the

12 actual or exact amount of the controlled substance need not be

13 proven.  The evidence received in this case need not prove the

14 actual amount of the controlled substance that was part of the

15 alleged transaction or the exact amount of the controlled

16 substance alleged in the indictment as possessed with intent to

17 distribute by the defendant.  The Government must prove beyond a

18 reasonable doubt, however, that a measurable amount of the

19 controlled substance was, in fact, knowingly and intentionally

20 possessed with intent to distribute as charged in Count 1.

21       Let's now talk about possession of a controlled

22 substance with the intent to distribute and a definition of

23 possession.  To possess a controlled substance means to have it

24 within a person's control.  The Government does not have to

25 prove that the defendant physically held the controlled

1    substance, that is, had actual possession of it.  As long as the

2    controlled substance within -- was within his control, he

3    possessed it.

4          If you find that the defendant either had actual

5    possession of the controlled substance or had the power and

6    intention to exercise control over it, even though it was not in

7    his physical possession, that is, that the defendant had the

8    ability to take actual possession of the substance when he

9    wanted to do so, you may find that the Government has proved

10   possession.  Possession may be momentary or fleeting.  Proof of

11   ownership of the controlled substance is not required.

12         The law also recognizes that possession may be sole or

13   joint.  If one person alone possesses a controlled substance,

14   that is sole possession.  However, more than one person may have

15   the power and intention to exercise control over a controlled

16   substance.  That is called joint possession.

17         If you find that the defendant had such power and

18   intention, then he possessed the controlled substance even if he

19   possessed it jointly with another.  Mere proximity to the

20   controlled substance or mere presence on the property where it

21   is located or mere association with the person who does control

22   the controlled substance or the property is not enough to

23   support a finding of possession.

24         Let's now talk about possession of a controlled

25   substance with intent to distribute and define intent to

1    distribute.  In order to find the defendant guilty of possession

2    of a controlled substance with intent to distribute as charged

3    in Count 1 of the indictment, you must find that the Government

4    proved beyond a reasonable doubt that the defendant intended to

5    distribute a mixture or substance containing a controlled

6    substance.  To find that the defendant had the intent to

7    distribute, you must find that the defendant had in mind or

8    planned in some way to deliver or transfer possession or control

9    over a controlled substance to someone else.

10         In determining whether the defendant had the intent to

11   distribute, you may consider all the facts and circumstances

12   shown by the evidence presented, including the defendant's words

13   and actions.  In determining the defendant's intent to

14   distribute a controlled substance, you may also consider, among

15   other things, the quantity and purity of the controlled

16   substance, the manner in which the controlled substance was

17   packaged, and the presence or absence of weapons, large amounts

18   of cash, or equipment used in the processing or sale of

19   controlled substances.

20         Let's talk about controlled substance offense,

21   accomplice liability, aiding and abetting.  A person may be

22   guilty of an offense because he personally committed the offense

23   himself or because he aided and abetted another person in

24   committing the offense.  A person who has aided and abetted

25   another person in committing an offense is often called an

1  accomplice.  The person whom the accomplice aids and abets is

2  known as the principal.

3      In this case, the Government alleges that the

4  defendant aided and abetted the principal in committing the

5  possession with intent to distribute fentanyl as charged in

6  Count 1.  In order to find the defendant guilty of this offense,

7  because he aided and abetted the principal in committing this

8  offense, you must find that the Government proved beyond a

9  reasonable doubt each of the following four requirements: first,

10  that the principal committed the offense charged by committing

11  each of the elements of the offense charged as I've explained

12  those elements to you in these instructions.  The principal need

13  not have been charged with or found guilty of the offense,

14  however, as long as you find that the Government proved beyond a

15  reasonable doubt that he committed the offense.  Second, that

16  the defendant knew that the offense charged was going to be

17  committed or was being committed by the principal.  And third,

18  that the defendant knowingly did some act for the purpose of

19  aiding, assisting, soliciting, facilitating, or encouraging the

20  principal in committing the specific offense charged and with

21  the intent that the principal commit that specific offense.  And

22  fourth, that the defendant performed an act in furtherance of

23  the offense charged.

24      In deciding whether the defendant had the required

25  knowledge and intent, you may consider both direct and

1 circumstantial evidence, including his words and actions and the

2 other facts and circumstances.  However, evidence that he merely

3 associated with persons involved in a criminal venture, was

4 merely present, or was merely a known spectator during the

5 commission of the offense is not enough for you to find him

6 guilty as an aider and abettor.  If the evidence shows that he

7 knew that the offense was being committed or was about to be

8 committed but does not also prove beyond a reasonable doubt that

9 it was his intended purpose to aid, assist, encourage,

10 facilitate, or otherwise associate himself with the offense, you

11 may not find him guilty of the offense as an aider and abettor.

12 The Government must prove beyond a reasonable doubt

13 that the defendant in some way participated in the offense

14 committed by the principal as something the defendant wished to

15 bring about and to make succeed.  To show that the defendant

16 performed an act in furtherance of the offense charged to

17 satisfy the fourth requirement, the Government needs to show

18 some affirmative participation by the defendant which at least

19 encouraged the principal to commit the offense.  That is, you

20 must find the defendant's act did in some way aid, assist,

21 facilitate, or encourage the principal to commit the offense.

22 The defendant's act need not further aid, assist, facilitate, or

23 encourage every part or phase or element of the offense charged.

24 It is enough if the defendant's acts further aid, assist,

25 facilitate, or encourage only one part or phase of the offense.

1  Also, the defendant's acts need not themselves be against the

2  law.

3         Let's now talk about video recordings.  During the

4  trial, you saw a video recording of the defendant made without

5  his knowledge.  These recordings were made with the consent and

6  agreement of one of the other parties to the recording.  The use

7  of this procedure to gather evidence is lawful, and the

8  recording may be used by either party.

9         Let's now talk about audio recordings, nonconsensual.

10  During the trial, you heard recordings of conversations with

11  individuals which were made without the knowledge of the parties

12  to the conversations but with the consent and authorization of

13  the Court.  These recordings, sometimes referred to as wiretaps,

14  were lawfully obtained.  The use of this procedure to gather

15  evidence is lawful, and the recordings may be used by either

16  party.

17         Let's now talk about transcript of a recording in

18  foreign language.  During the trial, you listened to a tape

19  recording in Spanish.  Each of you was given a transcript of the

20  recording which was admitted into evidence.  The transcript was

21  a translation of the foreign language tape recording.

22         Although some of you may know the Spanish language, it

23  is important that all jurors consider the same evidence.

24  Therefore, you must accept the English translation contained in

25  the transcript and disregard any different meaning.  Whether a

1    transcript is an accurate translation in whole or in part is for

2    you to decide.  In considering whether a transcript is an

3    accurate translation of the conversation, you should consider

4    the testimony presented to you regarding how and by whom the

5    transcript was made.  You may consider the knowledge, training,

6    and experience of the translator as well as the nature of the

7    conversation and reasonableness of the translation in light of

8    all the evidence in the case.

9         Let's talk about chain of custody.  The defense has

10   raised the issue of defects in the chain of custody of the

11   fentanyl.  You may consider any defects in determining the

12   authenticity of this evidence and what weight to give it.  The

13   Government must prove beyond a reasonable doubt that the

14   fentanyl seized by law enforcement authorities on June 17, 2017,

15   is the same as the fentanyl introduced in this case during the

16   trial.

17        Let's talk about prior bad acts or crimes.  You've

18   heard testimony that the defendant was convicted in 2015 by the

19   Commonwealth of Pennsylvania for felony possession with intent

20   to deliver a controlled substance and felony conspiracy to

21   commit that offense.  This evidence of other acts was admitted

22   only for limited purposes.  You may consider the evidence only

23   for the purpose of deciding whether the defendant had the state

24   of mind, knowledge, or intent necessary to commit the crime

25   charged in the indictment.  You may also consider evidence of

1  the defendant's previous conviction to decide whether to believe

2  his testimony and how much weight to give it.  Do not consider

3  this evidence for any other purpose.

4           Of course it is for you to determine whether you

5  believe this evidence and, if you do believe it, whether you

6  accept it for the purposes offered.  You may give it such weight

7  as you feel it deserves but only for the limited purposes that I

8  described to you.  The defendant is not on trial for committing

9  these other acts.

10          You may not consider the evidence of these other acts

11  as a substitute for proof that the defendant committed the

12  crimes charged.  You may not consider this evidence as proof

13  that the defendant has a bad character or any propensity to

14  commit crimes.  Specifically, you may not use this evidence to

15  conclude that because the defendant may have committed the other

16  acts, he must also have committed the acts charged in the

17  indictment.

18          Remember that the defendant is on trial here only for

19  possession with intent to distribute 40 grams or more, that is

20  approximately 199 grams of a mixture and substance containing a

21  detectable amount of fentanyl, a Schedule II controlled

22  substance in violation of 21 U.S.C. Section 841(a)(1), b(1)(B),

23  and aiding and abetting in violation of 18 U.S.C. Section 2, not

24  for these other acts.  Do not return a guilty verdict unless the

25  Government proves the crimes charged in the indictment beyond a

1   reasonable doubt.

2           Let's talk about prior statement of the defendant.

3   The Government introduced evidence that the defendant, Angel

4   Luis Concepcion-Rosario, made a statement to Troopers Reed and

5   Quesada and Special Agent Romig.  You must decide whether

6   Concepcion-Rosario did, in fact, make the statements.  If you

7   find that Concepcion-Rosario did make the statements, then you

8   must decide what weight, if any, you feel the statements

9   deserve.

10          In making this decision, you should consider all

11  matters and evidence having to do with the statement, including

12  those concerning Concepcion-Rosario himself and the

13  circumstances under which the statement was made.  If, after

14  considering the evidence, you determine that a statement was

15  made voluntarily, you may give it such weight as you feel it

16  deserves under the circumstances.  On the other hand, if you

17  determine that the statement was not made voluntarily, you must

18  disregard it.

19          In determining whether any alleged statement was made

20  voluntarily, you should consider the defendant's age, training,

21  education, occupation, and physical and mental condition and his

22  treatment while in custody or under interrogation as shown by

23  the evidence in the case.  Also, consider all other

24  circumstances and evidence surrounding the making of the alleged

25  statement.

1       Let's talk about election of a jury foreperson, the

2  requirement of unanimous verdict, that you should not consider

3  punishment, your duty to deliberate, and any communications with

4  the Court.  That which I've just read to you concludes my

5  instructions explaining the law regarding the testimony and

6  other evidence and the offense charged.  Now let me explain some

7  things to you about your deliberations in the jury room and your

8  possible verdicts.

9       The first thing that you should do in the jury room is

10  to choose someone to be your foreperson.  This person will speak

11  for the jury here in court.  He or she will also preside over

12  your discussions.  However, the views and vote of the foreperson

13  are entitled to no greater weight than those of any other juror.

14       Second, I want to remind you that your verdict,

15  whether it is guilty or not guilty, must be unanimous.  To find

16  the defendant guilty of an offense, every one of you must agree

17  that the Government has overcome the presumption of innocence

18  with evidence that proves each element of that offense beyond a

19  reasonable doubt.  To find the defendant not guilty, every one

20  of you must agree that the Government has failed to convince you

21  beyond a reasonable doubt.

22       Third, if you decide that the Government has proved

23  the defendant guilty, then it will be my responsibility to

24  determine what the appropriate punishment should be.  You should

25  never consider the possible punishment in reaching your verdict.

1          Fourth, as I have said before, your verdict must be

2  based only on the evidence received in this case and the law I

3  have given to you.  You should not take anything I may have said

4  or done during the trial as indicating what I think of the

5  evidence or what I think your verdict should be.  What the

6  verdict should be is the exclusive responsibility of you, the

7  jury.

8          Fifth, now that all the evidence is in, the arguments

9  are completed, and once I finish these instructions -- we're

10 almost there -- you will then be free to talk about the case in

11 the jury room.  In fact, it is your duty to talk with each other

12 about the evidence and to make every reasonable effort you can

13 to reach unanimous agreement.  Talk with each other.  Listen

14 carefully and respectfully to each other's views and keep an

15 open mind as you listen to what your fellow jurors have to say.

16         Do not hesitate to change your mind if you are

17 convinced that other jurors are right and that your original

18 position was wrong.  But do not ever change your mind just

19 because other jurors see things differently or just to get the

20 case over with.  In the end, your vote must be exactly that,

21 your own vote.  It is important for you to reach unanimous

22 agreement but only if you can do so honestly and in good

23 conscience.  Listen carefully to what your other jurors have to

24 say, and then decide for yourself if the Government has proved

25 the defendant guilty beyond a reasonable doubt.

1    No one will be allowed to hear your discussions in the

2  jury room, and no record will be made of what you say.  You

3  should all feel free to speak your minds.

4    Sixth, once you start deliberating, do not talk,

5  communicate with or provide any information about this case by

6  any means to the court officials or to me or to anyone else

7  except each other.  During your deliberations, as I indicated

8  earlier, you may not use any electronic device or media such as

9  a telephone, cell phone, smart phone, iPhone, Blackberry, or

10  computer, the internet, any internet service or any text or

11  instant messaging service, or any internet chatroom, blog, or

12  website such as Facebook, LinkedIn, YouTube, or Twitter.  And

13  you may not communicate to anyone any information about this

14  case or to conduct any research about the case.

15    Seventh, if you have any questions or messages, your

16  foreperson should write them down on a piece of paper, sign it,

17  and then give it to the court official who will give that

18  message to me.  I will first talk to the lawyers about what you

19  have asked, and I will respond as soon as I can.  In the

20  meantime, if possible, continue with your deliberations on some

21  other subject.

22    One more thing about messages.  Do not ever write down

23  or tell anyone how you or anyone else voted.  That should stay

24  secret until you have finished your deliberations.  If you have

25  occasion to communicate with the Court while you are

1  deliberating, do not disclose the number of jurors who have

2  voted to convict or voted to acquit on any offense.

3         Let's talk about the verdict form.  We're only going

4  to have one verdict form, but I'm going to show each one of you

5  a copy of it right now.

6         Mr. Wood, would you distribute it, please?

7         THE DEPUTY CLERK:  Yes, sir.

8         THE COURT:  Counsel, do you have a copy?

9         MR. NAIR:  Yes, sir.

10         MR. CLARK:  Yes, Your Honor.

11         THE COURT:  All right.

12         Mr. Wood is going to distribute a copy to each one of

13  you.  We're going to take a quick look at it, and then we're

14  going to collect all the forms, because we only want to have one

15  to go out with you.

16     (Pause)

17         THE COURT:  I'll take one too.

18         Ladies and gentlemen, each of you has in front of you

19  a copy of the jury verdict slip, and you'll see the questions

20  for you to answer under Count 1.  And then there's a question

21  after that where you answer yes/no.  Then at the bottom, each of

22  you should sign after you've reached a unanimous verdict.  And

23  as you can see, the jury foreperson signs at the bottom on the

24  right.

25         Take this form with you to the jury room.  You'll take

1    one copy of it only.  When you have reached your unanimous

2    verdict, the foreperson should write the verdict on the form,

3    date and sign it.

4            And I'm going to ask the jury foreperson to write the

5    date in underneath the jury foreperson's signature.  The date's

6    not on the form, but I'm going to ask that the foreperson write

7    the date.  Today is December 7th, as I recall, 2018.

8            Once it's dated and signed, return it to the courtroom

9    and give the form to my courtroom deputy who will give it to me.

10   If you decide that the Government has proved the defendant

11   guilty of the offense charged beyond a reasonable doubt, say so

12   by having your foreperson mark the appropriate place on the

13   form.  If you decide that the Government has not proved the

14   defendant guilty of the offense charged beyond a reasonable

15   doubt, say so by having your foreperson mark the appropriate

16   place on the form.

17           Let's talk about the jury interrogatory.  If you find

18   that Angel Luis Concepcion-Rosario guilty of the offense charged

19   in Count 1, you must answer a question called a jury

20   interrogatory which you will see halfway down the page, to

21   decide whether the offense involved certain weights or

22   quantities of controlled substances.  Do not answer this jury

23   interrogatory until you have reached your verdict.  If you find

24   that the Government has not proved the defendant guilty of the

25   offense charged in Count 1, then do not answer the

1   interrogatory.  To repeat, if you find the defendant not guilty,

2   do not answer the interrogatory.

3           However, if you find the defendant guilty, then, yes,

4   you should answer jury interrogatory number one.  If you find

5   the defendant guilty, then in answering the interrogatory, as in

6   deciding your verdict, you must be unanimous.  So you must be

7   unanimous on both questions and both answers.  And in order to

8   find that the offense involved a certain weight or quantity of

9   controlled substances, you must also -- all be satisfied that

10  the Government proved the weight or quantity beyond a reasonable

11  doubt.

12          Quantity means the total weight of any mixture or

13  substance which contains a detectable amount of the controlled

14  substance charged.  Jury interrogatory number one relates to

15  Count 1 and asks whether you unanimously agree beyond a

16  reasonable doubt that the quantity of fentanyl that was

17  possessed by the defendant with the intent to distribute was 40

18  grams or more.  If your answer to this question is yes, that

19  completes jury interrogatory number one.  If you unanimously

20  find that the Government did not prove beyond a reasonable doubt

21  that the offense involved 40 grams or more but rather involved

22  an amount less than 40 grams, your answer should be no.  And

23  that completes jury interrogatory number one.

24          All right.  Mr. Wood, I'm going to ask you now to

25  collect the forms from the jury.

1        And then I'll give Mr. Wood one copy to deliver to you

2    in the jury room.

3        (Pause)

4        THE COURT:  Counsel, have I given all of the charges

5    requested by the parties?

6        MR. NAIR:  Yes, Your Honor.

7        MR. CLARK:  I believe so, Your Honor.

8        THE COURT:  Any requests for additional charges?

9        MR. NAIR:  Not on behalf of the United States.

10        MR. CLARK:  No, Your Honor.

11        THE COURT:  I mean by the jury charges, that is.  Any

12    requests for any additional jury charges?

13        MR. NAIR:  No, Your Honor.  Thank you.

14        THE COURT:  All right.  Thank you.  And do both

15    counsel agree that I've properly set forth the law applicable to

16    the case?

17        MR. NAIR:  Yes, sir.

18        MR. CLARK:  Yes, Your Honor.

19        THE COURT:  All right.  Thank you.  You may be seated.

20        Let me now address my comments to our two alternate

21    jurors.  I'm going to ask that the two alternate jurors remain

22    temporarily here in the courtroom.  Since the 12 jurors are here

23    and ready to serve, you will not be called -- at least not

24    initially anyway -- to participate in the jury deliberations,

25    but we ask that you remain, nevertheless, until the matter is

1   concluded.  And so I'm going to ask the alternate jurors to now

2   go to the jury room, get any of your personal belongings out,

3   and them come back in and join us here in the courtroom.

4           Mr. Wood, would you help them with that?

5           THE DEPUTY CLERK:  Yes, sir.

6       (Pause)

7           THE COURT:  Gentlemen, I'm going to ask you to take a

8   seat in the back of the courtroom, and then I'll have some

9   additional instructions for you in a few minutes.

10          Ladies and gentlemen, we've now reached the time for

11  your deliberations to commence.  So I'm going to ask Mr. Wood to

12  take one copy of the jury verdict form with you back to the jury

13  room for you to start your work.

14          Mr. Wood?

15      (Court and Clerk confer)

16          THE COURT:  Ladies and gentlemen, as you know, the

17  material I read to you on the jury charge, the jury

18  instructions, was quite lengthy.  A lot of words.  And you're

19  not expected to memorize it.  But what we are going to do for

20  you is I've got a word-for-word, printed-out version for you.

21  So if you're trying to remember what did -- is the law on such

22  and such, you'll have a complete copy of what I just read to you

23  in the jury room.  Mr. Wood will deliver that to you along with

24  the -- a single copy of the jury verdict slip.

25          You may proceed, Mr. Wood.

1          THE DEPUTY CLERK:  All rise.

2      (Jury out at 11:46 a.m.)

3          THE COURT:  Please be seated.

4          Let me initially direct my comments to our two

5   alternate jurors.  Although, obviously, you won't have the

6   opportunity to participate in the deliberations, we never know

7   for sure until the case is over if a juror takes sick or

8   something happens.  Then we need someone to fill in.  We still

9   might need you.

10         And so we are going to have you remain until the case

11  has concluded.  When Mr. Wood returns to the courtroom, we're

12  going to set you up in one of two conference rooms.  The one

13  conference room is very nice, comfortable, has a beautiful view

14  with lots of windows, but it might be a little bit too chilly.

15  And if it is uncomfortable for you, we can move you to another

16  conference which is warmer but doesn't have a view.  It has no

17  windows.  So I'll leave it up to you which -- Mr. Wood will show

18  you the locations where you can camp out.

19         As in accordance with all my prior instructions, you

20  are not allowed to discuss this case with anyone.  All the

21  instructions I gave previously still are in effect.  You may not

22  discuss this case between the two of you.  Since you will be

23  here on the third floor, most likely, same restrictions as

24  before.

25         You may not discuss this case with anyone, and you

1  must avoid anyone here involved in the case.  So if you happen

2  to pass somebody in the hallway, and they don't say anything, as

3  I've indicated previously, it's on my orders.  They're not being

4  rude or anything like that.  And you should not engage them in

5  conversation either.

6         Do you understand my instructions?

7         UNIDENTIFIED SPEAKER:  Yes, sir.

8         THE COURT:  All right.  Very good.  When Mr. Wood

9  returns, we'll get you set up in another room then.

10        Counsel, I'm going to direct that you remain in the

11 courthouse for now.  You're certainly free to go anywhere in the

12 courthouse you want, but I'm going to ask you to let Mr. Wood

13 know where you are and to give him your cell phone in case we

14 have to track you down somewhere here in the building.

15        I think that's it for the moment.  Mr. Shuster

16 (phonetic), is there anything else?

17        Anything else from counsel's perspective?

18        MR. CLARK:  No, Your Honor.  Not from the defense.

19        MR. NAIR:  No, Your Honor.

20        THE COURT:  All right.  Very good.

21        MR. NAIR:  Thank you.

22        THE COURT:  When Mr. Wood returns, we'll temporarily

23 recess court, and we'll have Mr. Wood take care of the two

24 alternate jurors.

25        Mr. Wood, what we're going to do is we're going to

1  have you temporarily recess court.

2          THE DEPUTY CLERK:  Sure.

3          THE COURT:  The lawyers are going to stay in the

4  building for now.

5          THE DEPUTY CLERK:  Sure.

6          THE COURT:  But they will give you their cell phone

7  numbers in the event we need to track them down here in the

8  building.

9          THE DEPUTY CLERK:  Okay.

10          THE COURT:  And then after we recess court, we're

11  going to have you show the two alternate jurors to one of our

12  conference rooms.  Initially, I'm going to suggest you take them

13  to the nicer one with the windows and the nice view.  But if

14  they find it's too chilly or too cold, we'll put them in the

15  attorney conference room --

16          THE DEPUTY CLERK:  Okay.

17          THE COURT:  -- which is warmer but has no windows and

18  no view.

19          THE DEPUTY CLERK:  Sure.  All right.

20          THE COURT:  But they must also be -- they can't talk

21  to anyone.

22          THE DEPUTY CLERK:  Yes, sir.

23          THE COURT:  All right.  So why don't you recess court,

24  and then we'll proceed.

25          THE DEPUTY CLERK:  All rise.  Court is in recess.

1      (Recess is taken from 11:50 a.m. to 12:49 p.m.)

2            THE DEPUTY CLERK:  All rise.  Court is again in

3   session.  You may be seated.

4            THE COURT:  A few minutes ago, a message was passed

5   out by the foreperson of the jury to me that appears to request

6   examination of three documents.  I'm going to ask Mr. Wood --

7            Are you able to read this, Mr. Wood?

8            THE DEPUTY CLERK:  Yes, sir.

9            THE COURT:  All right.  Would you read it into the

10  record, please?

11           THE DEPUTY CLERK:  Number one.  Copy of documents at

12  roadside and barracks the defendant signed.  Number two, picture

13  of chain of custody bag.  Number three, transcript of Agent

14  Romig's testimony about the chain of custody bag.  And it is

15  signed by the foreperson.

16           THE COURT:  All right.  Thank you.

17           All right, counsel.  Have you had a chance to examine

18  this?  I'm going to photocopy it for each of you.

19           MR. NAIR:  Yes, sir.

20           THE COURT:  And, Mr. Clark, you've seen it?

21           MR. CLARK:  Well, no.  I --

22           THE COURT:  No.  I meant the --

23           MR. CLARK:  -- I --

24           THE COURT:  -- the photocopy.

25           MR. NAIR:  I think he's talking about this.

1          MR. CLARK:  Oh, yeah.  Yeah.

2          THE COURT:  Okay.

3          MR. CLARK:  I've seen this.

4          THE COURT:  And, Mr. Clark, have you had a chance to

5    explain to your client what's going on at the moment?

6          MR. CLARK:  Yes, I have, Judge.

7          THE COURT:  All right.  Thank you.

8          MR. CLARK:  Yeah.  Through the interpreter.

9          THE COURT:  All right.  Let's hear from both sides.

10         Mr. Nair, what's your position on these requests?

11         MR. NAIR:  Your Honor, I believe the jury should have

12   the documents that they're asking for, and they are the

13   following: Government Exhibit 5 and 5A.  Those are the consent

14   forms.  The one that's signed is in Spanish, but I think

15   5A -- when they say they want the forms, 5A should go back too,

16   because that's -- they were admitted together to show the

17   English version.  And, obviously, the jury cannot read the

18   Spanish.

19         Then as to the Miranda waiver, the rights warning and

20   waiver, the Government would request that 8 -- Government

21   Exhibit 8 and 8A -- 8 being the signed waiver, 8A the English

22   translation -- go back to the jury.

23         The exhibit that pertains to the picture of the chain

24   of custody is 7F.  The Government would ask that that go back.

25         As to the transcript of Agent Romig's testimony, I

1  believe their recollection would control.  But I would also ask

2  that since Exhibit 6 cannot go back to the jury, because that's

3  the drugs itself, that if they were to come out here and be

4  seated, we'll put the evidence bag filled out, the same number

5  that matches 7F, so that they can at least see it on the ELMO.

6         THE COURT:  Correct me if I'm wrong, but on the

7  subject of a transcript of Agent Romig's testimony, none was

8  introduced.  There is none.

9         MR. NAIR:  No.  I think they want to hear his

10  testimony back.  That's my guess.

11         THE COURT:  Oh, okay.  All right.  And, of course,

12  obviously, we have no transcript.  We just have the recording.

13  All right.

14         MR. NAIR:  Correct.  And I believe they can hear that.

15  I don't think it's necessary.  If they can't determine from

16  their recollection, then -- I'm trying to think if we've ever

17  replayed back testimony.  I'll leave it to the Court.

18         THE COURT:  All right.

19         Mr. Clark, what is your client's position on these

20  things?

21         MR. CLARK:  Judge, with respect to number one, I agree

22  that G5, G5A, G8, and G8A should go to the jury.  And I'm

23  looking now at 7F.

24         MR. NAIR:  7F is a picture of the chain of custody

25  bag.

1          MR. CLARK:  Well, I don't -- see, I guess what I'm

2     not -- I see 7F.  And why do we call this chain of custody bag

3     versus (indiscernible) --

4          MR. NAIR:  No, that's just the drugs and the scale

5     (indiscernible).

6          MR. CLARK:  (Indiscernible) there was nothing on

7     the --

8          MR. NAIR:  Right.  Because it's about to be filled

9     out, and then here it is filled out.

10          MR. CLARK:  Okay.  Ah.

11          MR. NAIR:  That's why I wanted them to see this on the

12     ELMO.

13          MR. CLARK:  So this is on G --

14          MR. NAIR:  6.

15          MR. CLARK:  G6.

16          MR. NAIR:  So I think they should see both in context

17     together.

18          MR. CLARK:  That's G6.

19          MR. NAIR:  Yes.

20          MR. CLARK:  Judge, 7F and G6, that's (indiscernible)

21     to display those to the jury.

22          THE COURT:  All right.  So with respect to Exhibits 5

23     and 5A, the consent forms, Exhibit 8 and 8A, the waiver forms,

24     Exhibits 6 and 7F, the photos of the chain of custody, both

25     sides agree those can be given to the jury?

1          MR. NAIR:  Yes, Your Honor.

2          MR. CLARK:  Yes.

3          THE COURT:  All right.  Then I'll grant that request,

4    and they will go out to the jury.  Then let's address --

5          MR. NAIR:  Your Honor --

6          THE COURT:  Yeah.

7          MR. NAIR:  -- if I may show 6 through the ELMO,

8    because that's the evidence bag and the drugs.  It can't --

9          MR. CLARK:  That's 6, right?

10         MR. NAIR:  It shouldn't --

11         THE COURT:  Oh.

12         MR. NAIR:  Yeah.

13         THE COURT:  Excuse me.  Yes.

14         MR. CLARK:  Yeah.

15         THE COURT:  And that's which number again?

16         MR. NAIR:  Government Exhibit 6.

17         THE COURT:  Okay.

18         MR. CLARK:  So that's 6 or 6A?

19         MR. NAIR:  6.

20         MR. CLARK:  Just 6?  Okay.

21         THE COURT:  All right.  And now as far as the

22   testimony of Mr. Romig, what's your -- what are your thoughts on

23   that, Mr. Clark, on behalf of your client?

24         MR. CLARK:  Judge, I -- there's no -- why don't we

25   make it -- maybe Your Honor can inquire to narrow it down.  I'm

1    not quite sure. I don't recall the -- I know he testified to

2    generally how that he was at the barracks and, you know, they

3    had the -- field tested it and all that. I get that.

4            But, yeah, I would (indiscernible) ask -- see if they

5    can get through with just relying upon their recollection,

6    Judge.

7            THE COURT: All right. All right. Then what I would

8    propose to do, if this is acceptable to both sides, I'm inclined

9    to say there is no transcript. I can inquire further if they

10   can be more specific. There is a recording, but it could recall

11   a considerable effort to try to pinpoint exactly what they're

12   looking for.

13           MR. CLARK: Where that is. Yeah.

14           THE COURT: I can ask them what it is they're looking

15   for.

16       (Parties confer)

17           MR. NAIR: Okay. So I think we can narrow it down to

18   when Agent Romig testified -- and he remembers testifying to

19   this during the last part of the day when he took the stand.

20   That's when he testified to chain of custody, and he discussed

21   putting the bag into evidence, securing it, and then getting it

22   to the DEA lab.

23           THE COURT: Would you have any objection to playing

24   that, Mr. Clark, if we can find it?

25           MR. CLARK: No, I don't --

1          THE COURT:  All right.

2          MR. CLARK:  Chain of custody is relevant

3  (indiscernible).  I was more concerned about how could we find

4  it, but he knows where it is, so --

5          THE COURT:  All right.  Let's just take a break for a

6  moment.

7      (Pause)

8          THE COURT:  All right, counsel.

9          MR. CLARK:  Your Honor, just a second?

10          THE COURT:  Sure.  Go ahead.

11      (Pause)

12          MR. CLARK:  Thank you, Judge.

13          THE COURT:  Ready?  All right.

14          MR. CLARK:  Yes.

15          THE COURT:  All right.  Counsel, I just consulted with

16  my staff.  We do not have -- as it turns out, we don't have the

17  technical capability, the technology to both record a session of

18  court when the jury comes in and to play back simultaneously

19  testimony from yesterday.  We can't do both at the same time.

20  And, obviously, we need an official court record of what we're

21  doing, but we just can't do both.  So what I'm going to do is

22  instruct the jury that we do not have a transcript, and they

23  must rely upon their recollections of what the testimony was.

24          All right.  Let me say -- see the exhibits that will

25  be handed to the jury.  And I want to just take a look at the

1    exhibit that's going to be shown on the screen.  All right.

2            MR. CLARK:  Your Honor, while they set this up, may I

3    be excused for a minute?

4            THE COURT:  Yes.  Go ahead.

5            I'm going to come down.  I just want to see 6 for

6    myself.

7            MR. NAIR:  I'll bring it up.  I can bring it up,

8    Judge.

9        (Pause)

10           THE COURT:  All right.  Mr. Wood, would you go get the

11   jury, please?

12           DEPUTY CLERK:  Yes, sir.

13       (Pause)

14           DEPUTY CLERK:  All rise.

15       (Jury in at 1:05 p.m.)

16           DEPUTY CLERK:  Court is again in session.  You may be

17   seated.

18           THE COURT:  Ladies and gentlemen, good afternoon.  I

19   received the note from your foreperson requesting three items.

20   And let me make this Jury Exhibit Number 1, the note, just for

21   the record.  And the note has requested -- or, number one, copy

22   of documents for roadside and barracks that defendant signed;

23   number two, picture of chain of custody bag; and number three,

24   transcript of Agent Romig's testimony about the chain of custody

25   bag.

1          And here's our response.  We are going to provide, in

2   response to request number one, copies of Government Exhibits 5

3   and 5A and 8 and 8A.  And in response to the request number two,

4   we're going to provide a copy of -- we're going to provide

5   Exhibit 7F, photo of the chain of custody bag.  And also we're

6   going to display the original chain of custody form on top of

7   the evidence, Exhibit 6, which is the -- that's the original of

8   the narcotics.  Isn't that correct?

9          MR. NAIR:  Yes, that's --

10          MR. CLARK:  Yes, Your Honor.

11          MR. NAIR:  -- the evidence bag that holds --

12          THE COURT:  All right.  So we're not going to send the

13   narcotics out with you, obviously, but --

14          UNIDENTIFIED SPEAKER:  Right.  (Indiscernible).

15          THE COURT:  But we are going to display it on the ELMO

16   projector.  And I'm going to turn the lights off in the

17   courtroom, so you can get a better view.

18          Is it possible to enlarge that view --

19          MR. MURRAY:  Yeah.

20          THE COURT:  -- Mr. Murray?

21          MR. MURRAY:  Make it clearer, obviously.

22          THE COURT:  All right.  Would you raise your hand if

23   anybody cannot see that?

24          MR. NAIR:  Also, Damian, if you could show the number

25   at the bottom.

1      Your Honor, I'm going to read the number into the

2  record.

3      THE COURT:  That's fine.

4      MR. NAIR:  Because that'll --

5    (Parties confer)

6      MR. NAIR:  It'll be S, as in Sam, 000568258.  And the

7  location that it was acquired was back at the Pennsylvania State

8  Police Reading barracks.  Signed by Special Agent Joshua Romig.

9  I'm sorry.  Acquired by Special Agent Joshua Romig with initials

10  next to it, sealed by Special Agent Joshua Romig with initials

11  next to it, and witnessed by task force officer Damian Murray

12  with the case number CY16-0023.

13      And then if we could go to the bottom.

14    (Parties confer)

15      MR. NAIR:  Okay.  At the bottom is the chemist's

16  number or name.

17      THE COURT:  Yeah.  Pardon me, Mr. Nair.

18      Ladies and gentlemen, I want to ask that you not talk

19  at this moment so that Mr. Nair can be heard, please.

20      MR. NAIR:  And then the date that the Drug Enforcement

21  Administration has under Jonathan Duffy's name is 6/28/17.  And

22  then the DEA case number for this case, CY16-0023, Exhibit

23  Number 3, and the lab number that was assigned to the case.

24    (Parties confer)

25      MR. NAIR:  It appears to have signatures sealed by, at

1  the top, 6/19/2017, Special Agent Joshua Romig.  And there

2  appears to be a signature above that.  And then witnessed by

3  6/19/2017, Task Force Officer Damian Murray with the signature

4  above it.

5          THE COURT:  All right.  I'm going to turn the lights

6  back on.  Now, with respect to the third request, the transcript

7  of the testimony, we do not have a transcript.  And we do not

8  have the technological capability of both conducting court and

9  recording court and playing back a previous court session at the

10  same time.  So we do not have the ability to give you the

11  transcript.  There is none.  And we don't have the ability to

12  play it back since we're holding open court and recording.  So

13  as a result, you are going to have to rely upon your

14  recollections as to what the testimony was.

15          Counsel, is there anything else before we send the

16  jury back into the jury deliberation room?

17          MR. CLARK:  Nothing further, Judge.  Thanks, Your

18  Honor.

19          MR. NAIR:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you.

21          Ladies and gentlemen of the jury, I'm going to ask

22  Mr. Wood to talk to you about lunch when he takes you back in

23  the jury room.  And he will have that discussion with you.  All

24  right?

25          DEPUTY CLERK:  All right.  All rise.

1    THE COURT:  Pardon me.

2    UNIDENTIFIED SPEAKER:  (Indiscernible).

3    THE COURT:  If there's any questions about the case,

4  I'm going to ask that the foreperson put them in writing.  If

5  they're questions about lunch, you can direct them to Mr. Wood.

6  Okay?

7    THE DEPUTY CLERK:  All rise.  Court is in recess.

8    (Jury out at 1:11 p.m.)

9    (Recess is taken from 1:11 p.m. to 1:40 p.m.)

10    THE COURT:  Mr. Wood, would you take the verdict,

11  please?  I might also ask, before you take the verdict, just to

12  confirm with the foreperson, has the jury unanimously agreed

13  upon its verdict?

14    THE FOREPERSON:  Yes.

15    THE COURT:  All right.

16    DEPUTY CLERK:  In Bill of Indictment Number 18-181

17  between the United States of America and Angel Luis

18  Concepcion-Rosario, as to Count 1, do you find the defendant

19  guilty or not guilty?

20    THE FOREPERSON:  We, the jury, find the defendant

21  guilty.

22    THE COURT:  Also, do you unanimously agree by proof

23  beyond a reasonable doubt that the quantity of the mixture and

24  substance containing a detectable amount of fentanyl that was

25  possessed by the defendant with the intent to distribute was 40

1  grams or more?

2          THE FOREPERSON:  Yes.

3          THE COURT:  All right.  Mr. Wood, would you access the

4  jury verdict slip form for me, please?  Okay.

5          All right.  I see that the jury verdict slip form has

6  been signed by all 12 jurors.

7          Mr. Wood, would you record the verdict and also poll

8  each individual juror to make sure that it's their verdict?

9          DEPUTY CLERK:  Yes, sir.

10          Members of the jury, please rise.  Hearken unto your

11  verdict as the Court has recorded it.  In the issue joined in

12  Bill of Indictment Number 18-181 between the United States of

13  America and Angel Luis Concepcion-Rosario, do you find the

14  defendant guilty as to Count 1?  Also, do you unanimously agree

15  by proof beyond a reasonable doubt that the quantity of a

16  mixture and substance containing a detectable amount of fentanyl

17  that was possessed by the defendant with the intent to

18  distribute was 40 grams or more?  And say you all?

19          IN UNISON:  Yes.

20          DEPUTY CLERK:  Thank you.  You may be seated.

21          Juror Number 1, please rise.  Do you agree with the

22  verdict as stated by the foreperson?

23          JUROR 1:  Yes.

24          DEPUTY CLERK:  You may be seated.

25          Juror Number 2, do you agree with the verdict as

1   stated by the foreperson?

2         JUROR 2:  Yes.

3         DEPUTY CLERK:  You may be seated.

4         Juror Number 3, do you agree with the verdict as

5   stated by the foreperson?

6         JUROR 3:  Yes.

7         DEPUTY CLERK:  Juror Number 4, do you agree with the

8   verdict as stated by the foreperson?

9         JUROR 4:  Yes.

10         DEPUTY CLERK:  Juror Number 5, do you agree with the

11   statement -- do you agree with the verdict as stated by the

12   foreperson?

13         JUROR 5:  Yes.

14         DEPUTY CLERK:  Foreperson, please stand.  Have you

15   stated the verdict as goes unanimously for the whole jury?

16         THE FOREPERSON:  Yes.

17         DEPUTY CLERK:  Thank you.  You may be seated.

18         Juror Number 6, do you agree with the verdict as

19   stated by the foreperson?

20         JUROR 6:  Yes.

21         DEPUTY CLERK:  Juror Number 7, do you agree with the

22   verdict as stated by the foreperson?

23         JUROR 7:  Yes.

24         DEPUTY CLERK:  Juror Number 8, do you agree with the

25   verdict as stated by the foreperson?

1          JUROR 8:  Yes.

2          DEPUTY CLERK:  Juror Number 9, do you agree with the

3   verdict as stated by the foreperson?

4          JUROR 9:  Yes.

5          DEPUTY CLERK:  Juror Number 11, do you agree with the

6   verdict as stated by the foreperson?

7          JUROR 11:  Yes.

8          THE COURT:  And Juror Number 12, do you agree with the

9   verdict as stated by the foreperson?

10         JUROR 12:  Yes.

11         DEPUTY CLERK:  Thank you.

12         THE COURT:  All right.  Thank you, ladies and

13  gentlemen.

14         Thank you, Mr. Wood.

15         Counsel, is there any reason why the jury cannot be

16  discharged at this time and released to go home?

17         MR. CLARK:  No reason, Your Honor.

18         MR. NAIR:  No reason, Your Honor.  Thank you.

19         THE COURT:  All right.

20         MR. CLARK:  Thank you for their service.

21         THE COURT:  All right.  Thank you.

22         MR. NAIR:  Thank you.

23         THE COURT:  You may be seated.

24         Ladies and gentlemen of the jury, your service has now

25  been concluded.  And on behalf of the United States of America

1   and all its citizens, thank you for your time.  Thank you for

2   your service.  We took you away from your lives, from your

3   livelihood.  And it was a sacrifice and a hardship.  But we

4   could not function as a nation with a system of justice without

5   you.  So you leave today with my thanks and my appreciation and

6   that of -- on behalf of the citizens of the United States.

7           You are now excused to return to your daily lives.

8   You are free now to discuss your verdict, but you're not

9   required to do so.  That will be your individual choice.  So I

10  thank you.  You are now excused.

11          I'm going to ask everyone else to remain.

12          DEPUTY CLERK:  All rise.

13       (Court and Clerk confer)

14       (Jury out at 1:45 p.m.)

15          THE COURT:  You may be seated.

16          Oh, yes.  And the alternates, too, I thank you as well

17  for your service.  You are free to go.  But the same thanks goes

18  with you, because we could not function without your presence.

19  Had one of the jurors become ill or had to be discharged, we

20  would have needed you to step in.  And if we -- if you weren't

21  here, we couldn't complete the process.  So you two are excused

22  to go home with my thanks and appreciation from the citizens of

23  the United States.

24          UNIDENTIFIED SPEAKER:  You're welcome.

25          THE COURT:  Have a good day.

1    I'll go back on the record as soon as Mr. Wood

2  returns.

3       (Pause)

4       THE COURT:  The folks in the audience are certainly

5  welcome to stay, but you don't have to if you don't want to.

6  The parties, however, and the lawyers must remain.

7       (Pause)

8       THE COURT:  All right, Mr. Wood.  Let me know when

9  we're ready to proceed.

10       DEPUTY CLERK:  We're ready.

11       THE COURT:  All right.  In view of the guilty verdict,

12  I'm going to schedule sentencing for April 4, 2019, at 2 p.m.

13  here in this courtroom.  Because there may be some substantive

14  legal arguments about sentencing, I wish to inform counsel that

15  sentencing memoranda will be due at least 14 days before the

16  sentencing date with all responses due seven days before

17  sentencing.

18       Since there has been a guilty verdict, I am remanding

19  Mr. Concepcion-Rosario to the custody of the United States

20  marshals.  And so they will take -- continue to retain custody

21  of him.

22       Is there anything else to address before we adjourn

23  today, counsel?

24       MR. NAIR:  Your Honor, I believe the coat that the

25  defendant had throughout trial belongs to the defender's office,

1 so they'll need that coat back. Other than that --

2 THE COURT: All right.

3 MR. NAIR: I've talked to the marshals about that.

4 MR. CLARK: And I guess the remainder of the clothing

5 belonged to the Government, Judge. Should we give those to

6 the --

7 MR. NAIR: No, that --

8 MR. CLARK: No?

9 MR. NAIR: That -- I think that's the client's.

10 MR. CLARK: Okay.

11 MR. NAIR: Yeah.

12 THE COURT: All right. Very good. Anything else,

13 counsel?

14 MR. CLARK: No, Your Honor.

15 MR. NAIR: No, Your Honor. Thank you.

16 THE COURT: All right. The marshals will take custody

17 of the defendant.

18 Mr. Wood, would you please adjourn court.

19 THE DEPUTY CLERK: All rise. Court is adjourned.

20 (Proceedings concluded at 1:51 p.m.)

21

22

23

24

25

### CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


_____

EILEEN DHONDT, CET 807
Aequum Legal Transcription

Dated: February 22, 2023